1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

_____

ASHLEY FERREIRAS,        :

            Plaintiff,    :

      -vs-                : CASE NO. 2:24-cv-0074

THE CITY OF COVINGTON,:

et al.                   : JUDGE:

            Defendants.  : HON. DANNY C. REEVES

_____


            Deposition of ANTHONY FRITSCH, a

Defendant herein, taken by the Plaintiff as

upon cross examination and pursuant to the

Federal Rules of Civil Procedure as to the

time and place and stipulations hereinafter

set forth, at the offices of Adams Law, PLLC,

40 West Pike Street, Covington, Kentucky, at

1:40 p.m., on Wednesday, June 18, 2025,

before Tina M. Shell, a Registered

Professional Reporter and notary public

within and for the Commonwealth of Kentucky.


            *   *   *   *   *   *

2

<u>QUICK REFERENCE INDEX</u>

WITNESS:  ANTHONY FRITSCH

                    DX   CX  RDX   RCX

BY: MR. WHITTAKER         4

<u>EXHIBITS</u>

| | MARKED | PAGE |
|---|---|---|
| PLF'S: | 1 | 25 |
| | 8 | 27 |
| | 9 | 53 |
| | 10 | 12 |
| | 18 | 98 |
| | 22 | 151 |
| | 36 | 171 |
| | 47 | 166 |
| | 48 | 167 |
| | 49 | 168 |
| | 52 | 169 |
| | 57 | 67 |

<u>INFORMATION REQUESTED</u>

                               PAGE

BY: MR. WHITTAKER

              NOT APPLICABLE

BY: MR. MANDO

           * * * * *

3

1                    A P P E A R A N C E S

2

     ON BEHALF OF PLAINTIFF
3
          Mr. Justin M. Whittaker
4         Attorney at Law
          Whittaker Law, LLC
5         2055 Reading Road
          Suite 260
6         Cincinnati, Ohio  45202

7    ON BEHALF OF DEFENDANTS

8         Mr. Jeffrey C. Mando
          Attorney at Law
9         Adams Law, PLLC
          40 West Pike Street
10        Covington, Kentucky 41011

11   ALSO PRESENT

12        Ms. Ashley Ferreiras
          Ms. Julie Niesen
13

14              *   *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25

4

1    WHEREUPON:

2                    ANTHONY FRITSCH,

3    of lawful age, a Defendant herein, being

4    first duly sworn as hereinafter certified,

5    was examined and deposed as follows:

6                    CROSS EXAMINATION

7    BY MR. WHITTAKER:

8        Q.    Good afternoon, everyone.  We are

9    here on the record in the case of Ferreiras

10   versus the City of Covington and others, in

11   the Eastern District of Kentucky, Case No.

12   2:24-cv-074.  With us is Officer Fritsch.

13   Officer Fritsch, would you please state your

14   full name.

15       A.    Anthony Fritsch.

16       Q.    Okay.  And are you currently a

17   Covington police officer?

18       A.    Yes.

19       Q.    Okay.  How long have you been a

20   Covington police officer?

21       A.    Three years.

22       Q.    Okay.  Do you remember your start

23   date?

24       A.    Not off the top of my head

25   currently.

5

1          Q.   Okay.  Did you go through basic

2     training?

3          A.   Yes.

4          Q.   When did you do that?

5          A.   In the year -- in 2022.  July of

6     2022 is when I left for the academy.

7          Q.   You left the academy in July of

8     2022?

9          A.   I went to the academy.

10          Q.   Oh, okay.  And when did you

11     complete that training?

12          A.   After 20 weeks.

13          Q.   20 weeks?

14          A.   Yes.

15          Q.   So that would have been in -- if my

16     math is right you would have completed the

17     training sometime in 2023, is that right?

18          A.   Yes.

19          Q.   Do you remember what month?

20          A.   I do not.

21          Q.   Okay.  Have you ever given your

22     deposition before?

23          A.   Yes.

24          Q.   You have.  Okay.  In what case?

25          A.   Civil suit.  Not pertaining to

6

1    work.

2         Q.    Oh, okay.  What kind of case?

3         A.    Car accident.

4         Q.    Okay.  Were you involved in the car

5    accident?

6         A.    Yes.

7         Q.    Okay.  Have you ever, have you ever

8    had your deposition taken in your capacity as

9    a police officer?

10        A.    No.

11        Q.    Okay.  You have testified at trial

12   before though, right?

13        A.    Yes.

14        Q.    In fact, you testified at the trial

15   of this case back in the summer -- last

16   summer, right?

17        A.    Yes.

18        Q.    Have you testified in other cases,

19   other criminal cases?

20        A.    Not any trials.

21        Q.    No trials?

22        A.    Just prelims and Grand Jury.

23        Q.    Okay.  Never, never in front of --

24   no more -- no other testimony in jury trials?

25        A.    No.

7

1       Q.   As a witness or any other capacity,

2   anything?

3       A.   No.

4       Q.   Okay.  How many times in

5   preliminary proceedings?

6       A.   I don't recall.

7       Q.   Can you recall how many times in

8   Grand Jury proceedings?

9       A.   No.

10      Q.   Did you testify in the Grand Jury

11  proceeding of this case?

12      A.   I don't recall.

13      Q.   Okay.  How old are you?

14      A.   27.

15      Q.   Okay.  Did you go to high school?

16      A.   Yes.

17      Q.   Where did you go to high school?

18      A.   Randall K. Cooper.

19      Q.   Randall K. Cooper?

20      A.   Yes.

21      Q.   Where is that?

22      A.   Boone County.

23      Q.   Okay.  Did you graduate?

24      A.   Yes.

25      Q.   When did you graduate?

8

1    A.    2016.

2    Q.    Did you go to college after that?

3    A.    Yes.

4    Q.    Where did you go?

5    A.    NKU.

6    Q.    Okay.  What did you study?

7    A.    Criminal justice.

8    Q.    Okay.  When did you start at NKU?

9    A.    That same year.

10    Q.    Okay.  So the fall of 2016?

11    A.    Yes.

12    Q.    All right.  Did you get a degree in

13    criminal justice?

14    A.    Yes.

15    Q.    Is that a four-year degree?

16    A.    Yes.

17    Q.    So did you get a bachelor -- BS or

18    BA?

19    A.    BA.

20    Q.    So a BA in 2020 --

21    A.    Yes.

22    Q.    -- in criminal justice?  Did you

23    minor in anything, any other courses of study

24    while you were at NKU?

25    A.    I minored in organizational

9

1    leadership.

2        Q.    Is that a -- do you get a

3    certificate with that or is it an associate's

4    or is it --

5        A.    Just a minor, that's all.

6        Q.    Okay.  Graduated in 2020, did you

7    go to work somewhere after graduation?

8        A.    Yes.  I was working at the, a

9    restaurant in Boone County.

10       Q.    Okay.  Which restaurant?

11       A.    Backyard Grill.

12       Q.    Backyard Grill?

13       A.    Yeah.  Backyard Bar and Grill.

14       Q.    Okay.  Where is that?

15       A.    In Burlington, right across from

16   the Burlington firehouse.

17       Q.    Oh, yeah, yeah, yeah.  Okay.  I

18   think everything in Burlington is at that

19   exact same place.  How long did you work

20   there?

21       A.    Six years.

22       Q.    Did you work there through school?

23       A.    Yes.

24       Q.    Did you put yourself through school

25   in part working at the Backyard Grill -- or

10

1    Backyard Bar and Grill?

2          A.    Tried to, to take out loans.

3          Q.    Yeah.  What was your role at the

4    Backyard Bar and Grill?

5          A.    I was a cook.

6          Q.    For the whole six years?

7          A.    Yes.

8          Q.    When did you end your tenure at the

9    Backyard Bar and Grill?

10         A.    When I got hired at Covington.

11         Q.    When was that?

12         A.    June of '22.

13         Q.    Okay.  You were hired as a police

14    officer by the City of Covington?

15         A.    Yes.

16         Q.    Okay.  Did you apply anywhere else?

17         A.    Yes.

18         Q.    Where else?

19         A.    Florence PD, Highlands PD, Boone

20    County Sheriff's Department, and I believe

21    Dayton Police Department as well.

22         Q.    Dayton, Kentucky?

23         A.    Yes.

24         Q.    Did you get offers from any of

25    those outfits?

11

1     A.    No.

2     Q.    So the City of Covington hired you

3   as a police officer in June of '22; did you

4   do anything -- did you have any other

5   employment between 2020 and 2022 other than

6   the Backyard Bar and Grill?

7     A.    No.

8     Q.    Okay.  So immediately upon being

9   hired, is that when you went to basic

10  training at the academy?

11    A.    There was about a three-week period

12  where we were doing policy and procedure at

13  the PD.

14    Q.    Okay.  Could you describe for me

15  what that -- you said it was a three-week

16  period?

17    A.    Yes.

18    Q.    Could you just tell me what that

19  involved?

20    A.    It was a lot of PowerPoints using

21  our portal PowerDMS for our policy and

22  procedure and how -- just learning all of

23  that before we go to the academy.  Then

24  becoming qualified on our firearms as well

25  before we leave for the academy.

12

1      Q.   Okay.  So in that three-week period
2  before you went to the academy did you go
3  over written police policies and procedures?
4      A.   Yes.
5      Q.   Did you go over the Use of Force
6  procedure for the City of Covington Police
7  Department?
8      A.   Yes.
9           (WHEREUPON, Plaintiff's
10  Deposition Exhibit 10 was marked for
11  identification.)
12  BY MR. WHITTAKER:
13      Q.   I'm going to hand you what has
14  already been marked as Exhibit 10.  Now, I'm
15  going to -- this is dated 5-3 of 2023, but in
16  June of 2022 did you review a Use of Force
17  policy that looked anything like this?
18      A.   Yes.
19      Q.   Okay.  Do you recall what other
20  policies you reviewed?
21      A.   Not off the top of my head.
22  There's a lot of policies.
23      Q.   Yeah.  Okay.  And then you did
24  training on firearms?
25      A.   Yes.

1    Q.   Okay.  Was that at the same time as

2  the policy stuff or --

3    A.   Yes.

4    Q.   Okay.  Then you went to the

5  academy, right?

6    A.   Yes.

7    Q.   And you were done 20 weeks later,

8  do you remember what month in 2023?

9    A.   Not off the top of my head.

10    Q.   Okay.  Was it in the winter?

11    A.   Yes, it was close to the

12  wintertime.

13    Q.   And so you graduated and you're

14  done with the academy in early 2023; at that

15  point did you do field training?

16    A.   Yes.

17    Q.   Okay.  Who was your FTO?

18    A.   My first FTO was Officer Denny.

19    Q.   How long was your FTO training?

20    A.   Mine was about 24 weeks.

21    Q.   24 weeks.  And Officer Denny was

22  your first FTO?

23    A.   Yes.

24    Q.   How long was he your FTO?

25    A.   Two weeks.

14

1          Q.    What happened with that, why did he
2    stop being your FTO, or she, I'm sorry, I
3    don't know?
4          A.    He.  I have -- I was just given to
5    another officer at the time.
6          Q.    Who was that?
7          A.    Officer Shepherd.
8          Q.    How long was Officer Shepherd your
9    FTO?
10         A.    I believe six weeks.
11         Q.    Okay.  And then so, let's see,
12   we've got, that's eight down.  Who was your
13   officer -- who was your FTO after that?
14         A.    On second shift it was Officer
15   Murphy.
16         Q.    Second shift.  How long with
17   Officer Murphy?
18         A.    Four weeks.
19         Q.    Four weeks.  So did you have
20   training on first shift at the same time?
21         A.    No.  It was first shift, second
22   shift.  It's a process.
23         Q.    Gotcha.  So you did first shift
24   with Denny?
25         A.    Denny and Shepherd.

15

1      Q.   And Shepherd.  And then second
2  shift with Murphy for four weeks?
3      A.   Yes.
4      Q.   And then did you do third shift
5  training, too?
6      A.   Before third shift I was on power
7  shift.
8      Q.   Power shift.  What's power shift?
9      A.   It's from 5:00 to 3:00 in the
10  morning.
11      Q.   That sounds dreadful.  5:00 p.m. to
12  3:00 a.m.?
13      A.   Yes.
14      Q.   How long did you do that?
15      A.   Six weeks.
16      Q.   Who was your FTO for that?
17      A.   Berkeley.  It's now Rose.
18      Q.   Say again.
19      A.   She was married at the time.  I
20  can't remember if she was Berkeley or Rose at
21  the time, but I call her -- she went by
22  Berkeley with me.
23      Q.   Gotcha.  So she could be Rose now?
24      A.   Yeah.
25      Q.   Or she could be Rose-Berkeley or

16

1    some -- okay.  That's six more weeks, and

2    then you went to third shift training?

3         A.    Yes.

4         Q.    Who was your FTO for that?

5         A.    First it was Morris.

6         Q.    Uh-huh.  How long?

7         A.    I believe four more weeks.

8         Q.    Uh-huh.  Who after that?

9         A.    Gier.

10        Q.    Say again.

11        A.    Jake Gier.

12        Q.    Could you spell that?

13        A.    I always get this wrong.  G-I-E-R.

14        Q.    G-I-E-R.  How long with Gier?

15        A.    Four weeks.

16        Q.    And then who?

17        A.    During that four-week period I was

18   with Jake I had Specialist Ullrich as an FTO

19   for a week.

20        Q.    Okay.  So one of the four weeks

21   with Gier, or one week in addition to the

22   four weeks with Gier?

23        A.    With, with Gier.

24        Q.    Oh, I see.  So you were with Gier

25   and Ullrich at the same time?

17

1      A.    Yes.

2      Q.    Okay.  On third shift?

3      A.    Yes.

4      Q.    So Morris, Gier, and Ullrich.  Was

5   that the end of your FTO training?

6      A.    Yes.

7      Q.    Okay.  So nobody after that one

8   week with Ullrich?

9      A.    Nobody after Gier.

10      Q.    Nobody after Gier?

11      A.    Yes.

12      Q.    Ullrich interrupted the --

13      A.    Yes.

14      Q.    Okay.  Was there a reason for that

15   one-week interruption, do you have any idea?

16      A.    He's a -- at the time he was a

17   special -- a specialty.  It was a patrol

18   traffic specialty.  So we conduct traffic

19   stops and all that nature.  At that time he

20   was -- helped recruits improve their traffic

21   stops.

22      Q.    Gotcha.  Did you understand

23   Ullrich, Specialist Ullrich to be the person

24   who would help all recruits with their

25   traffic stop skills or do you have any idea

18

1    about that?

2         A.   I just know that was a phase in the

3    process.

4         Q.   Okay.  From when to when was

5    Specialist Ullrich your FTO?

6         A.   I don't recall the date.

7         Q.   Okay.  Just one week, though,

8    right?

9         A.   Yes.

10        Q.   Okay.  And since then have you been

11   a patrol officer?

12        A.   Yes.

13        Q.   Okay.  What shifts do you work?

14        A.   Power shift.

15        Q.   Okay.  Exclusively?

16        A.   Yes.

17        Q.   And that's from 5:00 p.m. to

18   3:00 a.m.?

19        A.   Yes.

20        Q.   And are you alone on patrol at that

21   time or is there somebody with you?

22        A.   At the time now, currently?

23        Q.   Yeah, sure.

24        A.   Yes, I'm -- I drive a cruiser by

25   myself.

19

1     Q.   You're by yourself now.  Isn't FTO
2  training 22 weeks generally?
3     A.   Generally, yes.
4     Q.   Why did you do 26?
5     A.   I was extended at power shift.
6     Q.   Okay.  So you -- the power shift
7  training was extended to you in particular
8  because for what reason, do you know?
9     A.   I just needed additional training.
10     Q.   For power shift specifically or --
11     A.   Yes.
12     Q.   So an additional four weeks for
13  power shift?
14     A.   Additional two weeks.
15     Q.   Additional two weeks.  That
16  explains two of the four extra; what were the
17  other two for?  Was there only two extra
18  weeks?
19     A.   It was only two extra weeks.
20     Q.   So FTO training is usually
21  24 weeks?
22     A.   Mine was 24 weeks.  It's usually 22
23  to 24, depending on the recruit.
24     Q.   I understand now.  Okay.  So now
25  when you're on patrol you patrol alone?

20

1        A.    Yes.

2        Q.    How long have you been doing that?

3        A.    About a year and a half now.

4        Q.    And you've been on the power shift

5    the whole time since you ended your FTO

6    training?

7        A.    Yes.

8        Q.    And did you patrol with someone

9    before this past year and a half?

10        A.    No.

11        Q.    Okay.  So you've been -- for the

12    past year and a half you've been patrol --

13    maybe I had my time wrong.  Okay, I

14    understand.  What do your duties involve on

15    the power shift?

16        A.    Like any other shift, patrolling

17    the streets, responding to calls for service.

18        Q.    So the power shift, the only

19    difference between the power shift and

20    another shift is the time of day?

21        A.    Yes.

22        Q.    Is there a particular reason for

23    the existence of that power shift between

24    5:00 and 3:00, is there an additional need

25    for officer patrols?

21

1      A.    That's usually around the time that
2  we get most of our calls for service.
3      Q.    Okay.  So you're overlapping second
4  shift and third shift?
5      A.    Yes.
6      Q.    So during the power shift, like any
7  other shift, you respond to calls for
8  service?
9      A.    Yes.
10     Q.    Okay.  Could you estimate how many
11 calls you get per shift?
12     A.    Couldn't say.  It depends on the
13 day.
14     Q.    Could you say if, if a hundred
15 calls per shift would be possible?
16     A.    No.
17     Q.    50?
18     A.    Huh-uh.
19     Q.    25?
20     A.    That could be average.
21     Q.    25 could be average for one shift?
22     A.    Could be.
23     Q.    Do you do traffic stops and stuff
24 like that?
25     A.    Yes.

22

1    Q.    Could you estimate how -- what

2    percentage of your calls -- well, scratch

3    that.  Does a traffic stop count as a call

4    for service?

5        A.    It counts as a call.

6        Q.    Okay.  So you would include traffic

7    stops in your -- if you could, if you could

8    give a total, you would include traffic stops

9    as a call like any other call?

10       A.    Yes.

11       Q.    Okay.  Could you estimate what

12    percentage of your calls are traffic stops?

13       A.    I have no idea.

14       Q.    If you average 25 calls per shift,

15    do you think that you do ten, ten of those

16    would be traffic stops?

17            MR. MANDO:  Objection.  Asked

18    and answered.  Go ahead.

19            THE WITNESS:  I do not -- I

20    couldn't say.

21    BY MR. WHITTAKER:

22       Q.    Would all of them be traffic stops?

23       A.    No.

24       Q.    Okay.  So fewer than 25?

25       A.    I couldn't say.  It would depend on

23

1    the day.

2         Q.    Okay.  Would you say that 25

3    calls -- scratch that.  You say that's about

4    average.  Fair enough.

5              Okay.  Now, you know that you've

6    been named as a Defendant in this case?

7         A.    Yes.

8         Q.    Okay.  What did you do to prepare

9    for your deposition today?

10        A.    I reviewed my body cam footage, the

11   NIBRS report, and my Use of Force report.

12        Q.    You reviewed your body cam footage?

13        A.    Yes.

14        Q.    Did you review anybody else's?

15        A.    No.

16        Q.    What else did you review, your

17   body-worn camera footage and what else did

18   you say?

19        A.    The NIBRS report.

20        Q.    What's that?

21        A.    It's the, just the incident report

22   for the call.

23        Q.    And did you say you reviewed a Use

24   of Force report?

25        A.    My Use of Force report, yes.

24

1      Q.    Because there were two Use of Force

2   reports in this incident, weren't there?

3      A.    Mine was a supplemental report.

4      Q.    Yours is supplemental, okay.  Who

5   prepared -- did Officer Ullrich -- Specialist

6   Ullrich prepare the Use of Force, the first

7   Use of Force report?

8      A.    Yes.

9      Q.    Did you review that?

10      A.    I did not.

11      Q.    Okay.  And to clarify, I'm asking

12   about whether or not you reviewed it in

13   preparation for your deposition?

14      A.    No.

15      Q.    Okay.  Did you review it ever?

16      A.    No.

17      Q.    Now, to clarify that question, you

18   never reviewed the report that Specialist

19   Ullrich prepared when it was final, when it

20   was concluded, is that right?

21      A.    Not for preparing for any

22   deposition or trial.  We did discuss the Use

23   of Force after the fact.

24      Q.    Okay.  Good clarification.  So you

25   didn't review Ullrich's, Specialist Ullrich's

25

1    Use of Force report in preparation for your

2    deposition or trial, right?

3        A.    Correct.

4        Q.    But you reviewed it for other

5    reasons, is that right?

6        A.    That day of the use of force.

7        Q.    You reviewed his report that day?

8        A.    Yes.

9        Q.    Okay.  Any other time that you

10   reviewed Specialist Ullrich's Use of Force

11   report?

12       A.    No.

13             (WHEREUPON, Plaintiff's

14   Deposition Exhibit 1 was marked for

15   identification.)

16   BY MR. WHITTAKER:

17       Q.    Okay.  I'm going to hand you what

18   has been premarked as Exhibit 1.  Officer, do

19   you recognize this document as the complaint

20   filed in this case?

21       A.    I do.

22       Q.    Have you reviewed this before?

23       A.    Yes.

24       Q.    Did you review it in preparation

25   for your deposition?

26

1        A.    No.

2        Q.    Okay.  In preparation for your

3    deposition did you -- did you speak with

4    anybody?

5        A.    No.

6              MR. MANDO:  Other than counsel?

7    BY MR. WHITTAKER:

8        Q.    That was going to be my next

9    question.

10       A.    Just spoke with counsel.

11       Q.    Okay.  I don't want to know, I'm

12   not asking about any of the substance of

13   that, but was that here at Mr. Mando's

14   office?

15       A.    Yes.

16       Q.    Do you recall how long you met?

17       A.    Couldn't say off the top of my

18   head.

19       Q.    Do you remember when you met?

20       A.    Two days ago.

21       Q.    Okay.  And you did not review the

22   complaint in preparation for your deposition?

23       A.    I did not.

24       Q.    Okay.  Do you remember when you

25   reviewed the complaint at all?

27

1          A.    I believe when I received it.

2          Q.    Okay.

3                (WHEREUPON, Plaintiff's

4    Deposition Exhibit 8 was marked for

5    identification.)

6    BY MR. WHITTAKER:

7          Q.    I'm going to hand you what has

8    been -- I've previously marked as Exhibit 8.

9    Officer Fritsch, do you recognize this

10   document?

11         A.    I do.

12         Q.    Could you tell us what it is,

13   please?

14         A.    My Supplemental Use of Force

15   report.

16         Q.    Okay.  Was it prepared in Ashley

17   Ferreiras's case?

18         A.    Yes.

19         Q.    And you prepared it, right?

20         A.    Yes.

21         Q.    Okay.  As far as you know -- I

22   think this is, looks like it's three pages;

23   as far as you know, is this a complete copy

24   of your report?  Yes, feel free to look

25   through it.

28

1          A.   Yes.

2          Q.   Okay.  As far as you know, is this

3    an authentic copy of that --

4          A.   Yes.

5          Q.   -- report?

6          A.   Yes.

7          Q.   And as far as you know, everything

8    in here is true and accurate, right?

9          A.   Yes.

10          Q.   Okay.  Was this the first Use of

11    Force -- Supplemental first Use of Force

12    report that you prepared in any case?

13          A.   No.

14          Q.   When else did you prepare one, do

15    you recall when you prepared one before this?

16          A.   Sometime prior on second shift, I

17    believe.

18          Q.   Okay.  Have you prepared Use of

19    Force reports subsequent to this one dated

20    5-4 of 2023?

21          A.   Yes.

22          Q.   Were they incidents in which you

23    used force?

24          A.   Yes.

25          Q.   Okay.  Have you prepared

29

1   Supplemental Use of Force reports as well?

2       A.   Yes.

3       Q.   Okay.  Is a Supplemental Use of

4   Force report prepared when more than one

5   officer uses force?

6       A.   Yes, more than one person is

7   involved in the use of force.

8       Q.   Okay.  So could there be multiple

9   Supplemental Uses of Force for one incident?

10      A.   Yes.

11      Q.   So you prepared this Supplemental

12  Use of Force report that's Exhibit A because

13  you were also involved in the use of force?

14      A.   Yes.

15      Q.   Okay.  Is there any particular

16  reason why Ullrich prepared, Officer Ullrich

17  prepared the Use of Force report and you

18  prepared the Supplemental Use of Force

19  report?

20      A.   Because he was the primary during

21  the arrest.

22      Q.   Okay.  Were you a trainee at that

23  time?

24      A.   Yes.

25      Q.   Okay.  Prior to the incident on 5-4

30

1    of 2023, had you been involved in other use

2    of force incidents?

3         A.   Yes.

4         Q.   Were you the primary on any of

5    those reports?

6         A.   For one.

7         Q.   For one.  And for the others you

8    were -- prepared supplemental reports?

9         A.   Yes.

10        Q.   Okay.  Did anybody assist you with

11   this Supplemental, in your preparation of

12   this Supplemental Police Use of Force report?

13        A.   No, I do not recall.

14        Q.   Did you speak to anybody about it

15   before you prepared it?

16        A.   Supervisor.

17        Q.   Okay.  Who was that?

18        A.   Sergeant Gilliland I believe.

19        Q.   Could you spell that, Gilliland?

20        A.   Not off the top of my head.

21        Q.   Sergeant Gilliland?

22        A.   Gilliland.

23        Q.   He was your supervisor at the time?

24        A.   Yes.

25        Q.   Is he still your supervisor?

31

1      A.    No.

2      Q.    Okay.  Who is your supervisor now?

3      A.    My current supervisor is Sergeant

4  Craymer.

5      Q.    What did you and Gilliland talk

6  about in the preparation of your Supplemental

7  Force -- Use of Force report?

8      A.    We spoke about the, what I

9  perceived happened during the use of force.

10     Q.    He spoke to you about what you

11 perceived?

12     A.    Yes.

13     Q.    Did he instruct you about what you

14 perceived?

15     A.    Nope.

16     Q.    What was the conversation?

17     A.    It's a procedure after use of force

18 that officers speak with the supervisor.

19 Supervisor also speaks with the suspect as

20 well, and any witnesses on scene.

21     Q.    When did you speak with Gilliland?

22     A.    On scene.

23     Q.    Okay.  How long did you speak with

24 him?

25     A.    I don't recall.

32

1    Q.   Okay.  And I'm going to direct you

2    to your Supplemental Use of Force report

3    dated 5-4 of 2023.  In the sort of middle of

4    the top sort of box there it says:  Reason

5    for force used.  Do you see that?  Do you see

6    that?  And then it's --

7    A.   Yeah.

8    Q.   Okay.  And you say to effect

9    arrest, right?

10   A.   Yes.

11   Q.   And to defend self, right?

12   A.   Yes.

13   Q.   Is self referring to you?

14   A.   Yes.

15   Q.   And what did you have to defend

16   yourself from?

17   A.   Ms. Ferreiras did have a crutch on

18   her, I wanted to prevent her from striking me

19   with a crutch.

20   Q.   Okay.  So you wanted to prevent her

21   from striking you with a crutch that -- did

22   she threaten you with a crutch?

23   A.   No, but could be used as a weapon.

24   Q.   But it wasn't, right?

25   A.   It was not.  But we had to prevent

33

1    that from even occurring.

2         Q.    And so to defend yourself you had

3    to prevent her from doing something that she

4    hadn't tried to do, right?

5         A.    Correct.

6         Q.    Okay.  And in the box under that,

7    under that first box there's three columns

8    with boxes within those columns, and you,

9    looks like you checked wrestling with

10   officer; is wrestling with an officer, what

11   is that, a reason why you had to use force?

12        A.    Levels of resistance.

13        Q.    Say again.

14        A.    Levels of resistance.

15        Q.    Okay.  So Ashley Ferreiras -- oh,

16   I'm sorry.  Ashley Ferreiras from your

17   perspective was wrestling with who?

18        A.    Myself and Specialist Ullrich.

19        Q.    Okay.  When was that?

20        A.    When we went to the ground.

21        Q.    Okay.  When you took her to the

22   ground, right?

23             MR. MANDO:  Objection.

24   Characterization.  Form.  Lack of foundation.

25   Go ahead.

34

1          THE WITNESS:  When we went to

2     the ground.

3     BY MR. WHITTAKER:

4          Q.   So you all went to the ground

5     together?

6          A.   Yes.

7          Q.   What was the cause of you all going

8     to the ground together?

9          A.   Once I was able to take the crutch

10    from Ms. Ferreiras she elbowed me in the nose

11    knocking off my glasses, and we all lost our

12    balance and went to the ground.

13         Q.   So when you -- after -- okay.  When

14    you took Ms. Ferreiras's crutch away, she

15    elbowed you in the nose, breaking your

16    glasses, and that caused you all to fall to

17    the ground?

18         A.   Yes.

19         Q.   It had nothing to do with the fact

20    that you had yanked her crutch away that she

21    fell to the ground?

22              MR. MANDO:  Objection.

23    Characterization.  Go ahead.

24              THE WITNESS:  I was still

25    holding on to her arm, preventing her from

35

1    falling over.

2    BY MR. WHITTAKER:

3        Q.   Okay.  And it was while she was

4    on -- at that point she didn't have crutches

5    at all, did she?  She had no crutches?

6        A.   I can only recall what happened on

7    my side.

8        Q.   And she punched you in the nose or

9    elbowed you in the nose?

10       A.   Elbowed.

11       Q.   And broke your glasses?

12       A.   Yes.

13       Q.   Okay.  You're not wearing glasses

14   today?

15       A.   No.

16       Q.   Do you wear glasses typically?

17       A.   Yes.

18       Q.   Any reason why you're not wearing

19   them today?

20       A.   Not right now, no.

21       Q.   Do you wear them on patrol?

22       A.   Yes.

23       Q.   Nearsighted or farsighted?

24       A.   Both.

25       Q.   Do you wear contacts?

36

1          A.    No.

2          Q.    So you need them to see?

3          A.    To drive, correct.

4          Q.    To drive, okay.  Do you need them

5     for any other purpose?

6          A.    Not usually.

7          Q.    Is that for driving at night or

8     driving always?

9          A.    Both.  Always.

10         Q.    Did you drive over here today?

11         A.    Yes.

12         Q.    Did you wear your glasses then?

13         A.    I have prescription sunglasses.

14         Q.    You describe in your Supplemental

15    Use of Force report Ms. Ferreiras as being

16    armed, right?

17         A.    Yes.

18         Q.    With crutches?

19         A.    Yes.

20         Q.    You didn't check any of the other

21    boxes, knife, club, or firearm; so just the

22    crutches, right?

23         A.    Correct.

24         Q.    And what made you think that her --

25    she was armed -- that her crutches were an

37

1   armament?

2        A.    Because I considered it could be

3   used as a weapon against me.

4        Q.    So because you considered her to

5   be -- you considered the crutches to be a

6   weapon, you considered her to be armed?

7        A.    Yes.

8        Q.    And the fact that you considered

9   her crutches to be a weapon and, therefore,

10  Ashley Ferreiras armed, did that in your mind

11  justify the use of force against her?

12             MR. MANDO:   Objection.  Lack of

13  foundation.  Characterization.  You can

14  answer.

15  BY MR. WHITTAKER:

16       Q.    Did you understand the question?

17  Do you need me to repeat it?

18       A.    If you could, please.

19       Q.    So you characterize Ms. Ferreiras

20  as being armed with crutches, right?

21       A.    Yes.

22       Q.    And the fact that she -- you

23  considered her to be armed, is that a factor

24  that went into your thinking in justifying

25  the use of force against her?

38

1          MR. MANDO:  Objection.
2  Characterization.  Lack of foundation.  You
3  can answer.
4          THE WITNESS:  Yes, it could be
5  justification for it as well.
6  BY MR. WHITTAKER:
7      Q.   Okay.  What part of the general
8  orders of the Covington Police Department
9  describes crutches as being an armament?
10          MR. MANDO:  Objection.  Lack of
11  foundation.
12  BY MR. WHITTAKER:
13      Q.   Or an arm?
14          MR. MANDO:  Same objection.  You
15  can answer.
16  BY MR. WHITTAKER:
17      Q.   Is there any rule or --
18      A.   No, not that I'm aware of.
19      Q.   Is there a rule or regulation in
20  the general orders of the police department
21  that describes what an arm is?  I don't mean
22  a person's arm, I mean an arm as a weapon.
23      A.   I believe there's a definition in
24  there.
25      Q.   Okay.  Do you know where that is?

39

1          A.    I do not.

2          Q.    Did you consult that definition

3    when you prepared your Supplemental Use of

4    Force report?

5          A.    I do not recall.

6          Q.    Did you talk with Gilliland about

7    whether or not -- am I pronouncing his name

8    correct by the way?

9          A.    Gilliland, correct.

10          Q.    Did you speak with him about

11    whether or not crutches are considered an arm

12    in this instance?

13          A.    No.

14          Q.    How about Officer Ullrich?

15          A.    No.

16          Q.    On the bottom of the first page it

17    says Situational Factors.  In the middle

18    column it says Environmental.  You checked

19    unstable ground, night hours, presence of

20    bystanders, residential area, and urban area;

21    right?

22          A.    Yes.

23          Q.    Were there any other, anything you

24    left off of this list?

25          A.    No.

40

1      Q.    Okay.  You knew she was on

2   crutches, right?

3      A.    Yes.

4      Q.    And you knew that she was on

5   crutches at the scene, right?

6      A.    Yes.

7      Q.    Because you pulled one away from

8   her?

9      A.    Yes.

10          MR. MANDO:  Objection.

11   Characterization.  Go ahead.

12   BY MR. WHITTAKER:

13      Q.    You also knew that she was -- had a

14   cast or a splint on her leg, right?

15      A.    Yes.

16      Q.    And she told you that she couldn't

17   walk, right?

18      A.    She said it.

19      Q.    She said that repeatedly in fact,

20   right?

21      A.    Yes.

22      Q.    I'm just wondering why you didn't

23   check physical condition of suspect under the

24   situational factors; any reason for that?

25      A.    No.

41

1      Q.   The only situational factor that
2  went into this report was her ignoring
3  officer -- which officer?
4      A.   Ignoring officer commands.
5      Q.   Okay.  It says ignoring the
6  officer.  Was she ignoring you?
7      A.   As well.  During the use of force.
8      Q.   My question is whether or not you
9  were the officer that she was ignoring?
10     A.   Yes.
11     Q.   Okay.  Do you remember what she,
12 what -- I assume you mean she was ignoring
13 your commands?
14     A.   Yes.
15     Q.   Do you remember what commands that
16 she ignored?
17     A.   To give me her arm.
18     Q.   To give you her arm.  In your mind
19 did she have some obligation to give you her
20 arm?
21     A.   Yes, she was being placed under
22 arrest.
23     Q.   For what?
24     A.   Obstruction.
25     Q.   Obstruction what?

42

1       A.    Our traffic stop.

2       Q.    What did she do to obstruct your

3   traffic stop?

4       A.    She was approaching the traffic

5   stop, involving herself in the traffic stop,

6   preventing me from conducting my

7   investigation.

8       Q.    That sounds well rehearsed.

9           MR. MANDO:  Objection.  Move to

10  strike.

11  BY MR. WHITTAKER:

12      Q.    She approached the traffic stop?

13      A.    Yes.

14      Q.    Interjected herself, is that what

15  you said?

16      A.    Yes.

17      Q.    And prevented what?

18      A.    Prevented me from continuing my

19  investigation, continuing the traffic stop.

20      Q.    She prevented you from continuing

21  your investigation into the traffic stop?

22      A.    Yes.

23      Q.    So she approached the traffic stop,

24  interjected herself in the traffic stop,

25  prevented you from continuing your

43

1    investigation into the traffic stop, and what

2    else did she do to obstruct the traffic stop?

3         A.    Didn't follow commands to go back

4    into her yard, and continued yelling until we

5    began to place her into custody.

6         Q.    Yelling?

7         A.    Yes.

8         Q.    That was a thing?  Okay.  In your

9    mind, did she have some obligation to follow

10   commands to go back into her yard?

11        A.    Yes.

12        Q.    Why?

13        A.    Because she was interjecting

14   herself into our investigation.

15        Q.    How did she do that?

16        A.    By yelling and approaching the

17   traffic stop.

18        Q.    So by yelling?

19        A.    She was yelling loud enough that I

20   was -- I heard her from my, the inside of my

21   cruiser.  That's why I stepped out to

22   interject myself into the --

23        Q.    So she --

24        A.    To help Specialist Ullrich.

25        Q.    I didn't mean to step on you.  So

44

1   she was yelling, and what else did she do,

2   sorry?

3        A.   Not following commands.

4        Q.   Yeah, I know she wasn't following

5   commands, but why did she have an obligation,

6   what -- why did she have an obligation to

7   follow any commands, in your view?

8        A.   Because she was not involved in the

9   traffic stop.

10        Q.   So a person who's not involved in

11   the traffic stop is obliged to follow any

12   command of a police officer who is involved

13   in the traffic stop, is that right?

14        A.   Could you rephrase it for me?

15        Q.   Yeah, I'll repeat it.  Is a person

16   who's not involved in a traffic stop required

17   to follow every instruction of a police

18   officer who is involved with a traffic stop?

19        A.   If they are attempting to interject

20   themselves into the traffic stop.

21        Q.   What did she do again to attempt to

22   interject herself?

23        A.   She was approaching the traffic

24   stop after given repeated commands to not

25   approach the traffic stop, and was yelling.

45

1          Q.   Okay.  So --

2               MR. MANDO:  Can I interject?

3               MR. WHITTAKER:  Yes.

4               MR. MANDO:  You guys are

5     starting to talk over one another.  So,

6     Anthony, please let him finish his question

7     and he'll do his best to let you finish your

8     answer, and the court reporter will be much

9     obliged.

10    BY MR. WHITTAKER:

11         Q.   Yes, I should have mentioned that.

12    Okay.  So I understand, she interfered with

13    the traffic stop, right?

14         A.   Yes.

15         Q.   By yelling, right?

16         A.   Yes.

17         Q.   And approaching?

18         A.   Yes.

19         Q.   Okay.  And not going back into her

20    yard?

21         A.   Yes.

22         Q.   Okay.  And interfering with your

23    investigation, right?

24         A.   Yes.

25         Q.   Okay.  Okay.  I'm going to go

46

1    through each of these four things.  What did
2    she yell?
3         A.   I don't recall.
4         Q.   Was her yelling, in your view,
5    unlawful?
6         A.   Yes.
7         Q.   So yelling is a crime in Covington?
8         A.   It's causing alarm and annoyance.
9         Q.   Who was alarmed and annoyed?
10        A.   It would be -- it's a residential
11   area, yelling at that time of night would be
12   alarming.
13        Q.   To who?
14        A.   People in the area.
15        Q.   Did anybody tell you that?
16        A.   No.
17        Q.   Nobody did, right?
18        A.   No.
19        Q.   Nobody called to report an annoying
20   or an alarming yeller, did they?
21        A.   No, I don't recall.
22        Q.   Why else is it illegal?  Yelling,
23   sorry.
24        A.   Yelling?
25        Q.   Yeah.  Why else is that illegal?

47

1          A.    It caused a disturbance.

2          Q.    Who was disturbed?  Nobody was,

3     right?  Nobody called to say that there was a

4     disturbance, did they?

5          A.    No, I don't believe so.

6          Q.    Okay.  Anything, any other reason

7     why yelling would -- is a crime in the City

8     of Covington?

9               MR. MANDO:  Objection.

10    Characterization.  Go ahead.  He never said

11    yelling was a crime.  Go on.

12               THE WITNESS:  Could you repeat

13    the question, please?

14    BY MR. WHITTAKER:

15         Q.    Yeah.  Is yelling -- you're telling

16    me that yelling causes alarm and annoyance

17    and disturbances; what other violations of --

18    how else is yelling unlawful?

19         A.    I've already answered it.  It could

20    be -- cause alarm and annoyance to the public

21    in the area.

22         Q.    So causing alarm and annoyance and

23    disturbance could have done that; nobody

24    called to complain about it, though, right?

25         A.    No, but it did cause me to leave

48

1    the -- my investigation and move to the

2    sidewalk.

3         Q.    So by virtue of her yelling, she

4    caused you to -- she prevented your

5    investigation?

6         A.    Not just the yelling.  The

7    approaching the scene.

8         Q.    I understand that.  But yelling

9    contributed to your inability to complete the

10   investigation?

11        A.    Yes.

12        Q.    Okay.  And at that point was she

13   subject to arrest?

14        A.    After giving repeated commands to

15   go back into her yard, and then when

16   Specialist Ullrich said you're placing under

17   arrest, yes.

18        Q.    So the yelling in and of itself

19   wasn't grounds for arrest?

20        A.    No.

21        Q.    And you don't recall what the

22   content of her yelling was, do you?

23        A.    No, I do not.

24        Q.    Is there situations in which the --

25   could the content of her yelling be grounds

49

1    for arrest in your view?

2         A.    Depends on the situation.

3         Q.    She was yelling that she had a

4    broken foot and couldn't walk and stuff like

5    that, right?

6         A.    I believe she --

7              MR. MANDO:  Objection.  Asked

8    and answered.  Go ahead.

9              THE WITNESS:  I believe she

10   yelled that when we placed her in custody.

11   BY MR. WHITTAKER:

12        Q.    Is that the only -- that's the only

13   time she yelled that?

14        A.    From my recollection.

15        Q.    Okay.  How else were you prevented

16   from completing your investigation into the

17   traffic stop?

18        A.    I had to -- I was assisting

19   Specialist Ullrich in placing her into

20   custody, so I had to finish that situation

21   before I could continue my investigation.

22        Q.    Okay.  Who told you to do that?

23   Who told you to go away from your

24   investigation to help Specialist Ullrich?

25        A.    It was my decision.

50

1      Q.    Okay.  So you chose to divert
2  yourself from the investigation?
3              MR. MANDO:  Objection.
4  Characterization.  Go ahead.
5  BY MR. WHITTAKER:
6      Q.    Right?
7      A.    It was my, it was my call, my
8  traffic stop, I had to help assist the --
9  handle the situation.
10      Q.    Was it your traffic stop or
11  Specialist Ullrich's traffic stop?
12      A.    The traffic stop was mine.
13      Q.    Okay.  Then why did you do a
14  supplemental report?
15      A.    They're separate incidences.
16      Q.    They're separate incidences, okay.
17      A.    Separate incidences to the same
18  report.
19      Q.    So Specialist Ullrich's report and
20  your supplemental report are the same
21  report -- are two reports to the same
22  incident, is that a fair characterization?
23      A.    Yes.
24      Q.    Okay.  I'm not saying that they are
25  literally the same report, but they are part

51

1    of the same report; put them together they're

2    one report, is that fair?

3         A.    They're not the same, they're not

4    one report.  It's, it's all, the NIBRS, the

5    use of force, it's all filed under the same

6    incident.

7         Q.    Okay.  One incident, two reports?

8         A.    Yes.

9         Q.    Was there another incident?

10   Because I thought I understood there to be --

11   was the traffic stop considered to be a

12   separate incident from the report for which

13   you -- for the incident that you wrote your

14   Use of Force report for?

15        A.    No, the same -- they're under the

16   same report.

17        Q.    Okay.  They're under the same

18   report?

19        A.    Under the same report.

20        Q.    Different incidents?

21        A.    Yes.

22        Q.    They are different incidents, okay.

23   So the first incident is the traffic stop?

24        A.    Yes.

25        Q.    That was your stop?

52

1       A.   Yes.

2       Q.   Is it because you were driving, is

3   what how that is --

4       A.   I was in the FTO program, I was

5   expected to make traffic stops.

6       Q.   I see.

7       A.   As the traffic car.

8       Q.   I see.  So Specialist Ullrich, was

9   he supervising your traffic stop?

10       A.   Yes.

11       Q.   Okay.  Because you were still a

12   trainee, but it was still your stop and not

13   Specialist Ullrich's stop?

14       A.   Correct.

15       Q.   Okay.  So that's one incident, the

16   stop?

17       A.   Correct.

18       Q.   Right?  And that's the reason why

19   you were on that -- on Nancy Street that

20   evening, right?

21       A.   Correct.

22       Q.   Okay.  Where on Nancy Street did

23   you effect the stop?

24       A.   I believe in the front of the house

25   next door to her residence.

53

1      Q.    Okay.  At what point did a second
2   incident begin?
3      A.    When she began to interject herself
4   into my investigation.
5      Q.    Okay.  At that time you were
6   sitting in your cruiser?
7      A.    Yes.
8      Q.    Did she approach you?
9      A.    No.
10      Q.    Did she say anything to you?
11      A.    No.
12      Q.    Did she threaten you?
13      A.    No.
14      Q.    Wave anything at you, did she shake
15   her crutches at you or anything like that,
16   did she brandish anything at you?
17      A.    No.
18      Q.    Okay.
19          (WHEREUPON, Plaintiff's
20   Deposition Exhibit 9 was marked for
21   identification.)
22   BY MR. WHITTAKER:
23      Q.    I'm going to hand you Exhibit 9.
24   Officer, have you seen this before?
25      A.    Yes.

54

1      Q.   Exhibit 9, it appears to me to be a
2  Use of Force report dated 5-4-23 prepared by
3  Officer Ullrich, right?
4      A.   Correct.
5      Q.   Okay.  Did you have any input
6  into -- was Specialist Ullrich a specialist
7  at the time?
8      A.   Yes.
9      Q.   Okay.  Did you have -- what input
10  did you have into the preparation of his
11  report?
12      A.   None.
13      Q.   Okay.  And I think you testified
14  before that you didn't, you didn't review
15  Officer Ullrich's report before preparing
16  yours, right?
17      A.   No, I did not.
18      Q.   Did I understand that right?
19      A.   Yes.
20      Q.   Okay.  You reviewed your Use of
21  Force report in preparation for your
22  deposition, right?
23      A.   Correct.
24      Q.   But not Officer Ullrich's?
25      A.   No.

55

1          Q.    But you reviewed Officer Ullrich's
2    Use of Force report at some time?
3          A.    Yes.
4          Q.    Not in preparation for your
5    deposition or trial?
6          A.    No.
7          Q.    What caused you to review his Use
8    of Force report if not in preparation of your
9    deposition or for trial?
10         A.    I believe I reviewed it in
11   preparation, prior preparation for the trial.
12         Q.    Okay.  You didn't sign this
13   anywhere, did you?
14         A.    No.
15         Q.    Okay.  I'm going to turn you to the
16   second page.  Situational Factors, mark all
17   that apply.  Repetitive phrases is checked,
18   do you see that?
19         A.    Uh-huh.
20         Q.    Do you know what Officer Ullrich
21   means by that?
22         A.    I do not.
23         Q.    What about sudden attack?
24         A.    I believe when he was bitten.
25         Q.    When was he bitten?

56

1           A.    During the use of force.

2           Q.    When did the use of force start?

3      I'm not asking for the time, but like what

4      events caused the -- what events began the

5      use of force?

6           A.    After he was bitten when he struck

7      her.

8           Q.    Okay.  So the use of force began

9      after she bit him?

10          A.    Yes.

11          Q.    Okay.  There was no force used

12     before she bit him?

13          A.    No, not that I'm aware of.

14          Q.    Okay.  At that point she was on the

15     ground, right?

16          A.    Yes.

17          Q.    And were you the, were the two of

18     you -- the two of you had her restrained on

19     the ground?

20          A.    Attempting to place her into

21     custody.

22          Q.    Okay.  Was she cuffed?

23          A.    Not initially.

24          Q.    She ended up being cuffed at some

25     point, right?

57

1          A.    Yes.

2          Q.    And you placed the cuffs on her?

3          A.    Yes.

4          Q.    Did she have her arms behind her

5     back at that point?

6          A.    Yes.

7          Q.    Were you holding an arm behind her

8     back?

9          A.    Yes.

10          Q.    Was Officer Ullrich holding an arm

11     behind her back?

12          A.    He was holding an arm.

13          Q.    He was holding an arm and --

14          A.    I don't remember specifically where

15     he held her arm.

16          Q.    Oh, okay.

17          A.    All I know is that once we were

18     able to, we were able to put her in handcuffs

19     behind her back.

20          Q.    Gotcha.  So you were holding an arm

21     and he was holding an arm?

22          A.    Yes.

23          Q.    You recall that you were holding

24     one behind her back, you don't know where

25     Officer Ullrich was holding her arm -- the

58

1    other arm?

2        A.    Correct.

3        Q.    But eventually you managed to get

4    both of her arms behind her back?

5        A.    Correct.

6        Q.    And cuff her?

7        A.    Correct.

8        Q.    Okay.  When did the biting happen?

9        A.    Before we got her in the handcuffs.

10       Q.    Okay.  Did you see that happen?

11       A.    I did not.

12       Q.    Okay.  So you don't know when the

13   biting happened, right?

14       A.    I believe it happened when he

15   yelled out in pain.

16       Q.    Okay, fair enough.  You didn't

17   witness the biting, though?

18       A.    No.

19       Q.    How do you know she bit him?

20       A.    Because he yelled -- I believe she

21   {phonetic} yelled she bit me.

22       Q.    She yelled or he yelled?

23       A.    He yelled.

24       Q.    Okay.  So all of the information

25   that you have about a biting is secondhand

59

1    from Officer Ullrich, right?

2                MR. MANDO:  Objection.

3    Characterization.  Go ahead.

4                THE WITNESS:  I heard him yell

5    in pain.

6    BY MR. WHITTAKER:

7        Q.    Uh-huh.

8        A.    And I heard what he said.

9        Q.    Uh-huh.  So all of the information

10    you have available to you about Officer

11    Ullrich being bitten was because of him

12    yelling out and -- did he tell you?

13        A.    No.

14        Q.    He didn't tell you that he got

15    bitten?

16        A.    No.

17        Q.    Ever?

18        A.    I don't recall from the whole

19    scenario.

20        Q.    Okay.  When did you find out that

21    he had been bitten?

22        A.    It had to be on the scene, I don't

23    recall the exact time.

24        Q.    Okay.  I'm not trying to get you to

25    say the time, I'm just curious about when it

60

1    happened.  And you believe -- and your

2    knowledge of the biting occurred because he

3    yelled out?

4        A.   Yes.

5        Q.   Okay.  You have reviewed your body

6    cam footage, right?

7        A.   Yes.

8        Q.   Does the biting take place on

9    your -- did you come to see the biting take

10    place on your body cam footage?

11        A.   No.

12        Q.   Have you reviewed any of the other

13    officers' body cam footage from the evening?

14        A.   No, not in preparation for this

15    deposition.

16        Q.   At all have you reviewed it?

17        A.   No, not recently.  For the trial I

18    did review Ullrich's and mine, and the dash

19    cam.

20        Q.   Gotcha.  Nobody else's -- did you

21    review Officer Jansen's?

22        A.   I did not.

23        Q.   Did you see a mark on Officer

24    Ullrich indicating a bite?

25        A.   I didn't see any mark.

61

1          Q.   Okay.

2          A.   He didn't show me.

3          Q.   He didn't show you?

4          A.   No.

5          Q.   Okay.  And at some point, and I

6     think Officer Ullrich testified about this at

7     trial, he testified that he punched her in

8     the face twice, right?

9               MR. MANDO:  Objection.  Lack of

10    foundation.

11   BY MR. WHITTAKER:

12         Q.   That's true, you weren't, you

13    weren't -- you were sequestered.  But Ullrich

14    punched him -- punched Ashley Ferreiras twice

15    in the face, right?

16         A.   Correct.

17         Q.   While she was on the ground?

18         A.   Correct.

19         Q.   While you were holding one of her

20    arms, right?

21         A.   Correct.  I was attempting to gain

22    control of her arm.

23         Q.   Behind her back, right?

24         A.   I was attempting to gain control of

25    her arm.

62

1      Q.   You were holding her arm behind her

2   back at the time, right?  You just told me

3   that you did -- you were holding her arm

4   behind the back but you didn't know where

5   Ullrich's arm was.

6              MR. MANDO:  Objection.

7              MR. WHITTAKER:  Or where Ullrich

8   was holding her arm.

9              MR. MANDO:  Objection.

10  Characterization.  Go ahead.

11             THE WITNESS:  During the

12  situation I was attempting to gain control of

13  her arm.  I don't know exactly, I can't

14  recall exactly when it occurred.  I can state

15  that towards the end of the situation when we

16  were actually able to get her in handcuffs, I

17  had her hand behind her back.

18  BY MR. WHITTAKER:

19      Q.   Gotcha.

20      A.   I was focused on gaining control of

21  that left arm during the situation.

22      Q.   Okay.  And the use of force,

23  however, didn't begin until Officer Ullrich

24  yelled out and then punched -- and the use of

25  force was him punching her in the face?

63

1          A.   Yes.

2          Q.   Okay.  There was no use of force

3     before that?

4          A.   No.

5          Q.   Gotcha.  So you don't consider you

6     struggling to get her arm under control and

7     Officer Ullrich trying to get her arm under

8     the control so that you could get her cuffed,

9     force?

10          A.   No.

11          Q.   Okay.  But as far as the event that

12     precipitated the use of force, you don't have

13     any actual personal knowledge of that, you're

14     just relying on what you heard Officer

15     Ullrich say?

16          A.   What I heard him yell and what I

17     heard him say, yes.

18          Q.   Okay.  Were you injured in that, in

19     that melee?

20          A.   My glasses were broken, so --

21          Q.   Broken glasses, right.  But aside

22     from that?

23          A.   No.

24          Q.   You didn't have to go get checked

25     out by a doctor or anything?

64

1      A.    No.

2      Q.    The extent of your injuries was

3  your broken glasses?

4      A.    Yes.

5      Q.    What injuries did you see on

6  Ullrich's person?

7      A.    I didn't see his injuries.

8      Q.    So because you didn't suffer any

9  injuries there's no photographs of your

10  injuries, is that fair?

11      A.    We take photos of everyone involved

12  in a use of force.

13      Q.    Right.

14      A.    So there was no injuries, but there

15  was photos of me after the incident.

16      Q.    Yeah, yeah, yeah.  But there's no

17  photos of any injuries sustained by you?

18      A.    No.

19      Q.    Okay.  I have handed you -- let's

20  go back to -- you know, I'm moving on to a

21  new topic so I think now is a good time for a

22  quick break.

23            MR. MANDO:  All right, cool.

24            (WHEREUPON, a discussion was

25  held off the record.)

65

1    BY MR. WHITTAKER:

2         Q.   Officer Fritsch, you're still under

3    oath, you understand that?

4         A.   Yes.

5         Q.   Okay.  Let's go through Exhibit 10.

6              MR. MANDO:  It's probably at the

7    bottom of the stack.

8    BY MR. WHITTAKER:

9         Q.   Yes.  It is the Use of Force

10   policy.  This one's dated 5-3 of 2023, as

11   revised, do you see that up at the top?

12        A.   Yes.

13        Q.   Which, oddly enough, is the day

14   before the incident in question.  Did you

15   receive this Use of Force standard that day,

16   on 5-3 of 2023?

17        A.   It would have been in our PowerDMS.

18        Q.   And that's the portal that you can

19   view records in?

20        A.   Yes.

21        Q.   And that's something you need to

22   review and then acknowledge that you've

23   reviewed it, right?

24        A.   Yes.

25        Q.   By clicking on something

66

1     acknowledging it and it places your

2     electronic signature, date and time, is that

3     right?

4         A.   Yes.

5         Q.   Did you review it on 5-3-2023?

6         A.   I don't recall.

7         Q.   And while you were training did

8     someone go over the Use of Force policy with

9     you?

10         A.   Any incident that -- we talk about

11     it before.

12         Q.   Okay.  You said you talk about it

13     before; before what?

14         A.   Such as when I, I've had a previous

15     use of force.  Or just prior to being in the

16     FTO program at the academy we, we go over the

17     use of force.

18         Q.   I see.  So when you were at the

19     academy you went over the use of force?

20         A.   Not Use of Force policy, but use of

21     force.  And then Use of Force policy is at --

22     is here.

23         Q.   Okay.  While you were training did

24     you -- did a specialist or an FTO train you

25     on the Use of Force policy?

67

1      A.   No one specifically trained us on

2  the Use of Force policy.  We're expected to

3  read it and understand it.

4      Q.   Gotcha.

5      A.   And if we do have to use force like

6  I have had, a lot of times the FTO will go

7  through it.

8      Q.   Okay.  And did you have to use

9  force before the incident that we're

10  discussing today?

11      A.   Yes.

12      Q.   Okay.  How many times?

13      A.   Just once prior.

14      Q.   Okay.  What were the circumstances

15  of that?

16      A.   Intoxicated subject.  Basically

17  stumbling in a crosswalk, almost following

18  over.  I told him to stop.  Refused to stop.

19  Went to go hands-on and place him into

20  custody, attempted to pull away from me.  I

21  took, took him to the ground and placed him

22  into custody.

23      Q.   Okay.

24           (WHEREUPON, Plaintiff's

25  Deposition Exhibit 57 was marked for

68

```
1    identification.)
2    BY MR. WHITTAKER:
3        Q.   I'm going to hand you I think -- I
4    thought.  One second, I think I might have
5    combined.  Yeah, okay.  I'm going to hand you
6    what I have previously marked as Exhibit 57.
7    And forgive me, I have to separate these from
8    another exhibit so that is why I am taking
9    them out.  And it is not going to be stapled,
10   unfortunately.  I apologize for that.
11            Do you recognize this document,
12   Exhibit 57, which I believe goes from 2472
13   through 2475?
14            MR. MANDO:  He's referring to
15   these numbers down here.
16   BY MR. WHITTAKER:
17       Q.   Yeah, I'm sorry, it's the numbers
18   at the bottom.
19       A.   Repeat those numbers again.  It
20   just goes to three.
21       Q.   Okay.  Can I see what I handed you?
22   I'm sorry.  Well, then I'm going to give
23   you --
24       A.   Apologies, it was stuck to the
25   other stack.
```

69

1          Q.    Oh.   Just to make sure, you've got

2     2472 through 475 in front of you, is that

3     right?

4          A.    Yes.

5          Q.    Okay.  Do you recognize this?

6          A.    Yes.

7          Q.    Is it your Use of Force report

8     dated 4-15 of 2023?

9          A.    Yes.

10         Q.    Is that the Use of Force report

11    that we were just talking about?

12         A.    Yes.

13         Q.    Okay.  Who was your FTO on

14    4-15-2023?

15         A.    Morris.

16         Q.    Okay.  And before preparing this

17    Use of Force report had you reviewed the Use

18    of Force policy?

19         A.    Yes.

20         Q.    Okay.  Understanding that it wasn't

21    the one dated 5-3-23, but it was a different

22    one?

23         A.    Yes.

24         Q.    Did you review that report on your

25    own or was it under the instruction or

70

1    supervision of an FTO?

2        A.   As it was my first Use of Force

3    report, he would have to look over our

4    reports and make sure they're grammatically

5    correct and everything.

6        Q.   Okay.  So Morris looked over it for

7    you?

8        A.   And then a supervisor as well.

9        Q.   Okay.

10       A.   I believe it was Gilliland that

11   went over that use of force with me.

12       Q.   Okay.  So Sergeant Gilliland was

13   your supervisor at the time or your FTO at

14   the time?

15       A.   Supervisor.

16       Q.   Gotcha.  And Morris was your FTO?

17       A.   Yes.

18       Q.   Gotcha.  And as for the preparation

19   of this report, the document we're looking

20   at, I understand that they assisted you with

21   preparing the report because it was your

22   first report.  My question is a little bit

23   different than that, and I'm just wondering

24   if you reviewed the Use of Force policy,

25   Exhibit 10, at any point before preparing

71

1    this report?

2         A.   Yes.

3         Q.   Okay.  Did you review it before

4    using force in this -- well, yes, obviously.

5    Scratch that question.  Okay.  So the primary

6    reason you used to effect arrest of this

7    person is for -- to restrain for subject's

8    own safety, is that right?

9         A.   Correct.

10        Q.   And the person, you say he or she

11   was observed stumbling in a crosswalk?

12        A.   Yes.

13        Q.   Okay.  And the other -- another

14   officer was present with you, right?

15        A.   Morris was.

16        Q.   Morris was.  Okay.  And you

17   suspected, I'm not going to put the guy's

18   name in the record, but you suspected the

19   person of being intoxicated?

20        A.   Yes.

21        Q.   What gave you that impression?

22        A.   The way he was walking and almost

23   falling over.

24        Q.   Okay.  And this was at, it says, it

25   says about 1:19 in the morning, does that

72

1    seem right?

2         A.    Yes.

3         Q.    Okay.  What actions did the person

4    you used force against depicted in this

5    report take against -- what actions did he

6    take that required the use of force?

7         A.    He was attempting to pull away from

8    me.

9         Q.    Okay.  He was attempting to pull

10   away from you?

11        A.    When I was attempting to take him

12   into custody.

13        Q.    Okay.  You were trying to take him

14   into custody for public intoxication?

15        A.    Alcohol intoxication.

16        Q.    Alcohol intoxication.  And he tried

17   to pull away from you -- or did pull away

18   from you?

19        A.    Attempted.

20        Q.    Attempted to pull away from you.

21   And then what was the force you used against

22   him?

23        A.    I did a takedown.

24        Q.    A takedown.  Did you do that alone

25   or did Morris assist you?

73

1          A.    Alone.

2          Q.    Was Morris present?

3          A.    He was.

4          Q.    Okay.  Did Morris supervise your

5     takedown of the guy -- I'm going to call

6     him -- Scarberry's his name, did he supervise

7     your takedown of Scarberry?

8          A.    Yes.

9          Q.    Did he instruct you to take down

10    Scarberry?

11         A.    No.

12         Q.    Okay.  You did that on your own?

13         A.    Yes.

14         Q.    Okay.  And he didn't participate in

15    that?

16         A.    No.

17         Q.    Okay.  If we go to the second page

18    of that exhibit, let's go down to your

19    narrative of the incident.  You observed

20    Scarberry staggering and falling over in the

21    crosswalk at Madison and West Robbins.  You

22    made contact with him because you believed he

23    was a danger to himself, right?

24         A.    Yes.

25         Q.    And you gave him repeated commands

74

1    to put his phone away?

2         A.    To stop and put his phone away.

3         Q.    Okay.  What did his phone have to

4    do with anything?  Why did you instruct him

5    to put his phone away?

6         A.    Because I was attempting to conduct

7    an investigation and he was intoxicated, and

8    him speaking on the phone interrupted that

9    investigation, and it also could be used as a

10   weapon against me.

11        Q.    He was speaking on the phone?

12        A.    Yes.

13        Q.    Was he yelling?

14        A.    He was just talking.

15        Q.    He was just talking.  Did he

16   seem -- he was talking and stumbling?

17        A.    Yes.

18        Q.    Okay.  In the crosswalk, right?

19        A.    He had made it to the sidewalk by

20   then.

21        Q.    Oh, he was on the sidewalk by the

22   time --

23        A.    Yes.

24        Q.    Okay.  But you observed him in the

25   crosswalk stumbling and falling over?

75

1        A.    Yes.

2        Q.    So he physically fell to the

3    ground?

4        A.    Almost fell over.

5        Q.    Gotcha.  The whole time managing to

6    keep ahold of his phone?

7        A.    His phone was what he was trying to

8    pick up when he almost fell over.

9        Q.    I see.  So he dropped his phone and

10    tried to pick it up?

11        A.    Yes.

12        Q.    And successfully picked it up?

13        A.    Yes.

14        Q.    Got up, carried on, and continued

15    talking?

16        A.    Yes.

17        Q.    Okay.  And so is the first command

18    you gave Scarberry to put his phone away?

19        A.    I told him to stop and then put his

20    phone away.

21        Q.    Okay.  You told him to stop and put

22    his phone away?

23        A.    Uh-huh.

24        Q.    What was your reason -- what was

25    your basis for telling him to stop?

76

1    A.    Because I had reasonable suspicion

2  to believe that he was intoxicated.

3    Q.    Okay.  So intoxication is

4  justification for you to stop him, in your

5  mind?

6    A.    His level of intoxication, yes.

7    Q.    What level of intoxication was he?

8    A.    I believe his level of intoxication

9  put him at danger to himself and others in

10  the area.

11    Q.    Okay.  Was he ever tested for, did

12  he ever take -- did he blow -- did he do a

13  breathalyzer?

14    A.    No.

15    Q.    Was there a blood test?

16    A.    No.

17    Q.    Hair test, hair follicle test or

18  anything?

19    A.    No.

20    Q.    Are there any other tests that you

21  can employ after you arrest him to see if he

22  was intoxicated?

23    A.    I don't -- I didn't see any reason

24  to conduct those tests.

25    Q.    So there's no, there's no, there's

77

1    no report or lab report or anything saying

2    that his blood alcohol level was X, Y, Z?

3         A.   No.

4         Q.   Okay.  So he refused your command

5    to put his phone away or to stop?

6         A.   Both.

7         Q.   So he refused your command to put

8    his phone away and stop, and stated that he

9    was good and began to walk away?

10        A.   Yes.

11        Q.   I told him to stop and that he

12   wasn't walking away.  So you told him to

13   stop -- when he -- he said I'm good and began

14   to walk away, at that point you told him to

15   stop again and that he was not walking away?

16   I told him to stop and that he wasn't walking

17   away?

18        A.   Yes.

19        Q.   Okay.  Was he under arrest at that

20   point?

21        A.   I was placing him into custody,

22   yes.

23        Q.   Was he under arrest at that point?

24        A.   He was detained.

25        Q.   Was he under arrest at that point?

78

1      A.    He wasn't free to go.

2      Q.    Okay.  So he was under arrest?

3      A.    Detained and arrest are separate

4  things.

5      Q.    Yeah, I know.  So was he detained

6  or arrested?

7            MR. MANDO:  Objection.

8  Characterization.  Asked and answered.  Go

9  ahead.  Explain.

10            THE WITNESS:  When I first got

11  out with him he was detained, he wasn't free

12  to leave.  When he began to walk away, I made

13  a decision to place him into custody.

14  BY MR. WHITTAKER:

15      Q.    Okay.  So he was detained at what

16  point?

17      A.    When I first got out with him and

18  told him to stop.

19      Q.    So he was detained when you told

20  him to stop, correct?

21      A.    Yes.

22      Q.    Did you tell that him he was being

23  detained?

24      A.    No.

25      Q.    And so did you tell him why he was

79

1   being detained?

2         A.    No.

3         Q.    And so he walked away?

4         A.    Yes.

5         Q.    And at that point you decided you

6   were going to arrest him because he walked

7   away?

8         A.    No, because he was intoxicated.

9         Q.    Okay.  Okay.  In your report it

10  says:  I told him to stop and that he wasn't

11  walking away.  I walked behind Scarberry and

12  secured his arms by using my left hand to

13  grab his left arm above the elbow and used my

14  right hand to grab his right arm above the

15  elbow and pulled them both back in an attempt

16  to put him in handcuffs.  Did I read that

17  right?

18        A.    Yes.

19        Q.    And does that accurately describe

20  the events?

21        A.    Yes.

22        Q.    This is about 1:00, 1:19 in the

23  morning in Covington, yeah?

24        A.    Yes.

25        Q.    I know you said it was on -- I know

80

1    the report says it was on Madison and West

2    Robbins, is that near Mainstrasse?

3        A.   No.

4        Q.   Okay.  Is that further south?

5        A.   Yes.

6        Q.   Okay.  Do you stop everybody who

7    appears to be drunk or intoxicated if they're

8    walking down the street?

9        A.   If I believe they are a danger to

10   themself, yes.

11       Q.   Okay.  Have there been other people

12   that you stopped for intoxication when

13   they're walking down the street?

14       A.   Yes.

15       Q.   Okay.  Did you arrest them?

16       A.   I -- it would have to be a specific

17   incident, I can't recall.

18       Q.   You can't recall.  Okay.  You can't

19   recall arresting anyone else?

20       A.   I have arrested people for public

21   intoxication and alcohol intoxication.

22       Q.   Gotcha.  So when he refused your

23   command, he was detained, is that -- when you

24   told him to stop, he was detained, Scarberry?

25       A.   Yes, he wasn't free to leave.

81

1    Q.   He wasn't free to leave.  You
2 didn't tell him that and he presumably didn't
3 ask, right?
4    A.   He just told me he was good and
5 walked way.
6    Q.   Told you he was good and walked
7 away.  And at that point you decided you were
8 going to arrest him because he told you he
9 was good and walked away?
10    A.   No, because of what I observed and
11 what I perceived, he was intoxicated and
12 presented a danger to himself.
13    Q.   Okay.  Had he not walked away,
14 would you have put him under arrest?
15    A.   At his level of intoxication, yes,
16 I would have.
17    Q.   Okay.  So the next thing you say is
18 that he tried to pull away, right?
19    A.   Yes.
20    Q.   And this was after you had observed
21 him stumbling drunk through a crosswalk at a
22 level of intoxication so bad -- so high that
23 you had to -- you felt the need to restrain
24 and arrest him, right?
25    A.   Correct.

82

1    Q.   Okay.  At this point were you, had

2    you -- where was your -- where was Officer

3    Morris?

4    A.   I don't recall.

5    Q.   Okay.  At that point you took him

6    down to the ground with your hands still

7    wrapped around his arms, right, that's what

8    is next?

9    A.   Yes.

10    Q.   As far as you know that's what

11    happened?

12    A.   Yes.

13    Q.   You then placed him in handcuffs in

14    a prone position; is that, is that what

15    happened, is that an accurate recitation of

16    what happened?

17    A.   Yes.

18    Q.   Okay.  So your use of force against

19    Scarberry was taking him to the ground?

20    A.   Yes.

21    Q.   Okay.  Have you employed the use of

22    force similarly with other suspects by taking

23    them to the ground, that being the use of

24    force?

25    A.   Yes.

83

1    Q.    Okay.  And, again, this was the
2    first use of force -- the first incidence in
3    which you used force?
4    A.    Yes.
5    Q.    And, therefore, had to prepare a
6    report, right?
7    A.    Yes.
8    Q.    Okay.  What was Scarberry's verbal
9    defiance?
10    A.    When he said, no, I'm good.
11    Q.    That was verbal defiance?
12    A.    When I told him to stop, yes.
13    Q.    Okay.  In your report you say that
14    Scarberry refused your commands and stated
15    that he was good and began to walk away?
16    A.    Yes.
17    Q.    Okay.  He doesn't -- in your report
18    it doesn't say he said, no, that he was good,
19    and began to walk away.  I'm just wondering
20    if that's -- if he said no and you just left
21    it out of your report or, or what.  I'm
22    trying to find the defiance is what I'm
23    getting at.
24    A.    I told him to stop, he said I'm
25    good, and then walked away.

84

1      Q.   So the saying I'm good is the
2  verbal defiance?
3      A.   Yes.
4      Q.   Yes?  Okay.  When did he flee?  Did
5  he flee by walking?
6      A.   When I told him to stop, yes, he
7  was walking away from me.
8      Q.   And was it in the same direction
9  that he was walking in the first place?
10     A.   Yes.
11     Q.   Did he pick up speed?
12     A.   He was just walking.
13     Q.   Did he run?
14     A.   He was just walking.
15     Q.   Did he look behind him and see you
16  and then pick up his pace or anything?
17     A.   No, he was just walking.
18     Q.   Just walking as he was.  And
19  that -- okay.
20     A.   Ignoring commands.
21     Q.   Ignoring commands to stop?
22     A.   Yes.
23     Q.   Did you identify yourself as a
24  police officer?
25     A.   I didn't say I'm a police officer,

85

1    stop.

2         Q.    You did not or did?

3         A.    I did not.

4         Q.    Okay.  So how did he know he had

5    any obligation to listen to you?

6         A.    Because I was in a uniform.

7         Q.    But he was walking straight ahead,

8    right, and you said stop, and he kept

9    walking, right?  Right?

10        A.    Okay, I'm -- just want to -- can

11   you clarify?

12        Q.    Yeah.  Let's go back to the

13   beginning.  You observed Scarberry stumble

14   drunk walking through a crosswalk, dropped

15   his phone, stumbles while he's trying to pick

16   up the phone, manages to pick up the phone

17   despite how wasted he is, manages to get to

18   the crosswalk -- he's talking on his phone,

19   right?

20        A.    He was at that time, yes.

21        Q.    And he's just walking down the

22   street stumbling, right?

23        A.    Yes.

24        Q.    And then you say stop, right, while

25   he's on his phone walking?

86

1      A.   Correct.  He does look at me and
2  respond.
3      Q.   Okay.  He looked at you and said
4  what; no, I'm good, or I'm good and just kept
5  going?
6      A.   Yes.
7      Q.   Okay.  And that was the fleeing or
8  evading?
9      A.   Yes.
10      Q.   His continued walking on?
11      A.   Yes.
12      Q.   Okay.  And I think you testified
13  before that you've taken other suspects to
14  the ground and had to fill out a Use of Force
15  report for that, right?
16      A.   Yes.
17      Q.   Do you have any idea how many
18  times?
19      A.   I do not.
20      Q.   Why was the taking of Ashley
21  Ferreiras to the ground not use of force?
22           MR. MANDO:  Objection.
23  Characterization.  Asked and answered.  Go
24  ahead, Anthony.
25           THE WITNESS:  Because we did not

87

1    intentionally take her to the ground.

2    BY MR. WHITTAKER:

3        Q.   Okay.  Did you try to deescalate

4    with Scarberry?

5        A.   I did not.

6        Q.   Were you trained in deescalation

7    techniques?

8        A.   Yes.

9        Q.   Who trained you?

10        A.   At the academy.

11        Q.   Okay.  Not part of your FTO

12    training?

13        A.   Not specifically.

14        Q.   Okay.  Let's go back to Exhibit 10.

15    1.3.1, at the bottom under heading A, it

16    says:  It is the policy -- oh, sorry.  Let me

17    know when you're there.  At the bottom it

18    says:  It is the policy of the Covington

19    Police Department that officers shall exhaust

20    all other reasonable means of achieving a

21    lawful police objection, including the

22    application of deescalation techniques,

23    before resorting to the use of force.  Did I

24    read that right?

25        A.   Yes.

88

1        Q.    Did you -- and I think you said you

2   didn't use deescalation techniques against

3   Scarberry -- or with Scarberry, right?

4        A.    No.

5        Q.    And what deescalation techniques

6   did you use with Ms. Ferreiras?

7        A.    I did not.

8        Q.    You didn't?

9        A.    I did not.

10       Q.    Okay.  The legitimate use of force,

11  including deadly and non-deadly measures, is

12  limited to only the amount reasonable and

13  necessary under the circumstances to achieve

14  a lawful police objective.  Did you see that?

15  I'm sorry, it's at the top of the next page.

16       A.    Yes.

17       Q.    Okay.  So we're agreed that you

18  didn't use any deescalation techniques with

19  Ferreiras, right?

20       A.    I did not.

21       Q.    Okay.  And you didn't use any with

22  Scarberry either, right?

23       A.    No.

24       Q.    What instruction or education or

25  correction did any of your supervisors use

89

1    with you to inform you about your obligations

2    to deescalate before the use of force after

3    Scarberry?

4              MR. MANDO:  Objection.  Form.

5    Lack of foundation.

6              THE WITNESS:  I did have a

7    supervisor state I should be more identifying

8    myself; hey, police, stop.

9    BY MR. WHITTAKER:

10        Q.   Okay.  Who was that supervisor?

11        A.   I don't recall at this time.

12        Q.   Did that supervisor identify that

13   as a possible reason why maybe Scarberry

14   didn't respond to your commands?

15        A.   No.

16        Q.   But said that you should do it

17   anyway?

18        A.   Yes.

19        Q.   The supervisor?  Okay.  What

20   other -- did the supervisor give you any

21   instruction or tutelage or training about the

22   use of force -- or about deescalation

23   techniques before the use of force after the

24   Scarberry incident?

25        A.   No, not that I'm aware of.

90

1      Q.    Did anybody instruct you or give

2  you any education or teaching about

3  deescalation techniques after the Ferreiras

4  incident?

5      A.    No.

6      Q.    Okay.  At what point in your, in

7  the week of training with Officer Ullrich --

8  I'm sorry, Specialist Ullrich did the

9  Ferreiras incident occur, was that second

10  day, third day, fourth day, fifth day, do you

11  remember?

12      A.    I was with Specialist Ullrich for

13  four days.  I believe it was the -- I can't

14  recall what specific day it was.

15      Q.    That's okay.  But it was in the

16  middle of the week, the week you were with

17  him?

18      A.    Yes.

19      Q.    Did he give you any instruction

20  about the deescalation techniques?

21      A.    Not that I recall.

22      Q.    His instruction and supervision of

23  you was purely for traffic stops, how to

24  effect traffic stops?

25      A.    Traffic stops and -- since he was a

91

1    specific traffic car, his specialization is

2    in traffic enforcement.

3         Q.   I'm afraid that you might have to

4    repeat that because I'm not sure if Tina

5    heard it.

6         A.   Specialist Ullrich at the time was

7    a traffic car, he specialized in traffic

8    enforcement.

9         Q.   Okay.  And that's what your

10   assignment with him was designed to teach

11   you?

12        A.   Correct.

13        Q.   Okay.  Before the Ferreiras

14   incident had you received any education or

15   training on deescalation from any, anybody?

16             MR. MANDO:  Objection.  Asked

17   and answered.  Go ahead, Anthony.

18             THE WITNESS:  Yes, I have.

19   BY MR. WHITTAKER:

20        Q.   I'm not saying in response to

21   anything in particular, I'm just asking as

22   a -- as training, as part of your training

23   with the department.

24        A.   Yes.

25        Q.   Okay.  You said that Officer

92

1    Ullrich was doing traffic at the time; is he

2    doing something different now?

3         A.   Yes, I believe so.

4         Q.   Okay.

5         A.   He's on a different shift now.

6         Q.   Okay.  And I don't know if you know

7    or not, if you don't know you can tell me,

8    but is he no longer doing traffic enforcement

9    or just a different shift?

10         A.   I believe he's just on a different

11    shift, but I do not know at this time.

12         Q.   Fair enough.  So as part of your

13    FTO training you did training -- and I'm not

14    saying in response to Ferreiras or Scarberry,

15    but you did training on the use of force --

16    or I'm sorry -- on deescalation before the

17    use of force?

18         A.   Yes.

19         Q.   Okay.  Do you remember who provided

20    that training?

21         A.   I do not.

22         Q.   Okay.  Did Officer Morris?

23         A.   I can't recall.

24         Q.   Okay.  Did Sergeant Gillilad --

25    Gilliland, I'm sorry, Gilliland do that?

93

1        A.    I can't recall.

2        Q.    Okay.  And you don't recall Officer

3 Ullrich doing any of that?

4        A.    Correct.

5        Q.    Fair?  Okay.  Let's go, I want to

6 find your other supervisors, maybe we can

7 nail them down.

8                Did Officer Denny give you any

9 supervision -- or any instruction about

10 deescalation techniques?

11       A.    I don't recall.

12       Q.    How about Officer Shepherd?

13       A.    I don't recall.

14       Q.    How about Officer Berkeley, maybe

15 Berkeley-Rose?

16       A.    I can't recall.

17       Q.    Okay.  How about Officer Murphy?

18       A.    I can't recall.

19       Q.    How about Officer Gier, Gier?

20       A.    Gier.

21       Q.    Gier, I'm sorry.  Okay.  And did

22 you have any training after Ullrich, FTO

23 training?

24       A.    No.

25       Q.    Okay.  Okay.  Did you have, you

94

1    know, aside from FTO training did you have

2    like class, in-class sessions or any other

3    kind of training separate and apart from FTO

4    training?

5         A.   After FTO training or during FTO

6    training?

7         Q.   Yeah, that's a good, that's a good

8    distinction.  While you were doing FTO

9    training, is that what you're doing, are you

10   doing any other kind of training?

11        A.   No.

12        Q.   Okay.  Would you have had any like

13   classroom instruction or anything like that

14   about deescalation techniques before or after

15   FTO training?

16        A.   During the academy, yes.

17        Q.   During the academy, okay.  So use

18   of force, deescalation, those things would

19   have been taught at the academy, and then,

20   just correct me if I'm wrong, and then when

21   you get to the Covington PD are you just, are

22   you handed here's our Use of Force policy,

23   learn it, and then there's no instruction, or

24   is there some sort of separate instruction

25   about here's what we do in the City of

95

1    Covington with respect to the use of force,

2    something like that?

3                    MR. MANDO:  Objection.  Form.

4    Go ahead.

5                    THE WITNESS:  It would depend on

6    the FTO.  We could be in -- if we have

7    questions they're there to inform us, teach

8    us, show us how to be a police officer.

9    BY MR. WHITTAKER:

10        Q.    Right.

11        A.    And talking about uses of force,

12    talking about deescalation are some of the

13    things that we would have to talk about

14    during our FTO program.

15        Q.    During your FTO.  And you, correct

16    me if I'm wrong, you remember that you had

17    such instruction but you don't remember which

18    of the FTOs supplied that instruction?

19        A.    I do not.

20        Q.    Okay.  Did you observe Officer --

21    I'm sorry -- Specialist Ullrich employ any

22    deescalation techniques during the Ferreiras

23    incident?

24        A.    I don't recall.

25        Q.    You were a participant in the use

96

1    of force with Ferreiras and I'm just -- did

2    you observe the entire process of the use of

3    force with Ms. Ferreiras?

4        A.    Just from when she was out on the

5    sidewalk.

6        Q.    Okay.  Does that mean that there

7    was force used against her before that or

8    that you didn't observe it before that?  I'm

9    trying, I'm just trying to nail down the

10   point at which you observed the use of force

11   used against Ms. Ferreiras.

12       A.    Could you clarify the question for

13   me, please?

14       Q.    Yeah.  Yeah.  I'm trying to clarify

15   when you recall -- because you got out of the

16   car, right?  You were in the car working on

17   your investigation?

18       A.    Uh-huh.

19       Q.    So you didn't -- did you observe

20   the entire interaction between Ullrich and

21   Ferreiras when they were on the sidewalk?

22       A.    No.

23       Q.    Okay.  At some point you got out of

24   the car to assist Ullrich?

25       A.    Yes.

97

1      Q.   Okay.  Were you called to get out

2   of the car or did you notice something was

3   going on and then got out to assist?

4              MR. MANDO:  Objection.  Form.

5   Go on.

6              THE WITNESS:  I heard Ms.

7   Ferreiras yelling and I went over to assist.

8   BY MR. WHITTAKER:

9      Q.   Gotcha.  And at that point you, at

10  that point you began -- you were able to

11  observe the interaction between Officer

12  Ullrich and Ferreiras, right?

13     A.   Correct.

14     Q.   Were you able to witness the entire

15  interaction between them?

16     A.   Just from the point when she was on

17  the sidewalk.

18     Q.   When she was standing on the

19  sidewalk?

20     A.   Yes.

21     Q.   Okay.  Okay.  That's where I --

22  okay.  You don't recall Officer Ullrich

23  employing any deescalation techniques?

24     A.   I don't recall what he was -- what

25  he stated.

98

1    Q.   Fair distinction.  I'm asking if

2    you recall observing him employ any

3    deescalation techniques?

4              MR. MANDO:  Objection.  Asked

5    and answered three times.  Go ahead.

6              THE WITNESS:  I don't recall.

7    BY MR. WHITTAKER:

8    Q.   Okay.  In part of -- well, in

9    addition to or in part of your FTO training

10   were you given any training on how to

11   interact with people in the public who could

12   be disabled?

13   A.   It was in the policy.  I had read

14   the policy prior.

15   Q.   You had or had not?

16   A.   I had.

17   Q.   You had, okay.

18             (WHEREUPON, Plaintiff's

19   Deposition Exhibit 18 was marked for

20   identification.)

21   BY MR. WHITTAKER:

22   Q.   I don't think this is what you're

23   talking about but I can't -- I don't know

24   until I ask.  I've marked this as Exhibit 18.

25   Have you seen Exhibit 18, Officer Fritsch,

99

1    which is Defendant's 948 through 950, have

2    you seen this before?

3         A.   Yes.

4         Q.   Is this something that you received

5    training on?

6         A.   I have read the policy, I'm aware

7    of it.

8         Q.   I'm sorry.  You read the policy --

9         A.   I didn't have specific training on

10   this.

11        Q.   But you read the policy.  Did you

12   read the policy before -- was this other

13   training that was done at the academy?

14        A.   It was -- this topic was discussed

15   at the academy, but it was, this -- our

16   policy I read prior.

17        Q.   Prior to being at the academy?

18        A.   Yes.

19        Q.   Okay.  But you don't recall any

20   specific training during the FTO training or

21   otherwise on the policy?

22        A.   No.

23        Q.   Okay.  Well, we'll go back to that

24   later.  Let's pull up Officer Fritsch's body

25   cam.  We're moving on to body cam, it's going

100

1    to take some time, you guys need a break

2    before we do that?  You're welcome to have a

3    break.

4         A.   I'm fine.

5              MR. MANDO:  Is that going to

6    take you a couple minutes to pull up?

7              MR. WHITTAKER:  Yeah.

8              MS. NIESEN:  Yeah.

9              MR. MANDO:  I'm just going to

10   run something upstairs, I'll be right back.

11             (WHEREUPON, a discussion was

12   held off the record.)

13   BY MR. WHITTAKER:

14        Q.   I'm going to show you, Officer,

15   what has been produced by the City as

16   Defendants' -- is it 630, 0630?

17             MS. NIESEN:  Yes.

18   BY MR. WHITTAKER:

19        Q.   Okay.  This appears to be I think

20   your body cam footage.

21             (Playing video.)

22             First of all, do you recognize

23   this as your body cam footage?

24        A.   Yes.

25        Q.   Okay.  This is at 23:23:06.  Do you

101

1    recall, was this after you did the traffic

2    stop?

3         A.   Yes.

4         Q.   Okay.  Could you tell us what part

5    of the process you're involved in while

6    you're in the car in this part of the video?

7         A.   Running the driver --

8         Q.   Okay.

9         A.   -- see if he has a valid license,

10   making sure he doesn't have any warrants.

11        Q.   Okay.

12        A.   Just conducting my investigation.

13        Q.   Okay.  This is part of your

14   investigation?

15        A.   Yes.

16        Q.   What is this -- is that laptop a --

17   what's the word for those laptops?

18             MR. MANDO:   MDT.

19   BY MR. WHITTAKER:

20        Q.   Is that what that is?

21        A.   Yes.

22        Q.   Okay.  I'm going to continue from

23   23:23:23, I don't know how that happened.

24             (Playing video.)

25             And you're listening to the

102

1    Ramones and checking -- doing your

2    investigation.  Now, I know you can't see it

3    in this video but do you -- could you see in

4    your periphery Officer Ullrich?

5         A.   I can't recall.

6         Q.   Okay.  Were you just focused on

7    this at the time?

8         A.   Yes.

9         Q.   Okay.  Could you see Ms. Ferreiras

10   in your periphery at all?

11        A.   I don't recall.

12        Q.   At this point you're putting on

13   gloves, right?

14        A.   Yes.

15        Q.   Is that related to your

16   investigation or was that related to

17   something else?

18        A.   My investigation.

19        Q.   Okay.  And to be clear, your

20   investigation of the traffic stop?

21        A.   Yes.

22        Q.   Okay.  You're getting out of the

23   car now.  I'm going to pause it at 23:24:10.

24   And here's the traffic stop, the white or

25   whatever color SUV is up ahead of you, right?

1          A.    Yes.

2          Q.    And standing next to the vehicle on

3    the driver's side is -- I forget, who is that

4    officer?

5          A.    I can't remember.

6          Q.    It's not Jansen.

7          A.    Goshorn.

8          Q.    Yes.  Okay.  And is this the point

9    that you get out of the car because you hear

10   yelling?

11         A.    Yes.

12         Q.    Okay.  I'm going to back up.  You

13   tell me if I've gone back far enough for when

14   you heard yelling.

15               (Playing video.)

16               We're at 23:23:50.  So was it

17   yelling that caused you to get out of the car

18   then, around 23:24:06?

19         A.    Not at that moment, no.

20         Q.    Okay.  What caused you -- at this

21   point were you still --

22         A.    I was still conducting my

23   investigation.

24         Q.    Gotcha.

25               (Playing video.)

104

1              I'm going to pause it again.
2      Now we're at 23:24:20.  Has there been --
3      have we reviewed a point in which you heard
4      Ms. Ferreiras yelling?
5              A.    Yes.
6              Q.    Okay.  When was that?
7              A.    When I had just gotten out of the
8      cruiser.
9              Q.    When you got out of the cruiser,
10     okay.  Okay.
11                   (Playing video.)
12                   So 23:24:21, looks like to me
13     you're coming around the cruiser and you
14     heard -- and now you're coming around the
15     cruiser and your body cam can see, that's
16     Officer Ullrich, right, in the blue, and not
17     the one wearing the -- oh, let me go back.
18                   (Playing video.)
19                   Okay.  Do you hear yelling now?
20             A.    If you go back previously you can
21     hear her yelling.
22             Q.    Okay.  That's all I'm trying to
23     find.
24                   (Playing video.)
25             A.    Further.  Right there.

105

1      Q.   That was it?  So 23:24:10.  Was

2  that, excuse me, was that the yelling that

3  you were referring to before --

4      A.   Yes.

5      Q.   -- that caused you to -- caused

6  interference with your investigation?

7      A.   Yes.

8      Q.   Okay.  Was there yelling anytime

9  before that?

10     A.   I don't recall.

11     Q.   Okay.  Was there yelling anytime

12  after that?

13     A.   Yes.

14     Q.   Okay.  But this was the yelling

15  that interfered with your investigation into

16  the traffic stop?

17     A.   Yes.

18     Q.   Okay.  Continuing from 23:24.

19          (Playing video.)

20          Now, at this point are you able

21  to hear Officer Ullrich speaking or is that

22  just being picked up on the body cam?

23     A.   I'm able to hear him, but I can't

24  recall specifically what he said after --

25  without reviewing the body cam footage.

1        Q.    Sure.  I'm just wondering if, when

2    you're standing there, is his voice louder

3    than it would be on the body cam footage or

4    any idea?

5        A.    It could be.

6        Q.    But you could hear him?

7        A.    Yes, I could hear him.

8        Q.    Okay, gotcha.  Who is this officer

9    there?

10       A.    Jansen I believe.

11       Q.    Okay.  And he was scene security,

12   right?

13       A.    Yes.

14       Q.    That's why he was there?

15       A.    Yes.

16       Q.    Okay.  That's Jansen and then this

17   is Ullrich on the sidewalk, right?

18       A.    Yes.

19       Q.    And this is Ferreiras in front of

20   him a little bit further back towards the

21   house, does that seem right?

22       A.    Yes.

23       Q.    And do you recall if this building

24   behind all of them, is that the building --

25   first of all, did you observe her come out of

107

1    a building?

2         A.   No.

3         Q.   So you don't know if she came out

4    of that building or not?

5         A.   No.

6         Q.   Okay.  Have you seen any body cam

7    footage or any other footage of her coming

8    out of that building?

9         A.   I don't recall.

10             (Playing video.)

11        Q.   I heard somebody say stay back, was

12   that Jansen or you?

13        A.   That was me.

14        Q.   Okay.  Were you telling this fellow

15   to stay back?

16        A.   Yes.

17        Q.   Okay.  He's inside the fence now,

18   right -- or he's on the other side of the

19   fence in the yard for this building, right?

20        A.   At this point in time, yes.

21        Q.   Yes.  And this is Ashley Ferreiras,

22   here's Officer Ullrich again.  Do you have

23   any idea if Officer Ullrich is pointing at

24   this person?

25        A.   I don't know.

108

1          Q.   Okay.

2               (Playing video.)

3               Have you heard any yelling from

4     her since you got out of the car at that one,

5     that one instance, since then?

6          A.   Just when they were first

7     interacting.

8          Q.   Okay.

9               (Playing video.)

10              Do you see Officer Ullrich with

11    his right hand attempt to grab Ms.

12    Ferreiras's right arm?

13              MR. MANDO:  Objection.

14    Characterization.  Go ahead.

15              THE WITNESS:  Yes, I see him

16    attempt to place her into custody.

17    BY MR. WHITTAKER:

18         Q.   By grabbing her arm?

19         A.   Yes.

20         Q.   Okay.  Because you were there,

21    right?  I mean, did you see it at the time

22    or --

23         A.   Yes.

24         Q.   Okay.

25              (Playing video.)

109

1          Officer Jansen's still here,
2     right, and he's scene security.  Here's the
3     other guy who managed to get upon Ferreiras
4     and Ullrich where, you know, he's just a few
5     feet away from them.  And at this point have
6     you heard any yelling?
7               MR. MANDO:  Objection.  Asked
8     and answered.
9               MR. WHITTAKER:  Well, this is
10    further down.
11              MR. MANDO:  Go ahead.
12              THE WITNESS:  I have not heard
13    yelling.
14    BY MR. WHITTAKER:
15       Q.   Okay.  Since you got out of the
16    car?
17       A.   Only when they first interacted.
18              (Playing video.)
19       Q.   Okay, that happened quickly.  Did
20    you make contact with the guy who came out of
21    the yard at that point?
22       A.   Yes.
23       Q.   Okay.  Did you attempt to subdue
24    him?
25       A.   No.

110

1       Q.    Okay.  Could you describe your

2  contact with him?

3       A.    I just moved him out of the way.

4       Q.    You moved him out of the way.  How

5  did you move him out of the way, did you sort

6  of -- like how did you move him?

7       A.    Basically, yes, I grabbed him and I

8  moved him out of the way.  He was somewhat

9  cooperative.  And then Jansen took over.

10      Q.    Okay.  Did you grab him by the

11  shoulders?

12      A.    I can't recall where I grabbed him.

13      Q.    Okay.  Was that guy taller than

14  you?

15      A.    Yes.

16      Q.    Okay.  And then you moved him out

17  of the way and then Jansen took over?

18      A.    Yes.

19      Q.    And then Jansen was able to get him

20  a little bit further away from the

21  Ullrich/Ferreiras incident?

22      A.    Yes.

23      Q.    Or whatever you want to call it.

24  Jansen was able to get the other guy away?

25      A.    Yes.

111

1          Q.    And then -- okay.

2                 (Playing video.)

3                 Now, this is 23:24:49.  Is this

4      you, are you reaching for -- I'll try to put

5      it in better context so it's not just a

6      still.

7                 (Playing video.)

8                 Okay.  Do you see you, I think,

9      you trying to grab her around 23:24:50?

10         A.    Yes.

11         Q.    Are you, I can't tell, are you

12     grabbing her right or left arm?

13         A.    Left arm.

14         Q.    Left arm, okay.  And she was

15     standing on crutches at that point?

16         A.    Yes.

17         Q.    Okay.  Were you able to tell if

18     Officer Ullrich had, had her by the right arm

19     at that point?

20         A.    I know he was on the right side, I

21     can't recall if he had control of her right

22     arm.  I was focused on attaining control of

23     her left arm.

24         Q.    You were tying to get control of

25     her left arm, but you know that Officer

112

1    Ullrich was on her right side?

2         A.    Yes.

3         Q.    Was he -- you don't know if he had

4    contact with her right arm at that point?

5         A.    I don't know if he -- I know he

6    grabbed her.  I don't know if he had actual

7    control of that arm.

8         Q.    Okay.  But you know that he grabbed

9    her?

10        A.    Yes.

11        Q.    Irrespective of whether or not he

12   had control over the arm, he had grabbed her

13   arm --

14        A.    Yes.

15        Q.    -- is that fair?  Okay.  Do you

16   recall being -- do you recall hearing about

17   her having a broken ankle before that?

18        A.    No.

19        Q.    Okay.  At what point did you

20   observe her with crutches?

21        A.    When I walked up to her.

22        Q.    Okay.  You observed her with

23   crutches when you came around the car and

24   began walking up to Ullrich -- well, in

25   order, it would have been Jansen and then

113

1    Ullrich and then Ferreiras?

2         A.   Yes.

3         Q.   You knew that she had crutches

4    then, right?

5         A.   Yes.

6         Q.   Did you see -- were you able to see

7    that she had a splint or a cast or anything

8    on her foot?

9         A.   Yes.

10        Q.   Okay.  At that point were you

11   worried about her fleeing?

12        A.   No.

13        Q.   Okay.  At that point were you

14   worried about her approaching the traffic

15   stop?

16        A.   Yes.

17        Q.   What led you to be worried about

18   that?

19        A.   Because she was approaching the

20   traffic stop.

21        Q.   Okay.

22        A.   Before Specialist Ullrich stopped

23   her --

24        Q.   Okay.

25        A.   -- and was interacting with her.

114

1          Q.   Okay.  I'm going to go back I think
2     to you getting out of the car.  23:24:17.
3                    (Playing video.)
4                    Okay.  Are you able to see her
5     approaching toward the traffic stop at this
6     point?
7          A.   Yes.
8          Q.   Okay.  Can you -- okay.  This is
9     24 -- 23:24:22.
10                    (Playing video.)
11                    Okay.  Do you see her
12    approaching the traffic stop at that point?
13    It's 23:24:22, I think it's the same thing I
14    had before, I don't remember.
15         A.   Yes.
16         Q.   Okay.  Can you point, can you point
17    to and show me where she is in relation to
18    Officer Ullrich at this point?
19         A.   In front of him.
20         Q.   He's in front of her.  Is he, is he
21    between her and the traffic stop?
22         A.   Yes.
23         Q.   And Jansen's back here as well
24    between her and the traffic stop, right?
25         A.   Yes.

115

1    Q.    And so are you, correct?

2    A.    Correct.

3          (Playing video.)

4    Q.    Is she approaching the traffic stop

5    now around 23:24:25?

6    A.    No, not that -- now that Specialist

7    Ullrich stopped her.

8    Q.    Okay.  So she stopped advancing

9    toward the traffic stop when Specialist

10   Ullrich stopped her, is that right?

11   A.    Yes.

12   Q.    And at that point your fear had to

13   have been alleviated of her interfering with

14   your traffic stop, right?

15   A.    I was focused on the situation.

16   Q.    Which situation?

17   A.    Dealing with Ferreiras.

18   Q.    Okay.  You were no longer worried

19   about the traffic stop?

20   A.    My, my, my focus was diverted from

21   the traffic stop to the situation with

22   Ferreiras.

23   Q.    Okay.  I thought I understood you

24   to testify that Officer Ullrich had

25   successfully prevented her from approaching

116

1    the traffic stop, did I understand that

2    right?  By standing in front of her he had

3    prevented her from approaching the traffic

4    stop, is that right?

5          A.    He had stopped her, yes, but he was

6    still dealing with the situation.

7          Q.    He was still dealing with the

8    situation --

9          A.    Uh-huh.

10         Q.    -- but the situation at that point

11   I think did not, did no longer involve the

12   risk of Ashley Ferreiras approaching the

13   stop, correct?

14         A.    Could you rephrase the question,

15   please?

16         Q.    Sure.  Situation's still ongoing,

17   but by virtue of placing himself, Officer

18   Ullrich, in between himself and Ashley

19   Ferreiras, the risk of her interfering with

20   the stop was eliminated, right?

21         A.    He had stopped her on the sidewalk,

22   yes.

23         Q.    Okay.  So he had stopped her on the

24   sidewalk, and in your mind is there any risk

25   of her getting around Officer Ullrich and

117

1    advancing to the stop?

2         A.   In my mind at the time she could

3    have still made the attempt.

4         Q.   She could have attempted to.  Is

5    there anything in particular that she could

6    have done do you think that would have -- to

7    attempt to interfere with the stop at that

8    point?

9         A.   Continue approaching or yelling.

10        Q.   Okay.  Is she approaching or is she

11   stopped?

12        A.   She is stopped.

13        Q.   Okay.  She doesn't advance towards

14   the traffic stop any further than there,

15   right?

16        A.   No.

17        Q.   I'm wrong?

18        A.   No, she's -- you're right.

19        Q.   Okay.

20             MR. MANDO:  Can we define for

21   the record what there is?  I mean, is it a

22   time stamp on there --

23             MR. WHITTAKER:  There sure is.

24             MR. MANDO:  -- that you're

25   referring to?

                                                                118

1              MR. WHITTAKER:  There sure is.

2    Go back to --

3                    (Playing video.)

4    BY MR. WHITTAKER:

5        Q.    Okay.  At 23:24:26, you would agree

6    with me that Ashley Ferreiras is stopped on

7    the sidewalk by Officer Ullrich and not

8    advancing towards the traffic stop, would you

9    not agree with that?

10       A.    He stopped her on the sidewalk,

11   yes.

12       Q.    Okay.  And would you also agree

13   with me that she did not advance any further

14   towards the traffic stop than where she's

15   standing at 23:24:26, correct?

16       A.    Correct.

17       Q.    Would you agree with me that she

18   didn't try to advance past Officer Ullrich?

19       A.    Correct.

20                    (Playing video.)

21       Q.    Again, that was you saying stay

22   back to the guy in the yard, right?

23       A.    Uh-huh.

24       Q.    And then Officer Ullrich says, stay

25   back and go back in the yard, I thought;

119

1    we're not sure if he's talking to the guy in

2    the yard or Ashley Ferreiras, are we, at that

3    point?

4                    MR. MANDO:  Objection.

5    BY MR. WHITTAKER:

6        Q.    Did you know who he was talking to?

7        A.    No, I did not.

8                    (Playing video.)

9        Q.    Any reason why you didn't try to

10   stop the bigger guy from approaching Ullrich

11   and Ferreiras?

12       A.    No.

13       Q.    Any reason why he, in your

14   estimation, who was advancing towards the

15   traffic stop, was not a risk to interfere

16   with your investigation?

17       A.    No.

18                    (Playing video.)

19       Q.    Okay.  Do you agree with me at

20   23:24:40 that Officer Ullrich in this footage

21   attempts to grab Ms. Ferreiras's right --

22   either her arm or her right crutch, I can't

23   tell, I don't know if you can tell?

24       A.    I can't tell from the footage, but

25   I know he's attempting to grab her.

120

1          Q.    Gotcha.

2                  (Playing video.)

3          Q.    Can you tell me at what point, at

4     what point her conduct justified an arrest?

5          A.    Being given repeated commands to go

6     back into her yard.

7          Q.    Okay.  And at that point her

8     standing there was subject to arrest?

9                  MR. MANDO:  Objection.

10    Characterization.

11    BY MR. WHITTAKER:

12         Q.    Is that fair?  Is that a fair

13    characterization?

14                 MR. MANDO:  You can answer.

15                 THE WITNESS:  She was also

16    intoxicated as well.

17    BY MR. WHITTAKER:

18         Q.    How do you know that?

19         A.    After interacting with her.

20         Q.    You didn't have any reason to

21    believe that at this point, did you?

22         A.    No, but I wasn't the one that was

23    up close to her interacting with her, that

24    was Specialist Ullrich's call.

25         Q.    Okay.  So any suspicion of Ashley

121

1    Ferreiras being intoxicated was something you

2    heard from Ullrich, is that fair?

3                    MR. MANDO:  Objection.

4    Characterization.  Go ahead.

5    BY MR. WHITTAKER:

6         Q.    Did I mischaracterize anything

7    there?  Any suspicion you had of Ashley

8    Ferreiras being drunk you learned from

9    Officer Ullrich, right?

10        A.    No.  When I interacted with her I

11   also smelled alcohol coming from her person.

12        Q.    Okay.  But at that point you could

13   not have, right, you were not close enough to

14   her?

15        A.    No, I was not.

16        Q.    The Grand Jury no billed anything

17   related to alcohol, right?

18        A.    Could you repeat the question,

19   please?

20        Q.    The Grand Jury no billed any

21   charges having to do with alcohol, right?

22        A.    I don't recall.

23        Q.    She wasn't charged with any

24   alcohol-related offense, was she?

25        A.    She was charged with alcohol

                                                            122

1    intoxication.

2         Q.    She was?

3         A.    Yes.

4         Q.    Okay.  Is that true?

5         A.    Yes.

6              MR. MANDO:  Yep.

7    BY MR. WHITTAKER:

8         Q.    Oh, but she wasn't indicted.

9    That's what I'm getting at, she wasn't

10   indicted?

11        A.    Yeah.

12        Q.    Yeah.  She was arrested, but she

13   wasn't indicted for it, right?

14        A.    Correct.

15        Q.    Okay.

16              (Playing video.)

17              That's you -- can you tell me if

18   use of force has begun at this point or not?

19        A.    No.

20        Q.    The two of you are grab -- you have

21   ahold of her at this point?

22        A.    Yes.

23        Q.    Does Officer Ullrich have ahold of

24   her at this point?

25        A.    I believe so, yes.

123

1      Q.   Okay.  And use of force has not

2  begun yet?

3      A.   No.

4      Q.   Okay.  I understand that -- I

5  understand from your testimony that you all

6  fell to the ground, is that correct?

7      A.   Correct.

8      Q.   Okay.  Had you taken her to the

9  ground deliberately, would that be use of

10  force?

11      A.   Yes.

12      Q.   Okay.

13          (Playing video.)

14          Has use of force begun yet?

15      A.   I don't know.

16      Q.   Is that when you heard him say,

17  Officer Ullrich say that she bit him?

18          MR. MANDO:  Objection.

19  Characterization.  He said more than that.

20  But go on.

21          MR. WHITTAKER:  Well, he said

22  the F word, too.

23          MR. MANDO:  Yeah.

24          MR. WHITTAKER:  Called her a

25  fuckin' bitch I think.

124

1    BY MR. WHITTAKER:

2         Q.    That's when you heard him say --

3    that's when you heard him cry out she bit me?

4         A.    Yes.

5         Q.    Okay.  And at that point is when

6    the use of force began?

7         A.    When he struck her, yes.

8         Q.    Okay.  Now, I think we allege in

9    the complaint that you struck her, and that's

10   inaccurate, right, that was wrong, that was

11   a -- that allegation in the complaint was

12   wrong?

13        A.    Correct.  I did not strike her.

14        Q.    Okay.  Did you see him strike her?

15        A.    I did not.

16        Q.    Okay.

17               (Playing video.)

18               Okay.  23:25:11 is when he says

19   the F word.  He says she F'n bit him around

20   25:25:12.  Does that sound about right?

21        A.    Yes.

22        Q.    And at that point the use of

23   force -- he punched her in the face, right,

24   Officer Ullrich punched her in the face?

25        A.    Yes.

125

1     Q.   And it was at that point that the
2  use of force began?
3     A.   Yes.
4     Q.   Okay.  Let's look at Exhibit 10.  I
5  think we established previously that you
6  didn't see Ashley Ferreiras bite Officer
7  Ullrich, right?
8     A.   Correct.  I just heard it.
9     Q.   And you didn't see him punch her,
10  right?
11     A.   Correct.
12     Q.   Okay.  In your mind, having no
13  direct knowledge of those two things at the
14  time, was there something else that justified
15  the use of force or was it Ullrich saying he
16  was bitten?
17               MR. MANDO:  Objection.  Form.
18               THE WITNESS:  She was attempting
19  to pull away from us as well.
20  BY MR. WHITTAKER:
21     Q.   Okay.  While she was on the ground?
22     A.   Yes.
23     Q.   Okay.  She was attempting to pull
24  away from you on the ground after you threw
25  away one of her crutches, right?  Didn't you

126

1    toss aside one of her crutches?

2         A.   Yes.

3         Q.   Did she have -- she didn't have

4    either of her -- her other crutch under her

5    control at that point either did she, because

6    she was on the ground?

7         A.   I, I don't know.

8         Q.   Okay.  At what point did you fear

9    that crutch, one of those crutches to be used

10   as a weapon against you?

11        A.   When I went to take her into

12   custody.

13        Q.   Was it, was it at this point that

14   you began to take her into custody?

15        A.   No, it's when I first went hands-on

16   with her, grabbing her left arm.

17        Q.   Uh-huh.

18        A.   I was -- grabbed her arm and trying

19   to take the crutch away to prevent it from

20   ever actually being used as a weapon.

21        Q.   Did you come up from behind her at

22   that point?

23        A.   More to her side.

24        Q.   To her side.  To her left side?

25        A.   Yes.

127

1    Q.    And it was at that point you were

2    worried about a crutch being used as a weapon

3    against you or your fellow officers?

4    A.    Yes.

5    Q.    Did she make any threatening

6    gesture with one of those crutches?

7    A.    No.

8    Q.    Did she brandish either of those

9    crutches in any way that would lead you to

10   believe that they were a weapon?

11   A.    No, she did not brandish it.

12   Q.    Okay.  Did she swing it or anything

13   like that?

14   A.    No.

15   Q.    So was it the fact, was it the fact

16   alone of there being crutches that led you to

17   believe that there could be a weapon?

18   A.    If they could have been used as a

19   weapon, that's why we removed it from the

20   situation.

21   Q.    Okay.  So you removed it from the

22   situation because you were -- to eliminate

23   the possibility of a crutch becoming a

24   weapon, is that fair?

25   A.    Yes.

128

1    Q.   Okay.  Because up until then it

2   hadn't been used as a weapon, is that fair?

3    A.   Correct.

4    Q.   And is it also fair to say that it

5   was never used as a weapon in this

6   altercation?

7    A.   Correct.

8    Q.   Okay.  Was there any other thing

9   that Ashley Ferreiras did with those crutches

10  that led you to believe that she was going to

11  use it as a weapon?

12   A.   No.

13   Q.   Have you encountered a suspect

14  before where they had crutches?

15   A.   No.

16   Q.   Okay.  Have you encountered a

17  suspect before who you were worried was going

18  to use some sort of mobility aid against you

19  as a weapon?

20   A.   Yes.

21   Q.   Other than this incident?

22   A.   Yes.

23   Q.   Could you describe that for us?

24   A.   It could be a cane, different

25  situation, just anything that could be

129

1    perceived as a weapon, just removing it from

2    the situation.

3        Q.   Okay.  Okay, back to the video.

4    It's resuming from 23:25:12.

5                (Playing video.)

6                Now, forgive me, had he punched

7    her at this point, by this point?

8        A.   Yes, before that.

9                (Playing video.)

10       Q.   You've got her left arm in hand?

11       A.   Yes.

12       Q.   She's on the ground at this point,

13   right?

14       A.   Yes.

15       Q.   She's not going anywhere at this

16   point, is she?

17       A.   No.

18       Q.   She's not able to get away from you

19   guys at this point, is she?

20       A.   No, because we have her arms.

21               (Playing video.)

22       Q.   Is that you cuffing her?

23       A.   Yes.

24       Q.   Both hands are cuffed now, right --

25       A.   Yes.

130

1      Q.    -- at 23:25:48?  Did you cuff both

2   hands or did Officer Ullrich cuff the other

3   hand?

4      A.    I cuffed both hands.

5      Q.    Was he standing at that point or

6   was he still on the ground?

7      A.    I believe he stood up.

8      Q.    Is this him over here or -- if you

9   don't know you don't know.

10      A.    I don't know.

11      Q.    This is still you, right?

12      A.    Yes.

13            (Playing video.)

14      Q.    Are you able to hear the person

15   talking about -- talking to you at this

16   point?  I don't know if he was talking to

17   you.  Are you able to hear at this point the

18   person who was talking?

19      A.    Yes.

20      Q.    Are you able to comprehend what he

21   was saying or was it too hectic of a

22   situation?

23      A.    I was focused on making sure she

24   was secure.

25      Q.    So at the time do you recall

131

1     hearing him?

2         A.    I do.

3         Q.    Do you recall processing what he

4     was saying?

5         A.    I don't recall.

6               (Playing video.)

7         Q.    Did you know it before -- when she

8     told you -- did you hear her say that she had

9     a broken leg at this point?

10        A.    Yes.

11        Q.    Did you hear her say anything to

12    that effect before that point?

13        A.    Yes, when we went to place her in

14    custody.

15        Q.    And that was when you -- you went

16    to place her in custody when you went to grab

17    her?

18        A.    Yes.

19        Q.    And at that point you understood

20    that she had a broken leg?

21        A.    Yes.

22              (Playing video.)

23        Q.    Did Officer Ullrich just say I did

24    punch you in the head or I did not punch you

25    in the head?  I don't know if you heard it.

132

1    I'll go back.

2              (Playing video.)

3              Did you hear Ms. Ferreiras say

4    they punched her in the head?

5         A.   Yes.

6         Q.   Okay.

7              (Playing video.)

8              Did you hear somebody say, and I

9    think it's Ullrich, did somebody say I did

10   punch you in the head or I did not punch you

11   in the head?

12        A.   He stated I did.

13        Q.   He said that he did?

14        A.   Yes.

15        Q.   At that time?

16        A.   Yes.

17        Q.   And you heard him say it at that

18   time?

19        A.   I don't know if I heard him say it

20   at the time.  I was focused on trying to get

21   her onto -- like sit her up.

22        Q.   Okay.  So you -- was the first time

23   you learned about her being punched in the

24   head when you looked back at body cam

25   footage, or did you learn it when she said

133

1    it?

2              MR. MANDO:  Objection.  Form.

3    Go ahead.

4              THE WITNESS:  When I heard it.

5    BY MR. WHITTAKER:

6         Q.    At the time?

7         A.    Heard the strike.

8         Q.    Oh, you heard the strike?

9         A.    Heard the strike.

10        Q.    The strike of her being punched in

11   the head?

12        A.    Yes.

13        Q.    Okay.  So while you didn't see it,

14   you heard it?

15        A.    Yes.

16        Q.    Okay.  And did you register what

17   that sound was?

18        A.    I knew what it sounded like.

19        Q.    What did it sound like to you at

20   the time?

21        A.    Someone being hit.

22        Q.    Okay.  How many times did you hear

23   that sound?

24        A.    I only heard it the one time.

25        Q.    One time.  So when she says she got

134

1    punched in the face, that's, you agree with

2    that, right?

3        A.    Yes.

4        Q.    And then Officer Ullrich seems to

5    corroborate that by saying I did punch her in

6    the face, right?

7        A.    Yes.

8        Q.    And did you hear him at the time

9    say that?

10            MR. MANDO:  Objection.  Asked

11   and answered.  Go ahead.

12            THE WITNESS:  I don't recall if

13   I heard him say that.

14            (Playing video.)

15   BY MR. WHITTAKER:

16       Q.    When were your glasses broken, did

17   we already go past that part?

18       A.    Yes.

19       Q.    Did you yell out that you got

20   punched in the face or elbowed in the face or

21   anything like that?

22       A.    No.

23       Q.    Are there any pictures -- did

24   you -- were there pictures of that injury

25   taken, are you aware?

135

1          A.    There were photos of me taken, yes.

2          Q.    Okay.

3                (Playing video.)

4                Is this you putting her down to

5    the ground again?

6          A.    Yes.

7          Q.    Okay.  What caused you to do that?

8          A.    That's how we react when someone

9    starts becoming aggressive again.

10          Q.    Were you telling her to get up?

11    You were telling her --

12          A.    I was telling her to get up before,

13    but she had just previously just kicked

14    Specialist Ullrich so I was securing her back

15    on the ground.

16          Q.    Okay, let's talk about the kick.

17                (Playing video.)

18                I see her leg move right there,

19    is that when she kicked him?  This would have

20    been at 23:26:52.

21          A.    Yes, that is when she kicked him.

22          Q.    Did you see him -- did you see her

23    kick him?

24          A.    Yes.

25          Q.    Okay.

136

1                    (Playing video.)

2                    Is the kick depicted on your

3       body cam?

4            A.    Yes.

5            Q.    Okay.

6                    (Playing video.)

7                    It happens very quickly.  Has

8       the kick happened at this point?  We're at

9       23:26:53.

10           A.    Yes.

11           Q.    It did, okay.  So it happened

12      before 23:26:53.

13                   (Playing video.)

14                   Would you agree with me that in

15      the moment there Ms. Ferreiras seems to

16      disagree with that and believes that she --

17      her foot was stepped on?

18                   MR. MANDO:  Objection.

19      Characterization.  Calls for speculation.

20      You can answer.

21      BY MR. WHITTAKER:

22           Q.    I mean, she's saying that

23      somebody's stepped on her foot, right?

24           A.    Yeah, she's saying that.

25           Q.    And she's becoming aggressive at

137

1    that point that you pushed her to the ground?

2        A.    Yes.

3        Q.    Okay.  With her hands cuffed behind

4    her back, right?

5        A.    Yes.

6        Q.    With a broken foot that you knew

7    about, right?

8        A.    Correct.

9        Q.    And crutches that one of which you

10   knew that had been thrown away and we don't

11   know where the other one is, but I think you

12   testified before that she was not going

13   anywhere at this point, before this, right?

14       A.    Correct.

15       Q.    You had her subdued?

16       A.    Correct.

17            (Playing video.)

18       Q.    So you -- are you telling her to

19   sit up or is Ullrich telling her to sit up?

20       A.    Myself and Jansen are.

21       Q.    Jansen is, okay.

22       A.    I believe it was Jansen.

23       Q.    Is that Officer Jansen we just saw

24   with the bike helmet?

25       A.    Yes.

138

1                    (Playing video.)

2         Q.    Is Jansen saying sit up now?

3         A.    No, I am.

4         Q.    You are.  Do you know where Ullrich

5    is at this point?

6         A.    No.  I'm focused on her.

7                    (Playing video.)

8         Q.    Are you able to hear the person

9    telling you that she can't move, she's got a

10    broken leg, etc.?

11        A.    Yes.

12        Q.    Okay.

13                   (Playing video.)

14                   Is that you telling her that she

15    broke your glasses?

16        A.    Yes.

17        Q.    Did you hear that?

18        A.    Yes.

19        Q.    Okay.

20                   (Playing video.)

21                   So when she says are you 12 --

22    fist of all, you're not 12, so we know she's

23    not right about that.

24                   (Playing video.)

25                   Did you hear her say that at

139

1    23:27:37?

2        A.    Yes.

3        Q.    And then did you jerk her --

4        A.    I lifted her up --

5        Q.    -- at 23:27:39?

6        A.    I lifted her up to a seated

7    position.

8        Q.    Immediately after she asked you if

9    you were 12, right?

10        A.    Yeah.

11        Q.    I'm not saying that it was in

12    response to that, but that is the sequence of

13    events?

14        A.    Yes, I lifted her up into a seated

15    position.

16            (Playing video.)

17        Q.    Are you holding her at this point?

18        A.    Yes.

19            (Playing video.)

20        Q.    And that's true, right, either

21    Ullrich said that or you said that you were

22    going to drag her?  Somebody said that they

23    were going to drag her, right?

24        A.    Correct.

25            (Playing video.)

140

1      Q.    But at that point you knew that she

2   had a broken leg, couldn't walk, and that you

3   had thrown away one of her crutches, right?

4      A.    Correct.

5             (Playing video.)

6      Q.    How far away are you all from a car

7   at this point?

8      A.    20 feet.

9      Q.    Is the car in the middle of the

10   street or is it on the other side of the

11   street?

12      A.    Middle of the street.

13      Q.    Okay.

14             (Playing video.)

15             That was another incidence in

16   which she told you fellows that she couldn't

17   walk, right?

18      A.    Correct.

19      Q.    On top of the instances in which

20   the other guy was telling you guys that she

21   couldn't walk, right?

22      A.    Correct.

23      Q.    Which you registered at the time,

24   correct?

25      A.    During that instance, yes.

141

```
 1        Q.    Okay.

 2              (Playing video.)

 3              Still dragging her at this

 4   point?

 5        A.    We're carrying her over to the

 6   cruiser, yes.

 7        Q.    Carrying her or dragging her?

 8        A.    Carrying her.

 9        Q.    Is her -- is any -- are her feet on

10   the ground?

11        A.    I don't recall.

12        Q.    Okay.  So it could have been

13   dragging?

14              MR. MANDO:  Objection.  Calls

15   for speculation.  Asked and answered.

16   BY MR. WHITTAKER:

17        Q.    You don't know -- but you don't

18   know if her feet were on the ground or any

19   portion of her body was on the ground, right?

20        A.    I know at one point in time one

21   of -- her good foot was down.

22        Q.    Okay, her good foot was down.  Did

23   you see it?

24        A.    Yes, because it was planted.

25        Q.    Could you tell by the, could you
```

142

1    tell that part of her foot was on the ground

2    by perhaps some of the force of her weight

3    being lift -- alleviated?  Does that make any

4    sense?  You were carrying her?

5          A.    Uh-huh.

6          Q.    But if her foot was on the ground

7    perhaps it would have been easier to carry

8    her, is that -- because she wouldn't have

9    weighed as -- she would have weighed the same

10   but part of her body would have been

11   supported by her own foot, right?

12         A.    Correct.  But she was using that

13   foot to prevent us from taking her over to

14   the cruiser.

15         Q.    How was she doing that?

16         A.    We were both holding on to her and

17   she was having her outstretched leg planted,

18   her good leg planted --

19         Q.    Her good leg was planted in the --

20              MR. MANDO:  Let him finish,

21   please.  Let him finish his answer.  Go

22   ahead.

23              THE WITNESS:  We were both

24   holding on to her, supporting her, making

25   sure she wouldn't fall over, but she was

143

1    planting her good foot with resistance, and

2    we were feeling that resistance when we were

3    carrying her to the cruiser.

4    BY MR. WHITTAKER:

5        Q.    How tall are you?

6        A.    Approximately 5'8".

7        Q.    Any idea how tall Ullrich is?

8        A.    No idea.

9        Q.    How much did you weigh at the time?

10       A.    I can't recall.

11       Q.    It's your testimony that with her

12   one good foot she was preventing you guys

13   from getting her to the car, did I understand

14   that right?

15       A.    She was attempting to prevent us.

16       Q.    She was attempting to prevent you

17   from getting her to the car with her one good

18   foot, right?

19       A.    Correct.

20       Q.    Have you seen any of the body cam

21   footage depicting that?

22       A.    I don't recall.

23            (Playing video.)

24       Q.    Who is this woman?

25       A.    Officer Brown.

144

1        Q.    Officer Brown?

2        A.    Yes.

3             (Playing video.)

4        Q.    Do you have any thoughts about how

5 she could have helped you on her own get

6 herself over there, to the car, sorry?

7        A.    Could you rephrase it, please?

8        Q.    Do you have any thoughts about how

9 she could have gotten over to the police car

10 on her own, any idea how she could have done

11 that?

12        A.    Yes, we could have taken our time

13 and supported her and walked her over to it.

14 But that's if she was cooperative.

15        Q.    If she was cooperative she could

16 have walked over without her crutches?

17        A.    Supporting her, yes.

18        Q.    Okay.  She could have walked with

19 one leg?

20        A.    As I said, if we were supporting

21 her she could have taken her step and get

22 over to the cruiser, if she was able to be

23 cooperative with us to take her over to the

24 cruiser.

25        Q.    Were you supporting her?

145

1      A.   Yes.

2           (Playing video.)

3      Q.   What does a double lock mean?  Did

4  you hear that?

5      A.   Yes.  On handcuffs there is a

6  double lock so that when we have them to the

7  fit and tightness that we, that we need

8  for -- to make sure she's secure, we double

9  lock them so that they do not tighten on her

10  and make them more uncomfortable.

11      Q.   Okay.  And did you -- I think you

12  answered in the affirmative that you double

13  locked them?

14      A.   Yes, I did that.

15      Q.   What was the purpose of asking

16  about that?

17      A.   It is so that if, when she got in

18  the car, if they were not double locked, how

19  she is, with her hands behind her back, they

20  would have tightened up on her and that would

21  have been just uncomfortable.

22      Q.   Okay.

23           (Playing video.)

24           23:29:07, it looks like to me

25  that you two picked her up or directed her

146

1    towards the car door, is that, is that right

2    what happened there?

3         A.    Yes.

4         Q.    Okay.

5         A.    We did direct her to the car.

6         Q.    Was her good foot on the ground at

7    that point?

8         A.    I believe it was.

9         Q.    Okay.  And it looks like to me this

10   is her head and face first into the car, is

11   that what you were trying to do is get her

12   into the car?

13        A.    We were just trying to get her into

14   the cruiser, yes.

15        Q.    Okay.

16              (Playing video.)

17              That's another instance in which

18   she's telling you that she can't move because

19   of her broken foot -- or she can't follow a

20   command because of her broken foot, is that

21   fair?

22              MR. MANDO:  Objection.

23   Characterization.  Go ahead.

24              THE WITNESS:  She's stating she

25   can't move, that -- I did hear that, yes.

147

1    BY MR. WHITTAKER:

2         Q.    In response to an instruction or a

3    command?  We can listen again.

4                 (Playing video.)

5                 I think he said come on, did you

6    hear that?

7         A.    I did not.

8         Q.    Okay.  It seems maybe she's not

9    responding directly to a command at that

10   point, but she is telling you I can't get in

11   the car, I have a broken foot; fair?

12        A.    She's stating that, yes.

13        Q.    And you recall hearing that at the

14   time?

15        A.    Yes.

16                 (Playing video.)

17        Q.    Now, this part has me confused

18   because she's facing -- you have her facing

19   the cruiser at this point?

20        A.    Uh-huh.

21        Q.    Did you hear Officer Ullrich saying

22   put your butt in?

23        A.    Yes.

24        Q.    How -- do you have any idea how

25   that would have been possible with her facing

148

1    the cruiser?

2         A.    We could have turned her around.

3         Q.    Okay.

4         A.    Like I've done before.

5              (Playing video.)

6         Q.    Do you know who Officer -- I think

7    that was Officer Ullrich saying somebody's

8    going to reach through and drag her through

9    the car?

10        A.    Yes.

11        Q.    Who was he referring to, do you

12   know?

13        A.    I don't recall.

14        Q.    Could that have been Officer Brown?

15        A.    Possibly, yes.

16        Q.    Were there any other female

17   officers there?

18        A.    No.

19              (Playing video.)

20        Q.    So it looks like to me that you

21   were able to stuff her into -- is she on the,

22   is she on the seat or was she on like between

23   the seat and the front seat?

24        A.    She was on the seat.

25        Q.    All right.  Is the back seat of the

149

1      police car like a continuous seat, like it's

2      one long seat without like gaps in between,

3      it's not like bucket seats or anything like

4      that?

5          A.    No, it's not bucket seats.

6          Q.    At that point were you and Officer

7      Ullrich sort of pushing her in by the legs?

8          A.    Yes.

9          Q.    Okay.  Did one of you have ahold of

10     her broken leg?

11         A.    I didn't grab it.

12         Q.    You did not?

13         A.    No.

14              (Playing video.)

15         Q.    And at that point did you slam the

16     door or did Ullrich slam the door?

17         A.    I slammed the door the third time.

18         Q.    Third time, okay.  Let me go back.

19              (Playing video.)

20              That was once, right?

21         A.    Uh-huh.

22         Q.    At 23:30:30.

23              (Playing video.)

24              Was that a second time?

25         A.    Yes.

150

1    Q.    Around 23:30:32.  Was that you

2    trying to close it?

3    A.    Yes.

4    Q.    Okay.  The third time's a charm,

5    23:30:34, you successfully slam the door,

6    right?

7    A.    Correct.

8    Q.    What was preventing you from

9    closing the door the first two times?

10    A.    She kicked the door open.

11    Q.    From where?  She was in the car,

12    right, you had her in the back of the car?

13    A.    Yes, she was in the back of the

14    cruiser and she kicked the door open.

15    Q.    You had her in face first or head

16    first into the car and you couldn't -- are

17    you saying that you couldn't get the door

18    closed those two times because she kicked it

19    open?

20    A.    Yes.

21    Q.    Okay.  It didn't, it didn't not

22    close because her foot was in the way of the

23    door?

24    A.    No, she kicked it open.

25    Q.    Okay.  So at that point have you

151

1    completed the arrest?

2        A.   Yes, she is in custody.  She is

3    secured in the back of our cruiser.

4        Q.   Okay.

5             (WHEREUPON, Plaintiff's

6    Deposition Exhibit 22 was marked for

7    identification.)

8    BY MR. WHITTAKER:

9        Q.   I'm going to hand you what has been

10   previously marked as Exhibit 22.  This was

11   produced in discovery as Defendants' 1135

12   through 1142.  I think it is eight pages.

13   Have you seen this document before, Officer

14   Fritsch?

15       A.   Yes.

16       Q.   Is this something you reviewed

17   before your deposition?  And for the record,

18   it's titled Persons With Special Needs

19   Standards.

20       A.   No.

21       Q.   This is not something you reviewed

22   before your deposition?

23       A.   Not prior.

24       Q.   Not prior.  But you're familiar

25   with it?

152

1        A.    Yes.

2        Q.    Okay.   Under 43.4.1, it says

3    Purpose and Policy.  Letter C says:  The ADA,

4    Americans With Disabilities Act, requires the

5    following of law enforcement agencies:

6    Sensitivity to, and appropriate physical

7    support in, aiding people who have mobility

8    issues.  Did I read that right?

9        A.    Yes.

10       Q.    Would you agree with me that in

11   this incident Ashley Ferreiras had mobility

12   issues?

13       A.    Yes.

14       Q.    Could you tell me what sensitivity

15   to and appropriate physical support you gave

16   in aiding her with mobility issues?

17       A.    I attempted to support her while

18   she was in custody to prevent her from

19   falling over.

20       Q.    Anything else?

21       A.    No.

22       Q.    Would you go to the next page,

23   please, it's Defendants' 1136.  Under 43.4.2,

24   Definitions, Item B says:  Recognized

25   disability slash protected person under ADA:

153

1    Any person who has a physical or mental

2    impairment that substantially limits one or

3    more major life activities such as walking,

4    seeing, hearing, speaking, breathing,

5    learning, and working.  Did I read that

6    right?

7        A.    Correct.

8        Q.    Would you agree with me that Ms.

9    Ferreiras during this incident had -- was

10   impaired in her ability to walk?

11       A.    Yes.

12       Q.    Would you agree with me that she

13   was injured at that time?  I'm not saying you

14   injured her, I'm saying that she was injured

15   by virtue of her broken foot?

16       A.    Correct.

17       Q.    Okay.  Other disabilities are

18   defined as in Item C:  Injury, illness,

19   mental, or emotional state that would render

20   a person more volnerable to police actions

21   such as use of force, incarceration, or

22   restraint.  Did I read that right?

23       A.    Yes.

24       Q.    Would you agree with me that Ms.

25   Ferreiras fit that description?

154

1      A.    Based off the injury, correct.

2      Q.    Let's go down to 43.4.3,

3  Procedures.  Item C says:  In some cases, an

4  employee -- and when it mentions employee, we

5  would agree that you're an employee of the

6  City of Covington, is that fair?

7      A.    Correct.

8      Q.    Okay.  In some cases, an employee

9  may not be able to immediately recognize that

10  an individual has a disability; for example,

11  deaf/hard of hearing, diabetes, epilepsy,

12  brain injury, etc.

13          Is it fair to characterize your

14  knowledge of Ms. Ferreiras as maybe the first

15  time you encountered her you didn't know she

16  had a disability?

17      A.    Could you rephrase the question,

18  please?

19      Q.    Did you know Ms. Ferreiras had a

20  disability the first time you encountered

21  her?

22      A.    As to the injury, yes.

23      Q.    Okay.  The invisible disability

24  becomes apparent to others when the

25  individual's outward behavior is affected.

155

1              Would you say that Ms. Ferreiras

2     was behaving as someone who was concerned

3     about pain or injury to her foot?

4              MR. MANDO:  Objection.

5     Characterization.  Lack of foundation.  Go

6     ahead.

7              THE WITNESS:  During the

8     incident she was yelling I have a broken

9     foot, so, yes.

10    BY MR. WHITTAKER:

11        Q.   Okay.  Many persons with

12    disabilities will either physically or

13    verbally inform the employees that -- I think

14    there is a typo -- that they have a

15    disability.  Did I read that right?

16        A.   Yes.

17        Q.   Would you agree with me that she

18    informed you that she had a disability?

19        A.   Yes.

20        Q.   After you had her subdued on the

21    ground, correct?

22        A.   Correct.

23        Q.   After you had her in cuffs,

24    correct?

25        A.   Correct.

156

1          Q.    After I think we agree that she

2     wasn't going anywhere when you and Officer

3     Ullrich had her placed on the ground?

4                    MR. MANDO:  Objection.  Asked

5     and answered.

6     BY MR. WHITTAKER:

7          Q.    Right?

8                    MR. MANDO:  Multiple times.  Go

9     ahead.

10                   THE WITNESS:  Correct.

11    BY MR. WHITTAKER:

12         Q.    Let's go to the next page, 1137.

13    Item I says:  Use of Force:  In determining

14    the appropriate level of force to be used to

15    control a situation involving a person with a

16    recognized or other disability, officers

17    should consider whether the particular

18    control or restraint tactic is more dangerous

19    or unreasonable in light of the particular

20    person's disability.  Did I read that right?

21         A.    Yes.

22         Q.    And did you undertake any analysis

23    to consider whether or not your actions and

24    your handling of Ms. Ferreiras would be more

25    dangerous or unreasonable in light of her

157

1    disabilities?

2         A.    Could you rephrase the question,

3    please?

4         Q.    Sure.  Did you do any analysis of

5    Ms. Ferreiras's situation to determine

6    whether or not your handling of her would

7    have been more dangerous or unreasonable

8    because of her disabilities?

9         A.    I was aware of her injury, so I

10   took measures to ensure that she did not fall

11   over.  When I went to grab her, I grabbed her

12   arm before grabbing the crutch.

13        Q.    So every action, every physical

14   action you took towards Ms. Ferreiras, you

15   took knowing that she had a disability,

16   right?

17        A.    Correct.

18        Q.    What step did you take to

19   accommodate her disabilities?

20             MR. MANDO:  Objection.  Form.

21   Lack of foundation.  Go ahead.  And asked and

22   answered.  Go ahead.

23             MR. WHITTAKER:  I don't think I

24   asked about accommodation yet.

25             THE WITNESS:  Well, I attempted

158

1    to keep -- make sure she did not fall any

2    during anytime we were encountering her,

3    moving her to the cruiser, in the cruiser,

4    out of the cruiser.  When we took her to St.

5    E Covington we required a wheelchair to move

6    her from the cruiser to inside and then back

7    and forth.

8    BY MR. WHITTAKER:

9        Q.    Okay.

10       A.    And then also while at the jail we

11   got a wheelchair for her as well.

12       Q.    Okay.  Let's go to Page 1138.  Item

13   K at the top says, Mobility:  Standard

14   transport procedures may be dangerous for

15   many people with mobility disabilities.  Did

16   I read that right?

17       A.    Correct.

18       Q.    Okay.  Officers should use caution

19   not to injure the person, damage their

20   mobility device, or themselves.  That's

21   worded a little bit awkwardly.  I think that

22   the word themselves refers to the officers,

23   is that how you take it?  I'll read it again.

24   Sentence says:  Officers should use caution

25   not to injure the person, damage their

159

1    mobility device, or themselves.  Themselves

2    referring to officers, right?

3         A.   Yes.

4         Q.   Okay.  And what steps did you take

5    not to cause damage to Ms. Ferreiras's

6    crutches?

7         A.   Well, I attempted to get them from

8    her, and that's it.

9         Q.   Okay.  Next sentence says:  The

10   best approach when possible is to ask the

11   person what type of transportation they can

12   use.  Did you do that?

13        A.   No, I did not.  She was not being

14   very cooperative during the whole encounter.

15        Q.   And, therefore, you didn't ask her

16   what transportation she could use?

17        A.   No.

18        Q.   Okay.  And then:  And how to lift

19   or assist him -- lift or assist him or her in

20   transferring them in or out of the vehicle.

21             Did you ask her anything about

22   how you could assist her in and out of the

23   vehicle ever that evening?

24        A.   Yes, I did.  While we were at the

25   hospital, once -- and leaving the hospital,

160

1    how could I helped her into the vehicle.

2        Q.    Okay.  So when you're leaving the

3    hospital later that evening -- I guess it

4    might have been morning at that point.  When

5    you're leaving the hospital you asked her how

6    could you help her?

7        A.    Or just what, like if she could get

8    in the car, if I could -- I'm here, like just

9    to make sure she doesn't fall over.

10       Q.    Gotcha.  Let's go to the next page,

11   1140.  Item O says:  Physical Disabilities.

12   Individuals with a physical disability may

13   have limited mobility and often have to use a

14   mobility device, for example, wheelchair,

15   cane, walker, scooter, leg braces, etc. to

16   assist in movement.  During the performance

17   of their duties, employees may encounter an

18   individual with a physical disability who may

19   have to use his or her mobility device to

20   comply with an employee's request, for

21   example, stepping out of a car, moving to a

22   certain location, etc.  Did I read that

23   right?

24       A.    Yes.

25       Q.    Would you agree with me that during

161

1    your encounter with Ms. Ferreiras she had a

2    physical -- she was a person with a physical

3    disability who needed to use her mobility

4    device, her crutches, to move on her own?

5        A.   Yes.

6        Q.   Okay.  And that she, I think she --

7    would you agree with me that she told you

8    that she couldn't comply with some of your

9    requests because of her disability, right,

10   because she had a broken foot?

11       A.   Correct.  She said she couldn't

12   move because she has a broken foot.

13       Q.   I think she said she couldn't get

14   into the car the way you were instructing her

15   because of her broken foot, too; did I hear

16   that right?

17            MR. MANDO:  Objection.  Form,

18   characterization.  Go ahead.

19            THE WITNESS:  I don't recall if

20   she did.

21   BY MR. WHITTAKER:

22       Q.   Okay.  The next sentence says:

23   Many individuals will reach for their

24   mobility device upon contact.  Employees

25   shall be careful to not interpret this as an

162

1    act of aggression.  Did I read that right?

2        A.    Yes.

3        Q.    But you interpreted all of her

4    movements as an act of aggression, didn't

5    you?

6        A.    No, we were placing her in custody

7    and we needed to remove a potential weapon

8    from the situation until she was in custody.

9        Q.    Uh-huh.  Individuals with a

10   physical disability will often inform the

11   employee that they have a physical disability

12   and have to use their mobility device for

13   movement.  She told you that during your

14   encounter, right?

15       A.    She said she could not move, yes.

16       Q.    Do you know what the term go blue

17   means?

18       A.    Just to mute our body cam footage.

19       Q.    Are you aware of a policy, City of

20   Covington policy about muting body cam

21   footage?

22       A.    I'm not aware of the specific

23   policy.

24       Q.    Aside from the specifics of the,

25   maybe the name of the policy, are you aware

163

1    of a policy that governs when you can and

2    cannot mute your body cam?

3         A.    Yes.  When we're interacting with

4    the public, our body cameras are required to

5    be on.

6         Q.    Okay.  Are you aware of the

7    instances in which you are not required to

8    have your body cam recording audio or

9    otherwise where you can mute it?

10        A.    Specifically when we're not

11   interacting with the public.

12        Q.    Okay.

13             MR. WHITTAKER:  Jeff, if we were

14   to take a break now, I think I can narrow

15   down the rest of my questions to just a

16   handful.

17             MR. MANDO:  Okay.

18             (WHEREUPON, a discussion was

19   held off the record.)

20             MR. WHITTAKER:  Let's go back on

21   the record real quick.  I just want to put on

22   the record that Mr. Mando and I have agreed

23   that we're going to stipulate that documents

24   produced in discovery by the City of

25   Covington with respect to their policies and

164

1    procedures were in effect on May 4th of 2023,

2    the date of the incident that is the subject

3    of this dispute; and that its employees,

4    including the officers, Officers Fritsch,

5    Jansen, and Ullrich were subject to those

6    policies at the time, and still subject to

7    those policies.

8              And we have agreed to stipulate

9    that all Use of Force reports produced in

10   discovery are true, authentic, accurate

11   copies of what they purport to be.  All

12   objections as to the contents of those

13   reports, relevance, etc., are reserved, only

14   stipulating to the authenticity of these

15   documents.  That's my understanding.

16             If Mr. Mando has anything he

17   would like to put on the record about that --

18             MR. MANDO:  No.

19             MR. WHITTAKER:  -- I'd welcome

20   it.

21             MR. MANDO:  So stipulated and

22   agreed.

23             MR. WHITTAKER:  Okay.  Can we

24   stipulate to the same as to the Covington

25   Police Department field training program

165

1    manual, guidelines, expectations, and

2    responsibilities?

3                MR. MANDO:  I can certainly

4    stipulate that that's authentic, Justin, and

5    that that is a Covington Police Department

6    document.  What I'm a little reluctant on is,

7    because we're constantly training field

8    training officers those manuals can get

9    updated and changed, and there might be a

10    different one in effect for Anthony versus

11    the one when Michael Jansen was hired nine

12    years ago.

13                MR. WHITTAKER:  Yeah.

14                MR. MANDO:  That's my only

15    concern.  But there's no -- we don't -- we

16    will stipulate that they are authentic.

17                MR. WHITTAKER:  Okay.

18                MR. MANDO:  And that they are

19    Covington Police Department documents.

20                MR. WHITTAKER:  And this one,

21    the one produced in discovery is Defendants

22    2367, and it's large, it goes on, it's

23    revised May 2024, and that's the one we're

24    stipulating to the authenticity of.

25                MR. MANDO:  Correct.  And --

1    yes.

2               MR. WHITTAKER:  If there's other

3    versions --

4               MR. MANDO:  That's the only

5    version I've been given that they have.  You

6    know, whether they've got versions from years

7    ago, I don't know.

8               MR. WHITTAKER:  Okay.  Fair

9    enough.

10              MR. MANDO:  You'll note that on

11   some of these they have a disclaimer that the

12   document retention is a number of years, like

13   five years or whatever.

14              MR. WHITTAKER:  Uh-huh.

15              MR. MANDO:  That's on some of

16   these.  So --

17              MR. WHITTAKER:  And if we need

18   to get into document retention, we can do

19   that in maybe a 30 (b)(6) or stipulate to it

20   some other way.

21              (WHEREUPON, Plaintiff's

22   Deposition Exhibit 47 was marked for

23   identification.)

24   BY MR. WHITTAKER:

25        Q.   Officer Fritsch, I'm going to hand

167

1    you what's been premarked as Exhibit 47.

2    Officer, do you recognize these as your

3    glasses?

4        A.    Yes.

5        Q.    Are these the glasses that were

6    broken?

7        A.    Yes.

8            (WHEREUPON, Plaintiff's

9    Deposition Exhibit 48 was marked for

10   identification.)

11   BY MR. WHITTAKER:

12       Q.    I'm going to hand you what I have

13   marked as Exhibit 48.  And it is my mistake

14   for not having the body cam bates number

15   on -- or the number on this, so I'm going to

16   represent that this is a screenshot,

17   Exhibit 48, of somebody's body cam from the

18   incident.  You don't have to accept my

19   representation as true, but, Officer Fritsch,

20   does Exhibit 48, which is two pages, does

21   that look like Ms. Ferreiras to you?

22       A.    Yes.

23       Q.    And does it look like to you that

24   you're depicted in these pictures?

25       A.    Yes.

168

1        Q.    Okay.  Is Exhibit 48 on the

2   front -- on the first page of Exhibit 48, is

3   that an example of Ms. Ferreiras planting her

4   foot on the ground?

5        A.    Yes.

6        Q.    How about the second page?

7        A.    Yes.

8        Q.    And is it you and Officer Ullrich

9   who are depicted in the photograph with her?

10       A.    Yes, we're the ones holding her up.

11       Q.    You're the ones holding her up.

12             (WHEREUPON, Plaintiff's

13   Deposition Exhibit 49 was marked for

14   identification.)

15   BY MR. WHITTAKER:

16       Q.    It looks like I had the same

17   problem with identifying the body cam from

18   which this still screen capture came from.

19   I'm, again, going to represent that it is a

20   screen capture of somebody's body camera.

21   You don't have to accept my representation.

22   But, Officer Fritsch, does Exhibit 49 depict

23   images of you from the evening of May 4th of

24   2023?

25       A.    Yes.

169

1    Q.   This is three pages, this Exhibit

2    49.  Do any of these pages depict an injury

3    suffered by you that evening?

4    A.   No.

5    Q.   I think we'd established previously

6    that you didn't suffer any injuries that

7    evening, is that -- am I remembering that

8    right?

9    A.   Yes.

10   Q.   Okay.

11        (WHEREUPON, Plaintiff's

12   Deposition Exhibit 52 was marked for

13   identification.)

14   BY MR. WHITTAKER:

15   Q.   I'm going to show you, Officer

16   Fritsch, Exhibit 52.  Same problem, my

17   incompetence with getting screen captures

18   with time code in it.  I'm going to represent

19   to you that Exhibit 52 are screen captures of

20   body cam footage from May 4th, 2023,

21   depicting the incident that is the subject of

22   this dispute.

23        MR. MANDO:  I don't think these

24   are screenshots from body-worn camera, I

25   think these are actual photos taken of the

170

1    officers, Justin.

2                    MR. WHITTAKER:  Okay.  That

3    makes more sense.  Does that seem like --

4                    THE WITNESS:  Yes.  After use of

5    force, photos are taken of us and suspects.

6                    MR. WHITTAKER:  Okay.

7                    MR. MANDO:  Same on Exhibit 49,

8    those are actually straight photos from the

9    camera that are taken pursuant to policy.

10                   MR. WHITTAKER:  Okay.  So it

11   wasn't my incompetence, it's because there is

12   no time code there.

13   BY MR. WHITTAKER:

14        Q.   Officer Fritz, does Exhibit 52 look

15   to you like an image of -- images of Officer

16   Ullrich taken that evening?

17        A.   Yes.

18        Q.   Looks like there's four of them --

19   I'm sorry, five of them.  And can you show

20   me, can you tell me in any of these pictures

21   where Officer Ullrich was bitten?

22        A.   The last two.

23        Q.   The last two.  Okay.

24        A.   There's a red mark on his forearm.

25        Q.   Okay.  Did you see that that

171

1    evening?

2        A.    I did not see it on scene, not that

3    I recall.

4        Q.    Okay.  I'm going to hand you

5    something other than I have in my hand.  Do

6    you have any knowledge of any injuries

7    suffered by Ms. Ferreiras that evening?

8        A.    I don't recall.

9        Q.    And by injuries I don't mean

10   whether or not -- by injuries I mean whether

11   or not she was diagnosed with having been

12   injured by a doctor, like any, anything like

13   that?

14       A.    We did take her for jail clearance

15   and just to get her foot checked out.

16       Q.    And she was cleared to go to jail,

17   right?

18       A.    Yes, she was.

19       Q.    Okay.

20               (WHEREUPON, Plaintiff's

21   Deposition Exhibit 36 was marked for

22   identification.)

23   BY MR. WHITTAKER:

24       Q.    I'm going to hand you Exhibit 37 --

25   no, I'm not.  36.  This is a document that

172

was produced in discovery by the City of
Covington -- I can barely read -- 01474
through 1477.  This document's entitled
Covington Police Department Employee
Appraisal General Responsibilities.  And it
looks like it's dated, looks like it might
have been dated by an HR person in July of
2023, and perhaps somebody else in August of
2023; do you see that at the top, those
initials?

     A.   Yes.

     Q.   Do you have any idea if HR refers
to a person or if it refers to Human
Resources?

     A.   I believe that it refers to Human
Resources.

     Q.   Do you have any idea whose initials
are under the second date there?

     A.   I'm not sure.

     Q.   Okay.  Not yours?

     A.   No.

     Q.   Okay.  Have you seen this before?

     A.   Yes, I have.  I believe so.

     Q.   Okay.  And on the back at 1477, the
last page of this exhibit, it says employee

173

1    signature, there's a signature, and I think

2    it's dated, I want to say 7-9 of 2023, but

3    I'm not sure.  Is that 7-29 -- or -- is that

4    your signature?

5         A.   Yes, it's my signature.

6         Q.   Okay.  And is it dated 7-4?

7         A.   7-4.

8         Q.   Gotcha.  Would you please turn to

9    1475, which is the second page of this

10   document?

11        A.   Yes.

12        Q.   There's a sentence in the middle of

13   Work Quality that says:  Officer Fritsch is

14   able to gain information during calls for

15   service however, he does show some issues

16   with officer presence.  Did I read that

17   right?

18        A.   Yes.

19        Q.   Could you tell me what officer

20   presence refers to?

21        A.   Basically being able to control and

22   handle a scene.

23        Q.   Okay.

24        A.   Just my -- the presence of an

25   officer is being able to control and handle

174

1    that situation.

2        Q.    Okay.

3        A.    I struggled with that during some

4    periods of FTO.

5        Q.    Okay.

6        A.    But have since improved.

7        Q.    Okay.  I'm going to go to the next

8    page, 1476.  In the middle of the page it

9    says, Ability to Handle Stress:  Officer

10   Fritsch has greatly improved with his ability

11   to handle stress and several evaluations

12   during power and third shift commented on

13   that improvement.  In his week 22 evaluation

14   he was mentioned -- it was mentioned that

15   Officer Fritsch still struggles with tunnel

16   vision, which has been an ongoing problem.

17   Could you tell me, could you tell us what

18   tunnel vision refers to in this instance?

19       A.    Going to a high stress situation,

20   getting focused in on one particular thing

21   and not seeing the whole situation.

22       Q.    Okay.  Is that something you

23   believe you've improved on?

24       A.    Yes.

25       Q.    Have you become proficient in

175

1    Spanish?

2         A.    Not yet.

3         Q.    Are you taking any classes or

4    lessons or anything?

5         A.    Duolingo.

6         Q.    Okay.  Like, like street lingo?

7         A.    No, the app Duolingo, just to --

8         Q.    Oh, Duolingo.  My bad.  Have you

9    learned any defensive tactics especially in

10   the area of Jiu-Jitsu?

11        A.    Yes.

12        Q.    And ground defense?

13        A.    Yes.

14        Q.    Do you think that you've improved

15   your overall interviewing and communication

16   abilities?

17        A.    Yes.

18             MR. WHITTAKER:  That's all I've

19   got for this afternoon for the officer.  Mr.

20   Mando might have some questions for you.

21             MR. MANDO:  We've got no

22   questions at this time.  We reserve -- we'll

23   take signature on the deposition through me,

24   please.

25             (WHEREUPON, deposition concluded

176

1    at 5:15 p.m.)

2

3

4

5

6    _____
                   ANTHONY FRITSCH

7              *    *    *    *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

177

1                      C E R T I F I C A T E

2

3    COMMONWEALTH OF KENTUCKY
                      SS:

4

5

6         I, Tina M. Shell, the undersigned, a
     Registered Professional Reporter, and Notary

7    Public within and for the Commonwealth of
     Kentucky, do hereby certify that before the

8    giving of aforesaid deposition, said ANTHONY
     FRITSCH, was by me first duly sworn to depose

9    the truth, the whole truth, and nothing but
     the truth; that the foregoing is the

10   deposition given at said time and place by
     said ANTHONY FRITSCH; that said deposition

11   was taken in stenotypy by the court reporter
     and transcribed into typewriting under her

12   supervision; that the transcribed deposition
     was submitted to the witness for his

13   examination and signature; the court reporter
     was neither a relative of nor attorney for

14   any of the parties to the case, nor relative
     of nor employee for any of the counsel and

15   has no interest whatever in the result of the
     action.

16

17        IN WITNESS WHEREOF, I herein set my hand
     and official seal of office this 6th day of

18   July, 2025.

19   My commission expires /s/ Tina M. Shell
     October 10, 2026        Tina M. Shell

20   Notary Public, Commonwealth of Kentucky

21

22

23

24

25