Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CASE NO. 2:24-cv-0074


ASHLEY FERREIRAS,          :
                           :
      Plaintiffs,          :
                           :
vs.                        : (Judge Reeves)
                           :
THE CITY OF COVINGTON,     :
et al.,                    :
                           :
      Defendants.          :


        Deposition of DOUGLAS ULLRICH, a
witness herein, taken as upon cross-
examination by the Plaintiff, pursuant to the
Kentucky Rules of Civil Procedure, at Wood &
Lamping, 600 Vine Street, Suite 2500,
Cincinnati, Ohio, before me, Kelly Green,
RPR, a Notary Public within and for the State
of Ohio, on Thursday, October 26, 2023, at
10:00 a.m.

```
 1                 APPEARANCES

 2   On behalf of the Plaintiff:

 3        JUSTIN M. WHITTAKER, ESQ.
          Whittaker Law
 4        2055 Reading Road, Suite 260
          Cincinnati, OH  45202
 5        Justin@whittakerlawfirm.com

 6   On behalf of the Defendants:

 7        JEFFREY C. MANDO, ESQ.
          Adams Law, PLLC
 8        40 West Pike Street
          Covington, KY  41011
 9        Jmando@adamsattorneys.com

10   ALSO PRESENT:

11        Julie Niesen
          Ashley Ferreiras
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                    EXAMINATION INDEX

2
   WITNESS:                                    PAGE
3  DOUGLAS ULLRICH
        CROSS BY MR. WHITTAKER.................4
4

5

6                    EXHIBIT INDEX

7           (No exhibits were marked.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1           DOUGLAS ULLRICH,

2    a witness herein, having been duly sworn, was

3    examined and testified as follows:

4               CROSS-EXAMINATION

5    BY MR. WHITTAKER:

6        Q.    Good morning.  We're here on the

7    record in the case of Ferreiras versus the

8    City of Covington and others, Case Number

9    2:24-cv-0074 in the Eastern District of

10   Kentucky, in a deposition of Officer Douglas

11   Ullrich.

12             Officer Ullrich, would you please

13   state your name.

14       A.    Douglas Ullrich.

15       Q.    And do you have a middle name?

16       A.    Karl.

17       Q.    With a "K"?

18       A.    Yes, sir.

19       Q.    And let's see.  You've had your

20   deposition taken before?

21       A.    I have.

22       Q.    Two times?

23       A.    I believe that's correct.

24       Q.    Okay.  Any other times you can

25   think of in which you've been deposed?

Page 5

1          A.    I think that's it.

2          Q.    Okay.  And they were in -- the

3    other two cases were in the Wynn and Cundiff

4    cases?

5          A.    That's correct.

6          Q.    Yeah.  And I'm assuming those took

7    place in this room?

8          A.    They did.

9          Q.    So just a couple things.  You're

10   under oath right now as you would be in

11   court.  Do you understand that?

12         A.    I do.

13         Q.    Okay.  And we have to give our

14   answers to questions orally instead of uh-uh

15   or uh-huh or shaking our heads or nodding our

16   heads because Kelly, the court reporter,

17   needs to take down everything we're saying,

18   and she can't record nods and mumbles.  Does

19   that make sense?

20         A.    Certainly.

21         Q.    Okay.  And Jeff will tell you that

22   I will ask you some really bumbling

23   incomprehensible questions from time to time.

24   I mumble.  I don't speak clearly sometimes.

25   I don't have a voice that carries.

1                If you don't understand a question

2    I ask or if you need me to clarify something,

3    would you please ask me?  Otherwise, I'll

4    assume that you understood my question if you

5    answer it.  Is that fair?

6         A.    That is fair.

7         Q.    Okay.  If I ever need a break,

8    please let me know.  I don't tend to take a

9    lot of breaks and don't tend to think about

10   them; but if you need one at any time, unless

11   there's a question pending, please let me

12   know, and we can take a break for as long as

13   you want any time you want.

14        A.    Yes, sir.

15        Q.    Are you on any medications that

16   would impair your ability to answer questions

17   truthfully today?

18        A.    No.

19        Q.    Do you have any health conditions

20   that would impair your ability to answer

21   questions truthfully?

22        A.    No.

23        Q.    Okay.  So you've been deposed a

24   couple times in the Cundiff and Wynn cases,

25   and you testified in court before too, right?

Page 7

1          A.     Thousands of times.

2          Q.     Thousands of times.  Have those all

3     been in the Kenton Circuit Court?

4          A.     No.

5          Q.     What other courts have you

6     testified in?

7          A.     Kenton Circuit and District Courts,

8     Boone District Court, Campbell County

9     District Court and Circuit Court as well as

10    the Eastern District of Kentucky.

11         Q.     Did you testify as a party in the

12    Wynn and Cundiff cases?

13         A.     I did.

14         Q.     Have you testified as a witness in

15    federal court in cases in which you weren't a

16    party?

17         A.     I've testified in criminal cases in

18    federal court where I've been an

19    investigator, and then I've testified in

20    federal court in Wynn and Cundiff.  I believe

21    that is it as far as civil cases.

22         Q.     Okay.  But you're a party in the

23    Wynn and Cundiff cases, right?

24         A.     Yes.

25         Q.     No other cases in court in which

Page 8

1   you testified when you were a party?

2        A.    I don't believe so.

3        Q.    Okay.  And you said thousands of

4   times?

5        A.    Yes, sir.

6        Q.    10,000?  Is that high?

7        A.    I'd guess...  I approximate...

8   Boy, I don't know.  It would be difficult to

9   guess.  I would bet that that number is

10  probably --

11             MR. MANDO:  Don't guess.

12       A.    It would be hard to nail that down.

13       Q.    If it's thousands of times, then I

14  would expect it would be difficult.

15             Have you ever been qualified to

16  testify as an expert witness in a case

17  before?

18       A.    I have.

19       Q.    And do you know what I mean by

20  that, as an expert witness as opposed to a

21  fact witness?

22       A.    Yes.

23       Q.    When have you been qualified to

24  testify as an expert?

25       A.    In cases of DUI or impairment

Page 9

1    cases, as a drug recognition expert.  I've

2    been through a Daubert.  I've been through

3    other cases where they haven't had a Daubert,

4    but they have conceded that I do have the

5    ability to offer expert opinion.

6           Q.    Could you estimate how many times

7    you've been qualified as an expert in DUI and

8    drug recognition?  Is that what you said?

9           A.    Yes, sir.

10          Q.    Okay.

11          A.    Formally, maybe half a dozen, ten.

12          Q.    Okay.  Were those in the Kenton

13   Circuit Court?

14          A.    Kenton Circuit as well as during a

15   federal case.

16          Q.    Which federal case?

17          A.    I don't recall.

18          Q.    Was it Wynn or Cundiff?

19          A.    I don't believe so, no.

20          Q.    Okay.  And when you were -- you

21   went through Daubert proceedings and other --

22   the other side conceded from time to time

23   that you were qualified, were you a

24   complaining witness in those cases, or were

25   you just retained as an expert?

Page 10

1          A.    I was a witness on the

2    investigatory side.  Most of them were my

3    arrests, my investigation; but there were

4    cases, at least one that I can think of off

5    the top of my head, in which I was just an

6    ancillary responder to a case.

7          Q.    So many of the times you were the

8    investigating officer on the case, and --

9          A.    That's correct.

10         Q.    -- you testified in that capacity

11   as well?

12         A.    I did.

13         Q.    Okay.  So you testified as to the

14   facts of your investigation, fair?

15         A.    I did.

16         Q.    And you were also qualified to

17   testify as an expert too, right?

18         A.    Yes, sir.

19         Q.    How many times in federal court?

20   The one time?

21         A.    I believe it's just once in federal

22   court.

23         Q.    Was that U.S. v. Jackson?

24         A.    I don't know.

25         Q.    Okay.  The other times were in

Page 11

1   Kenton Circuit?

2        A.   The rest of them were in Kenton

3   Circuit Court, yes, sir.

4        Q.   Okay.  And I think you said you

5   were qualified as an expert to testify on

6   cases of DUI and drug recognition.  Did I

7   hear that right?

8        A.   Yes, sir.

9        Q.   Any other topics on which you were

10  qualified in any case to testify as an

11  expert?

12       A.   No.

13       Q.   Have you been offered as an expert

14  in any case in which you were not -- you did

15  not end up being qualified to testify as an

16  expert?

17       A.   I've been offered repeatedly in

18  cases in which I did not testify because a

19  plea was arranged or something along those.

20       Q.   Okay.

21       A.   I've never been excluded from any

22  case.

23       Q.   That's a better way of putting it.

24  Have you been offered to testify on subject

25  matter other than drug -- DUI and drug

Page 12

```
 1    recognition cases?

 2         A.    In an expert context --

 3         Q.    Yes.

 4         A.    -- no.

 5         Q.    Do you anticipate testifying as an

 6    expert in this case?

 7         A.    I don't have any idea.

 8         Q.    Okay.  I think you said that you

 9    were -- you were an expert in drug

10    recognition.  Was that what you said?

11         A.    That's correct.

12         Q.    Is that a formal designation by an

13    accrediting body of any kind?

14         A.    It is.

15         Q.    What body is that?

16         A.    National Highway Traffic Safety

17    Administration.

18         Q.    National Highway... Okay.

19         A.    NHTSA.

20         Q.    And how do you go about -- do you

21    take courses to get that certification?

22         A.    To become a certified drug

23    recognition expert, you take a two-week

24    in-person course.  I took mine down in DOCJT.

25         Q.    What's that?
```

Page 13

1         A.    The Department of Criminal Justice

2    Training in Richmond.  It's the State Police

3    Academy.  And then we traveled to Los

4    Angeles, California, and took part in a drug

5    recognition task force with LAPD, California

6    Highway Patrol, and several other California

7    agencies in which we conducted drug

8    evaluations of thousands of folks over the

9    course of the week to achieve our

10   certification.

11              Once that certification was

12   achieved, which was September of 2016, every

13   two years, I must recertify, which requires a

14   certain number of evaluations during that

15   time and a certain quantity of ongoing

16   training.

17        Q.    And when you recertify, do you do

18   the same program?  Do you go to LA to do the

19   same training?

20        A.    No, sir.  The retraining or the

21   ongoing training is typically either

22   in-person or webinar training, and it can

23   consist of anything kind of related to the

24   drug recognition field.

25        Q.    Okay.  And you mentioned DUI

Page 14

1    recognition or cases of DUI.  Is that a

2    separate training?

3          A.    Yes and no.  So the drug

4    recognition expert training and the

5    certification is pretty well within DUI

6    investigations, is where it's targeted.

7          Q.    Okay.

8          A.    That's why it's through the traffic

9    administration.

10         Q.    Gotcha.

11         A.    So that was an extension of my DUI

12   training.  I have a whole bunch of other DUI

13   training as well.

14         Q.    What other DUI training?

15         A.    So in the Basic Academy, we do 40

16   hours of DUI investigations as well as how to

17   testify in those investigations and

18   conducting standard field sobriety tests.

19              After that, I became certified as

20   an advanced roadside impaired driving

21   enforcement officer.  After that, I continued

22   with a whole lot of ongoing training.

23              It's all contained within my CV,

24   each of the specific trainings.  I couldn't

25   tell you all off the top of my head.

Page 15

1      Q.    Sure.

2      A.    I've been the TAP officer for

3   Covington -- that's a Traffic Accident

4   Prevention officer -- since April of 2014.

5   In that capacity, I have been tasked with

6   high-visibility traffic enforcement and DUI

7   investigation for the department.

8          So if someone would pull over a

9   suspected DUI, they would stop what they were

10  doing.  They'd have me respond to that scene.

11  And as the well-trained advanced investigator

12  in that, I would take over that scene and

13  conduct that investigation.

14     Q.    So correct me if I'm wrong, but you

15  work third shift, right?

16     A.    I am now on first shift.  At the

17  time of this incident, I had been on third

18  shift.

19     Q.    Okay.  And would you -- if there

20  was a DUI on any shift, would you be called

21  in, or just if it was a shift you were

22  already working?

23     A.    It depends a little bit.  If it is

24  a serious incident -- we had an officer who

25  was a hit by a drunk driver this week while I

Page 16

1    was off, and I came in and I worked that.

2                So if there's a fatality or a

3    significant case, I can get pulled out of bed

4    and brought in to investigate those.  If I am

5    on shift, I certainly take care of them, but

6    it really depends on supervisory discretion

7    at that point.

8        Q.    So even if you're on vacation or a

9    day off, you could conceivably be called in?

10       A.    I'm always on call-out status for

11   DRE and DUI investigation, yes, sir.  I could

12   get pulled away from this for that.

13       Q.    Oh, boy.  Well, let's hope that

14   doesn't happen.  And you could typically be

15   called in if there was a fatality or a

16   serious -- something else serious?  Could you

17   give us an example what, other than a

18   fatality, would qualify?

19       A.    So like I said, the policy says any

20   critical accident, serious physical injury,

21   any abnormal instances.

22                This past week, an officer was on

23   her -- was driving out on 17, and a DUI

24   turned out in front of her, and there was a

25   wreck and she became injured.  So I was

Page 17

1    called out for that, which is pretty typical.

2        Q.    Is she okay?

3        A.    I don't know.  I haven't followed

4    up.

5        Q.    Oh, boy.  Okay.  Was she a

6    Covington officer?

7        A.    She is.

8        Q.    Do you respond in that capacity to

9    other municipalities if they have a similar

10   incident but maybe not the same officers

11   tasked to do it?

12       A.    Yes.  Any agency in the region can

13   request.  I've conducted investigations for

14   quite a few:  Kenton County Sheriff's Office,

15   Newport PD, Florence, Erlanger, Ft. Mitchell.

16   I'm sure there's others, but those are the

17   ones I can think of off the top of my head.

18       Q.    I should have asked this before,

19   but you're currently employed by the City of

20   Covington Police Department?

21       A.    I am, sir.

22       Q.    Is that since 2014?

23       A.    No.  September 5 of 2011 is my hire

24   date.

25       Q.    I don't know where I got '14.

Page 18

1    Okay.  And is your hire date considered after

2    you complete basic training?

3         A.    No, sir.

4         Q.    Before?

5         A.    Before.

6         Q.    Okay.  So you're hired September 5,

7    2011.  Did you then go do basic training?

8         A.    I did, sir.

9         Q.    Is that in Richmond?

10        A.    It is.

11        Q.    How long was that?  How long was

12   the training?  Sorry.

13        A.    20 weeks, 22 weeks, something like

14   that.  It's fluctuated over the years how

15   long it is, but it's in that ballpark.

16        Q.    And was that a continuous 20 or 22

17   weeks, or did you come home on the weekends

18   or anything?

19        A.    I would come home on the weekends,

20   and we had some extra days off for, like,

21   Christmas and Thanksgiving.

22        Q.    Is that a rolling training program

23   -- meaning if you get hired at any point in

24   the year, you start the program two weeks

25   later -- or do they have specific times of

Page 19

```
 1    the year where they do the training?

 2         A.    They have -- they'll start them

 3    once they have a full class.

 4         Q.    Gotcha.

 5         A.    So they -- so they -- when I

 6    started, I think we had six classes going on

 7    at once.  I don't know how many they're

 8    rolling with now.  So sometimes people will

 9    get hired and then have to wait for a couple

10    weeks --

11         Q.    Okay.

12         A.    -- before they go down.

13         Q.    Gotcha.  Okay.  Is it your

14    understanding that all the officers employed

15    by -- if I say CPD, would you understand that

16    as Covington Police Department?

17         A.    I will.

18         Q.    All the officers employed by CPD go

19    through same or similar training at basic?

20         A.    The vast majority do.

21         Q.    Are there instances that some have

22    not done that --

23         A.    Yes.

24         Q.    -- that you're aware of?

25         A.    Yes.
```

Page 20

```
1        Q.    Okay.  Could you just maybe explain
2   what those are?
3        A.    I know we have some lateral
4   officers from Ohio who had an adequate amount
5   of lateral time, that they were not required
6   to go to the full academy.  I don't know if
7   we have anybody who's former KSP at this
8   point.
9        Q.    Kentucky State Police?
10       A.    Yes, sir.  But I do know that we
11  have a Louisville and a Lexington officer
12  that has lateraled over.  They have their own
13  separate academies.
14       Q.    Louisville and Lexington officers
15  do not attend the same academy that CPD
16  officers do?
17       A.    That's correct.
18       Q.    If you know, are they their own --
19       A.    They have their own --
20       Q.    -- training --
21       A.    They have their own academies.
22             (Parties overspeaking, reporter
23       interruption, and off-the-record
24       discussion.)
25       Q.    (By Mr. Whittaker) But even if they
```

Page 21

```
 1   don't -- even if officers don't attend the

 2   Richmond training, they attend some basic

 3   training either in Ohio or Lexington or

 4   Louisville that qualifies them to still work

 5   for CPD?

 6        A.    Yes, sir.

 7        Q.    Okay.  And after your 20 or 22

 8   weeks, that would have put us -- would that

 9   have been in early 2012 that you finished

10   basic?

11        A.    I believe it was February of 2012.

12        Q.    Okay.  And then did you do FTO

13   training?

14        A.    I did, sir.

15        Q.    How many weeks of that?

16        A.    Again, that fluctuates a little bit

17   depending on each particular officer, but it

18   runs usually 20 -- the longest I've seen is

19   27 or 28 weeks.

20        Q.    Any idea how long yours was?

21        A.    I have no idea.

22        Q.    Do you think yours would have been

23   longer than average?

24        A.    No.

25        Q.    About the average time, you think?
```

Page 22

1          A.     (Witness shrugged shoulders.)

2          Q.     I'm not holding you to a time.  I'm

3    just wondering if you --

4          A.     Yeah, I --

5          Q.     I know some officers have gone

6    longer.  I'm just wondering if you went

7    longer.

8          A.     I believe it was pretty standard.

9          Q.     Okay.  You mentioned your CV.  I

10   just want to make sure I have -- we're

11   talking about the same document.

12              I'm going to hand you what I've

13   previously marked as Exhibit 83.  This was

14   produced by your counsel in discovery in this

15   case.  First of all, do you prefer to be

16   referred to as officer?

17         A.     It doesn't matter, sir.

18         Q.     I know that you're a specialist as

19   well; is that right?

20         A.     That's correct.

21         Q.     So specialist or officer is okay

22   with you?

23         A.     Yes, sir.

24         Q.     Okay.  You won't take offense if I

25   forget and call you officer instead of

Page 23

1   specialist?

2        A.    I will not.

3        Q.    Okay.  You mentioned your CV.

4   Exhibit 83 in front of you, is that the

5   document you were talking about?

6        A.    It is.  The CV, though, is marked

7   from July of 2018.  That may be the last time

8   that I provided it to Mr. Mando.

9        Q.    Okay.

10       A.    I've obviously kept it up to date

11  since then.

12       Q.    Okay.  And do you use this -- have

13  you submitted a CV like this one or similar

14  to this in the times that you were qualified

15  to be an expert?

16       A.    Yes, sir.

17       Q.    Is that what this is for?

18       A.    This is required as part of the DRE

19  expert program.  And then, yes, it is

20  specifically utilized for any expert

21  testimony or qualification.

22       Q.    Okay.  It says you've got a

23  master's in science of criminal justice at

24  UC.  You graduated in 2016?

25       A.    Yes, sir.

Page 24

1      Q.    So while you were an officer,

2   you're getting your master's in science --

3      A.    Yes, sir.

4      Q.    -- master's in criminal justice?

5      A.    Yes, sir.

6      Q.    Was that paid for by the

7   department?

8      A.    In part, it was, yes.

9      Q.    Okay.  Is that a four-year program?

10      A.    It's a typical master's program

11   which is, what, two years.

12      Q.    Oh, yeah.

13      A.    But because I was doing it and

14   working full time, I was a part-time student.

15      Q.    So it took longer than --

16      A.    It did.

17      Q.    -- longer than two years?

18      A.    Sorry.

19      Q.    That's okay.  Did you have to write

20   a master's thesis or anything like that?

21      A.    There was not a thesis in that

22   master's program.

23      Q.    Your concentration was in law

24   enforcement and crime prevention, right?

25      A.    It was.

Page 25

1       Q.    What sort of classes did that

2   involve?

3       A.    I would have to look back through

4   my actual academic records to tell you what

5   the classes were.

6       Q.    Okay.  And you got a bachelor's of

7   science from Xavier in 2008; is that right?

8       A.    Yes, sir.

9       Q.    And was that a four-year program?

10      A.    It was.

11      Q.    Gotcha.  You got minors in

12  criminalistics -- is that the word?

13      A.    It is.

14      Q.    Could you tell us what

15  criminalistics is?

16      A.    If you think of your Hollywood

17  shows about crime lab technicians, so we were

18  doing things like blood splatter,

19  fingerprints, ballistics, that kind of

20  science behind criminal evidence.

21      Q.    Gotcha.  How accurate are the cop

22  shows when they talk about blood splatter and

23  things like that?  Like, does that comport to

24  your experience and training at all?

25      A.    If they had an absolutely unlimited

Page 26

1   budget, sure.

2       Q.    Okay.

3       A.    But the things they do cost tens of

4   thousands of dollars and take weeks or months

5   to come back; and on the TV show, it takes 5

6   minutes and everybody's trained in it.

7       Q.    Right.  You've been certified as an

8   intermediate law enforcement officer June

9   2017.  Could you tell us what that means?

10      A.    So the career development program

11  is through DOCJT, and it is a way to mark how

12  much additional training subsequent to the

13  Basic Academy that you have achieved that

14  falls within their requirements so that you

15  will be qualified for the intermediate.

16            And then subsequent to this, I

17  received my advanced officer as well.

18      Q.    Any idea how many officers and CPD

19  are advanced officers like you?

20      A.    I don't have any idea.

21      Q.    Who did you do your FTO training

22  with?

23      A.    I started with Steve Bohman.

24      Q.    Could you spell Bohman?

25      A.    B-O-H-M-A-N.  I rode with a whole

1  bunch of different officers depending on

2  people who had sick days or training or

3  other, you know, unavailability.

4           But my main were Steve Bohman,

5  James Miskanin, M-I-S-K-A-N-I-N, Josh Craig,

6  John Mairose, M-A-I-R-O-S-E, and Chris Dees,

7  D-E-E-S.  I believe that's it.

8       Q.    Are those officers still with CPD?

9       A.    Last I knew, Steve Bohman was a

10  chief somewhere in the area.  I know he was

11  the chief of Elsmere for a while.  Josh Craig

12  is still with CPD, so are Dees and Mairose.

13       Q.    "Macannon"?

14       A.    Miskanin.

15       Q.    Miskanin.

16       A.    Miskanin was with us for a little

17  bit longer, yeah.

18       Q.    Are you currently an FTO?

19       A.    I am certified as an FTO, yes.

20       Q.    And are you currently serving as a

21  field training officer for any of the

22  officers at CPD?

23       A.    No, I do not have a recruit at this

24  time.  With my change to first shift,

25  everything's kind of bounced around a little

Page 28

1    bit.

2        Q.    Do you recall when the last recruit

3    you had as an FTO -- when that would have

4    been?

5        A.    The last recruit I trained was

6    maybe four months ago.

7        Q.    You were on first shift, you said?

8        A.    Yes.

9        Q.    When did you go to first shift?

10       A.    April of this year.

11       Q.    On the evening of May 4th of 2023,

12   which is the date of the events that occurred

13   in Ashley Ferreiras's case, you were -- that

14   was third shift, right?

15       A.    Yes, sir.

16       Q.    And you were assigned third shift

17   at that time as part of your regular

18   assignments?

19       A.    Yes, sir.

20       Q.    Okay.  Why the move to first shift

21   in April of 2025?

22       A.    I've got 14 years in at this point.

23   I'm getting old.  I'm getting fat.  I'm

24   getting broken down.  It's just better for my

25   body, better for my home life, so I requested

1  to move to first shift finally.

2      Q.    You requested the move?

3      A.    I did.

4      Q.    Who did you make that request to?

5      A.    Captain Josh Bornhorn.

6      Q.    Bornhorn?

7      A.    B-O-R-N-H-O-R-N.  I suppose at this

8  point, he is -- in about a week, he will be

9  Assistant Chief Bornhorn, but he's the patrol

10  captain at the time.

11      Q.    Okay.  And as far as you know, was

12  he the person in your chain of command to

13  make that request to?

14      A.    That's correct.

15          MR. WHITTAKER:  Jeff, I don't think

16      that request is in Ullrich's file -- his

17      personnel file.  I was wondering if we

18      could get a copy of that?

19          MR. MANDO:  Yeah.  I thought we

20      produced personnel files.

21          MR. WHITTAKER:  You did produce the

22      personnel file, but I don't believe the

23      request to transfer to first --

24          MR. MANDO:  They may have occurred

25      after we --

Page 30

```
 1            MR. WHITTAKER:  It might have,
 2       yeah.  Very easily could have.
 3            MR. MANDO:  Any documents that
 4       relate to the transfer I can get you.
 5            MR. WHITTAKER:  Thank you very
 6       much.
 7       Q.    (By Mr. Whittaker) And on the
 8  evening of May 4th of '23, you were Officer
 9  Fritsch's FTO, right?
10       A.    That's correct.
11       Q.    And I think he testified that he
12  served with you in that -- or you served at
13  the -- in that role for him for a week?  Does
14  that sound right?
15       A.    I don't know about him in
16  particular, but that was pretty typical for
17  me.
18       Q.    Did you do anything to prepare for
19  this deposition?
20       A.    I did.
21       Q.    What did you do?
22       A.    I reviewed a number of documents, I
23  watched the body cam video.
24       Q.    Which documents did you review?
25       A.    I reviewed my trial testimony from
```

Page 31

1    the criminal case.  I reviewed my report and

2    citation, my use of force, and a handful of

3    general orders.

4         Q.    Okay.  Which general orders?

5         A.    Use of force.  I looked at the

6    uniform, the general order.

7         Q.    Uniform as in your physical

8    uniform?

9         A.    Yes, uniform and clothing and

10   uniform equipment.  Response to persons with

11   special needs.

12        Q.    Any other general orders?

13        A.    I'm not sure if it's within the

14   response to persons with special needs, but

15   our ADA compliance general order.  I'm not

16   sure if those are separate or the same.

17        Q.    Gotcha.

18        A.    But I believe that's it.

19        Q.    When did you review those?

20        A.    In the last couple weeks.

21        Q.    Did you meet with Mr. Mando?

22        A.    I did.

23        Q.    I don't want to know what you spoke

24   about, but when did you meet with him?

25        A.    Last week, maybe.

Page 32

1      Q.    Anybody present at that meeting

2   other than anyone in Mr. Mando's office?

3      A.    No.

4      Q.    Any idea how long you met with him?

5      A.    Not long.

6      Q.    Not long.

7      A.    Less than an hour, I think.

8      Q.    Did you discuss your deposition

9   with anybody else other than Mr. Mando or

10  anyone in his office?

11     A.    Not specifics really with anyone

12  other than I do have the deposition, and I

13  certainly spoke with my wife about it.

14     Q.    So the fact of the deposition, you

15  mentioned --

16     A.    Correct.

17     Q.    -- it to somebody?

18          THE WITNESS:  Sorry.  I'm going to

19     continue to step on him.  I apologize

20     for that.

21     Q.    And your wife is an attorney,

22  correct?

23     A.    That's correct, sir.

24     Q.    Okay.  Did she help you prepare?

25     A.    No.

Page 33

1          Q.    Has she ever helped you prepare for

2    any of your testimony in any other cases?

3              MR. MANDO:  Hold on.

4              THE WITNESS:  Yeah.

5              MR. MANDO:  Hold on.  I'm going to

6          object on the grounds of spousal

7          privilege, Federal Rules of Evidence

8          503, I believe.

9              I think -- I'm saying it's okay for

10          you to ask if they discussed.  I'm going

11          to instruct Doug not to answer anything

12          as to content of communications with

13          your wife.

14          Q.    Officer, your attorney has objected

15    to my question based on the spousal privilege

16    within the confines of the substance of any

17    discussions with your spouse about

18    preparation for testimony and instructed you

19    not to answer.  Are you taking that advice?

20          A.    I'm going to take the advice of my

21    attorney.

22              MR. WHITTAKER:  I think we agree

23          that there's no objection based on

24          whether or not the fact of the

25          discussions occurred.  Is that a fair

Page 34

1       question?

2              MR. MANDO:  I'm not objecting.  I'm

3       not instructing him.  He can answer that

4       question.

5              MR. WHITTAKER:  Okay.

6       Q.    (By Mr. Whittaker) Has she helped

7    you prepare for testimony in any other case?

8       A.    Before we were in any relationship,

9    she was a prosecutor and we had cases

10   together, and we certainly prepared for those

11   cases.  But since we've been together, we

12   have not had shared cases, and we don't prep

13   my cases through her, no.

14      Q.    When did you get married?

15      A.    Oh, I should know that.  October

16   10th of '21 sounds right.

17      Q.    And so that's when you were married

18   -- that's when you got married to your

19   current spouse?

20      A.    That's correct.

21      Q.    Because you were married before

22   her, correct?

23      A.    I was.

24      Q.    Your current spouse being a

25   prosecutor in the Kenton County Commonwealth

Page 35

1    Attorney's Office; is that fair?

2        A.    Yes.

3        Q.    Any idea how long she served in

4    that role?

5        A.    More than 10 years.

6        Q.    You said you hadn't consulted her

7    about your trial testimony since you got

8    together.  Does that mean since you got

9    married or since you became -- you started

10   dating?

11       A.    Once we began a relationship, once

12   we began dating, we then identified the

13   potential conflict and no longer worked cases

14   together.

15       Q.    Is that something you had to

16   disclose?

17       A.    I don't know if it had to be

18   disclosed.  I didn't have to disclose it

19   through my chain of command.  There's no

20   policy regarding that.

21             I know that she spoke to

22   Mr. Sanders about it to explain why she

23   shouldn't be running my cases, but I don't

24   know if there's any requirement for that.

25       Q.    Okay.  But you know that she spoke

Page 36

1    to the Commonwealth Attorney's Office, in

2    particular, Mr. Sanders?

3         A.    Yes.

4         Q.    Any idea when that was?

5         A.    June of '16, maybe.

6         Q.    Around the time you maybe started

7    dating?

8         A.    Yes.  As soon as we started dating,

9    she had that conversation.

10         Q.    Is that something that she -- I

11    want to be careful here.  Is that something

12    she told you that she needed to do, or is

13    that something -- like, was that discussed

14    before she did it, or how did that come

15    about?

16              MR. MANDO:  Objection, form.  You

17         can answer.

18         A.    We recognized the ethical

19    complications of persons in relationships on

20    two separate pieces of a criminal action, and

21    we had discussions about that.

22         Q.    Okay.  So since then, have you ever

23    been a complaining witness on a case that she

24    was handling, since 2016?

25         A.    I've never been the complaining

Page 37

1    witness on a case that she has handled.  I

2    have been an ancillary witness on a few

3    cases, which is apparently allowed through

4    the -- through the rules.

5         Q.    Any idea how many cases in which

6    you served as a witness that your spouse was

7    handling?

8         A.    One.

9         Q.    Just one?

10        A.    Yeah.

11        Q.    Was that Commonwealth v. Miller?

12        A.    Marsha Miller, yes, sir.

13        Q.    Was that disclosed ahead of time?

14        A.    I don't know.  I wasn't privy to

15   all that.  I know that the attorneys in that

16   case -- I know the attorneys in that case

17   were aware that we were married.

18        Q.    How did they become aware of that?

19        A.    I believe all the attorneys in

20   Kenton County are aware of that.

21        Q.    That's fair enough.  You mentioned

22   that you looked at the uniform.  I think you

23   said the uniform general order.  Did I hear

24   that right?  And that pertains to your

25   physical dress and equipment and things like

Page 38

1    that?

2         A.    Yes, sir.

3         Q.    Does the uniform guidelines have

4    anything to say about what gloves you wear?

5         A.    It does.

6         Q.    What does it say about that?

7         A.    It says that gloves must be -- it

8    says gloves must be within the same color

9    scheme of the uniform so as to not stand out.

10        Q.    Does it have any -- does it specify

11   what kind -- like, what material they can be

12   made of or can't be made out of?

13        A.    I believe the only thing that is in

14   that policy is that they have to be in the

15   same color scheme.

16        Q.    Okay.

17        A.    I think there's two or three lines

18   about it, and that is all.

19        Q.    Okay.  Are you an expert in hostage

20   negotiations?

21        A.    I'm a certified hostage negotiator.

22        Q.    But you wouldn't consider yourself

23   qualified to give expert testimony on that

24   topic?

25        A.    I suspect I would pass a Daubert on

Page 39

1    that.  I think I could be qualified.  I've

2    not been qualified as an expert -- nobody's

3    moved for that -- but I think, given the

4    training and experience I have, I would

5    qualify.

6         Q.    How about the use of force?

7         A.    I don't know that I would

8    necessarily be an expert in the use of force

9    policy or use of force -- use of force policy

10   or use of force itself.

11        Q.    How about an expert on the

12   engagement, handling, arrest, and

13   transportation of persons with disabilities?

14   Do you think you would be an expert on that?

15        A.    I think I would likely pass a

16   Daubert on that, yes, given my education, my

17   experience, and my training.

18        Q.    Okay.  Which particular parts of

19   your education would qualify you to testify

20   as an expert about handling and arresting and

21   transporting suspects with disabilities?

22        A.    My degree from Xavier includes a

23   minor in gender and diversity studies.

24        Q.    Okay.

25        A.    Subsequent to that, my training

Page 40

1    through DOCJT.  I'm trained as a certified

2    crisis intervention response team member.

3    I've also received training in law

4    enforcement response to special needs

5    persons.  There's additional in my CV.  I

6    don't -- without looking at it...

7                    I've arrested a lot of people over

8    14 years with varying degrees of actual

9    disability -- people in wheelchairs, people

10   in electric wheelchairs.

11                   I frequently provide training to

12   new officers and sometimes not new officers

13   about whether or not someone who utilizes a

14   mobility device such as an electric

15   wheelchair -- whether or not that constitutes

16   a motor vehicle for the purposes of DUI or

17   driving offenses, because that law is a

18   little tricky if you're not well tuned with

19   it.  I believe that pretty well covers that.

20       Q.    What about persons with crutches?

21       A.    Using crutches --

22             MR. MANDO:  Objection to form, lack

23       of foundation.

24       Q.    You testified that you teach other

25   officers and you arrest a lot of people with

Page 41

1    special needs including people with

2    wheelchairs, right?

3         A.    Yes, sir.

4         Q.    Electric wheelchairs?

5         A.    Yes, sir.

6         Q.    Does any of that training involve

7    people using crutches?

8         A.    I've certainly arrested a number of

9    people who have used crutches or canes.

10        Q.    Any particular training on that?

11        A.    I know that we receive training on

12   handling people who have different mobility

13   issues --

14        Q.    Okay.

15        A.    -- both in the basic academy as

16   well as some of those trainings that I've

17   already listed.

18        Q.    Okay.

19        A.    But I don't know of anything

20   specific off the top of my head.

21        Q.    Could you estimate how many hours

22   of training that you've taken with respect to

23   handling, arresting, and transporting people

24   with disabilities?

25        A.    I couldn't make an estimation on

Page 42

1    that.

2         Q.    Is that something you do yearly,

3    that kind of training?

4         A.    I believe our recurrent training is

5    every two years, and it frequently covers

6    different things like mobility issues or

7    disabled person issues.

8         Q.    Okay.  What did you mean by actual

9    disability?

10        A.    Well, for example, if I got into an

11   electric wheelchair right now and I was

12   drunk --

13        Q.    Yeah.

14        A.    -- that is a DUI.  If someone who

15   is utilizing an electric wheelchair because

16   that is necessary for their ability to be

17   mobile, it is not a DUI.  They are still a

18   pedestrian.

19        Q.    Okay.  Are there other instances in

20   which somebody, in your estimation, might not

21   be actually disabled?

22             MR. MANDO:  Objection to form, lack

23        of foundation.  Go ahead.

24        A.    Certainly.  We've dealt with people

25   who malinger.  We frequently have people who

1    we have to take to the hospital because they

2    lie about any particular illness or a medical

3    need or disability pretty constantly --

4         Q.    Okay.

5         A.    -- because people think that's a

6    way they can avoid getting into trouble --

7         Q.    Sure.

8         A.    -- avoid going to jail.

9         Q.    So in those instances, you would --

10   there wouldn't be a discrepancy between the

11   person's condition; it's just they're lying

12   about having a condition at all in the first

13   place that would qualify as an actual

14   disability?

15        A.    Potentially.  But then there's also

16   times -- I don't want to get into specifics

17   because I don't know -- I don't want to

18   disclose someone else's situation.

19             But I have had situations where

20   persons have said, No, I'm not drunk; I have

21   epilepsy.  No, I'm not drunk; I have -- you

22   know, the reason I can't walk this straight

23   line is I have a bad back.

24             Now, they may have epilepsy.  They

25   may have a bad back.  That doesn't -- that

Page 44

 1    doesn't prevent them from being drunk at that

 2    time.  So they may misrepresent exactly what

 3    the situation is with their particular

 4    malady.

 5         Q.    And this would be persons in the

 6    case of a DUI?

 7         A.    Those were just examples.  It could

 8    be persons in case of anything.

 9         Q.    Okay.  So not just DUIs.  Have

10    there been instances in which you've

11    perceived a suspect as being disabled but

12    they weren't?

13         A.    I don't know.

14         Q.    How many traffic stops have you

15    made in your career with CPD?

16         A.    A lot.  That was my -- it's been my

17    primary assignment since 2014.  I would be

18    kind of guessing -- throwing a number into

19    the void if I guessed.  I can tell you last

20    year, I wrote 770 seat belt citations alone.

21    I believe that's the correct number.

22         Q.    What makes that stand out?

23         A.    There's a specific award for

24    occupant protection that's issued by the

25    governor, so that number gets -- comes across

Page 45

1   my desk at the end of the year.  So I saw

2   that it was 770.  So that's only one reason

3   to stop.  You know, several traffic stops a

4   day, four days a week, for 15 years.

5        Q.    You previously testified that

6   you've done over a hundred thousand stops,

7   right?

8        A.    That may be accurate, yeah.

9        Q.    That you testified to that or that

10  the stops were in excess of a hundred

11  thousand?

12       A.    I would say both.  I think that's a

13  pretty accurate number.  I don't remember

14  specifically testifying to that, but that may

15  be accurate.

16       Q.    Now, does a stop -- is a stop

17  involved with every -- you mentioned seat

18  belt violations.  Does a seat belt violation

19  count as a stop and then some other violation

20  within that scenario count as a stop, or is a

21  stop one thing?

22       A.    I would --

23       Q.    One incident.  Sorry.

24       A.    I would define a stop as a car

25  being pulled over and whatever happens during

Page 46

1    that incident.

2         Q.    Okay.  So never -- I don't want to

3    say never, but you wouldn't consider multiple

4    stops to occur within one incident?

5              MR. MANDO:  Objection, form.  Go

6         ahead.

7         A.    Pulling over one car --

8         Q.    Yeah.

9         A.    -- at one point in time --

10        Q.    Yeah.

11        A.    -- is one incident.

12        Q.    Okay.

13        A.    There are times where I've pulled

14   over -- I've pulled over three cars at

15   once --

16        Q.    Okay.

17        A.    -- who were driving like fools.

18        Q.    Okay.

19        A.    Or there may be -- pull over a car;

20   it takes off and pulls over -- gets pulled

21   over again.

22        Q.    Okay.

23        A.    But pulling over one car at one

24   time.

25        Q.    One car, one time, one stop?

1        A.    One stop.

2        Q.    One incident?

3        A.    Yes.

4        Q.    So if there's three cars that you

5    pulled over at one time, would that be three

6    stops?

7        A.    Yes.

8        Q.    Okay.  So it's more -- it's more

9    accurate to call a stop -- a stop is a stop

10   in respect to a vehicle?

11       A.    Yes.

12       Q.    An incident, though, could be...

13   I'll ask you.  Were those three times you

14   pulled somebody over that was three stops,

15   was that one incident?

16       A.    We're getting into kind of

17   minutiae.  Is it one situation?  Yeah.  There

18   were three people who were -- I don't know if

19   they were road-raging or street racing or

20   something.  So I flipped my lights on, and

21   they all pull over.  Is that one incident?

22   Sure.

23       Q.    Okay.

24       A.    I stopped three cars.

25       Q.    Okay.

Page 48

1      A.    I would constitute that as three

2  stops.

3      Q.    Three stops.  In your mind, does an

4  -- is there any meaning behind the word

5  incident, or is that -- is that defined to

6  you, or is that something of a broader way of

7  describing an event?

8           MR. MANDO:  Objection, form.  Go

9      ahead.

10     Q.    Yeah, bad question.  Did you

11  understand what I was asking?  I'll rephrase

12  it if you like.

13     A.    I think I can offer an answer to

14  it.

15     Q.    Okay.

16     A.    So, like, an incident comes with an

17  incident number.

18     Q.    Okay.

19     A.    So, for example, in this case, the

20  incident number's, I think, 2319970, I think.

21  But if I made a stop of three cars, it would

22  only have one incident number.

23     Q.    Gotcha.

24     A.    But then at the same time, you may

25  have multiple incident numbers related to one

Page 49

1    investigation.  It's fairly fluid.

2         Q.    Okay.  And do you just sort of use

3    your best judgment in terms of whether or not

4    a new incident number needs to be assigned,

5    or is that decision made by somebody else?

6         A.    I suppose it's made by our dispatch

7    center, because I will announce I'm stopping

8    three cars --

9         Q.    Okay.

10        A.    -- at Fourth and Philadelphia --

11        Q.    Okay.

12        A.    -- and they will do the computer

13   side because I'm concerned with the

14   investigation and safety on the scene.

15        Q.    So if you're dispatched to a call

16   -- to a stop, the incident number is assigned

17   by the dispatcher?

18        A.    That's correct.

19        Q.    If the stop is precipitated by your

20   judgment of pulling somebody over, who

21   assigns the number in that -- the incident

22   number in that situation?

23        A.    The dispatcher again.

24        Q.    Dispatcher again?

25        A.    It's generated automatically --

Page 50

1    Q.    Okay.

2    A.    -- when they create the call or --

3    it's all computer stuff.

4    Q.    You don't assign an incident

5    number?

6    A.    No, I don't.

7    Q.    Somebody tells you what the

8    incident number is?

9    A.    Correct.

10    Q.    Okay.  Have you spoken with Officer

11    Fritsch about your deposition today?

12    A.    Merely that it was going to be

13    today.

14    Q.    Have you spoken to him about his

15    deposition testimony?

16    A.    Very briefly.

17    Q.    What was that conversation?

18    A.    He said -- oh, boy, what did he

19    say?  I believe it was his first deposition,

20    so we talked about how he wasn't sure what to

21    expect.

22    Q.    This is before his depo?

23    A.    No.  This was a couple days ago.

24    Q.    Gotcha.

25    A.    He had -- he hadn't -- didn't know

Page 51

1    what to expect, and it was a more relaxed

2    setting than I think he thought it was going

3    to be.

4         Q.   Well, that's good.

5         A.   He's used to a court hearing where

6    there's a judge up at the --

7         Q.   Yeah.

8         A.   -- judge's seat and all of that as

9    opposed to sitting in a conference room with

10   three or four people.

11        Q.   And is that all you talked about?

12   Anything else?

13        A.   We didn't talk about the content of

14   his deposition because, quite frankly, I knew

15   you would ask, so we didn't talk about it.

16        Q.   Anybody else you spoke to about --

17   in preparation for your deposition besides

18   Mr. Mando, anybody in his office?

19        A.   No, sir.

20        Q.   Didn't talk to Jansen?

21        A.   No.  He's been on light duty.  I

22   haven't really seen him in a couple months.

23        Q.   Did you know that he was deposed

24   the same morning as Fritsch?

25        A.   I did.

Page 52

1        Q.    Could you tell us about what

2   training you needed to do to become a field

3   training officer?

4        A.    So our field training officers are

5   selected by our command staff for that

6   training after they demonstrate knowledge and

7   expertise in basic patrol functions, as well

8   as we get sent to either Field Training

9   Officer school or PTO, which stands for

10  Patrol Training Officer school.

11             I went to that course, which is 40

12  hours, and became certified that way.  And my

13  field training specifically is geared towards

14  accident investigation, DUI enforcement,

15  traffic stops, and officer safety during

16  traffic stops, and investigations in traffic

17  stops because my supervision acknowledges

18  that that's what I do all day every day, and

19  I'm good at it.

20       Q.    And on first shift, are you doing

21  the same -- same thing?

22       A.    That's to be determined a little

23  bit.  The problem with that right now is on

24  first-shift FTO, our recruits come out of the

25  academy, they spend four or five weeks on

Page 53

1    first shift, so they are very, very green.

2        Q.    Right.

3        A.    And the type of training that I

4    typically provide as the TAP officer and FTO

5    is high-level specialized.

6              All right.  You've got all the

7    basic mechanics.  You can keep a scene safe.

8    You know where you're at.  Now let's get into

9    what does the law say as far as search and

10   seizure.  How do we conduct interviews?  How

11   do you conduct deeper interviews?  How do you

12   investigate a DUI?  How do you investigate a

13   collision?

14             So I don't know that I'm going to

15   be doing any FTO training in that vein on

16   first shift, but I'm currently training

17   Officer Fritsch because he has, in the last

18   week or so, been tapped as our new TAP

19   officer, so he is getting on boarded.

20             I gave him a bunch of documents on

21   how to track his paperwork, create a CV for

22   himself, and getting him up to speed so that

23   he will be the future of our TAP program.

24       Q.    Is he essentially replacing you in

25   that role?

Page 54

1        A.    That's correct.

2        Q.    Did you select him?

3        A.    I did not.

4        Q.    Who selected him?

5        A.    I don't know.  Someone up his chain

6    of command.

7        Q.    Okay.  So he's in a separate chain

8    of command than you?

9        A.    Well, he's on power shift --

10        Q.    Power shift.

11        A.    -- so he goes through the power

12    shift sergeant, lieutenant, and then we both

13    have the same patrol captain.

14        Q.    Okay.  And --

15        A.    And I've spoken with them generally

16    about who I thought would be a good fit for

17    that job.

18        Q.    Okay.

19        A.    It's not for everybody.

20        Q.    Sure.

21        A.    And I certainly recommended Officer

22    Fritsch as someone who has every ability to

23    do that and do it well.

24        Q.    Who did you recommend Officer

25    Fritsch to?

1         A.    I know I spoke with Sergeant Powers

2    about it.  I know that Lieutenant Haubner

3    asked me at one point who might fill that TAP

4    spot, because I know they wanted it to be

5    during power shift hours.

6         Q.    Okay.

7         A.    And I gave them a couple of names,

8    and Officer Fritsch was in that list.

9         Q.    So is it your understanding that

10   the TAP officer will be during the power

11   shift only or...

12        A.    From what I've heard from someone

13   who heard from someone, they want the next

14   TAP unit to be a power shift TAP unit because

15   the number of collisions goes up during those

16   hours.

17        Q.    Sure.

18        A.    And at that time, we're -- we're in

19   a state of flux in that the other TAP

20   officer, Officer or Specialist Krieger, is

21   set to promote at the end of the month.  So

22   we're actually going to be down to just one.

23             And that power shift gives us

24   better coverage until they get another TAP

25   officer created, up to speed, well trained,

Page 56

1   and ready to really run the street with it.

2        Q.    So would that be a first shift

3   officer, then?

4        A.    It fluctuates a little bit.

5        Q.    Yeah.

6        A.    Traditionally, they've been on

7   third shift.

8        Q.    Okay.

9        A.    And then Officer Rudy, I think, was

10  the first power shifter to be a TAP officer.

11       Q.    When was that?

12       A.    Rudy was a TAP officer before I

13  started in TAP.

14       Q.    Oh.

15       A.    So maybe 2012 he started on power

16  shift with it.

17       Q.    Okay.

18       A.    And Officer Krieger became a TAP

19  officer on second shift.  But they prefer

20  them kind of in the dark hours because that's

21  when we get more of those investigations.

22       Q.    And forgive me.  On May 4th, you

23  all were working third shift, right?  That

24  wasn't --

25       A.    That's correct.

Page 57

```
 1        Q.    That wasn't power?  Okay.

 2              What particular -- what about

 3    Officer Fritsch do you believe would make him

 4    a good fit as your replacement?

 5        A.    Officer Fritsch is driven.  He's

 6    smart.  He cares about doing the job and

 7    doing it properly.  He's detail oriented.

 8    And from the time he was a recruit in my car

 9    until now, I've seen a tremendous amount of

10    growth and development in him.

11              And what you need to be successful

12    in TAP is you need to be very detail

13    oriented, you need to have a fairly long

14    fuse, and you need to be able to follow the

15    procedure because the standard field sobriety

16    tests only work because they're standardized.

17    If you go outside of that standardization,

18    you may well get them junked out of court.

19        Q.    Right.  By long fused, do you mean

20    he's, like, a patient guy?  He doesn't

21    overreact --

22        A.    Correct.

23        Q.    -- something like that?  He tends

24    to de-escalate situations?

25        A.    He does.
```

Page 58

1        Q.    Are those skills that you believe

2    that you imparted upon him?

3        A.    I won't take full credit for

4    anything that he got trained on other than

5    DUI and traffic; but even there, he had, just

6    like I did, six or seven main training

7    officers as well as all of his other informal

8    mentors during his time here.  And him just

9    as a person -- that's where he's at.

10       Q.    Would you consider yourself to have

11   been one of his informal mentors since, say,

12   the FTO training you did with him in May of

13   '23?

14       A.    Yes.

15       Q.    Could you tell us what goes into

16   your informal mentorship of Officer Fritsch?

17       A.    So in a general -- in a general

18   space, we do a lot of what we call after

19   action where we will talk about a situation

20   after it occurs about anything that went

21   poorly, things that went well, any hiccups

22   maybe, issues that could have been handled

23   differently, legal-related issues, choice and

24   specific charges.

25             We just kind of break it down and

Page 59

1    have a pretty open conversation about the way

2    the work goes.

3        Q.    And that's --

4        A.    And many of those -- sorry.  Many,

5    many officers -- because I have trained --

6    almost everyone in patrol at this point have

7    been trained by me -- will come to me for

8    those kinds of conversations.

9            We'll get phone calls:  This is

10   what my fact pattern is.  This is what I

11   think the appropriate charge is.  Do you

12   agree?  Do you believe that's correct?  And

13   how to move forward.

14       Q.    So would that be -- that wouldn't

15   be during a call, though, would it, or would

16   that be afterwards?

17       A.    Both.

18       Q.    So an officer could call you on --

19   when they're responding to a call and say,

20   Officer Ullrich, could you -- here's what I'm

21   thinking.  Can I run this by you and get your

22   thoughts on it?

23       A.    Yeah.  I had an officer call me

24   yesterday.  He was in the middle of a traffic

25   stop.  He said, Hey, this is what I have.  Is

Page 60

1    this correct?

2        Q.    Okay.  Do they do that to you when

3    you're not even on your shifts?

4        A.    I've answered phone calls like that

5    at Disney World, on cruise ships.  I answered

6    a call like that in Hawaii.  I get them all

7    the time.  I make sure that they know that my

8    phone is always on and it's always open.

9        Q.    Okay.

10       A.    And they utilize that.

11       Q.    Okay.  And that's something --

12   that's something you let them know that

13   they're free to do?

14       A.    Absolutely.

15       Q.    Have you encouraged them to do

16   that?

17       A.    I have.

18       Q.    Okay.  You said you've trained

19   almost everyone on patrol who's currently

20   serving.  Could you -- could you tell us how

21   many officers that is in patrol that you've

22   trained?

23       A.    I believe the latest number is 84

24   officers.  Not all of those officers still

25   are with CPD.  Some of them washed out.

Page 61

1      Q.    Okay.

2      A.    Some of them have lateraled to

3   other agencies.

4      Q.    Okay.

5      A.    But I believe the number is 84,

6   plus or minus one.

7      Q.    Sure.  So that's 84 officers, some

8   of whom are still with the department, some

9   of whom may have lateraled, some of whom may

10   have washed out?

11      A.    Yes.  The vast majority is still

12   with Covington.

13      Q.    The vast majority is still with

14   Covington.  Would you put that number, the

15   vast majority, being at 60?  Does that seem

16   like a fair number?

17      A.    I wouldn't -- I wouldn't guess at

18   that number.  During my time as the TAP

19   officer, essentially with a few exceptions on

20   people who are laterals or were advanced at

21   that point, every single recruit came through

22   me for training.

23      Q.    Could you give us a time frame of

24   when that was?

25      A.    I took over TAP in February of

Page 62

1    2014.

2        Q.    So between 20 -- February of 2014

3    and when you handled -- you -- every recruit

4    went through you?

5        A.    Through when I came back in April

6    to first shift.

7        Q.    Okay.  So --

8        A.    I did take six months off in '22

9    with an injury, and I didn't get full-time

10   with those officers but have conducted other

11   training with them and would count them as

12   well.

13       Q.    So other than some interruptions

14   when you were injured in '22, between

15   February of '14 and April of '25, you would

16   estimate that you trained every patrol

17   officer who came through CPD?

18       A.    With the exception of a couple

19   laterals, some rehires.

20       Q.    Right.

21       A.    You know, Matt Hugenberg spent 27

22   years as a Covington police officer, retired,

23   and came back.  He didn't need the training.

24   The same with a couple other retiree hires.

25       Q.    Are you proud of that?  Is that an

Page 63

1    accomplishment in your eyes?

2         A.    I am.

3         Q.    Have there been officers who you

4    trained who you just knew weren't going to

5    cut it?

6         A.    Yes.

7         Q.    Could you estimate -- would those

8    be the washouts?

9         A.    Yes.

10        Q.    Could you estimate how many of

11   those there were?

12        A.    Five to ten that just physically

13   couldn't do the job.

14        Q.    Physically couldn't.  And is that

15   -- that's something you can -- you can...

16   Can you tell something like that pretty

17   quickly when you first start working with a

18   recruit?

19        A.    No.  I try to make sure that we

20   give everyone a fair shake, you know.

21   It's -- 118 is a big department, and that's

22   where we're at, but it's also a small

23   department.

24        Q.    Sure.

25        A.    We know everybody.  So as they're

Page 64

1    making their way through first shift, second

2    shift, and finally onto third shift, I'll run

3    with them on some calls, and I'll see them.

4    I'll hear from the other FTOs.

5                And I read everybody's evaluations

6    before they get in my car.  So I have a fair

7    read on them, but I also try to make sure

8    that I give them the benefit of the doubt,

9    get them in my car, and see what kind of work

10   they can do.

11        Q.    Okay.

12        A.    Everybody learns differently and at

13   different speeds.

14        Q.    5 or 10 of them, though, you just

15   knew -- you knew weren't going to make it?

16        A.    Yes.

17        Q.    Okay.  How often has Officer

18   Fritsch come to you informally for advice?

19        A.    I would qualify it as frequently,

20   but I couldn't give you numbers, and

21   especially now that we're on opposite shifts.

22   I get off at 5.  He starts at 5.  We see each

23   other pretty infrequently.  But in the last

24   week since he's become a TAP officer, we've

25   been talking almost every day.

Page 65

1      Q.    Okay.  When was he tapped to become

2  a TAP officer?

3      A.    I don't know the specific day.  I

4  found out about it maybe a week ago.  I had

5  been on vacation earlier, so he may have --

6      Q.    Sure.

7      A.    It may have been during that time.

8      Q.    This might be included the advice,

9  but do you socialize with Officer Fritsch

10  outside of work?

11      A.    No, not generally.

12            MR. WHITTAKER:  I think this is a

13       good time to take a break.  I'm going to

14       move on to a different line of

15       questioning if it's okay for everybody.

16            (A brief break was taken.)

17      Q.    (By Mr. Whittaker) Officer Fritsch,

18  you're still under -- Officer Ullrich, you're

19  still under oath.  Do you understand that?

20      A.    Yes.

21      Q.    And I've got a Fritsch, a Jansen,

22  and an Ullrich, so if I mix up names, that is

23  not intentional.  That is what my ADHD does.

24  So I apologize for calling you Fritsch.

25            You testified during the criminal

Page 66

1    proceeding -- during Ashley Ferreiras's

2    criminal trial, right?

3        A.    I did.

4        Q.    And you know what I mean by that?

5    Do you need me to find the case number or

6    anything like that?

7        A.    No.

8        Q.    Okay.  And that was in June of '24,

9    right?

10       A.    That sounds right.  I don't know

11   exactly when it was.

12       Q.    And you testified truthfully at all

13   times during that -- your testimony, right,

14   in that trial?

15       A.    I did.

16       Q.    As you do in every instance, right?

17       A.    Yes.

18       Q.    Whether in a deposition or in a

19   court proceeding in front of a judge?

20       A.    Yes.

21       Q.    Same with grand jury proceedings?

22       A.    Yes.

23       Q.    I'm going to hand you...  I was

24   going to hand you a copy of your Use of Force

25   Report, but I don't think I have other copies

Page 67

1    of it.

2              MR. MANDO:  I should have a copy.

3              MR. WHITTAKER:  It was introduced

4         as Exhibit 9.

5              MR. MANDO:  I've got a copy of

6         Doug's Use of Force Report Bates stamped

7         Defendants' 588 through 592.

8              MR. WHITTAKER:  And that's dated --

9         it's report number 23019970?

10             MR. MANDO:  Correct.

11             MR. WHITTAKER:  Dated 5/24/23?

12             MR. MANDO:  At 2326 hours.

13             MR. WHITTAKER:  Would you mind

14        letting him use that in lieu of me

15        making the mistake of not having an

16        exhibit?  And I will get you a copy of

17        this.

18             MR. MANDO:  You have that marked as

19        exhibit number what?

20             MR. WHITTAKER:  9.

21        Q.    (By Mr. Whittaker) With that out of

22   the way, Officer Ullrich, do you recognize

23   the document that was just handed to you?

24        A.    Yes, sir.

25        Q.    Do you recognize it as your Use of

Page 68

1   Force Report.

2       A.   Sure.

3       Q.   Is report number the same as

4   incident number?

5       A.   I think they're used

6   interchangeably.

7       Q.   Okay.  Do you recognize this as the

8   Use of Force Report prepared by you in Ashley

9   Ferreiras's case?

10      A.   It was prepared initially by me,

11  and then it was edited or adjusted by all of

12  the command staff that are listed on page 4.

13      Q.   Okay.  Is that your -- is that your

14  signature under responding -- no.  I'm sorry.

15  Your signature's on page 3, right?

16      A.   Yes, sir.

17      Q.   And 0265, is that a number used to

18  identify you as a police officer?

19      A.   Yes, sir.  It's my badge number.

20      Q.   Badge number.  So the persons

21  listed on page 4 of this document, these --

22  the responding supervisor, watch commander,

23  bureau commander, training section

24  supervisor, executive officer, assistant

25  chief, and the chief of police are all people

Page 69

1    who reviewed this Use of Force Report?

2         A.    That's correct.

3         Q.    And this is their signatures --

4    respective signatures under wherever their

5    signature belongs?

6         A.    Yes, sir.

7         Q.    And these folks reviewed -- did

8    they review a written draft that you had

9    prepared, or was this something you discussed

10   with them orally, you put it in your report,

11   you handed it to them, they signed off?

12        A.    I don't recall on this particular

13   case if there was a draft or not.

14        Q.    Okay.  Would it be typical for

15   there to be a draft?

16        A.    Not typically, no.  We -- I discuss

17   the situation with the responding supervisor,

18   create the report, and then it may go up or

19   down a couple times.  It depends on --

20   frequently, there are clerical errors or

21   anything that needs to be corrected.

22        Q.    Is that what it's checked for, for

23   clerical errors and grammar and things like

24   that?

25        A.    You'd have to ask --

Page 70

1          MR. MANDO:  Objection.  Document

2     speaks for itself.  Go ahead.

3     Q.    As far as you know, were any

4 changes made to your -- the document you

5 prepared?

6     A.    I don't know.

7     Q.    Does anyone tell you if there are

8 any changes?

9     A.    I don't recall.  This was two years

10 ago.

11    Q.    As far as you know, do the persons

12 on page 4 who review this -- do they ever

13 make changes to your reports; do you know?

14    A.    I know that changes have been made,

15 yes.

16    Q.    You just don't know if changes were

17 made to this one?

18    A.    That's correct.

19    Q.    Other than the people listed on

20 page 4 of your Use of Force Report, did

21 anybody else review -- did anybody else

22 review the Use of Force Report before you

23 signed it?

24    A.    I don't have any idea who reviewed

25 it.

Page 71

1          MR. MANDO:  Objection, form.  Your

2      question presumes that it was reviewed

3      by all these folks before he signed it.

4      Q.    That's a good...  When did you sign

5  the document?

6      A.    I sign it on the night of the force

7  and then provide it up the chain.

8      Q.    Gotcha.  Thank you for that

9  clarification.  So you sign it the night of

10  when the force is used.  Then you hand it up

11  the chain?

12      A.    Yes, sir.

13      Q.    Does it come back to you at any

14  point?

15      A.    It can.

16      Q.    Did this one?

17      A.    I don't recall.

18      Q.    What instances would inform whether

19  or not it came back to you?

20      A.    If there are clerical errors, as I

21  said, or if the narrative contains any issues

22  or problems with it.

23      Q.    What kind of issues or problems?

24      A.    If it lacks appropriate context for

25  them to be able to sit and read it and

Page 72

1    understand what exactly happened, or it may

2    have other issues.

3              Frequently, reports will get kicked

4    back if it doesn't indicate that there was

5    body camera or if the handcuffs are double

6    locked.  Those are -- I know those are

7    frequently cited issues.

8         Q.    I see.

9         A.    But anything that could be pretty

10   small minutiae to any major issues.

11        Q.    Okay.  Did you show this to Officer

12   Fritsch at any point before sending it up the

13   chain of command?

14        A.    No, I don't believe so.

15        Q.    Was it something you prepared at

16   the hospital that night?

17        A.    I don't recall.  I know I worked on

18   the computer.  I don't know what I was typing

19   on the computer.

20        Q.    Let me create some better

21   foundation for that.  After you all arrested

22   Ashley Ferreiras on March -- I'm sorry, May

23   4th, right?

24        A.    That's correct.

25        Q.    And then you transported her to

Page 73

1    Saint E.?

2         A.    Yes, sir.

3         Q.    Which office or which facility of

4    Saint E.; do you recall?

5         A.    Saint E. Covington.

6         Q.    And then you transported her to

7    jail after she was cleared?

8         A.    We did.

9         Q.    And my question was whether or not

10   you worked on your Use of Force Report at the

11   hospital, being Saint E. In Covington, after

12   you had transported Ashley Ferreiras to there

13   after arresting her.  Just to clarify, that's

14   when I was asking about.  Does that ring a

15   bell at all?

16        A.    I know she was there for a while,

17   and I was working on the computer.  I don't

18   know what I was working on at that time.

19        Q.    Is that a department-issued laptop?

20        A.    It is.

21        Q.    What's that called again?

22        A.    We typically refer to it as an MDC.

23        Q.    What's MDC stand for again?

24        A.    Mobile data computer, I think.

25        Q.    At the top, it says that she was --

Page 74

1    the time is 2326 hours.  Do you see that?

2         A.    Yes, sir.

3         Q.    Was that when the arrest occurred

4    or when you prepared your report?

5         A.    That should be the time the force

6    was used.

7         Q.    Force was used.  Okay.  And does

8    the date -- the date refers to the date in

9    which the force was used, right?

10        A.    Yes, sir.

11        Q.    Could the date on which the report

12   was prepared be different than the date in

13   which the force was used?

14        A.    Yes.

15        Q.    Okay.  For instance, you know, you

16   could have gone -- force could have been used

17   at 2326, and it takes you a while to transfer

18   her to the jail.  I'm just wondering if you

19   could have prepared the report early in the

20   morning of 5/5.  Is that possible?

21        A.    I would expect that this report was

22   not completed prior to then.

23        Q.    Sure.  Okay.  And your signature is

24   not dated, right?

25        A.    No, it is not.

1    Q.    Okay.  And you can't -- because

2    it's been a few years, you can't -- you can't

3    tell us whether or not you prepared the

4    report on 5/4 or if whether or not the report

5    was prepared the next morning?

6    A.    I can't tell you.  It was during

7    that same shift.

8    Q.    Okay.

9    A.    But I can't tell you if it was

10   before midnight or not.

11   Q.    Okay.  So you prepared the report

12   during your shift regardless of whether or

13   not it was on 5/4 or 5/5?

14   A.    That's correct.

15   Q.    And that shift ended at what time?

16   A.    Traditionally, it ends at 8:00 a.m.

17   I don't know if we went home early or late

18   that day for any reason.

19   Q.    Okay.  As far as you know, is

20   everything in your Use of Force Report true

21   and accurate?

22   A.    Yes, sir.

23   Q.    Okay.  As far as you know, nobody

24   added any information to this that you didn't

25   include in it yourself?

Page 76

1          A.     I don't know.

2          Q.     So the nature of the call was for a

3    traffic stop, right?

4          A.     It was.

5          Q.     The reason for presence, does that

6    refer to you or to the -- or Ms. Ferreiras?

7          A.     To us.

8          Q.     And self-initiated refers to the

9    traffic stop or to your interaction with

10   Ms. Ferreiras?

11         A.     The traffic stop.

12         Q.     Okay.  So the reason for presence

13   is the literal reason why you were in the

14   presence of Ashley Ferreiras that night?

15               MR. MANDO:  Objection, form.

16         A.     The reason for presence is that we

17   initiated a traffic stop.

18         Q.     Okay.  You would not have been in

19   presence to use force but for that traffic

20   stop, fair?

21         A.     Agree.

22         Q.     You had no other reason to be on

23   Nancy Street that night?

24         A.     I mean, we patrol the whole city,

25   but --

Page 77

1          Q.     Sure.

2          A.     -- there was no specific other

3     situation that brought us to Nancy Street in

4     that moment.

5          Q.     Gotcha.  And the reason force was

6     used -- I'm sorry.  I'm at the top -- I guess

7     that would be the top fifth of the page,

8     maybe.  The reason force was used is to

9     effect arrest, right?

10         A.     Yes, sir.

11         Q.     Does that mean you had to use force

12    in order to...  Sometimes I don't know if

13    these mean literally what they say or if

14    there's a euphemism behind it.  You had to

15    use force to put her under arrest?

16         A.     Yes.

17         Q.     And to defend yourself?

18         A.     Yes, sir.

19         Q.     And to protect other officers?

20         A.     Yes, sir.

21         Q.     Okay.  Any other reasons why force

22    was used that evening?

23         A.     No.

24         Q.     If it's not in the report, it

25    wasn't -- it wasn't a reason, fair?  If you

Page 78

1    didn't list it in your report as a reason for

2    use of force, it wasn't a reason for use of

3    force?

4         A.    That's fairly broad.

5         Q.    Yeah.  Let me ask it better.  What

6    other reasons for the use of force could

7    there have been?

8         A.    You can use force to protect a

9    person.

10        Q.    Okay.

11        A.    I had a person yesterday who was

12   dealing with a mental health crisis running

13   back and forth across I-75.

14        Q.    Goodness.

15        A.    You could use it to protect a

16   civilian or a victim.  I'm sure there's other

17   reasons that I can't come up with off the top

18   of my head.

19        Q.    In your estimation, no one was

20   having a mental health crisis on May 4th,

21   right?

22        A.    My knowledge at this point, no, I

23   don't believe anyone was having a mental

24   health crisis.

25        Q.    Your knowledge now?

Page 79

```
 1      A.    Yes.

 2      Q.    What about at the time?

 3      A.    I had no idea what was going on

 4  with Ms. Ferreiras.

 5      Q.    What about the bystander, her

 6  brother?

 7      A.    I don't know that I even spoke with

 8  him.  I don't know if he was or not.

 9      Q.    But you knew he was there?

10      A.    There was at least one bystander

11  there.  I think there might have been more

12  than one.

13      Q.    More than one?

14      A.    I don't recall that.

15      Q.    But do you know who I mean -- do

16  you know who I mean -- we're going to get

17  into the body cam video, but do you know who

18  I mean when I refer to her brother?

19      A.    John Carlos.

20      Q.    John Carlos.  And that's -- okay.

21  So you knew he was there?

22      A.    I knew he was there.

23      Q.    You observed him?

24      A.    Yes.

25      Q.    Did you hear him?
```

Page 80

1          A.    I don't remember if I heard him.  I

2     certainly didn't -- I wasn't listening to

3     what he was saying because I was speaking

4     with Ms. Ferreiras.

5          Q.    So you don't recall if you heard

6     anything that he said?

7          A.     I could have heard that he was

8     speaking --

9          Q.    Yes.

10         A.     -- but I wasn't hearing the words

11    he was saying --

12         Q.    Okay.

13         A.     -- because I was otherwise

14    preoccupied.

15         Q.    Fair enough.  You could have heard

16    that he was speaking but not have registered

17    the content of his speech?

18         A.    Yes.

19         Q.    Did you see him?

20         A.    I did.

21         Q.    Do you recall when the first time

22    you saw him was?

23         A.     When he walked all the way up to

24    Ms. Ferreiras while she was still standing.

25         Q.    Okay.  Present at the scene besides

Page 81

1    yourself was Officer Fritsch?

2         A.    He was.

3         Q.    Jansen, right?

4         A.    He was.

5         Q.    Goshorn?

6         A.    Yes, sir.

7         Q.    Were there any other officers

8    present at 2326 hours on 5/4/2023?

9         A.    Not to my knowledge.

10        Q.    Other officers arrived later; is

11   that fair?

12        A.    Definitely.

13        Q.    Do you know who those officers

14   were?

15        A.    I couldn't tell you everyone that

16   was there, I don't think, but I know that

17   Officer Brown...

18        Q.    Nicollette Brown?

19        A.    Yes, sir.  He's now Captain

20   Haggard.  I think he was the lieutenant at

21   the time.  Sergeant Gilliland.  I don't

22   remember who else showed up off the top of my

23   head.

24        Q.    Nicollette Brown -- Officer Brown

25   is an officer, right?  She's not a captain or

Page 82

```
 1   a lieutenant?

 2        A.    She's a detective.

 3        Q.    She's a detective.  Was she a

 4   detective then?

 5        A.    No.

 6        Q.    On that evening, you held the title

 7   of specialist, right?

 8        A.    Yes, sir.

 9        Q.    Is that a rank separate from

10   officer, or is that --

11        A.    It is.

12        Q.    Okay.  So specialist outranks

13   officer; is that fair?

14        A.    It is separate from officer.

15        Q.    Okay.

16        A.    There's a pay difference --

17        Q.    Okay.

18        A.    -- but it does not have a chain of

19   command difference.

20        Q.    No chain of command difference.  So

21   Jansen at the time was also a specialist; is

22   that right?

23        A.    He was.

24        Q.    Was Goshorn?

25        A.    Yes.
```

Page 83

1       Q.    Fritsch was not, correct?

2       A.    Correct.

3       Q.    Who initiated the stop?  Was it you

4   or Fritsch?

5       A.    Officer Fritsch.

6       Q.    And you know what I mean by the

7   stop, the stop that the -- the traffic stop

8   that you initiated on Nancy Street on 5/4?

9       A.    Yes.

10      Q.    Officer Fritsch initiated, you

11  said?

12      A.    Yes.

13      Q.    Okay.  At that time, he was still

14  in the field training -- field training

15  program, right?

16      A.    Yes, sir.

17      Q.    Under your supervision?

18      A.    Yes, sir.

19      Q.    Now, Jansen and Goshorn arrived --

20  they're bicycle officers, right?

21      A.    Yes, sir.

22      Q.    Did they arrive based on -- did you

23  call for their assistance, or how did -- how

24  did they come to be there?

25            MR. MANDO:  Objection, form.  Go

Page 84

1          ahead.

2          A.    I don't know if Officer Fritsch

3    requested a second unit.

4          Q.    Okay.

5          A.    I know that they were close by and

6    showed up very quickly.

7          Q.    Okay.  So Officer Fritsch could

8    have requested a second unit.

9          A.    Yes, it's typically what happens.

10         Q.    Okay.  You did not request a second

11   unit?

12         A.    I don't recall being on the radio

13   until after she was in custody.

14         Q.    Okay.  As far as you remember and

15   as far as you're concerned, this is Fritsch's

16   -- it was Fritsch's stop, right?

17         A.    It is.

18         Q.    And it was up to him to request

19   additional officers?

20         A.    Yes.

21         Q.    But I think you said it would be

22   pretty standard for additional officers to be

23   called for something like this?

24         A.    A traffic stop is typically a two

25   unit or a two dispatched unit call.

Page 85

1        Q.    And is that because of -- I think

2    you testified -- I don't know if you

3    testified.  Are traffic stops inherently

4    dangerous?

5        A.    They are the second leading cause

6    to officer death on the job.

7        Q.    What's the first?

8        A.    Domestic violence situations.

9        Q.    So as a matter of course,

10   particularly at 11:30 at night, there would

11   be a second unit to arrive?

12       A.    Yes.

13       Q.    If Officer Fritsch didn't request

14   them and you didn't request them, would they

15   have been dispatched automatically?

16       A.    Potentially.

17       Q.    Okay.  Any other way that they

18   would have been -- any other way that they

19   would have had cause to go to your traffic

20   stop?

21       A.    Yes.

22       Q.    What other ways?

23       A.    They heard the traffic stop on the

24   radio.

25       Q.    Okay.

Page 86

1          A.     They were close by.

2          Q.     Okay.

3          A.     They are competent, well-trained

4     officers who recognize the need for a second

5     unit on a traffic stop --

6          Q.     Okay.

7          A.     -- and so would self-initiate their

8     response.

9          Q.     Gotcha.  So when you in your Use of

10    Force Report say to use force to protect

11    other officers, which other officers were you

12    protecting?

13         A.     Well, at that point, she had

14    already assaulted myself and Officer Fritsch

15    repeatedly.  So at the very least, Officer

16    Fritsch, let alone the other officers on

17    scene.

18         Q.     It's your testimony that she

19    assaulted you and Fritsch?

20         A.     It's what she was convicted of,

21    yes.

22         Q.     Is that what she did?

23         A.     It is.

24         Q.     And so were you there to protect

25    anyone besides yourself and Fritsch?

Page 87

```
 1        A.    Yes.

 2        Q.    Who?

 3        A.    Officer Goshorn and Officer Jansen

 4   were also on the scene.

 5        Q.    And in your estimation, were they

 6   in danger?

 7        A.    Potentially, yes.

 8        Q.    What potential danger did Ashley

 9   Ferreiras pose to Goshorn?

10        A.    I don't know if she has a gun, a

11   knife.  Any weapon whatsoever could have been

12   on her.

13        Q.    Same with the driver, right?

14        A.    Exactly.

15        Q.    But Goshorn was left alone with the

16   driver, wasn't he?

17        A.    He was.

18        Q.    What risk did she pose to Jansen?

19        A.    Again, she may have had a gun, a

20   knife.  It's impossible to tell until she's

21   put in custody and searched.

22        Q.    If we go down to -- I want to call

23   it the bottom quarter of the first page of

24   your report, there's a box that says, Level

25   of resistance by suspect, parenthesis, mark
```

Page 88

1    all that apply.  Do you see that?

2          A.    Yes, sir.

3          Q.    In the middle column, there is a

4    box with an "X" in it that says, Displays

5    aggression.  Do you see that?

6          A.    Yes, sir.

7          Q.    Did you place that "X" there?

8          A.    I did.

9          Q.    What aggression did Ashley

10   Ferreiras display?

11         A.    She elbowed Officer Fritsch in the

12   face, breaking his glasses.  She was pulling

13   away, yelling and screaming.  When on the

14   ground, she kicked me, and then she bit me,

15   and then she kicked me again.

16         Q.    Anything else?

17         A.    Her pulling, shoving, all of that

18   was aggressive.

19         Q.    Pulling and shoving?

20         A.    Yes.

21         Q.    Elbowed Fritsch?

22         A.    Yes.

23         Q.    Kicked you?

24         A.    Yes.

25         Q.    Did you say yelling?

Page 89

1       A.      Yes.

2       Q.      Bit you?

3       A.      Yes.

4       Q.      What other displays of aggression?

5       A.      I believe that's all.

6       Q.      Okay.  If there were other displays

7    of aggression, you would have included it in

8    this report, right?

9       A.      I would -- not in that specific

10   area but certainly in the narrative.

11      Q.      Fair enough.  What aggression had

12   she displayed before you put her under

13   arrest?

14      A.      I don't think I would have

15   qualified her as aggressive prior to telling

16   her she was going to jail other than directly

17   approaching officers and refusing numerous

18   commands to stop and go back into the yard.

19      Q.      Which officers did she approach?

20      A.      Me.

21      Q.      Any other officers that she

22   approached?

23      A.      Officer Jansen, who was next to me.

24      Q.      Officer Jansen was next to you by

25   your cruiser, wasn't he?

Page 90

1      A.    He was.

2      Q.    He wasn't next to you on the

3  sidewalk?

4      A.    I believe he was close to me on the

5  sidewalk.  I couldn't tell you exactly where

6  he was at that point.

7      Q.    Matter of fact, the reason why

8  Ashley Ferreiras was anywhere near you is

9  because you went to the sidewalk where she

10  was standing, right?

11      A.    No, that's not correct.

12      Q.    Did she approach you off the

13  sidewalk towards the car?

14      A.    She did not come off the sidewalk,

15  no.

16      Q.    Okay.  But had you -- was she

17  approaching -- was she approaching you or

18  fixing to approach you when you were standing

19  by the car with Jansen?

20      A.    Yes.

21      Q.    She was about to approach you and

22  Jansen when you were standing at the car with

23  Jansen?

24      A.    I don't know what she was about to

25  do.

Page 91

1        Q.    Okay.

2        A.    She could have been about to do a

3   lot of things, but she was, in fact,

4   approaching me while we were on the stop.

5        Q.    And to clarify, she was approaching

6   you while you and Jansen were standing at the

7   car?

8        A.    She was.

9        Q.    Okay.  And you immediately were

10  able to tell that she was using crutches,

11  right?

12       A.    I saw that she had crutches.

13       Q.    At what point did you see that she

14  had crutches?

15       A.    When she began to approach the stop

16  by coming outside.

17       Q.    When she came outside of her house?

18       A.    Yes.

19       Q.    Okay.  Is it your testimony that

20  she was approaching the stop upon exiting her

21  home?

22       A.    Yes.

23       Q.    And by exiting a home, I mean

24  coming out of her front door or the side door

25  or whatever door she came out of the

Page 92

1    building.

2        A.    Yes.

3        Q.    Okay.  So her approaching the stop,

4    in your estimation, began upon her exiting

5    her door?

6        A.    My observation of her approaching

7    the stop was her exiting the door to come to

8    the stop.  I suppose there's an argument that

9    when she decided to get dressed and then come

10   downstairs, she was approaching the stop in

11   that moment, but I obviously would be unaware

12   of that.

13       Q.    Okay.  And you observed that she

14   was using crutches when she exited the door

15   to her home?

16       A.    When she came around the side of

17   the house was -- as soon as I could see her

18   outside, I saw that she had crutches with

19   her.

20       Q.    Okay.  You couldn't necessarily see

21   her as soon as she came out of her door, but

22   as soon as you saw her come from the side of

23   her house, you could see that she was wearing

24   -- or she was using crutches, right?

25       A.    Correct.

1       Q.    And that was the first time you had

2    seen her, from your perspective, approaching

3    the stop?

4       A.    Correct.

5       Q.    And you saw that she was wearing a

6    cast or a boot or some sort of something on

7    her ankle, right?

8            MR. MANDO:  Objection, form.  You

9       may answer.

10      A.    I think I described it in my

11   reports as a wrap.  She had something on her

12   -- on her ankle.

13      Q.    Okay.  How long did it take her to

14   get to -- and you're aware that there was a

15   fence around the property?

16      A.    There is.

17      Q.    And was there a gate as well?

18      A.    There is.

19      Q.    Could you estimate how long it took

20   her to get from her door to the gate?

21      A.    No, I can't estimate that.  From

22   the time that I could see her to the time

23   that she got to the gate was just a few

24   seconds.

25      Q.    Okay.  So in your opinion, was her

Page 94

1   approaching the stop cause to arrest her when

2   she was approaching the stop in her yard?

3           MR. MANDO:  Objection, form.  You

4       may answer.

5       A.    No.

6       Q.    How about when she reached her

7   gate?

8       A.    No.

9       Q.    What about when she opened her

10  gate?

11      A.    No.

12      Q.    What about when she stepped outside

13  of the gate?

14      A.    Because I had told her not to come

15  out, not to approach the stop, and she did so

16  anyway, I believe at that time she could have

17  been arrested right then.

18      Q.    So upon exiting her gate, it's your

19  understanding that she could have been

20  arrested -- or your belief that she could

21  have been arrested then?

22          MR. MANDO:  Objection to form.  You

23      may answer.

24      Q.    For the reasons that you testified,

25  you had instructed her not to come out?

Page 95

1       A.      Correct.

2       Q.      Where was the stop in relation to

3   Ms. Ferreiras's home?

4       A.      10 steps away.

5       Q.      The car was stopped 10 steps away

6   from her home?

7       A.      You asked where the stop was, not

8   where her car was.

9       Q.      No, not her car.  His car.  I'm

10  sorry, the car that you stopped.

11      A.      Sure.  The stop includes both his

12  car --

13      Q.      Okay.

14      A.      -- and the police car, obviously.

15  And we were -- I think I took three, four,

16  maybe five steps to step up onto the sidewalk

17  to block her off.

18      Q.      Okay.  So the stop includes the car

19  that was stopped and the police car that's --

20  that was driven by the officer who stopped

21  it?

22      A.      Yes.

23      Q.      Okay.  Where was the car that was

24  stopped?

25      A.      15, 20 feet in front of the police

Page 96

 1  car.

 2        Q.    Is that a dead end on Nancy Street?

 3  Is that right?

 4        A.    The street ends into a parking lot

 5  that connects to a church, and that opens up

 6  to a street beyond it.

 7        Q.    16th Street on the other side?

 8        A.    Yes.

 9        Q.    And there is a house between

10  Ms. Ferreiras's house and that fence to the

11  parking lot, right?  There's a neighboring

12  house between Ashley Ferreiras's house and

13  the fence separating Nancy Street from the

14  church parking lot?

15        A.    At least one.

16        Q.    At least one house?

17        A.    Correct.

18        Q.    Okay.  So is approaching the

19  traffic stop in your mind different than

20  interfering with the traffic stop?

21        A.    Yes.

22        Q.    Okay.  In this instance, was Ashley

23  Ferreiras's approach also interfering with

24  the traffic stop?

25        A.    Once she came out and placed

Page 97

1    herself into the stop, yes.

2         Q.    Is it your testimony that she was

3    in the stop immediately upon exiting her

4    fence?

5         A.    She continued to go into the stop

6    deeper.

7         Q.    Okay.  Did the stop -- my question

8    was whether or not -- as soon as she exited

9    her fence, was she -- had she entered the

10   stop?

11        A.    Yes.

12        Q.    Okay.  Was there anything -- any

13   barrier or any other indication telling any

14   -- telling her that her fence was the barrier

15   between her and the stop?

16        A.    Other than my repeated

17   instructions?

18        Q.    Yes.

19        A.    Other than my repeated

20   instructions, no.

21        Q.    Okay.  At no point did she move to

22   step off of the sidewalk and move -- advance

23   towards the car, right?

24        A.    I stepped in front of her before

25   she could do that.

Page 98

1    Q.    So she did not?

2    A.    Correct.

3    Q.    And when you stepped in front of

4  Ferreiras onto the sidewalk, you were

5  standing between her and the stop, right?

6    A.    We were in the stop at that point,

7  but I was standing between her and Max's car.

8    Q.    Okay.  Did you speak with anybody

9  from the Kenton County Commonwealth

10  Attorney's Office in preparation for your

11  depo today?

12    A.    Other than my wife, no.

13    Q.    Okay.  Have you ever spoken to

14  anyone at the Kenton County Commonwealth's

15  office about preparation for any testimony

16  you've ever given before?

17    A.    Of course.

18    Q.    Okay.  How about in Ashley

19  Ferreiras's case?

20    A.    Of course.

21    Q.    Okay.  Jansen was also between her

22  and the car, right?

23    A.    He was.

24    Q.    Okay.  And Goshorn was at the car?

25         MR. MANDO:  Can we clarify?  When

Page 99

```
 1        you're saying car, you're purposefully
 2        differentiating that from cruiser?
 3        Q.   Good question.  I will call the
 4   cruiser --
 5             MR. MANDO:  The cruiser.
 6        Q.   Okay.  The cruiser being the
 7   vehicle that you and Fritsch pulled up in.
 8   Is that what you mean by the other vehicle at
 9   the stop beyond the car that was pulled over?
10        A.   Yes.
11        Q.   Okay.  So your cruiser and the car
12   that were pulled over are the two vehicles at
13   the stop?
14        A.   Correct.
15        Q.   Okay.  And when I -- when we were
16   discussing -- when I was discussing you
17   standing with Officer Jansen at a car, I was
18   referring to the cruiser.  Was that right;
19   you were standing with Jansen at your
20   cruiser?
21        A.   That was my understanding of your
22   understanding.
23        Q.   Okay.  I just -- counsel raised the
24   issue, and I wanted to make sure everyone
25   knew I was talking about a cruiser versus the
```

Page 100

1    stopped car.

2         A.    Right.

3         Q.    And Ferreiras did not ever approach

4    the cruiser?

5         A.    She did.

6         Q.    Okay.  I thought you just testified

7    that you stopped -- you prevented her from

8    approaching the cruiser.

9         A.    No.  I said I prevented her from

10   stepping off the curb.  She walked the 40 or

11   50 feet from her door, out of her yard, onto

12   the sidewalk, down the sidewalk.

13        Q.    40 or 50 feet from inside her yard

14   to where she eventually stopped walking?

15        A.    From her door to her gate, out of

16   the yard onto the sidewalk, down the sidewalk

17   where I stopped her.

18        Q.    That was 40 feet from her door?

19        A.    Approximately.

20        Q.    Okay.  Then I'm -- I just want to

21   make sure I'm clarifying.  When she stepped

22   out of her gate onto the sidewalk, she did

23   not advance towards the cruiser, did she?

24        A.    She does.

25        Q.    She does.  She advances into the

Page 101

1    street?

2         A.    No.

3         Q.    Okay.

4         A.    She does not step off the sidewalk.

5         Q.    Okay.  But she made some sort of

6    movement to advance towards the cruiser?

7         A.    Not in a straight line at the

8    cruiser, but by coming down the sidewalk, she

9    is getting closer.  She is advancing into the

10   stop, getting closer to the cruiser.

11        Q.    All right.  So she's getting

12   physically closer to the cruiser.  Is that

13   not different than advancing towards the

14   cruiser?

15        A.    No.

16        Q.    That is not different.  So by

17   virtue of her becoming closer to the cruiser,

18   she was advancing towards it?

19        A.    If you're 10 feet away, whether

20   you're off to the right or off to the left,

21   you're still 10 feet away.

22        Q.    I'm trying to draw -- I'm trying to

23   figure out if there's a distinction between

24   the act of physically becoming closer to the

25   cruiser and advancing towards the cruiser.

1        A.    Apparently, I do not understand the

2   word "advancing" --

3        Q.    Okay.

4        A.    -- because she has her body in a

5   position.  It is a certain distance from our

6   stop, from our cruiser.  That distance

7   continues to shrink.  I accept that as

8   advancing towards us.

9        Q.    Okay.

10       A.    Whether it's in a straight line or

11  she's zigzagging or if she's walking

12  tangentially --

13       Q.    Okay.

14       A.    -- she's getting closer to us which

15  raises her threat level.  She's been told

16  numerous times to stop and to go back.  She's

17  not.  Again, raises the threat level.

18       Q.    Okay.  Maybe this will clarify.  Do

19  you believe she was intentionally moving

20  closer to the cruiser?

21       A.    Yes.

22       Q.    Upon stepping out on the sidewalk,

23  did she intentionally move towards the

24  cruiser?

25       A.    Yes.

Page 103

1      Q.    Okay.  We agree that she didn't

2   step off the sidewalk?

3      A.    We do.

4      Q.    What was the movement she made to

5   step towards the cruiser from the sidewalk if

6   not stepping off of it?

7            MR. MANDO:  Objection, form.  Go

8       ahead.

9      A.    She stepped onto the sidewalk at

10  the gate.  She then walked down the

11  sidewalk --

12     Q.    Yeah.

13     A.    -- towards the cruiser --

14     Q.    Yes.

15     A.    -- and the stop.

16     Q.    Isn't the cruiser more or less

17  directly across from where she stepped out of

18  her gate?

19     A.    We're down the street a little bit.

20     Q.    A little bit.

21     A.    But she's getting closer to us.

22     Q.    Okay.  On the sidewalk?

23     A.    On the sidewalk.

24     Q.    You would agree with me that

25  walking down the sidewalk is different than

Page 104

```
 1    walking towards the car?  Is that a fair --

 2         A.    No, I wouldn't agree with that.

 3         Q.    Okay.

 4         A.    When she got out of her gate, she's

 5    -- a very rough guess, I don't know -- 30, 40

 6    feet away.

 7         Q.    From the cruiser?

 8         A.    From the cruiser from where we are

 9    standing.  As she walks down the sidewalk,

10    that number is dropping.  She is getting

11    closer.

12         Q.    Okay.  Maybe -- maybe -- the

13    cruiser is a little bit down from her gate?

14    That's --

15         A.    It is.

16         Q.    Okay.  It wasn't directly across

17    from the gate?

18         A.    Correct.

19         Q.    Okay.  Now I understand what you're

20    saying.  And you prevented her -- did you

21    prevent her -- when you left your cruiser,

22    did you prevent her from approaching the

23    cruiser?

24              MR. MANDO:  Objection, form,

25         characterization.  Go ahead.
```

Page 105

1        A.    I stepped -- it's called a tactical

2    reposition.  I moved to a place that stopped

3    her current movement in an attempt to get her

4    to go back to where it was safe.

5        Q.    Okay.  And safe was?

6        A.    Inside her gate.

7        Q.    Okay.  And that prevented her from

8    getting closer to the cruiser, right?

9        A.    Being behind the gate?

10       Q.    No, no, no, no, no.  Your tactical

11   repositioning prevented her from getting

12   anywhere closer to the cruiser?

13       A.    Yes.

14       Q.    It also prevented her from getting

15   anywhere closer to the stopped car?

16       A.    Correct.

17       Q.    And it prevented her from getting

18   anywhere closer to Goshorn?

19       A.    It did.

20       Q.    And it prevented her from getting

21   anywhere closer to Jansen?

22       A.    I believe he stepped over with me.

23   She was close to him as well.

24       Q.    Okay.  Jansen moved forward.

25   Fritsch was in the car, right?  The cruiser,

Page 106

1   sorry.

2          A.    He was.

3          Q.    And your tactical repositioning

4   prevented her from getting any closer to

5   Fritsch as well?

6          A.    It did.

7          Q.    Jansen was there for scene

8   security, right?

9          A.    He was.

10         Q.    Was Jansen's positioning -- did

11  Jansen take a similar tactical repositioning

12  to prevent her advancing towards the cruiser?

13         A.    He moved over in support, yes.

14         Q.    Okay.  And I'm not trying to -- I'm

15  not asking if you can read Jansen's mind

16  about what he was thinking, but from your --

17  did you observe him -- when you observed him

18  move towards her, was it your impression that

19  he was taking a similar tactical

20  repositioning?

21         A.    He positioned more along the lines

22  of the cruiser in what we would call a

23  tactical L.

24         Q.    Tactical L?

25         A.    Yes.

Page 107

1      Q.    Okay.  So he moved in a tactical L.

2   Does that describe the shape of the letter L?

3      A.    Yes.

4      Q.    Okay.  So he moved in a tactical L,

5   and you moved in a tactical reposition.  Is a

6   tactical reposition parallel?

7      A.    A tactical reposition will

8   eliminate whatever -- you know, whatever

9   direction they're moving.

10      Q.    Okay.

11      A.    The tactical L relates more to the

12   other officer that is on the scene.

13      Q.    The other officer being -- oh,

14   okay.  I'm sorry.  The L is in relation to

15   you?

16      A.    Correct.

17      Q.    Okay.  Jansen does a tactical L.

18   You do a tactical reposition roughly at the

19   same time?

20      A.    I believe so.

21      Q.    I think we agreed that your

22   reposition -- your tactical repositioning

23   prevented Ferreiras from approaching the

24   stopped vehicle, right?

25      A.    Yes.

Page 108

1       Q.    And Goshorn, right?

2       A.    Yes.

3       Q.    And Fritsch, right?

4       A.    Yes.

5       Q.    And it would seem to me that

6   Jansen's tactical L, if not calculated to

7   bolster your position, had the effect of

8   shoring up the prevention of Ashley Ferreiras

9   from approaching the stopped car; is that

10  fair?

11      A.    Yes.

12      Q.    He supported you, right?

13      A.    Yes.

14      Q.    And his support also prevented

15  Ashley Ferreiras from approaching Goshorn?

16      A.    Correct.

17      Q.    The driver?

18      A.    Sure.

19      Q.    Fritsch?

20      A.    Yes.

21      Q.    By virtue of him taking the

22  tactical L, Jansen, he put himself closer to

23  Ferreiras?

24      A.    Yes.

25      Q.    So he was approaching a direction

Page 109

1    that she was already going?

2        A.    She was walking down the sidewalk.

3    He walked toward the sidewalk.

4        Q.    Okay.  In an L position relative to

5    your position?

6        A.    Correct.

7        Q.    Okay.  So at that point -- how tall

8    are you?

9        A.    I'm six foot five.

10        Q.    I assume you were six foot five on

11    May 4th of 2023?

12        A.    I was.

13        Q.    What did you weigh at that time?

14        A.    I have absolutely no idea.

15        Q.    What do you weigh today?  I've got

16    to ask.

17        A.    Approximately 240.

18        Q.    Were you above 200 on May 4th of

19    2023?

20        A.    Yes.

21        Q.    Pounds?

22        A.    Yes.

23        Q.    You were.  Okay.  Were you heavier

24    then than you are now?

25        A.    I don't know.

1        Q.    But you were always six five?

2        A.    Yes.

3        Q.    So at the point that you stepped in

4   front of Ashley Ferreiras onto the sidewalk,

5   you had eliminated any threat whatsoever to

6   anyone at the scene, right?

7        A.    Absolutely not.

8        Q.    What other threat did she pose?

9        A.    I don't know Ms. Ferreiras.  I

10  don't know if she carries a gun.  I don't

11  know if she carries a knife.  I don't know if

12  what she's doing is attempting to gain the

13  three officers' attention and draw it onto

14  her because this car that has the wrong tags

15  with the wrong owner is a stolen car.  I

16  don't know if there's drugs or weapons in

17  that car.  I don't know what's going on.

18       Q.    Okay.

19       A.    There are threats in abundance at

20  that time.

21       Q.    Okay.  What threats did she

22  display?

23       A.    She ignored officer commands --

24       Q.    Okay.

25       A.    -- continued into the stop, and

ePage 111

1   refused to go back to where it was safe.

2       Q.   Okay.  Did she...  Did she display

3   a weapon to you?

4       A.   Other than crutches, no.

5       Q.   So you considered crutches to be a

6   weapon in this instance?

7       A.   Literally one of the things that

8   they would use in the WWF when I grew up were

9   crutches.

10      Q.   Okay.

11      A.   You don't want to get hit by

12  crutches.  They're just steel poles.

13      Q.   Yeah.  So immediately upon seeing

14  Ashley on crutches, you identified her

15  crutches as weapons?

16      A.   They're potentially weapons.

17      Q.   Okay.  And you regarded them as

18  such immediately, right?

19      A.   As potential weapons?

20      Q.   Mm-hmm.

21      A.   Yes.

22      Q.   She never used them as weapons, did

23  she, towards you?

24      A.   No.  We were able to take those

25  away before she began assaulting us.

1      Q.    And she never used her weapon --

2   her crutches towards Jansen, right?

3      A.    No.

4      Q.    She never used her crutches as a

5   weapon towards Fritsch?

6      A.    No.  She used her elbow as a weapon

7   towards Fritsch.

8      Q.    She never gave you any indication

9   that she was going to use her crutches for

10  anything other than crutches, right?

11     A.    Incorrect.

12     Q.    What else?

13     A.    When she started fighting and was

14  holding onto her crutches.

15     Q.    So when she started fighting, she

16  was holding onto her crutches to keep herself

17  up, right?

18     A.    Mm-hmm.

19     Q.    And by doing that, she was using

20  her crutches as a weapon?

21     A.    Well, she was jerking her arms

22  around.  We're telling her to put her hands

23  behind her back.  She's obviously under

24  arrest, and she's fighting at that point.  So

25  whatever is in her hand is potentially a

1    weapon.

2         Q.    So the crutches at that point, by

3    virtue of you telling her that she was under

4    arrest, convert from a potential weapon to an

5    actual weapon?

6         A.    Any time I think that you're

7    fighting police, whatever is in your hand

8    should be considered a weapon.

9         Q.    Okay.  And that began -- the

10   fighting of the police began at what point?

11        A.    As soon as I placed my hands on

12   her.

13        Q.    As soon as you placed your hands on

14   her, she was under arrest, right?

15        A.    She was certainly under arrest.

16        Q.    Okay.  When you placed your hands

17   on her to arrest her, were you using force

18   against her?

19        A.    No.

20        Q.    Okay.  At some point, you used

21   force because you prepared a Use of Force

22   Report, right?

23        A.    I did.

24        Q.    At what point did you use force

25   against Ashley Ferreiras?

1      A.    After she elbowed Officer Fritsch

2   in the face knocking us to the ground.

3      Q.    Let's stop there.  She elbowed

4   Fritsch knocking his glasses off, right?

5      A.    Broke his glasses, elbowed him in

6   the face.

7      Q.    In the same movement, the same sort

8   of gesture?

9      A.    Yes.

10      Q.    Okay.  At that point, did you use

11   force against her?

12      A.    No.

13      Q.    Okay.  What happened after she

14   elbowed Fritsch in the face, breaking his

15   glasses?

16      A.    We all fell on the ground.

17      Q.    Okay.  At that point, did you use

18   force against her?

19      A.    No.

20      Q.    Did you take her to the ground?

21      A.    No.

22      Q.    Had you taken her to the ground,

23   that would have been use of force, right?

24      A.    A take-down to the ground is a use

25   of force, yes.

Page 115

1     Q.   Had you done a take-down to the

2   ground, that would have been a use of force,

3   right?

4     A.   Yes.  A take-down is a use of

5   force.

6     Q.   Okay.  At some point, Officer

7   Fritsch discarded one of her other crutches,

8   right?

9     A.   He did.

10     Q.   That was before, as you describe

11   it, you all fell to the ground, right?

12     A.   It is.

13     Q.   Officer Fritsch's discarding of

14   that crutch was a use of force, correct?

15     A.   I would not constitute that as a

16   use of force.

17     Q.   Okay.  Even though that crutch was

18   -- would you agree with me that the crutch

19   was one of the things keeping her upright,

20   keeping her from falling?

21     A.   I don't have any idea at that time.

22     Q.   Okay.  Would you agree with me that

23   as a general matter, crutches are used by

24   people to keep them from falling?

25     A.   Yes.

1          Q.    To help them walk?

2          A.    As a general principal, sure.

3          Q.    Would you agree with me that Ashley

4    Ferreiras was using her crutches that evening

5    to walk?

6          A.    She was walking with crutches.

7          Q.    Okay.

8          A.    I don't know how much she was

9    utilizing those crutches.  And at the time we

10   took her crutches away, we were supporting

11   her body weight.

12         Q.    Okay.  Would you agree with me that

13   whether or not she was using crutches to

14   walk, the crutches were supporting her body

15   weight when she was approaching -- when she

16   was walking on the sidewalk?

17         A.    I don't know if they were

18   supporting her body weight.

19         Q.    Okay.  So at that point, did you

20   perceive her as injured?

21         A.    I saw that she had a wrap on her

22   ankle.  I saw that she had crutches.  I did

23   not know if she had a sprained ankle.  I did

24   not know if she was in some sort of a

25   preventative situation.  Don't know if she

Page 117

1    had surgery.  I don't have any idea how those

2    crutches are assisting her.

3         Q.    Fair enough.  Did you consider her

4    to be injured?

5         A.    I didn't know.

6         Q.    Okay.  Did you do a mental -- any

7    sort of mental assessment of whether this

8    person is injured?

9         A.    A mental assessment of whether or

10   not they were injured?

11        Q.    Yeah.

12        A.    I mean, I suppose so.  By

13   evaluating her person, I'm trying to evaluate

14   all sorts of things about who she is, what

15   she's doing here, and what threat she may be.

16        Q.    Okay.  And you did not consider

17   her -- you did not consider her to be injured

18   at that time?

19        A.    I didn't know.

20        Q.    Didn't know.

21        A.    Because I don't know -- there's

22   plenty of folks that use crutches that aren't

23   injured.

24        Q.    Sure.  In what instances, in your

25   experience as a police officer, do people use

1    crutches when they're not injured?

2        A.    Persons who may need an assistive

3    aid for walking.

4        Q.    Okay.

5        A.    If they have an amputation or some

6    other situation where crutches just may

7    assist them with walking.

8        Q.    Fair enough.  They can -- crutches

9    can -- sometimes people use crutches as

10   mobility aids if they have a disability,

11   fair?

12       A.    That is one possibility.

13       Q.    You considered her to be disabled,

14   though, didn't you?

15       A.    No.

16       Q.    You saw the crutches, right?

17       A.    I did.

18       Q.    You saw the wrap on her ankle,

19   right?

20       A.    I did.

21       Q.    You saw her moving from her yard to

22   the gate with crutches, right?

23       A.    I did.

24       Q.    You saw her exit the gate using

25   crutches, right?

1       A.    I did.

2       Q.    You saw her close the gate using

3   crutches, right?

4       A.    I did.

5       Q.    You saw her move down the sidewalk

6   while using crutches, right?

7       A.    I did.

8       Q.    And all that time, she was -- she

9   had a wrap on her ankle?

10      A.    She did.

11      Q.    Which you saw immediately?

12      A.    I did.

13      Q.    She told you that she had surgery,

14  didn't she?

15      A.    Eventually.

16      Q.    She told you that she couldn't

17  walk, right?

18      A.    Eventually.

19      Q.    She told you that she needed her

20  crutches to stand, right?

21      A.    Eventually.

22      Q.    She told you that she needed her

23  crutches to walk, right?

24      A.    Eventually.

25      Q.    Her brother told you that too,

1   didn't he?

2        A.    I don't -- again --

3        Q.    John Carlos?

4        A.    Again, I don't know that I ever

5   actually spoke with John Carlos.

6        Q.    You heard him speaking, though,

7   right?

8             MR. MANDO:  Objection, asked and

9        answered.

10       Q.    You heard him speaking, right?

11            MR. MANDO:  Same objection.  You

12       can answer.

13       A.    I did hear that he was making

14   noise.  I don't know what the content of that

15   was.

16       Q.    You didn't hear him telling you

17   that she just had surgery?

18       A.    I don't recall that, certainly not

19   up until the time that she was in custody.

20       Q.    You don't recall him telling you

21   that she was injured?

22       A.    Not before any of the force was

23   used, no.

24       Q.    Okay.  So you all fall to the

25   ground after, I think we agree, Fritsch

Page 121

1   discarded, I think, the crutch she had under

2   her left arm; is that right?

3          A.    It was under her left arm.

4          Q.    Fritsch discarded that; you all

5   fall to the ground?

6          A.    Fritsch discarded that.  He held

7   her up for a moment.  I held her up.  She hit

8   him in the face knocking him off balance, and

9   then we fell to the ground.

10         Q.    You fell to the ground and -- I

11  think I asked if you used force upon her upon

12  falling to the ground, and you said no; is

13  that right?

14         A.    Correct.

15         Q.    At what point did you use force

16  against Ashley Ferreiras?

17         A.    After we fell to the ground, I

18  attempted to reposition so that I could get a

19  hold of her right arm.  While I did that, she

20  kicked me.  I then got knocked off balance,

21  placed my hands down on the ground, my knees

22  down on the ground, and attempted to get a

23  hold of her arm.

24              Before I could do that, she bit me,

25  and I, in an instinctive defensive maneuver,

Page 122

1    struck her once with a closed fist in the

2    side of her head.

3         Q.    You punched her twice in the face,

4    didn't you?

5         A.    No, I didn't.

6         Q.    Okay.

7         A.    As the video shows, as all the

8    paperwork shows, I hit her once.

9         Q.    Okay.  She was on the ground when

10   you punched her in the face, though, right?

11        A.    She was.

12        Q.    You punched her with a closed fist?

13        A.    I did.

14        Q.    You were wearing gloves at the

15   time?

16        A.    I was.

17        Q.    Do you know the make or the brand

18   who makes those gloves?

19        A.    They're Mechanix gloves.

20        Q.    Mechanix?  Okay.  M-E-C-H-A-N-I-X?

21        A.    I believe that's correct.

22        Q.    What sort of reenforcement did they

23   have in the (indicating)...

24        A.    There's no reenforcement on the

25   back.  I believe it's cotton and polyester.

1      Q.    Fritsch was wearing gloves as well?

2    If you don't remember --

3      A.    I don't specifically recall, but he

4    should have been wearing gloves at that

5    point.

6      Q.    He should have been.  And should he

7    have been wearing Mechanix gloves?

8      A.    Whichever gloves he had.

9      Q.    Okay.  Whether or not they were the

10   brand Mechanix, they should have been of a

11   similar make as what you were wearing?

12     A.    I don't understand your question

13   exactly.

14     Q.    Okay.  We don't know if he was

15   wearing gloves.  We don't know if he was --

16   but he should have been wearing gloves?

17     A.    If we're physically interacting

18   with people, the preference is to have gloves

19   on.

20     Q.    Okay.  We don't know if they were

21   Mechanix gloves.  If he should have been

22   wearing gloves, should he have been wearing

23   gloves that were similar to yours?

24          MR. MANDO:  Objection, form.  You

25      can answer.

Page 124

1        A.    Gloves within policy, so gloves of

2    the same color scheme.  Yeah, he would have

3    been wearing black gloves.

4        Q.    Okay.  Now, I understand that

5    there's a policy about wearing gloves that

6    match the uniform, the color scheme.  What is

7    the policy about wearing gloves because

8    you're interacting with the public?  Is that

9    a different policy than the uniform policy?

10        A.    I don't believe there is a written

11    policy about wearing gloves when interacting

12    with the public.

13        Q.    Okay.

14        A.    It's more of a safety issue.

15        Q.    Gotcha.  Safety for whom?

16        A.    For everyone involved.

17        Q.    Okay.  By wearing gloves, you were

18    making Ferreiras more safe?

19        A.    By wearing gloves, I'm less likely

20    to get a cut on my hand or to scratch someone

21    with my fingernails or to hurt someone with

22    my wedding ring.  So, yes, if I get a cut on

23    my hand, I'm going to transfer my blood --

24    any pathogens in my blood, any issues in my

25    blood onto her body, which is unsafe.

Page 125

1      Q.    Okay.  And you say she bit you?

2      A.    She did.

3      Q.    And is it at that point that you

4   instinctively punched her in the face?

5      A.    Yes.

6      Q.    Okay.  And that was use of force?

7      A.    Yes.

8      Q.    Prior to that, there was no force

9   used by you, anyways, against Ashley

10  Ferreiras?

11     A.    Correct.

12     Q.    There's no visual evidence of the

13  bite on your arm, is there?

14     A.    I disagree with that.

15     Q.    Could you tell us if there's a

16  photograph or anything depicting that?

17     A.    There are.

18     Q.    Okay.  Do you know how many?

19     A.    I don't.

20     Q.    Okay.  There's been some

21  photographs produced, and I would like to

22  show them to you when I can remember what...

23  I think they're 56.  I believe they were

24  produced -- or they were introduced in --

25  during Fritsch's deposition as Exhibit 52.

Page 126

1    Then I should have them.

2              I'm going to show you what I

3    believe -- I'm pretty sure I've already

4    introduced this, but I'm going to hand you

5    what I've premarked as Exhibit 22.

6              It is five pages that I thought

7    were screenshots but I think was clarified

8    that they're actually photographs taken by

9    Officer Brown.

10             MR. WHITTAKER:  Does that seem

11       right?

12             MR. MANDO:  They would have been

13       taken by an officer at the scene, yes.

14       Q.    (By Mr. Whittaker) Are these the

15   photographs of your bite?  And I think I

16   actually circled the spot.  I didn't mean to

17   do that for your benefit, but...

18       A.    Yes.

19       Q.    Okay.

20       A.    These are the pictures of me --

21   well, these are some of the pictures of me

22   taken after this incident.

23       Q.    I'm going to do something here to

24   make sure -- there's five of them.

25             MR. MANDO:  We can just get a copy

1           at the break, and then you can

2           substitute color ones later if you want.

3           And that way, we'll at least know which

4           ones you saw.

5                 MR. WHITTAKER:  Yeah.  For now, I'm

6           just putting -- I'm just numbering them

7           because there's no Bates numbers on

8           them.  I just want to make sure -- and

9           we can do that later.  That's true.

10                MR. MANDO:  If we produced them,

11          there should have been a Bates number on

12          them.

13                MR. WHITTAKER:  That's why I think

14          I made a mistake doing a screenshot

15          because there's no Bates number on it,

16          but...  It's very possible it could be

17          tiny.  I don't see it, but...

18          Q.    (By Mr. Whittaker) Does page 1 that

19     I just handed you of Exhibit 52 show a bite

20     mark?

21          A.    No.  It's at a fair distance from

22     me.  You're not able to see my forearm very

23     well.

24          Q.    But this is after you were -- this

25     is going to be a dumb question, but the

1    forearm that was bitten is depicted in page 1

2    of 52?

3         A.    In part.

4         Q.    In part.  I'm going to show you

5    page 2 of that exhibit, and you tell me if

6    there's a bite mark depicted in page 2.

7         A.    You can't see the bite mark in page

8    2 given the coloring and all of the shadows.

9         Q.    Those are your arms, though?

10        A.    Those are my arms.

11        Q.    I'm going to show you page 3.  Is

12   there a bite mark depicted there?

13        A.    Yes.  I'm sorry.  I thought this

14   was a different one.  No, I cannot see it

15   here.

16        Q.    Still your arms, though?

17        A.    Yes.

18        Q.    Now I'm going to show you page 4,

19   which I had previously placed a red circle on

20   not for your benefit at the time, but I'm

21   going to hand you page 4.  And do you see a

22   bite mark on page 4?

23        A.    Yes.

24        Q.    Is it where that red circle is?

25        A.    It's the red circle that you

1    identified as the location of the bite mark

2    that's red, yes.

3         Q.    Okay.  And that red circle contains

4    the bite mark from Ashley Ferreiras?

5         A.    Yes.

6         Q.    Okay.  I'm going to show you page 5

7    of that, and I circled in red...  Does that

8    also depict the bite mark?

9         A.    Yes.  That same area, the redness

10   is from the bite mark.

11        Q.    Okay.  Are you aware of any other

12   photographs of the bite?

13        A.    They took a bunch of photographs.

14   I have not reviewed all of those photos

15   recently, but there were several dozen, I

16   expect, from that night.

17        Q.    Okay.  Did you take any with your

18   own phone or anything?

19        A.    No.

20        Q.    Did you ask anybody -- did you say,

21   Hey, can you take a picture of that bite

22   mark, to anybody?

23        A.    I expect that when I had Officer

24   Brown taking photos of me, or whoever took

25   photos of me, we made sure to take those

Page 130

1    specific photos you're showing.

2         Q.    And we think it was Officer Brown

3    who took the photos.  And doing that after

4    the incident, that's standard, right, because

5    the use of force was used, fair?

6         A.    Give me one moment.  (Examining

7    document.)  Yes, I believe it was Officer

8    Brown; and yes, that is a standard

9    requirement after use of force.

10        Q.    Okay.  So there wasn't anything

11   particular or unusual about this incident

12   that motivated Officer Brown to take

13   photographs?

14        A.    No.

15        Q.    It's standard?

16        A.    Yes.

17        Q.    Now, would there be photographs

18   taken of every interaction with the police or

19   just when a use of force is used or when

20   force is used?

21        A.    So there is not photographs of

22   every interaction with the police.

23        Q.    Okay.

24        A.    There are photographs where policy

25   states that photographs shall be taken for

Page 131

1  every use of force.  There's also a hundred

2  other reasons that photographs may be taken

3  on a particular incident.

4       Q.    Okay.  But in this case, it was

5  because of the use of force used?

6       A.    The use of force and then to

7  document the injuries.

8       Q.    Okay.  Did you get -- you didn't

9  get any treatment for that bite mark, did

10 you?

11      A.    No.  It didn't break the skin.

12      Q.    When you went to Saint E., did you

13 have anybody look at it?

14      A.    No.  It didn't break the skin.

15      Q.    When you went to Saint E., did you

16 mention it to anybody?  And when I -- to

17 clarify, I mean when you went to Saint E. On

18 the evening after -- on May 4th after

19 arresting and transporting Ashley Ferreiras,

20 you took her to Saint E.?

21      A.    I did.

22      Q.    Did you mention the bite mark to

23 anybody at Saint E.?

24      A.    I'm certain I did, yes.

25      Q.    Any idea who?

Page 132

1      A.    No.

2      Q.    Okay.  And you didn't get treatment

3  for it?

4      A.    Correct.

5      Q.    Did the bite mark become -- did it

6  become more -- did it look worse the next

7  day?

8      A.    I don't recall.

9      Q.    You mentioned that you punched her

10 out of instinct, right?

11     A.    It was an instinctual defense

12 maneuver, yeah.

13     Q.    Did you employ any of your training

14 when you made that decision to punch her?

15     A.    Any of my training?

16     Q.    Did you employ any de-escalation

17 techniques?

18          MR. MANDO:  Objection, form, lack

19     of foundation.  Go ahead.

20     Q.    Are you familiar with de-escalation

21 techniques that are in the general orders of

22 the Covington Police Department?

23     A.    I am.

24     Q.    Oh, boy.  (Examining document.)

25 Are you familiar with the techniques listed

Page 133

1    in the general orders for de-escalation?

2         A.    I'm familiar with that general

3    order, and there are a non-exhaustive list of

4    techniques in there.

5         Q.    Okay.  Which of those techniques

6    did you use before punching Ashley Ferreiras?

7              MR. MANDO:  Objection to form, lack

8         of foundation.  Go ahead.

9         Q.    Did you use any de-escalation

10   techniques before punching Ashley Ferreiras?

11        A.    While she was biting me or in

12   general --

13        Q.    In general.

14        A.    -- from the time I interacted with

15   her?

16        Q.    In general.

17        A.    Yes.

18        Q.    Which ones?

19        A.    So, initially, while she was

20   half-naked hanging out of a window yelling at

21   us, I disengaged in an attempt to allow her

22   to de-escalate and didn't draw any further

23   attention or engage with her.

24        Q.    Okay.

25        A.    Once she came out of the house, I

Page 134

1    didn't immediately engage with her because

2    she was not otherwise interrupting the stop.

3    And I allowed her to stay in her yard if she

4    wanted to watch to see what was going on,

5    watch because she was somehow involved with

6    it, videotape it, whatever.  If she had

7    questions afterwards, that was fine.  So I

8    did --

9        Q.    Did you tell her that if she had

10   questions afterwards, that you would address

11   them?

12       A.    No.  Then once she got to the gate,

13   I clearly communicated to stop and to stay

14   inside and don't come out.  I again clearly

15   communicated to her that if she comes out and

16   interrupts the stop, she will be arrested.

17       Q.    Did she pose an immediate threat?

18       A.    Yes.

19       Q.    At what point?

20       A.    As soon as she came out --

21            MR. MANDO:  Objection, asked and

22            answered.  Go ahead.

23       A.    I then told her to stay inside --

24       Q.    I'm sorry.  What was your answer to

25   the immediate threat question?  Did she pose

Page 135

1    an immediate threat?

2              MR. MANDO:  Objection, asked and

3         answered.  Go ahead.

4         A.    Yes.

5         Q.    When?

6         A.    As soon as she came out of the

7    house.

8         Q.    She was immediately threatening?

9         A.    That is a different question.

10        Q.    Yes, you're right.  She wasn't

11   immediately threatening, but she was an

12   immediate threat -- "noun" -- not immediately

13   threatening -- "verb"?

14        A.    Yes.

15        Q.    And she was an immediate threat

16   because why?

17        A.    By her simple status as a person on

18   the scene that is unknown.  I don't have any

19   idea why she's coming out there.  She

20   testified in trial that she came out there

21   looking to cause trouble.  I didn't know that

22   at the time, but I certainly know it now.

23        Q.    She testified that she was looking

24   to cause trouble?

25        A.    Yes, on her cross by Mr. Sanders.

Page 136

1    She testified that there was no amount of

2    times that I could have told her to go back

3    into her yard or go to jail.  She testified

4    that there was nothing I could do; that she

5    came down looking for -- it may have been

6    conflict, is what she was looking for.  She

7    was looking for conflict with the police when

8    she came down.

9        Q.    Which you didn't know at the time?

10       A.    Which I didn't know at the time,

11   but it's certainly always a possibility with

12   people, and we have to treat them in a safe

13   manner to prevent that.

14       Q.    Are all persons an immediate threat

15   in that situation?

16       A.    All persons are a possible threat.

17       Q.    Are they an immediate threat?  You

18   said she was.  Are all persons an immediate

19   threat in that situation?

20       A.    Anyone who came out at that time at

21   that point, yes.

22       Q.    Was anybody who was walking down

23   the other side of the street, would that

24   person be an immediate threat?

25       A.    Yes.  They would have gained our

```
 1    attention.  We would have addressed them

 2    appropriately too.

 3         Q.    So someone who is -- if they gain

 4    your attention or if they're doing something

 5    enough to gain your attention, they're an

 6    immediate threat?

 7         A.    They're a possible threat.

 8         Q.    Okay.

 9         A.    So if a car came up on Patton

10    Street, was at a stop sign and stopped,

11    that's a possible threat.

12         Q.    Okay.

13         A.    Now, if they continue to cross

14    Nancy and left the area, they're not an

15    immediate threat.

16         Q.    Okay.

17         A.    But if they got out of their car

18    and started walking towards us, they

19    certainly are.

20         Q.    So if someone -- that's a good

21    point.  If someone was driving down Nancy

22    Street, stopped in the middle of the street,

23    and got out of the car, that would be an

24    immediate threat?

25         A.    Absolutely.
```

Page 138

1      Q.    If someone was driving down Nancy

2    Street, stopped their car in the middle of

3    the street, and didn't get out of the car,

4    would there still be an immediate threat?

5      A.    Without a doubt.

6      Q.    Okay.  If that car stopped in the

7    middle of Nancy Street, no one got out, and

8    it began to back up, would the immediate

9    threat still be there?

10      A.    It would be a possible threat at

11    that point.

12      Q.    At some point, it crosses over from

13    an immediate threat to a possible threat?

14      A.    It fluctuates greatly.  Right?

15      Q.    Sure.

16      A.    Them putting it in reverse and

17    backing away from the stop is certainly an

18    indication that they are attempting to

19    disengage, as opposed to someone who's

20    sitting there behind a 2,000-pound vehicle...

21      Q.    Sure.

22      A.    I don't know if it's in drive.  I

23    don't know if it's in park.  I don't know

24    who's in it, how many people are in it, what

25    their intention is.

Page 139

1       Q.    Okay.  So the reverse -- if the

2   person were to back up from the scene or the

3   stop, that would reduce the chance of it

4   being an immediate threat?

5       A.    An indication that they are

6   complying or otherwise taking steps to

7   eliminate themselves from being a threat is

8   what we're looking for.

9       Q.    Gotcha.  So an indication that

10  someone is complying and removing themselves

11  from what you consider to be the immediate

12  threat tones down, in your estimation, the

13  risk of an immediate threat?

14      A.    Right.  It certainly lowers that.

15      Q.    Okay.

16      A.    You're much more dangerous at 6

17  feet than you are at 60 feet.

18      Q.    Sure.  Are you familiar with the

19  Covington Police Department's use of force

20  continuum?

21      A.    I am.  Do you want me to go through

22  the rest of the de-escalation?  Because we

23  only got to the point where she was at the

24  gate.

25      Q.    That's a good -- yes, enlighten me

Page 140

1    on the balance of the de-escalation.

2         A.    So I told her when she opened the

3    gate to not come out, gave her the

4    opportunity, clearly communicated that to

5    her.  When she did come out, I continued to

6    give her clear warnings that if she

7    interrupts, she's going to go to jail.  Go

8    back in the yard.  She continued to move

9    forward.

10              I used a tactical reposition to

11   block that movement.  Again warned her to go

12   back inside or face arrest.  I heard during

13   that conversation while I was giving her

14   those numerous instructions her complaint

15   that she felt disrespected.

16              Using those active listening

17   skills, I then responded to it and said, I'm

18   not trying to disrespect you, but if you

19   don't go back into your yard, you're going to

20   be arrested.

21        Q.    And you mentioned active listening

22   skills.  Is active -- your active listening

23   skills were engaged because she was speaking

24   to you?

25        A.    Yes.

1          Q.    Okay.  Is that a different skill

2     than just hearing somebody speak?

3          A.    Active listening --

4          Q.    Yes.

5          A.    -- versus just listening?

6          Q.    Yes.

7          A.    Oh, absolutely.

8          Q.    What's active listening?  What is

9     active listening in the context of her

10    telling her -- telling you she didn't want to

11    be disrespected?

12         A.    I was hearing that her issue at

13    that moment was not that the police were

14    telling her something.  It's that she felt

15    disrespected, and her motivation for not

16    following that instruction was a feeling of

17    disrespect.

18         Q.    Okay.

19         A.    So trying to recognize that and

20    acknowledging that I'm not trying to

21    disrespect her, but I need to keep my scene

22    safe.  I need you to go back in your yard.  I

23    was attempting to do everything I could to

24    just convince her to go stand inside her

25    yard.

Page 142

1        Q.    And at that point, she had not

2    threatened you, right?

3        A.    She had not outwardly threatened.

4        Q.    And she hadn't threatened Jansen

5    who was closer to you -- close to you, right?

6        A.    Correct.

7        Q.    Or Fritsch?

8        A.    Correct.

9        Q.    Or Goshorn?

10       A.    Correct.

11       Q.    Or even the driver?

12       A.    Correct.

13       Q.    Or anyone else who might have been

14   around?

15       A.    Correct.  So then at that point, I

16   informed her that she was under arrest.  I

17   told her she was going to jail.  I removed

18   her crutch, and I took a hold of her right

19   arm and held her body up.

20       Q.    What precipitated your decision to

21   put her under arrest?  What was the immediate

22   thing that she did that caused you to put her

23   under arrest?

24       A.    After giving her all of these

25   warnings --

1      Q.    Yes.

2      A.    -- and telling her to go back --

3      Q.    Yes.

4      A.    -- acknowledging all of that,

5  trying to do everything I could to get her to

6  just go back and watch from a distance that

7  was safe --

8      Q.    Yes.

9      A.    -- it became clear she was not

10 going to do that.

11     Q.    Okay.  And so how much time between

12 it becoming clear to you that she was not

13 going to go back inside -- how much time

14 passed between that becoming clear to you and

15 you electing, deciding to put her under

16 arrest?

17     A.    Once it was clear that she was not

18 going to respond to lawful orders --

19     Q.    Yes.

20     A.    -- to go back into her yard, that

21 decision was made.

22     Q.    Do you remember what the

23 circumstances were that caused you to decide

24 that she was -- it was clear she was not

25 going to comply with lawful orders?

1          A.     Giving her every opportunity,

2    telling her 10 different ways, Go back inside

3    your yard, or you will go to jail.

4          Q.     Okay.

5          A.     And she made no attempt, no

6    indication that she was going to follow that

7    order.  She made no movement in that

8    direction.  In fact, she continued to move

9    forward instead.

10               And at that point, we had exhausted

11   those requests and commands to go back into

12   her yard, and the only safe thing to do at

13   that point was to put her in custody so she

14   was out of play, she was no longer a threat,

15   and then we could deal with the investigation

16   of the car.

17         Q.     So she didn't take any affirmative

18   action to satisfy you that she was going to

19   comply with your orders?

20         A.     She made absolutely no indication

21   whatsoever she was going to comply with any

22   orders whatsoever.

23         Q.     Did she take an affirmative act

24   that caused her to become someone subject to

25   arrest?

1          A.    Yes.

2          Q.    What was that act?

3          A.    When she opened her gate, and I

4     said, No, don't come out.  You're not allowed

5     here.  You're not welcome here.  If you come

6     out, you will go to jail --

7          Q.    Okay.

8          A.    -- and then she came out.  And I

9     said, Go back inside your yard.  Go back

10    inside your yard, or you'll go to jail.  Go

11    back inside your yard, or I'm going to arrest

12    you.  Go back inside your yard now.  I'm not

13    disrespecting you, but I need you to go back

14    inside the yard.  You're interfering with the

15    stop.  You're going to go to jail.

16         Q.    When she opened the gate, that was

17    an affirmative act that could have led to her

18    arrest?

19         A.    When she refused to follow the

20    first command of stay in your yard, and she

21    then came out to interfere with the stop --

22         Q.    Okay.

23         A.    -- at that point, she's obstructing

24    me from doing my job.

25         Q.    At that point, she was obstructing

Page 146

1    her from -- you from doing your job --

2         A.    Yes.

3         Q.    -- which was securing the traffic

4    stop?

5         A.    Conducting the business of the

6    traffic stop.

7         Q.    But you didn't arrest her at that

8    point, right?

9         A.    I tried to give her every

10   opportunity in the world to just go back into

11   your yard and wait for us to be done with our

12   job.

13        Q.    What was the last event -- what was

14   the last affirmative action she took that

15   caused her to be arrested by you?

16             MR. MANDO:  Objection, asked and

17        answered.  Go ahead, Doug, answer it

18        again.

19        A.    I don't know.  It was in the

20   repeated instructions.  She's continuing to

21   move forward towards me trying to -- trying

22   to get around.  At that point, it was clear.

23   I tried everything I could to just get her to

24   go back.

25        Q.    Any other de-escalation techniques

Page 147

1    you used before placing her under arrest?

2          A.    Before placing her under arrest?

3          Q.    Yes.

4          A.    Or before actually effecting the

5    arrest?

6          Q.    Tell me the distinction between the

7    two.

8          A.    When I said, Fine, you're going to

9    jail --

10         Q.    Yeah.

11         A.    -- and I moved in and made physical

12   contact with her --

13         Q.    Yes.

14         A.    -- she is under arrest.

15         Q.    Okay.

16         A.    The effective -- the arrest is

17   effective when she is safely in handcuffs.

18         Q.    Okay.  Okay.  What de-escalation

19   techniques did you employ before moving --

20   place your hand on her arm to place her on

21   her -- place her under arrest?  Other than

22   the ones you described, were there any more?

23         A.    Yes.

24         Q.    What?

25         A.    So I grabbed a hold of her arm.

Page 148

1          Q.     Okay.

2          A.     I get rid of the crutch because

3     it's in the way and it's a potential weapon.

4          Q.     Let me stop you there.  At that

5     point, she's under arrest?

6          A.     Correct.

7          Q.     My question was whether or not you

8     employed any techniques, other than what

9     you've already described, before placing her

10    under arrest?

11         A.     I believe we covered all of that.

12         Q.     Okay.

13         A.     I tried to go step-wise through

14    that.

15         Q.     You did.

16         A.     I think we covered it all.

17         Q.     You did.  I just wanted to make

18    sure that -- of the chain of events.

19                So after she was placed under

20    arrest, you are giving effect to the arrest;

21    is that right?

22         A.     Yes, sir.

23         Q.     And after you moved to place her

24    under arrest until she is in handcuffs, that

25    arrest -- your actions are to give effect to

Page 149

1    the arrest -- or to effect the arrest?

2         A.    Yes, sir.

3         Q.    Okay.  And upon placing her in

4    handcuffs, the -- her arrest has been

5    effected?

6         A.    Yes.

7         Q.    Okay.  I still don't know if it's

8    an "A" affected or an "E" effected.  Do you

9    know how it's spelled?

10        A.    No.  I probably spell it both ways,

11   but I also don't know how to spell Officer

12   Shepard's name.  I spell it a couple of

13   different ways.

14        Q.    "Shep-herd"?

15        A.    "Shep-herd" or "Shep-ard."

16        Q.    "Shep-ard."

17        A.    I also don't know how many Ts are

18   in Officer Mathews' name.

19        Q.    What about...  What's that word?

20   I'll remember it.  Okay.  So between her

21   arrest and her arrest being effected, did you

22   employ de-escalation techniques then, between

23   that time?

24        A.    I did.

25        Q.    What were they?

1    A.    So upon taking a hold of her arm, I

2    supported her body weight, and I attempted to

3    slow down because I don't know how dependent

4    she is on these crutches.  I don't know if

5    she can't walk at all.  I don't know if she's

6    just on limited mobility.

7            I know that I had been on crutches

8    a few months prior, and it was mostly to try

9    to limit the amount of work my ankle was

10   doing, but I could walk.  So I didn't know if

11   we were going to have to carry her or if she

12   was going to be able to walk.  I didn't know.

13   Q.    So you knew from experience that

14   having to use crutches can affect people

15   differently?

16   A.    It can be a full situation where

17   all of your mobility is tied to those

18   crutches, or it can be very, very limited,

19   and I don't know where she is at that point.

20   Q.    How long were you on crutches

21   before that?

22   A.    I had -- in June the prior year, I

23   had a trimal fracture, which is similar to

24   what she had but it sounds like with a couple

25   of extra bones and had some pretty extensive

1    surgery and bolts and pins and screws put in.

2        Q.    Was it easy for you to move around

3    while using crutches after recovering from

4    that surgery?

5        A.    After recovering?

6        Q.    During the recovery process after

7    your surgery.

8        A.    I mean, easy is relative.

9        Q.    Would you describe --

10       A.    While --

11       Q.    -- it as easy --

12       A.    While --

13       Q.    -- for you?

14            (Parties overspeaking and reporter

15       interruption.)

16       Q.    Would you describe it as easy for

17    you?

18       A.    Once I was to the point where I was

19    moving around with crutches with a boot on, I

20    was able to go -- we went to Disney World.

21    We went on a cruise.  We went on other

22    vacations because we were off.

23            So I had a fair amount of mobility,

24    and I wouldn't -- I wouldn't really describe

25    myself as having any impairment to my

Page 152

1    mobility.  I just walked a little slower.

2          Q.    Was that because you had had some

3    time to recover and get used to the crutches,

4    get used to things?

5          A.    They had me back up on my feet

6    within about a week and a half.

7          Q.    Okay.

8          A.    There was some walking.

9          Q.    Some walking.  Was it easy for you

10   to, like, change direction while you were on

11   crutches?  Is that an easy thing to do?

12         A.    I mean, yes.  I mean, you've got

13   essentially three points of contact with the

14   ground to pivot on.

15         Q.    Okay.  But you didn't -- you didn't

16   ask her what sort of assistance she needed

17   with --

18         A.    Well, I tried to.

19               (Parties overspeaking.)

20               MR. MANDO:  Both of you.  You've

21         got to let him finish answering, you've

22         got to let him finish the question, or

23         she's going to --

24               THE WITNESS:  I'm trying.  I'm

25         trying.

Page 153

1         Q.    You didn't ask her what help she

2    needed in light of her crutches and boot on

3    her foot?

4              MR. MANDO:  Objection, form,

5         lack of foundation.

6         Q.    Did you?

7         A.    I attempted to.

8         Q.    When was that?

9         A.    When I told her she was going to

10   jail and attempted to put her in handcuffs.

11   I tried to get her hands behind her back,

12   supported her body weight.

13              I attempted to slow down at that

14   point because she was on crutches, and I

15   didn't know how dependent on those crutches

16   she was.  I didn't have any idea if she could

17   put any weight on her foot.  I didn't have

18   any idea if she could walk more or less

19   normally.  I just didn't know.

20        Q.    Because you didn't ask her, right?

21        A.    We were --

22              MR. MANDO:  Objection.

23        A.    -- dealing with...

24              MR. MANDO:  Go ahead.

25        A.    We were dealing with other issues

Page 154

1   at that time.

2        Q.    Did you ask her what help she

3   needed in light of her crutches?

4             MR. MANDO:  Objection, form, lack

5        of foundation.  Go ahead.

6        A.    It would have been inappropriate at

7   that time.

8        Q.    Okay.  So, no?

9        A.    Because --

10       Q.    I'm sorry.  Go ahead.

11       A.    Because while trying to put her in

12  handcuffs, it went from standing up, where I

13  was holding up her body weight and Officer

14  Fritsch was holding up her body weight, to a

15  position where she began to assault police,

16  and we fell to the ground.

17            I'm not going to stop in the middle

18  of getting bit and kicked and hit and say,

19  I'm sorry, ma'am, what do you need right now?

20  What we need to do then is to stop the

21  assault, get the person safely in handcuffs.

22            Then as you see on the video, what

23  we did is we stood her up, and I said, All

24  right.  We need to get you from point A to

25  point B over to the car.  I recognize that

Page 155

1    you have whatever's going on with your ankle.

2    We are going to help you.

3         Q.    That was the first time you

4    mentioned assisting her broken ankle, things

5    like that, right?

6         A.    Because that's the first time we

7    were under control where we were actually in

8    control of her body.

9         Q.    After dragging her to her feet,

10   right?

11        A.    We picked her up.

12        Q.    Picked her up.

13        A.    You can't really drag someone to

14   your feet.  Like, we lifted her up from under

15   her arms.

16        Q.    Okay.  When she was sitting on the

17   ground, right?

18        A.    She was.

19        Q.    Did you ask her what assistance she

20   needed in getting up?

21        A.    No, because even if you're

22   uninjured, standing from a sitting-on-your-

23   butt position in handcuffs is next to

24   impossible.  We pick people up.

25        Q.    Okay.  So even under the best of

Page 156

1    circumstances, a person sitting on the ground

2    in handcuffs behind their back, it is next to

3    impossible for them to stand up without

4    assistance, fair?

5         A.    Without assistance, next to

6    impossible.

7         Q.    Next to impossible.  You would

8    agree with me that after you had had her in

9    handcuffs, while she was sitting on the

10   ground, that she was subdued, right?

11        A.    Subdued?  Was she -- you're going

12   to have to clarify that.

13        Q.    Did you have her under control?

14        A.    She was no longer a threat in that

15   moment.

16        Q.    No longer a threat.  She certainly

17   couldn't get away from you?

18        A.    Correct.

19        Q.    She wasn't a threat to any of the

20   officers at the scene, fair?

21        A.    Well, I mean, once she was in

22   handcuffs, she still kicked me.  I mean,

23   she's still a threat to a certain degree.

24        Q.    Okay.

25        A.    Right?  She's not -- she's not

Page 157

1    hog-tied at that point.  She still can kick.

2    She can still lash out.  She can still bite.

3    These are all things she did during that

4    incident.

5        Q.    Which at the time she was sitting

6    on the ground, however, in hand -- with

7    handcuffs, she was not a threat?

8        A.    When she was on the ground in

9    handcuffs, she was still able to kick me, and

10   she did so.

11       Q.    Was she able to get away from you?

12       A.    It would have been much more

13   difficult for her to get away.

14       Q.    Because it's next to impossible for

15   her to get up, right?

16       A.    From a seated-on-her-butt position,

17   it is very, very difficult to get up.

18       Q.    Okay.  All right.  So you didn't

19   ask her what she needed to help her move or

20   get up or get to the car while she was

21   sitting on the ground; is that fair?

22            MR. MANDO:  Objection to form, lack

23       of foundation.  Go ahead.

24       A.    We didn't ask her about getting to

25   the car because we weren't at that bridge.

1        Q.    Okay.

2        A.    We are going to cross it one at a

3    time.  And she's not particularly compliant

4    or friendly at that point, so we picked her

5    up, supporting all of her body weight.

6        Q.    Okay.

7        A.    And then before we attempted to

8    move her, once she was up on her one foot

9    with us holding her up --

10       Q.    Okay.

11       A.    -- explained, We've got to get you

12   from here to the car.

13       Q.    Okay.

14       A.    Then I tried to convince her to

15   help.  I said that I saw you're on crutches.

16   We need you essentially to act -- have us act

17   as your crutches, and we'll support your

18   weight, and we'll get you there.

19       Q.    Okay.  And then that didn't happen,

20   right?

21       A.    Correct.

22       Q.    And you told her that she was

23   either going to get herself over there with

24   your help, or you're going to drag her,

25   right?

Page 159

1        A.     Those are really the only two

2    options.

3        Q.     And then you had to -- you dragged

4    her, or drug, dragged her?

5        A.     I wouldn't describe it as dragging

6    her, no.  We carried her over.  We didn't

7    drag her across the ground.  We supported all

8    of her body weight and then some because she

9    repeatedly stuck her good foot out in front

10   of her to physically prevent our forward

11   momentum.

12       Q.     I thought you testified that either

13   her getting over there on her own or you

14   dragging her were the only two options?

15       A.     That's probably what I said.

16       Q.     Okay.

17       A.     However, what we did wasn't really

18   dragging her.

19       Q.     Okay.

20       A.     You drag something behind you.  We

21   are under her armpits.  We are carrying her

22   from point A to point B.

23       Q.     Okay.  So despite telling her that

24   that was what you were going to do, you did

25   something other than drag her?

Page 160

1        A.    We carried her.

2        Q.    Okay.  And she used her good foot

3   to prevent you from doing that?

4        A.    She did.

5        Q.    All while telling you that she had

6   a broken leg, she had just had surgery, she

7   couldn't move, things like that, right?

8        A.    She did say those things.

9        Q.    At that point, did you become aware

10  -- or at that point, did you consider her to

11  be injured?

12       A.    I knew that she had had surgery,

13  and she had said these things about not being

14  able to move, so we were trying to make sure

15  that we did everything we could to assist her

16  and prevent any further injuries in moving

17  her from point A to point B.

18       Q.    So further injuries to me means you

19  considered her to be injured?

20       A.    I considered her to be -- I mean,

21  injured is a tricky -- is a tricky word.  Was

22  she in rehabilitation?  Did she have

23  something wrong with her leg?  Sure.  I don't

24  know if it's an injury --

25       Q.    Right.

Page 161

1          A.    -- exactly.  I mean, if you get

2    surgery on your shoulder to fix your

3    shoulder, is it injured, or is it just

4    healing?  We're getting into words minutiae.

5          Q.    Did you consider her to be

6    disabled?

7          A.    No.

8          Q.    I want to focus on the word

9    "interrupt" -- when you told her that if you

10   come out here and interrupt the stop, you're

11   going to jail.

12              What did she do?  And if it's what

13   you've already told me, you can say that.  I

14   just don't think we've used the word

15   "interrupt" yet.  What did she do to

16   interrupt the stop?

17         A.    Everything we've already talked

18   about --

19         Q.    Okay.

20         A.    -- where we had to stop doing the

21   investigation of the stop and turn all of our

22   attention onto her instead.

23         Q.    Okay.  So interrupt -- we've

24   already discussed -- strike that.  There's

25   nothing that she did to interrupt the stop

Page 162

1    different than what we've already discussed?

2         A.   I believe that's correct.

3         Q.   Okay.  I'm not trying to be tricky.

4    I'm just -- I know that words have meaning in

5    your line of work, and I want to make sure

6    I'm using the right words.

7              Now, you told her it was your stop

8    at some point, right?  Do not come out here

9    and interrupt your stop?

10        A.   Yes.

11        Q.   Fritsch told me it was his stop.  I

12   think you agree it was his stop.  At that

13   point when you're saying my stop, there's no

14   particular -- is there any particular meaning

15   to that, or are we describing the stop

16   regardless of whose it is?

17        A.   Right.  It's just the stop.

18        Q.   Jansen and Goshorn were there in

19   support roles to you?

20        A.   Yes.

21        Q.   Fritsch was your trainee?

22        A.   Correct.

23        Q.   Was there anybody there -- in terms

24   of chain of command, was anybody present

25   during their arrest of Ashley Ferreiras who

1    had more authority than you?

2         A.    No.

3         Q.    Okay.  Is that true up until her

4    arrest was effected?

5         A.    It is true up until the time that

6    either Sergeant Gilliland or Lieutenant

7    Haggard arrived, and I don't know when they

8    arrived.

9         Q.    That would have been after you had

10   gotten her into the car, though, right?  Or

11   no?

12        A.    I know that Sergeant Gilliland was

13   definitely there prior to her getting into

14   the car.

15        Q.    At that point, did the -- did the

16   stop or the scene stop -- scratch that --

17   cease becoming your stop, your scene, and

18   become under the supervision of somebody

19   else?

20        A.    If there is a supervisor present at

21   the scene, they are in charge of the scene,

22   but it is still mine and Fritsch's stop.

23        Q.    Okay.  Did you become aware of a

24   supervisor at the scene before the door to

25   your cruiser was closed behind her?

Page 164

1      A.    Yes.

2      Q.    You were aware of a supervisor

3  being there?

4      A.    Yes.

5      Q.    Okay.  Was that Gilliland?

6      A.    Sergeant Gilliland walked up as we

7  got Ms. Ferreiras to the car, and we were --

8  and we were taking pictures of her.

9      Q.    Okay.  To the car but not yet in

10  the car?

11      A.    Correct.

12      Q.    Was Sergeant Gilliland at that

13  point in charge of the scene?

14      A.    He would be the person who is on

15  paper responsible for the scene.

16      Q.    On paper but not actually?

17      A.    He is responsible for the scene;

18  however, our sergeants work in a supervisory

19  role, which means they're not necessarily the

20  ones who are making sure that we get her into

21  the car.  They're not the ones who are

22  telling her what to do.  They are supervising

23  the staff on the scene.

24      Q.    He's not going to micromanage

25  giving effect to the arrest?

Page 165

1          A.    He is going to do what he's

2    required to do as the supervisor to see that

3    things -- that the law and policy is followed

4    appropriately and that injuries are treated

5    appropriately.

6          Q.    And as far as you understand it,

7    did he do that?

8          A.    He did.

9          Q.    Did Sergeant Gilliland ever tell

10   you at any point, Officer Ullrich, stop doing

11   that?  Stop doing "X"?

12         A.    No, I don't believe so.

13         Q.    Did Sergeant Gilliland tell

14   sergeant -- Officer Fritsch, Officer Fritsch,

15   stop doing "Y"?

16         A.    Not that I heard.

17         Q.    Same thing with Jansen?

18         A.    Not that I heard.

19         Q.    What was Officer Brown's role that

20   evening?  Was she there to take pictures, or

21   was she there in another support role?

22         A.    She responded to the report that we

23   were on the ground fighting with the subject.

24         Q.    Okay.

25         A.    Once we get that scene more under

Page 166

1    control and Ms. Ferreiras is in custody,

2    there's a long list of things that have to be

3    done.  And I believe at one point I turned to

4    her and I said, Can you take pictures?

5         Q.    Gotcha.

6         A.    And I tasked her to do that.

7         Q.    You tasked her to take pictures --

8    Officer Brown, right?

9         A.    Correct.

10        Q.    Did you task any other assignments

11   to any of the other officers on the scene?

12        A.    I don't remember.  I know I made

13   sure Fritsch continued the investigation of

14   the stop with Max.  And then I did talk with,

15   I believe, Officer Goshorn and whoever else

16   stayed with the car awaiting impoundment to

17   make sure that they remained in a safe

18   situation.  It was -- it was our decision to

19   tow the car.  It was our decision to make

20   sure that that happened safely.

21        Q.    By "our" decision, do you mean your

22   decision?

23        A.    It's really -- it fluctuates a

24   little bit there because Fritsch is the one

25   who is doing the work --

1      Q.    Yeah.

2      A.    -- in this stage of his field

3  training.

4      Q.    Right.

5      A.    However, Fritsch reports to me.

6  But I try to empower the recruits to make the

7  decisions and conduct the investigations

8  appropriately within the rules.

9      Q.    I mean, is it possible that he

10  might not be -- he might not know to make the

11  decision about towing the car at that point

12  just due to a lack of experience, or is that

13  something that would be -- he should have

14  been trained on at that point?

15      A.    He will have had some training on

16  it, but it doesn't mean that he's seen a

17  similar situation before.  It's fairly rare

18  for us to have tags for one car on a

19  different car owned by a different person.

20  It's -- that's a lot of moving pieces that

21  lined up in this situation.

22      Q.    Is it your understanding that

23  Fritsch would have been looking to you for

24  instruction?

25      A.    Yes.

1      Q.    And that was appropriate; he should

2    have been?

3      A.    Yes.

4      Q.    What about Jansen; would Jansen

5    have been looking to you for instruction?

6      A.    Yes.

7      Q.    Same with Goshorn?

8      A.    Yes.  They were backup officers on

9    the scene.  The person at the scene who's in

10   charge up until a supervisor responds would

11   be either -- depending on the particular

12   situation, it would be the person whose stop

13   it was.

14     Q.    Okay.

15     A.    But then once Officer Fritsch was

16   clearly, due to the assault, unable to

17   perform his job functions at that point, I

18   then took over that primary role.

19     Q.    Okay.  And he was unable to

20   complete his job functions which tells me it

21   was your decision to tow the car?

22     A.    I don't know if it was my decision.

23   Had someone not made that decision, that's

24   absolutely what would have happened.

25     Q.    If a decision had not otherwise

1    been made, you would have made it?

2        A.    Yes.

3        Q.    And everyone would have understood

4    that that was the thing to do?

5        A.    Yes.

6        Q.    Which would have been appropriate?

7        A.    Yeah.  It was an unregistered,

8    uninsured car.  At the time, we didn't know

9    if it was stolen or not with a tag that

10   doesn't belong on it that's been in that

11   situation for an extended period.

12       Q.    Forgive me.  I wasn't suggesting

13   anything other than it's your understanding

14   that it would have been appropriate for the

15   other officers on the scene to respond to

16   your decision-making to have the car towed?

17       A.    Yes.

18       Q.    Okay.  Until a person -- is the

19   title of -- is there a title of supervisor

20   within the Covington Police Department?

21       A.    There's not.

22       Q.    But you understand someone to be

23   your supervisor?

24       A.    Yeah.  So in a situation like this,

25   Sergeant Gilliland was the direct sergeant

Page 170

1    for the night, but Lieutenant Haggard was

2    also working.  So if Sergeant Gilliland

3    arrived on scene, he would be the supervisor

4    on scene.

5        Q.    Okay.

6        A.    If Lieutenant Haggard arrived on

7    scene, he would be the supervisor on scene.

8        Q.    Okay.

9        A.    I've had situations where a chief

10   has arrived on scene.  He's the on-duty

11   supervisor.

12       Q.    Is the decision about who is the

13   supervisor of the scene, if not you, is that

14   decided by the presence of an officer with a

15   higher rank?

16       A.    It would be an officer in a

17   supervisory role.

18       Q.    Okay.  And Gilliland was in a

19   supervisory role by virtue of his -- by

20   virtue of his being on that shift that

21   evening; is that fair?

22       A.    As his assignment as the

23   supervisor.  Frequently, if we are running

24   short, a sergeant may work street overtime as

25   a patrol officer.  So I may be running a beat

1    with Sergeant Powers, which is very

2    frequently.

3              He's not in a supervisory capacity

4    at that scene, to my knowledge, but I would

5    point out that I am not a supervisor.  I'm

6    not trained the way they are.  They may have

7    a different understanding of that.

8         Q.    Do you recognize Gilliland as being

9    your supervisor?

10        A.    Yes.

11             MR. WHITTAKER:  I think this would

12        be a good time to take a break.

13             (A brief break was taken.)

14        Q.    (By Mr. Whittaker) Back on the

15   record.  Officer Fritsch, you're still under

16   oath.  Do you understand that?

17        A.    I understand that I'm still Officer

18   Ullrich.

19        Q.    Officer Ullrich.

20        A.    And I understand that I'm still

21   under oath.

22        Q.    I haven't called you Mando yet.

23   We'll get there at some point, I'm sure.

24             Officer Fritsch, who is not you,

25   testified in this case on June 18th during

Page 172

1    his deposition.

2         A.    Okay.

3         Q.    And he sat where you are.  And I

4    asked him what training he had had on the

5    Covington use of force policy.  His testimony

6    was, No one specifically trained us on the

7    use of force policy.  We were expected to

8    read it and understand it.  That's on page 67

9    of the transcript, which I understand your

10   attorney has.  Is he right about that?

11        A.    No.

12        Q.    I asked him, Officer Fritsch, if he

13   would agree with me that Ashley Ferreiras had

14   mobility issues.  He said, Yes.

15             I asked him, Could you tell me what

16   sensitivity to and appropriate physical

17   support you gave her in aiding her with

18   mobility issues?  He said, I attempted to

19   support her while she was in custody to

20   prevent her from falling.  I asked him,

21   Anything else?  He said, No.

22             Is he right about that?  And I can

23   break up that statement into chunks if that

24   -- if you think that will be most

25   appropriate.

1      A.    I don't know if he did anything

2  else in specific because once she was in

3  custody and we got her into the car, we

4  realized his glasses were broken and his

5  vision was an issue, and he was no longer the

6  primary for really anything.  I mean, I know

7  that he pushed the wheelchair we put her in.

8  So, I mean, I would group it that way.

9      Q.    He just needed glasses for driving,

10  though, didn't he?

11      A.    No.  The issue became when I

12  watched him typing to write his report, I

13  went -- and it's on the video.  I became

14  concerned that it could be an issue for him.

15  I think his vision is not so bad that he's

16  got severe issues with it, but once he became

17  not at a hundred percent, we're just going to

18  tag him out.

19      Q.    He agreed with me that Ashley

20  Ferreiras had mobility issues that evening.

21  Would you agree with that?

22      A.    Knowing everything I know now, yes.

23      Q.    Would you have agreed with that at

24  the time?

25      A.    At which time?

Page 174

1          Q.    During the incident.

2          A.    At the beginning of the incident, I

3    don't know.  Once she's in custody and she

4    informs me that she can't put weight on her

5    leg, that she had surgery and that it's

6    broken, at that point, I know that she does

7    have some issues with her mobility.

8          Q.    I asked Fritsch -- Officer Fritsch

9    if he agreed that Ms. Ferreiras was impaired

10   in her ability to walk that evening.  He

11   agreed yes.  Would you agree with that?

12         A.    With the full knowledge of her

13   injuries, I think it does, yes.

14         Q.    You just didn't know it at the

15   time?

16         A.    Correct.

17         Q.    I asked Fritsch if he would agree

18   that she was injured at the time, clarifying

19   that I wasn't saying he injured her, saying

20   that she was injured by virtue of her broken

21   foot.  He said, Correct.  Do you agree with

22   that?

23         A.    Knowing all of the information that

24   I know now, yes.

25         Q.    Not then, though?

Page 175

1      A.    Correct.

2      Q.    Fritsch testified that as soon as

3  he saw Ashley Ferreiras, he knew -- he

4  regarded her as being injured and that she

5  had a disability.

6          I'm not asking you to read his mind

7  and tell me whether or not he knew that, but

8  any reason to believe that he was wrong about

9  that?

10          MR. MANDO:  Objection,

11      characterization.  You can go ahead.

12      A.    That he was wrong about what he was

13  thinking, or that he was wrong in immediately

14  determining that she was injured and

15  disabled?

16      Q.    Let me read it again, and then...

17  I asked him if he knew Ms. Ferreiras had a

18  disability the first time you encountered

19  her.  As to the injury, yes, was his

20  testimony.

21          Was there any reason that you're

22  aware of at the time that would lead you to

23  believe that the information available to

24  both of you -- that he was wrong?

25      A.    Yes.

1      Q.    Okay.  What was that?

2      A.    You don't know what's going on with

3  Ms. Ferreiras when she comes out.

4      Q.    Okay.

5      A.    As I said earlier, I don't know if

6  she's got a sprained ankle, if she has mild

7  tendinitis, and the doctor said, Hey, wear

8  this wrap, use crutches to just limit how

9  much you're on your feet, or if she has, you

10  know, a freshly amputated set of toes or

11  something more severe.  Absolutely no way to

12  tell at that point.

13      Q.    What if a disability's obvious?

14      A.    I mean, if there is an obvious

15  disability, I mean, you can -- you can

16  sometimes identify those.

17      Q.    You would not agree that this is a

18  situation in which she was obviously

19  disabled?

20            MR. MANDO:  Objection, asked and

21        answered.  Go ahead again.

22      A.    No, I would not.

23      Q.    I asked Officer Fritsch if he would

24  agree with me that she informed him that she

25  had a disability.  He said, Yes.  I asked him

Page 177

1    if that was the case after he had subdued her

2    on the ground.  He said, Correct.  I asked

3    him if that was the case after he had her in

4    handcuffs.  He said, Correct.

5            I asked him, I think we agree that

6    she wasn't going anywhere when you and

7    Officer Ullrich had her placed on the ground.

8    Under Mr. Mando's objection, I asked him,

9    Right?  Mr. Mando objected again, and the

10   witness said, Correct.

11           Is there any of that -- and I will

12   break it up if you need -- that you disagree

13   with?

14           MR. MANDO:  Note an objection to

15       characterization and also the objections

16       as to form as to the questions that were

17       put to Officer Fritsch.

18   Q.    Fair enough.

19   A.    If we can go through those one at a

20   time.

21   Q.    Sure.

22   A.    That was a lot.

23   Q.    Yes.  The first question I asked

24   him in this line of questioning which is on

25   pages 153 to 56, Officer Fritsch, would you

Page 178

1    say that Ms. Ferreiras was behaving as

2    someone who was concerned about pain or

3    injury to her foot?

4              Objection, characterization, lack

5    of foundation.  Go ahead.

6              The Witness:  During the incident,

7    she was yelling, I have a broken foot, so

8    yes.

9              Do you agree --

10    A.    Can we go one at a time?

11    Q.    This was -- I'm sorry.  This was

12    one at a time, but there was a --

13    A.    Oh, okay.

14    Q.    -- an objection in there, so --

15    A.    Okay.  I'm sorry.

16    Q.    I will filter out the objection

17    part, noting that it is still a valid

18    objection.

19              My question:  Would you say that

20    Ms. Ferreiras was behaving as someone who was

21    concerned about pain or injury to her foot?

22              Fritsch:  During the incident, she

23    was yelling, I have a broken foot, so yes.

24              Do you agree with that?

25    A.    I do not agree that she was acting

1   as someone who was concerned about her foot.

2        Q.   Okay.

3        A.   I do agree that she was yelling she

4   had a broken foot.

5        Q.   Okay.  This is in the same line of

6   questioning.  I asked Officer Fritsch if he

7   would agree with me that Ms. Ferreiras

8   informed him that she had a disability.  He

9   said, Yes.  Do you agree with that?

10       A.   She never -- I don't believe she

11  ever used the word disability, and she

12  eventually said that she had a broken ankle

13  or broken leg or whatever she said and that

14  she had surgery.

15       Q.   Okay.  And then I followed up.

16  After you had subdued her on the ground,

17  correct?  And he said, Correct.

18            Do you agree with him that she

19  informed you all that she had a disability --

20  she didn't use the word "disability" -- after

21  he had been -- after he had subdued her on

22  the ground?

23            MR. MANDO:  Objection, form,

24       characterization.  Go ahead.

25       A.   I don't believe I had enough

Page 180

1    information at that time to make a judgment

2    on her being disabled or not.  She, I think,

3    said she had just -- she had just had surgery

4    or something.  I don't know what the extent

5    of that is.  I don't know if it causes a

6    disability.  I don't know if it's -- I don't

7    have any idea.

8          Q.    Anything you're aware of that would

9    suggest that Officer Fritsch was wrong in his

10   interpretation?

11               MR. MANDO:  Objection,

12         characterization, lack of foundation.

13         Go ahead.

14         Q.    You were there, right?

15         A.    I'm saying that I didn't have the

16   ability to determine she was disabled at that

17   point.

18         Q.    Understood.

19         A.    And I had identical facts that were

20   building that conclusion, so I don't see any

21   reason that Officer Fritsch would make that

22   conclusion.

23         Q.    Okay.

24         A.    However, I don't know what his

25   personal history is, so I don't know what he

1    is basing all of that off of.  And he is a

2    20-week recruit who's still learning all of

3    the ins and outs of policing, our policy,

4    procedures, the law.

5         Q.    My next question to him was, Would

6    you agree with me that she informed you that

7    she had a disability after you had her in

8    cuffs?  He said, Correct.

9         A.    I again --

10             MR. MANDO:  Same objection.

11    Characterization, form.  Go ahead.

12        Q.    Do you disagree with that

13   statement?

14        A.    I disagree with that statement for

15   the same reasons.

16        Q.    Next, I asked him, After -- I think

17   we agree that she wasn't going anywhere when

18   you and Officer Ullrich had placed her on the

19   ground.  And then I said, Right?  And the

20   witness said, the witness being Fritsch,

21   Correct.

22             Do you agree with that statement

23   that she wasn't going anywhere after you and

24   Ullrich -- you and Fritsch had placed her on

25   the ground?

1        A.    I would disagree that we placed her

2   on the ground.  We didn't place her on the

3   ground.

4        Q.    Okay.

5        A.    She assaulted Officer Fritsch.  We

6   fell to the ground.

7        Q.    Okay.

8        A.    Now, was she not going anywhere?

9   She may have tried.  She may have been

10  capable of doing that.  But at that point,

11  once we're on the ground and I get her into a

12  joint lock, she wasn't going anywhere because

13  I wasn't going to physically allow her to.

14       Q.    So you said she may have been

15  capable of doing it.  Does that mean -- did

16  you mean that she was physically capable of

17  trying or physically capable of escape?

18       A.    Both.

19       Q.    She was physically capable of

20  escape at that point?

21       A.    Yeah.  She came downstairs.  She

22  walked all the way out to us.  There's no

23  reason she couldn't do the reverse without us

24  using force to prevent that.

25       Q.    After she was on the ground in

Page 183

1   cuffs?

2        A.    Well, after she was cuffed is not

3   what you asked.

4        Q.    After you had subdued her on the

5   ground?

6        A.    Yes.

7        Q.    Okay.  I asked Fritsch on page 157,

8   So every action -- every physical action you

9   took towards Ms. Ferreiras you took knowing

10  that she had a disability, right?

11            MR. MANDO:  Objection, form,

12       characterization.  Go ahead.

13       Q.    He said, Correct.  There was no

14  objection in the transcript, but he said,

15  Correct.

16            Anything -- any facts you're aware

17  of that would cause you to say Fritsch is

18  wrong about that?

19       A.    Yes.

20       Q.    What?

21       A.    All of the things we've already

22  talked about.

23       Q.    Okay.

24       A.    And I don't believe that it rises

25  to a point of disability.

Page 184

1       Q.    Okay.  With respect to his Use of

2   Force Report, have you seen that report?

3       A.    I may have seen it either in

4   preparation for the criminal trial or at some

5   point.  I may have reviewed it after the fact

6   as his FTO or with the sergeant, but I don't

7   recall that, no.

8       Q.    Okay.  It has been previously

9   introduced as Exhibit 8.  I'm hoping

10  Mr. Mando has a copy to show you.

11          MR. MANDO:  I don't.  I can get

12      one, but I don't know that I've got it

13      here.  Fritsch's use -- Supplemental Use

14      of Force?

15          MR. WHITTAKER:  Yeah, the

16      Supplemental Use of Force.

17          MR. MANDO:  If you just give me two

18      minutes, I can go get it.

19          MR. WHITTAKER:  That's fine.  Let's

20      go off the record.

21          (A brief break was taken.)

22      Q.    (By Mr. Whittaker) You're under

23  oath.  Have you seen this before, Officer

24  Fritsch's Use of Force Report?

25      A.    I may have.

1        Q.    Supplemental Use of Force Report?

2        A.    I may have.  I don't recall.

3        Q.    Okay.  Fritsch testified on page 44

4    of his transcript that -- I asked him what

5    input he had into the preparation of your Use

6    of Force Report.  He said, None.

7              And I said, I think you testified

8    before that you didn't -- you didn't review

9    Officer Ullrich's report before preparing

10   yours.  He agreed that he did not.

11             And I want to make sure that you --

12   do you agree with that?  Is there any part of

13   that that you disagree with?

14       A.    (No response.)

15       Q.    I'll break it down for you.

16       A.    No, I just want to make sure that

17   I'm responding to the question you're

18   actually asking.

19       Q.    I appreciate that.

20       A.    I don't believe he reviewed my use

21   of force at any point.

22       Q.    Okay.

23       A.    He wouldn't be in my chain for

24   review, and I don't believe -- the only --

25   the only question really is, because he's a

1    recruit, did he look at how a use of force is

2    done; and I think he had had a use of force

3    prior to this, so he wouldn't have --

4        Q.    He had one the same day.

5        A.    Did he?

6        Q.    Mm-hmm.

7        A.    Well, I don't have any idea.  So

8    I'm not sure.

9        Q.    Would it have been appropriate for

10    him to review your Use of Force Report to

11    inform his supplemental Use of Force Report?

12        A.    It may be, depending on

13    circumstances.

14        Q.    Would it have been in these

15    circumstances appropriate?

16        A.    Potentially.

17        Q.    What circumstances would it

18    otherwise be inappropriate?

19        A.    If there weren't circumstances

20    that --

21        Q.    Yes.

22        A.    -- made it appropriate?

23        Q.    Yes.

24        A.    If there wasn't a reason for him to

25    review it, then I wouldn't expect him to

1    review it.

2         Q.    You would not?

3         A.    I don't believe it's against policy

4    or anything --

5         Q.    Okay.

6         A.    -- like that.

7         Q.    Would it be inappropriate for him

8    to do that if there wasn't otherwise a reason

9    for it?

10        A.    I don't know that it would go to a

11   point of inappropriate.  I read a lot of use

12   of force reports that I'm not related to at

13   all --

14        Q.    Gotcha.

15        A.    -- in an effort to learn what our

16   guys are doing.

17        Q.    Gotcha.  This is a video I believe

18   we produced in discovery.  The title of the

19   file is RBreplay_final with some numbers.

20             I'm going to represent to you that

21   this is video footage of Ms. Ferreiras's Ring

22   security camera, at least that's my belief as

23   to what it is, and I believe this is produced

24   in discovery.  If it wasn't, it will be.

25             MR. MANDO:  I don't recall seeing

1        that, Justin.

2              MR. WHITTAKER:  There was a video

3        filed that was labeled -- it started

4        with 09, and it's called Videos, and

5        there was a number of videos in that

6        file.  So I wouldn't -- I wouldn't be

7        surprised if you didn't see it.

8              I thought it was produced.  If it

9        hasn't been, then that was an error on

10       my part, and we'll make sure it's

11       produced.

12       Q.    (By Mr. Whittaker) But I'm going to

13  play this now.  I'm just going to --

14             MR. MANDO:  Have you seen this

15       before?

16             THE WITNESS:  I've never --

17       Q.    Okay.

18             THE WITNESS:  -- seen this before.

19       Q.    I was going to ask.  I'm going to

20  play it from beginning to end.  I understand

21  it to be 41 seconds.  (Playing video.)  You

22  can't hear what's going on right now, but

23  that's...  Okay.  I'm going to stop it

24  because I want it...  (Stopped video.)

25             I apologize.  I'm going to go back

1    towards the beginning.  (Playing video and

2    then stopped.)  Okay.  I'm going to pause it

3    there.  This is a 42-second video.  I paused

4    it at the 26 mark -- 26-second mark.  There's

5    18 seconds left.  Have you seen this video

6    before?

7         A.    Never seen this video before.

8         Q.    As far as you can tell, does this

9    depict the scene from a different angle on

10   May 4th, 2023?

11        A.    It appears to.

12        Q.    Do you recognize...  (Playing video

13   and then stopped.)  I'm pausing it at 20

14   seconds in the video.  Do you recognize the

15   person with a bicycle helmet in the middle

16   ground wearing what appears to be a

17   reflective shirt as Officer Jansen?

18        A.    That's correct.

19        Q.    Do you recognize the person he's

20   speaking to to be John Carlos?

21        A.    I believe that's correct.  I'm not

22   a hundred percent.

23        Q.    Okay.  Any reason to believe it's

24   somebody else?

25        A.    I believe there were multiple

1    people in the house.  I'm not sure.

2        Q.    Okay.  And is this the cruiser

3    we've been speaking about in the background

4    with the -- I don't know if it's a taillight

5    or if that's a bright light shining on it,

6    but is this, where my cursor is, the cruiser?

7        A.    Yes.

8        Q.    Okay.  Would you agree with me that

9    this is an angle opposite that of the

10   cruiser?

11       A.    (No response.)

12       Q.    If the cruiser was looking at the

13   house, the angle we're looking at now is the

14   opposite of that, fair?

15       A.    It seems correct.

16       Q.    I'm just trying to establish the

17   geography.  (Playing video and then stopped.)

18             Would you agree with me that around

19   the 3-second mark, we see Officer Jansen

20   ushering who we believe to be John Carlos

21   back into the yard?

22       A.    Yes.

23       Q.    Would you agree with me that he is

24   employing de-escalation techniques there?

25       A.    I can't tell exactly what he's

1    doing.  I can't really hear what he's doing.

2         Q.    I'll let it play from 3 seconds.

3    (Playing video and then stopped.)  We're at

4    13 seconds.  Would you agree with me that

5    whatever techniques and whatever Jansen did,

6    he successfully removed John Carlos -- who we

7    believe to be John Carlos -- from the

8    interaction with you and Ferreiras?

9         A.    Yes.  I can't hear exactly what

10   he's saying, but he's indicating to John

11   Carlos to go back into the yard, and John

12   Carlos does that.

13        Q.    Okay.  Would you agree with me that

14   however Officer Jansen managed to do that, it

15   was a successful effort to remove John Carlos

16   from your interaction with Ashley Ferreiras?

17        A.    Yes.

18        Q.    (Playing video and then stopped.)

19   Did you hear somebody say, Stop kicking?

20        A.    That's me.

21        Q.    Okay.  At 15 seconds to stop

22   kicking, the person saying that is you,

23   right?

24        A.    That's correct.

25        Q.    Okay.  (Playing video and then

Page 192

1   stopped.)  Did you hear somebody say,

2   Goddamnit, woman?

3        A.   That's me.

4        Q.   Also you.  (Playing video and then

5   stopped.)  Was that you who said, uhh, F

6   word, she effing bit me?

7        A.   Yes.

8        Q.   I want to go back again.  That

9   stopped around 22 seconds.  I'm going to go

10  back to 12 seconds.  (Playing video and then

11  stopped.)  Can you see this video?  Can you

12  see what's being depicted?

13       A.   I can see the video.  It's black

14  and white and it's not particularly large.

15       Q.   Right.

16       A.   So it...

17       Q.   I'm trying...  (Playing video and

18  then stopped.)  Is this...  I'm pointing to

19  what appears to me to be a person leaning

20  over Ashley Ferreiras at around -- somewhere

21  in the video.  Can you tell if that's you?

22       A.   It may be.  It's hard -- I mean,

23  it's small.  It's black and white.

24       Q.   Do you recall that during this

25  interaction, that you were at some point

Page 193

1    leaning over her?

2         A.    Yes.

3         Q.    Okay.  (Playing video and then

4    stopped.)  Now, I'm going to represent to you

5    that I see two punches.  You tell me if I'm

6    wrong.  If you don't see it, you don't see

7    it.  I'm representing what I see starting at

8    10 seconds.  (Playing video and then

9    stopped.)

10            The video might not be synced up

11   with the sound, but did you punch her while

12   you said, You bit me, or She bit me, or did

13   you punch her after you said that?

14            MR. MANDO:  Objection, form.

15        A.    I don't know.  My body cam I know

16   shows it better.

17        Q.    Okay.  (Playing video and then

18   stopped.)  This one might be a little bit

19   better.  I think it's Jansen's flashlight

20   pointed at Ashley Ferreiras on the ground.

21   Do you see that?

22        A.    I do.

23        Q.    Does that look like what it is to

24   you?

25        A.    That it's Ashley on the ground --

1      Q.    Yes.

2      A.    -- with his flashlight --

3      Q.    Yes.

4      A.    Yes.

5      Q.    It looks like to me that her head

6   and her face is in the grass.  Is that what

7   it looks like to you as well?

8      A.    Yeah, she's laying on the ground.

9      Q.    And you have a hold of her arm

10  that's in the air, correct?

11     A.    I do.

12     Q.    Where is Fritsch in relation to

13  this?

14     A.    He's hidden by the house.

15     Q.    He's hidden by the house.  So he's

16  on the other side of -- okay.

17              MR. MANDO:  What second is that on

18     the video?

19     Q.    That is 31 seconds.  (Playing video

20  and then stopped.)  This is still you, right?

21     A.    I believe so.

22     Q.    And you say, Give her -- give us

23  your hands?

24     A.    Yes.

25     Q.    While you have her hand, correct?

Page 195

1       A.    Officer Fritsch is still fighting

2   for her left hand.

3       Q.    Okay.  But you've got a hand?

4   You've got --

5       A.    I do.

6       Q.    -- a hold of her hand?  (Playing

7   video and then stopped.)

8             Okay.  That's the end of that.

9   Let's pull up the... Officer Fritsch's video

10  at the hospital.  I believe -- I don't know

11  what number it is.  I think it's 630,

12  Defendants' 630.

13            MS. NIESEN:  Yeah, I have the

14        video.

15            MR. MANDO:  You're pulling up

16        Anthony's body-worn camera?

17            MR. WHITTAKER:  Correct, which was

18        Defendants' 630.

19                Go to 00:18:13, so 18 minutes

20        and 13 seconds after.  That's a good

21        place to start right there.

22      Q.    (By Mr. Whittaker) This is -- this

23  is Officer Fritsch's body-worn camera

24  produced in discovery as Defendants' 630.

25            Would you agree with me that you

Page 196

1    both had your body-worn camera on at the

2    hospital after transporting Ferreiras there?

3         A.    Yes.

4         Q.    Okay.  And is it your understanding

5    that that's appropriate because you're

6    interacting with the public?

7         A.    We wear our body cams the whole

8    shift.

9         Q.    The whole shift?

10        A.    The whole shift, your body cams are

11   on.

12        Q.    Okay.  Is that -- it is my

13   understanding that it goes on when you're

14   interacting with the public, but it's

15   otherwise not necessarily on.

16        A.    It's on you the whole shift.

17        Q.    Right.

18        A.    And then you would activate it when

19   you are interacting.

20        Q.    This is Fritsch's camera starting

21   at 00:17:52.  I'm playing this so we have

22   more context of the lay of the land here.

23   (Playing video and then stopped.)

24             Okay.  He pans over a little bit to

25   the left.  And would you agree with me that

Page 197

1    this is you sitting down?

2        A.    If you can bring it closer.

3        Q.    Yes.  Is that you right here

4    sitting down?

5        A.    It is.

6        Q.    Okay.  And who is he speaking with

7    there, by the way?

8        A.    I can't tell who that is from this

9    frame.  I don't know.

10       Q.    Okay.  And would you agree with me

11   that... (playing video and then stopped)

12   ...Ashley Ferreiras -- this is her in the

13   hospital bed around 17:57?

14       A.    Yes.

15       Q.    Okay.  (Playing video and then

16   stopped.)  And is Officer Fritsch -- I'm just

17   curious about his positioning here.  He

18   appears to be positioned so that he can see

19   you and Ferreiras at the same time.

20             Is that something that he would be

21   trained to do?  Is there anything about his

22   positioning with respect to Ashley being in

23   the bed and you sitting over here that is

24   significant?

25             MR. MANDO:  Objection to form.  Go

Page 198

1          ahead.

2          A.    His job is to be in custody of her,

3     so being there with her.

4          Q.    Okay.

5          A.    The reason he's in his position

6     most likely is because that's where the chair

7     is in that room.

8          Q.    Okay.  So he's sitting in this --

9     in this?

10         A.    I don't know, but that's where the

11    chair is in this room.

12         Q.    Okay.  (Playing video and then

13    stopped.)  Did you hear -- I thought I heard

14    you say, Will you go blue?  Did you hear

15    that?

16         A.    Yes.

17         Q.    And does that mean to turn off the

18    volume on the camera?

19         A.    Yes.

20         Q.    Okay.  So you were telling Officer

21    Fritsch to turn off the volume on his camera

22    by saying, Go blue?

23         A.    Yes.

24         Q.    Why were you telling him that?

25         A.    I don't have any idea.

1        Q.    What are the circumstances -- what

2   is your understanding of the circumstances in

3   which an officer is permitted to turn off the

4   volume on his camera?

5        A.    When they're talking about a scene

6   or a situation or details, discussing use of

7   force, when officers are interacting strictly

8   with other officers.

9        Q.    Okay.  (Playing video and then

10  stopped.)  So around 00:18:16, it appears to

11  me that the volume on Fritsch's camera was

12  off.  Is it your understanding that he has

13  the ability to do that himself manually?

14       A.    On the cameras that we had at the

15  time, yes.

16       Q.    And there's different cameras now,

17  right?

18       A.    There are.

19       Q.    Is it not the same as it used to be

20  under these cameras?

21       A.    That's correct.

22       Q.    Okay.  How would an officer disable

23  the volume on his camera under the cameras

24  you use now?

25       A.    The cameras we use now only have a

1    temporary mute feature, which is you hold

2    down the mute button.  After, I think, three

3    seconds, it will mute.  It will give an

4    audible sound or a flash that it's muting,

5    and then as soon as you release the button,

6    it will unmute.

7         Q.    So you have to hold it the entire

8    time --

9         A.    Correct.

10        Q.    -- to keep it mute?

11              In this circumstance with the video

12   -- the body-worn cameras that were used at

13   the time -- is there a visual cue to anybody

14   looking at Fritsch's camera to see that it is

15   off -- that the volume is not being recorded?

16        A.    I don't -- we've had now four

17   different versions of these cameras, and I

18   don't remember.

19        Q.    Does "go blue" refer to a light or

20   anything?

21        A.    It does if the lights are turned

22   on.  For example, I keep my lights when I had

23   these -- when I had prior cameras, I keep my

24   lights turned off because I worked at night,

25   and I didn't want to be standing in the

Page 201

1    bushes or in the woods and have a bright

2    flashing light up on my face.

3          Q.    So you're able to disable the

4    lights that the device itself emits to

5    others?

6          A.    Correct.

7          Q.    Is that still the case with your

8    new cameras?

9          A.    (No response.)

10         Q.    Meaning, can you turn off those

11   lights?

12         A.    You can -- you can do a whole bunch

13   of things with the current cameras.  The

14   current cameras, though, have an LCD screen

15   on the top.

16         Q.    Is that so you can see what's being

17   recorded?

18         A.    It gives you indications of a whole

19   bunch of stuff.

20         Q.    Okay.  (Playing video and then

21   stopped.)  As far as you know, though, he

22   turned his camera -- the volume off?

23         A.    Yes.

24         Q.    At your instruction or request?

25         A.    Yes.

1        Q.    It looks to me like you're speaking

2    with him starting... (playing video and then

3    stopped) ...at 18:19.  Do you have any idea

4    what you're speaking with him about?

5        A.    No.

6        Q.    Is this your mobile data recorder

7    -- data computer?  What's the MDC?  What's

8    the MDC stand for again?

9        A.    I think it's mobile data computer.

10        Q.    Is that what you have in the front

11    of you here?

12        A.    It is.

13        Q.    What are you working on?  I don't

14    think you're going to be able to see the

15    laptop because -- maybe you can, but --

16        A.    So based on the overall size of the

17    windows in it, I believe that is the KYOPS

18    program where we prepare citations and

19    reports.

20        Q.    Would that have been -- okay.

21    Would that have been a citation and report

22    for this use of force incident?

23        A.    It wouldn't have been a use of

24    force report.

25        Q.    Gotcha.

Page 203

1        A.    It would have been the KYIBRS --

2        Q.    "Kiebers"?

3        A.    -- a citation, or a handful of

4    other types of paperwork that we complete

5    through that -- CIT reports, E-calls, that

6    kind of thing.  I don't know.  It could have

7    been from this case.  It could have been me

8    catching up on other paperwork.  I don't have

9    any idea what I'm working on right there.

10       Q.    These documents that you gave

11   examples of, is there a form that is

12   available to you to fill out?  Is it a

13   fillable form?

14       A.    For, like, the citations and --

15       Q.    Yeah, for citations.

16       A.    Yes.  Yes and no.  So it's multiple

17   pages.  There's check boxes.  There's places

18   for names, all that.  But then at the end of

19   most of them, there's a narrative section

20   that's much more open.

21       Q.    And you filled it in?

22       A.    Yes.

23       Q.    But is it the same form every time

24   that you access?

25       A.    No.

1        Q.    Okay.  (Playing video and then

2    stopped.)  No idea what you're telling him

3    here?

4        A.    No idea.

5              MR. MANDO:  I'll object to

6        characterization.

7        Q.    Okay.  Would you agree with me that

8    you were looking up at Fritsch?

9        A.    Yes.

10        Q.    Would you agree with me that you're

11    speaking to him?

12        A.    Yes.

13        Q.    (Playing video and then stopped.)

14    Okay.  And then he turns away around 18:39.

15    I thought you mentioned that you would -- you

16    would tell an officer to go blue when you

17    were discussing the use of force.  That's a

18    possibility in which you would -- you would

19    go blue.  Did I hear that right?

20        A.    That is one possibility.

21        Q.    Is that a possibility here?  Is it

22    possible that you were discussing the use of

23    force in the scenario we just watched?

24              MR. MANDO:  Objection to form,

25        asked and answered, and calls for

 1      speculation.

 2          A.    I mean, it's possible that we're

 3   talking about this incident.  It's possible

 4   that I'm trying to make sure that I'm getting

 5   all of the details right from his end.  I

 6   don't have any idea what's being discussed

 7   here.

 8          Q.    Okay.  You're his supervisor in

 9   this -- in this situation, right?

10          A.    I'm his field training officer.

11          Q.    Field training officer.  And he --

12   okay, field training officer.  (Playing video

13   and then stopped.)  He turns away and turns

14   back.  Do you see that around 14:48 -- 18:41?

15          A.    Yes.

16          Q.    Would you agree with me that you're

17   looking back at him, towards Fritsch?

18          A.    Yes.

19          Q.    Would you agree with me that you're

20   speaking to him?

21          A.    I can't tell from a single still

22   frame.

23          Q.    (Playing video.)

24          A.    I don't appear to be moving my

25   mouth.

1      Q.    (Stopped video.)  He turns away

2  again at 18:45.  (Playing video and then

3  stopped.)  I think he just -- he turned his

4  audio back on his body cam.  Is that your

5  understanding there of what --

6      A.    If we can play it a little further.

7      Q.    I'm going to go back and then

8  further, if that's okay.

9      A.    Yeah, I just want to --

10     Q.    Here's 18:41.  I think we agreed

11  you're looking back at Fritsch.  We're not

12  sure if you're talking, but I'm going to play

13  it from 18:41.  (Playing video and then

14  stopped.)  What is that buzzing noise?

15     A.    The buzz can happen from a number

16  of different things on the cameras.  It can

17  be -- it will buzz every so often to remind

18  you that it is running.

19            I believe on this model when you

20  would mute or unmute, it would buzz and give

21  you a haptic to let you know that you had

22  changed the settings.

23     Q.    As far as you can tell, did he

24  unmute his camera at some point?

25     A.    Yes, sir.

Page 207

1      Q.    And that would have been when the

2   volume returned?

3      A.    Correct.

4      Q.    Okay.  (Playing video and then

5   stopped.)  I'm not asking questions about

6   this.  (Examining video.)  Can a punch be

7   considered deadly force?  (Playing video and

8   then stopped.)

9      A.    Potentially.

10     Q.    If you're wearing reinforced

11  gloves, could it be considered a deadly --

12  use of deadly force?

13     A.    I've never worn reinforced gloves,

14  so I don't know what that's like, so I don't

15  know.

16     Q.    Jansen was there as scene security,

17  right?

18     A.    He was.

19     Q.    Why didn't you let Jansen take care

20  of Ferreiras, and you just go about working

21  the -- your police -- your traffic stop?

22     A.    She was the immediate threat that

23  needed to be addressed.

24     Q.    And as scene security, wouldn't

25  that be Jansen's role?

1      A.    We're both working scene security

2   at that point because Officer Goshorn is

3   dealing with Max, Officer Fritsch is trying

4   to figure out what's going on with the stop,

5   and everyone's responsibility is security all

6   the time.

7      Q.    You're still in charge of the

8   scene, right?

9      A.    I am.

10      Q.    Okay.  I'm going to go -- this is

11   the same video.  At 55:48, would you agree

12   that this is -- is this you standing here in

13   the foreground or middle ground?

14      A.    It is.

15      Q.    (Playing video and then stopped.)

16   And this is -- would you agree with me that

17   Fritsch -- Officer Fritsch turned off his --

18   the volume on his camera?

19      A.    He did.

20      Q.    Around 55:56?

21      A.    Yes.

22      Q.    Do you recall where you were at

23   this point?

24      A.    I appeared to be walking over to

25   her room.

Page 209

1      Q.   Okay.

2      A.   But I -- I don't -- without more

3  context, I don't know.

4      Q.   Fair enough.  It appears to me that

5  Fritsch is looking at the laptop that you had

6  been working on.  Is that the same laptop?

7      A.   It is.

8      Q.   Can you tell from that image what

9  document is open on your laptop?

10     A.   So I can tell you that this is the

11 KYOPS program, and that is a narrative box

12 for one of the forms for a narrative.

13     Q.   Okay.

14     A.   So it could be an E-crisis.  It

15 could be a KYIBRS.  It could be a narrative

16 for a collision.  But there's only about a

17 dozen different things that you can do in

18 that program.

19     Q.   Could it be a narrative for a use

20 of force report?

21     A.   No.  Use of force report is made in

22 a Word document, and that is not a Word

23 document.

24     Q.   Any reason why Fritsch would be

25 called over by you to turn off his camera

1    volume and look at that document?

2              MR. MANDO:  Objection, form,

3         characterization.  You can answer.

4         A.    Any time we're in the hospital and

5    we're moving around outside of the person's

6    room, we should be muted because I don't know

7    if these doctors are talking about somebody

8    else's medical condition.  I don't know if

9    there are other people in the area who's

10   medical conditions are being discussed.  And

11   he's not interacting with the suspect, so

12   there's no reason for his audio to be on.

13             When we were riding in an FTO

14   situation, all of our reports we both go

15   over.  I'm typing this report because of his

16   vision issue and how long it would take for

17   him to do it, but I wanted him to see the

18   report to see how it was written, to see what

19   was included --

20        Q.    Okay.

21        A.    -- because this is a different

22   situation than anything we had had up to that

23   point.

24        Q.    Would you agree that whatever he's

25   looking at more than likely relates to the

1    Ferreiras incident?

2          A.    I think that's probably accurate.

3    It could be some other report from earlier in

4    the day, but it is also very likely that it

5    is about her stop.

6          Q.    And you can see he's wearing gloves

7    too, right?

8          A.    He is.

9          Q.    Are those the same kind of gloves

10   that you would be wearing -- that you were

11   wearing?

12         A.    They are Mechanix gloves.  They

13   look similar, but I don't think they're the

14   exact same type, but I'm not certain.

15         Q.    Okay.  It looks like to me -- and

16   you tell me if I'm wrong -- there's some sort

17   of -- and this would be at 57:25 -- some sort

18   of padding on the hands -- on the top of the

19   glove here.  Do you see that?  Do you see

20   what I'm pointing at?

21         A.    I see what you're pointing at.

22         Q.    Is that what that looks like to

23   you, some sort of padding?

24         A.    I can't tell what that is.  I don't

25   think it's padding, but as I said, I don't

1    think those are the same types of gloves that

2    I wear.

3         Q.    But they are Mechanix gloves?

4         A.    They are Mechanix gloves.

5         Q.    Okay.  It might even say Mechanix.

6    Okay.  (Playing video and then stopped.)  It

7    looks like to me he is using the -- your

8    keyboard to either scroll through that

9    document or to insert something into it.

10         Would he have any reason to add

11   anything by typing into this document?

12        A.    I don't know.

13        Q.    From your perspective, would there

14   be any reason for him to do that?

15        A.    Without having the context of

16   exactly what it is and what I asked him to

17   do, I don't know.

18        Q.    Okay.  (Playing video and then

19   stopped.)  Then at 58:19, he departs your

20   camera, right -- or your laptop, right?

21        A.    He does.

22        Q.    (Playing video.)  And you're now

23   sitting maybe roughly where you think he

24   might have been sitting before he came over

25   to your spot?

1        A.    Yes, sir.

2        Q.    (Stopped video.)  Any idea what you

3   said to him at 58:35 that caused him to go

4   back to your laptop?

5        A.    No idea.

6        Q.    At this point, do you have any idea

7   if you're -- the volume on your camera is on?

8        A.    No idea.

9        Q.    Okay.  (Playing video and then

10  stopped.)  And shortly before -- maybe a

11  couple seconds before 59:10, it seems like to

12  me Fritsch's -- the audio on his camera

13  turned back on.  Does that seem right?

14       A.    Yes.

15       Q.    I think you testified before that

16  because you're in the hospital, you should --

17  you should have the audio off because you

18  don't know what -- you know, somebody might

19  be talking about another patient.  Did I hear

20  that right?  As a general matter.  Did I hear

21  that right?

22       A.    Yes.

23       Q.    Any reason why the audio would go

24  on from there, from where it was turned off

25  before?

1    A.    From when he returns to her room?

2    Q.    Yes.

3    A.    Because he's returning to her room.

4    Q.    Okay.  (Playing video and then

5    stopped.)  Did you say that he's super weird?

6    A.    He is super weird.

7    Q.    At 59:20?

8    A.    Yes.

9    Q.    Did you agree with me that that's

10    what you said?

11    A.    I believe that's what I said.

12    Q.    And are you also saying that he is

13    super weird?

14    A.    Yes.

15    Q.    Okay.  Was he super weird then?

16    A.    He is just a super weird guy.

17    Q.    What makes him super weird?

18    A.    Just his personal characteristics

19    and stuff we chat about, choice in music.  I

20    think he plays Dungeons & Dragons.  He's just

21    a weird dude.

22    Q.    Would calling him super weird here

23    relate to his general state of being a super

24    weird guy?

25              MR. MANDO:  Objection, form, lack

1          of foundation.  Go ahead.

2          A.     Yes.

3          Q.     Any idea what caused you to call

4     him super weird here?

5          A.     No.

6          Q.     Could it be any number of things?

7          A.     It could have been any sort of

8     things.

9          Q.     Okay.  I think we can put that

10    away, please.  And let's go back to -- let's

11    go to Jansen's video.  Let's start at the

12    beginning.  I just want to establish.  I

13    believe this was produced in discovery as

14    Defendants' 636.

15                This video starts around 23:16:07.

16    (Playing video.)  Currently, the audio is

17    off.  (Stopped video.)  I think Jansen told

18    me that it automatically goes on when you get

19    to the proximity of a scene.  Is that...

20         A.     There's a number of ways for it to

21    turn on.

22         Q.     Without him doing it?

23         A.     If they pull up -- if you're within

24    a certain distance of any triggers, there are

25    triggers that will turn your camera on for

Page 216

1    you.

2        Q.    What are those triggers?

3        A.    The gun locks in the car being

4    activated, the emergency lights being

5    activated to the position 3, a taser being

6    turned on.

7        Q.    At what distance would -- is that

8    effective to the camera?

9        A.    I'm not sure.

10       Q.    (Playing video.)  The volume is

11   off.  This is -- is this also -- this is

12   Jansen, and is that also Goshorn, or do you

13   have any idea?

14       A.    I believe it is.

15       Q.    (Still playing video.)  I'm going

16   to skip ahead.  Skip ahead.  (Stopped video.)

17   Now we're at 23:17 and 23...  This is Jansen.

18   Would you agree with me that he's approaching

19   the traffic stop that evening?

20       A.    It appears to be the traffic stop

21   that we're discussing, but without watching

22   more of it...

23       Q.    (Playing video.)  Does that seem to

24   be the case?

25       A.    Yes.

Page 217

1       Q.    (Still playing video and then

2    stopped.)  Is this your cruiser in the

3    foreground at 23:17?

4       A.    It is.

5       Q.    (Playing video.)  This is you,

6    correct, at 23:17:49?

7       A.    It is.

8       Q.    (Stopped video.)  This is

9    Ferreiras's house here in the background; is

10   that correct?

11      A.    Yes, sir.

12      Q.    29:18:05.  (Playing video and then

13   stopped.)  And the vehicle was stopped --

14   Max's vehicle was stopped in the direction of

15   where you were just walking from the cruiser,

16   correct, towards the end of Nancy Street?

17      A.    Yes.

18      Q.    In the direction the camera is

19   pointing?

20      A.    Yes.

21      Q.    (Playing video.)  I'm going to

22   pause it at 23:18.  (Stopped video.)  Is this

23   the truck or vehicle that was pulled over at

24   the end of Nancy Street?

25      A.    It is.

1        Q.    Is this Fritsch on the passenger

2   side?

3        A.    It is.

4        Q.    And you and Goshorn are on the

5   driver's side?

6        A.    Yes, sir.

7        Q.    Jansen is obviously still back?

8        A.    Yes.

9        Q.    (Playing video and then stopped.)

10   At this point, Jansen is scene security,

11   right?

12        A.    He is.

13        Q.    In fact, he's scene security from

14   the time he gets there?

15        A.    He is.

16        Q.    He's scene security without having

17   to be told that he's scene security; is that

18   fair?

19        A.    That's correct.

20        Q.    (Playing video and then stopped.)

21   You walked away from the car that was stopped

22   around 23:19.  And is this Fritsch who is

23   left at the stop -- at the car on the

24   passenger side?

25        A.    Fritsch and Goshorn are still

1    there.

2         Q.    Fritsch is on the passenger side,

3    right?

4         A.    That's correct.

5         Q.    And is Goshorn on the driver's

6    side?

7         A.    He is.

8         Q.    Okay.  We just can't see him in

9    this image?

10        A.    He's short.

11        Q.    He's short.  Okay.  (Playing

12   video.)  You're interacting with Jansen right

13   now?

14        A.    It sounds like it.

15        Q.    At your cruiser?

16        A.    Yes.

17        Q.    Fritsch is coming back towards you,

18   right?

19        A.    He did.

20        Q.    (Stopped video.)  With Goshorn

21   remaining with the car -- the stopped car?

22        A.    Yes.

23        Q.    He's short, but we can't -- so we

24   can't see him?

25        A.    You can see him at this point.

Page 220

1          Q.    Oh.  (Playing video and then

2    stopped.)  Tell me what the distance is

3    between your cruiser and the stopped car.

4          A.    I can't tell you exactly what the

5    distance is.  It should be 20 feet.

6          Q.    Why should it be 20 feet?

7          A.    That's the way the lights are set

8    up.  That's the way he's trained to.

9          Q.    I see.  (Playing video and then

10   stopped.)  You're at your cruiser, right?

11         A.    I am.

12         Q.    This is Jansen's video at 23:20:46.

13   To me, it looks like he panned away from the

14   traffic stop -- from the vehicle that was

15   stopped towards Ashley Ferreiras's house.

16   Does that seem about right?

17         A.    Yeah.  I don't know why he did, but

18   he's turning his body.

19         Q.    And I think we've established that

20   he is -- he and you are both standing at the

21   passenger side of your cruiser, right?

22         A.    That's correct.

23         Q.    And it looks to me that the

24   cruiser's right in front of the house.  Is

25   that -- would you say that's a product of

1    distortion of the camera, or am I wrong?

2        A.    We're relatively in front of the

3    house, and we're, you know, adjusted down.  I

4    think if we wanted to get into the minutiae

5    of it, I think the front wheels of the

6    cruiser are probably at the property line.

7        Q.    Okay.  Between Ferreiras's house

8    and the neighbor's house?

9        A.    Right.

10       Q.    Okay.  The front wheels?

11       A.    Right, roughly.  So we're on that

12   side of the front of the house.

13       Q.    Okay.  Would you -- okay.  (Playing

14   video and then stopped.)  Did the cruiser

15   move at any point between this point in time,

16   23:20:51, and the time in which you got

17   Ferreiras into the car -- into the cruiser?

18       A.    No.

19       Q.    It wouldn't... (Playing video and

20   then stopped.)  Are you speaking to Fritsch

21   here telling him steps?  Did you hear that?

22       A.    I couldn't hear what that...

23       Q.    (Playing video and then stopped.)

24   Did you hear that, Step one?

25       A.    I do.

Page 222

1      Q.    Do you think that's you speaking to

2   Fritsch?

3      A.    It is.

4      Q.    Is that giving him directions about

5   the steps of what?

6      A.    Step one was that he could roll his

7   window down so I could talk to him and ask

8   him about what the stop is.

9      Q.    Are you on the other side of the

10  cruiser at this point?

11     A.    No.  I'm standing at the passenger

12  window.

13     Q.    Okay.  And is Fritsch in the

14  driver's side at this point?

15     A.    He is.

16     Q.    And you're speaking to him through

17  the passenger side?

18     A.    Correct.

19     Q.    (Playing video and then stopped.)

20  Did you hear somebody say, What's going on?

21     A.    I heard some noise.  It was hard to

22  hear exactly what those words were in this

23  video.

24     Q.    (Playing video.)  Try it again.

25  (Stopped video.)  Did you hear what's going

Page 223

1    on that time?

2          A.    That's what it sounds like.

3          Q.    Do you recognize that as

4    Ferreiras's voice?

5          A.    I believe so.

6          Q.    At this point, do you know where

7    she is physically?

8          A.    I know now where she is.  I was

9    still facing the car at that time.

10         Q.    You were still facing the car.  Do

11   you know -- okay.  As you sit here now, do

12   you know where she was?

13         A.    She was hanging out of the second

14   story window.

15         Q.    Okay.  (Playing video and then

16   stopped.)  Did you hear a second, What's

17   going on, from her?

18         A.    I... I...

19         Q.    (Playing video and then stopped.)

20   I think that was the first, What's going on.

21   (Playing video and then stopped.)  Did you

22   hear that, What's going on?

23         A.    Yes.

24         Q.    Around 23:21?  Still Ferreiras?

25         A.    Yes.

Page 224

1          Q.      (Playing video and then stopped.)

2     Did you hear the, Hi?

3          A.      Yes.   That was me.

4          Q.      That was you or that was Jansen?

5          A.      That was me.

6          Q.      Okay.   (Playing video and then

7     stopped.)   Jansen is still scene security at

8     this point, right?   We're at 23:23.

9          A.      Yes.

10         Q.      And he's focused on the stopped

11    car, correct?

12         A.      He's focused on the entire scene.

13         Q.      Okay.   (Playing video.)   He turns

14    back towards the house, right, Ferreiras's

15    house?   (Stopped video.)

16         A.      He did.

17         Q.      That was around 23:23:48.   (Playing

18    video and then stopped.)   And you're standing

19    next to Jansen at this point, right?

20         A.      Approximately.

21         Q.      On the passenger side of the

22    cruiser?

23         A.      Yes.   We're both over by my front

24    passenger door.

25         Q.      (Playing video and then stopped.)

Page 225

1    Around 23:24:01, I think we see Ashley

2    Ferreiras come from the side of her house.

3    Is that what you understand?  And -- is that

4    right?

5         A.    Yes.

6         Q.    And I understand that this is

7    Jansen's perspective and not yours, but...

8    Start again.  (Playing video and then

9    stopped.)  Did you hear that hello?

10        A.    That was Jansen.

11        Q.    That was Jansen.  Okay.  (Playing

12   video and then stopped.)  And that's --

13   you're instructing her not to come out here

14   at 23:24:06?

15        A.    Yes, sir.

16             MR. WHITTAKER:  I need a quick

17        restroom break.  Let's go off the

18        record.

19             (A brief break was taken.)

20        Q.    (By Mr. Whittaker) Back on the

21   record.  We are still looking at Officer

22   Jansen's body cam, Defendants' 636, starting

23   from 23:24:06.  I'm sorry.  20 -- yeah,

24   23:24:06 after Officer Ullrich says, Don't

25   come out here.

Page 226

1                    (Playing video and then stopped.)

2      This is 23:24:09, Ferreiras standing at her

3      gate, right?

4           A.    It is.

5           Q.    And you are standing still at the

6      passenger side of your cruiser?

7           A.    I believe so.

8           Q.    Okay.  Again, this is Jansen's.

9      (Playing video and then stopped.)  If you

10     come out here and interrupt the stop, you're

11     going to go to jail.  Did you say -- did you

12     hear that?

13          A.    I did.

14          Q.    You said that around 23:24:13.

15     Okay.  (Playing video and then stopped.)  Do

16     you see her using crutches to walk down the

17     sidewalk?

18          A.    I do.

19          Q.    Is there a point in which she --

20     you perceived her to try to change direction

21     towards the cruiser?

22          A.    Not yet, I don't believe, at all,

23     but we stopped in the middle of it.

24          Q.    Right.  It hasn't happened yet.

25     I'm wondering if -- did you -- did you say

Page 227

1    that she didn't do that at all?

2        A.    I don't believe she does it at all,

3    no.

4        Q.    Gotcha.  (Playing video and then

5    stopped.)  That is you, correct?

6        A.    It is.

7        Q.    In the foreground pointing at

8    Ms. Ferreiras, correct?

9        A.    I'm pointing at the yard.

10       Q.    You're pointing at the yard?

11       A.    Which is behind her.

12       Q.    Behind her.  And you're able to see

13   that she's on crutches?

14       A.    I do.

15       Q.    This is 23:24:20.  So you're able

16   to see that at the time, right?

17       A.    I was.

18       Q.    (Playing video and then stopped.)

19   How far away are you from -- how far away

20   from her are you at this point, 23:24:24?

21       A.    I don't know.  3, 4 feet.

22       Q.    How far away is -- are the two of

23   you from Jansen?

24       A.    I don't know.  I can't tell from

25   this angle.

Page 228

1        Q.    At this point, Jansen -- has he

2   moved away from the cruiser?  Has he stepped

3   away from your cruiser?

4        A.    I mean, he's not up against my

5   cruiser, clearly, so he's maybe two or three

6   steps away.

7        Q.    And at this point, did he move --

8   was this when he did the L -- the L move?

9        A.    I can't tell if it was exactly now

10  or if it's when he takes a step or what.

11       Q.    (Playing video and then stopped.)

12  Is Jansen approaching you and Ferreiras?

13       A.    Yes.

14       Q.    (Playing video and then stopped.)

15  Is she advancing towards the stop at this

16  point, or is she stationary?

17       A.    I've stopped her from advancing --

18       Q.    Okay.

19       A.    -- towards the stop.

20       Q.    Okay.  Is she advancing towards

21  your cruiser?

22       A.    No.  I've stopped her from

23  advancing.

24       Q.    Is she advancing towards Jansen?

25       A.    No.

1          Q.    Is she advancing towards Fritsch,

2     who I believe at this point -- I'm not sure

3     if at this point if he's in the cruiser or if

4     he had come out.  Irrespective of that, is

5     she advancing towards Fritsch?

6          A.    No.  I stopped her.

7          Q.    (Playing video and then stopped.)

8     So at 23:24:30, by that point, she was -- she

9     was -- you said that you had stopped her

10    without touching her, right?

11         A.    Yes.

12         Q.    Without anybody having touched her,

13    right?

14         A.    Correct.

15         Q.    The reason why she was not moving

16    towards the car that was stopped was because

17    you had stopped her?

18         A.    Yes.

19         Q.    The reason why she wasn't moving

20    towards the cruiser, even if she was trying

21    to, she wasn't doing that because you stopped

22    her?

23         A.    Presumably.

24         Q.    Same with Fritsch; she was not

25    moving towards Fritsch because you had

Page 230

1    stopped her?

2         A.    Because I had stopped her.

3         Q.    Same with Jansen?

4         A.    Yes.

5         Q.    All without laying a glove on her,

6    right?

7         A.    Sure.

8         Q.    (Playing video and then stopped.)

9    At 23:24:36, I'm going to represent to you

10   that Ferreiras puts her hand up, palm facing

11   you, and let me know if you disagree with

12   that.  (Playing video and then stopped.)  Do

13   you hear her say, Please stop disrespecting

14   me, around 23:24:36?

15        A.    I do.

16        Q.    Are you pointing -- it looks to me

17   that you haven't changed your position of

18   where you're pointing.  Are you still

19   pointing to the yard?

20        A.    Yes.  I'm trying to convince her to

21   go back to the yard, and I am pointing to --

22   at the yard so she knows what I'm talking

23   about.

24        Q.    Okay.  (Playing video and then

25   stopped.)  At 23:24:40, you move to grab her

Page 231

1    right wrist; is that right?

2         A.    That's correct.

3         Q.    At this point, 23:24:40, you are

4    placing her under arrest, correct?

5         A.    Yes.

6         Q.    What was the last events before you

7    decided to put her under arrest that caused

8    you to put her under arrest?

9              MR. MANDO:  Objection.  Asked and

10        answered three times today.  You can

11        answer it for a fourth.

12        A.    That she's disregarded, I think, 10

13   or 12 -- I didn't keep count, but lawful

14   orders to go back to her yard, to not come

15   into the stop, to go back in her yard, to

16   leave or go to jail, and she has given no

17   indication that she was going to follow those

18   orders, and, in fact, she advanced forward

19   from that during those orders.

20        Q.    At this point, she was stopped,

21   right, because you had stopped her?

22        A.    Yes.

23        Q.    She wasn't advancing anywhere?

24        A.    She appears to be not moving, yeah.

25   She appears to be standing still.

Page 232

1       Q.    So she didn't take a step towards
2  you, fair?
3       A.    I believe that's correct.
4       Q.    She didn't take a step towards the
5  stopped car?
6       A.    Correct.
7       Q.    She didn't take a step towards
8  Jansen, right?
9       A.    Correct.
10      Q.    Or the cruiser, right?
11      A.    Correct.
12      Q.    Or Fritsch, correct?
13      A.    Sure.
14      Q.    Is it fair to say that you decided
15  to place her under arrest not because of
16  something she did but because of something
17  she didn't do, like follow your instructions?
18           MR. MANDO:  Objection, form, asked
19       and answered multiple times.  You can
20       answer it again, Doug.
21      A.    She went to jail because of what
22  she did do.
23      Q.    What is it she did?
24      A.    She refused to follow instructions.
25      Q.    Okay.

1      A.    And despite those instructions, she

2   continued to incur[sic] until I physically

3   prevented her by blocking the sidewalk from

4   going any deeper into the stop, and then she

5   chose to not go back into her yard.

6      Q.    To me --

7      A.    So she got to go to jail because

8   she decided she wanted to go to jail that

9   night.

10     Q.    To me, that means -- to me, you're

11  saying -- you're testifying that she didn't

12  do things.

13     A.    She did things.

14     Q.    What did she do?  That's what I'm

15  trying to get at.

16     A.    She put clothes on, sir.  She came

17  downstairs.  She walked outside.  She came to

18  the gate.  She was told to stay inside, and

19  she didn't listen, and she decided to come

20  outside the gate.

21          And then she decided to continue to

22  not to listen, and she walked down the

23  sidewalk until I physically stopped her from

24  doing so.  Those are all affirmative actions

25  she took.  Did she ignore the things I said?

Page 234

1    Sure, while taking those formal -- those

2    affirmative actions against them.

3         Q.    All I'm trying to gather is what is

4    the last affirmative action she took, keeping

5    in mind that we agree that she was stopped

6    because you stopped her.

7         A.    She chose to not --

8              MR. MANDO:  Objection, form, lack

9         of foundation, asked and answered

10        multiple times.

11        Q.    Were you there?

12        A.    I was there.

13        Q.    You were able to observe everything

14   that happened with your interaction with

15   Ashley Ferreiras?

16        A.    I was able to observe what I was

17   able to observe.

18        Q.    Okay.

19        A.    I certainly didn't observe

20   everything that was going on.

21        Q.    I understand that you're saying she

22   didn't -- she did not follow your

23   instructions.  I understand that.  I'm just

24   trying to get at what affirmative action she

25   took causing you to arrest her.

Page 235

1         A.    She refused to follow lawful

2    commands.  That is an affirmative action.

3         Q.    You're saying that her -- that the

4    absence of the action is the affirmative

5    action?

6         A.    No, no, not that the absence of

7    action is something, but that she chose to do

8    something in particular, and what she chose

9    to do was not follow the instructions.

10         Q.    She choose not to do something?

11         A.    She chose to refuse numerous

12    instructions despite being warned that she

13    was going to go to jail.  I don't know what

14    I'm supposed to do if I say, If you do this,

15    you're going to go to jail, and people do it

16    over and over and over and over again.

17              There has to be a point where after

18    being warned, after being told, after being

19    commanded, after being prevented from doing

20    something, that the police have to act.

21         Q.    I'm not trying -- I'm not arguing

22    with you that you told her to do these

23    things.  I'm not arguing with you at all

24    here.  I'm not arguing with you that she

25    didn't do the things you told her to do.

Page 236

1            I'm saying that by not doing those

2     things, she... did not take action that you

3     were informing her to take; is that fair?

4            MR. MANDO:  Objection to form,

5        characterization, asked and answered,

6        and argumentative at this point.  Go

7        ahead.

8        A.    She certainly did not follow any of

9     the instructions that she was given --

10       Q.    Okay.

11       A.    -- pretty much the entire night.

12       Q.    Okay.  In your mind, is the act of

13    not following instruction an affirmative act?

14       A.    Yes.

15       Q.    Okay.

16       A.    She chose to not follow those

17    instructions.

18       Q.    So it wasn't an action by omission

19    in your mind; the act of not doing what you

20    told her to do is the affirmative act?

21            MR. MANDO:  Objection, asked and

22        answered, characterization.  He's given

23        multiple steps that you want to continue

24        to ignore, Justin, about what she did

25        before he gave those orders.  So I'm not

Page 237

1       sure why we're repeating this multiple

2       times.

3               I'm usually pretty patient, but at

4       some point, I'm going to say let's stop

5      and we'll call the magistrate.  It's

6       getting beyond.  This has been over

7       multiple times.

8       Q.    All I want to --

9               MR. WHITTAKER:  Go ahead.

10      Q.    All I want to know is if there's an

11   affirmative act other than not doing what she

12   told you (as said) to do.

13      A.    Yes.

14      Q.    Okay.  What is the last one in

15   time?

16              MR. MANDO:  Same objection.

17      Q.    That's all I'm getting at.

18      A.    It's still requires the context.

19      Q.    I understand.

20      A.    The context is she's not only just

21   ignoring the orders; she continues to

22   advance, continues to advance, and continues

23   to advance until she is physically prevented

24   from doing so.

25      Q.    Right.

Page 238

1      A.    So all of those are affirmative

2   actions, choices she made inserting herself

3   into something that she had no business to

4   insert herself into, and refused to turn

5   around and go back into her yard.

6      Q.    I understand all of these things,

7   and I'm not arguing about that.  I'm just

8   trying to get at what affirmative act --

9   other than not doing what you told her to do,

10  what did she do?  Did she threaten you?

11     A.    Other than any of the things that I

12  have now listed repeatedly --

13     Q.    Yeah.

14     A.    -- I don't think she did anything

15  other than what we've gone over repeatedly.

16     Q.    Okay.  She didn't threaten you,

17  right?

18     A.    She did not make any threats.

19     Q.    At this point, you consider her

20  crutches to be weapons, right?

21     A.    They are --

22           MR. MANDO:  Objection, asked and

23        answered.

24     A.    They are potential weapons.

25     Q.    Potential weapons.  At this point,

Page 239

1   she's not an immediate threat, is she?

2           MR. MANDO:  Objection, asked and

3       answered multiple times.

4           MR. WHITTAKER:  We haven't even --

5       I haven't asked the question in the

6       context of what we're actually looking

7       at.

8           MR. MANDO:  You have.  You've asked

9       it -- the event.  The event.  We've been

10      over this event.  So that's why I'm

11      objecting.  We've been over this

12      multiple times, and you keep trying to

13      get him to say a different answer --

14          MR. WHITTAKER:  I'm not trying to

15      get him --

16          MR. MANDO:  -- and he's not.

17          MR. WHITTAKER:  I'm not trying -- I

18      don't want him to change his answer.

19      Q.   (By Mr. Whittaker) Is she an

20  immediate threat at this point?

21      A.   Absolutely.

22      Q.   At 23:24:40, when you moved to grab

23  her right wrist -- which we agree is you

24  placing her under arrest, right?

25      A.   It is.

1      Q.    Is she doing anything that leads

2   you to believe that she is an immediate

3   threat?

4      A.    Yes.

5      Q.    What is she doing affirmatively?

6      A.    She's refusing to follow any

7   instructions.  She's coming out to a traffic

8   stop.  She's refusing to -- I apologize.  I

9   know I'm talking fast.

10          She's coming out.  She's coming to

11   the gate.  She's being told to stop.  She's

12   refusing to do that.  She's being warned that

13   she's going to be arrested.  She's refusing

14   to stop.  She's refusing all of these things.

15          And with that in mind and she

16   continues to advance to the police, that is

17   absolutely an aggressive thing to do and

18   something that I take as a potential threat.

19          None of this can be taken in a

20   vacuum of one single thing.  We can't just

21   take the microscope and look at one tiny

22   thing.  She's now been out here for a couple

23   of minutes.  She's refusing all of these

24   things.  All of that is relevant to what her

25   state of mind is, what's going on.

1          Q.    And I agree with you that it is --

2     the context matters.  This is cross-

3     examination, though, and I'm not asking about

4     the context right now.  I'm asking about --

5     and I think you told me that other than what

6     you've described her doing, she did not do

7     anything else?

8          A.    I believe that's correct.

9          Q.    Okay.  So there's nothing else at

10    23:24:40 when you move to grab her arm that

11    she's doing that makes you believe she is an

12    immediate threat?

13              MR. MANDO:  Objection, form, asked

14         and answered.  Go ahead.

15         A.    Nothing other than the things we've

16    covered time and time again.

17         Q.    Okay.  Is John Carlos an immediate

18    threat?

19         A.    He is.

20         Q.    He's taller than Ashley, right?

21         A.    He appears to be.

22         Q.    He's about your height, maybe?  I

23    don't know if he's your height or a little

24    bit shorter, but he's -- you consider him to

25    be an immediate threat?

Page 242

1      A.    Absolutely.

2      Q.    Why is nobody taking any action

3   towards him or directing him to do anything?

4      A.    Again, because it's about context,

5   sir.  You will see if we play the video that

6   both Officer Jansen and Officer Fritsch, in

7   fact, do that.  They do exactly that.  They

8   get up, and they physically move him out of

9   the way --

10     Q.    Why --

11     A.    -- because he is a threat.

12     Q.    Why was he allowed to get that

13   close to you and Ashley?

14     A.    I thought that John Carlos was

15   trying to come out to convince her to go back

16   in, which is what it appears he's trying to

17   do is beg her to go back in.

18     Q.    Okay.  So he --

19     A.    But she won't listen to anybody.

20     Q.    So he wasn't -- so he was a threat,

21   or he wasn't a threat?

22     A.    He was a potential threat.

23     Q.    Was he an immediate threat?

24     A.    Yes.

25     Q.    At this point?

Page 243

1      A.   Yes.

2      Q.   When did he become an immediate

3  threat?

4      A.   Once he crossed out onto the

5  sidewalk where he could do something to

6  attack or assault someone.

7      Q.   Which he didn't do any of those

8  things, though, right?

9      A.   Correct.

10     Q.   And he was, despite being an

11 immediate threat, allowed to approach within

12 feet of you and Ferreiras, right?

13     A.   Yes.

14     Q.   And Jansen -- this is Jansen's

15 point of view, right?

16     A.   It is.

17     Q.   Jansen doesn't move towards him

18 either, does he?

19     A.   Not up to this point, but he's

20 about to.

21     Q.   Does anybody up to this point tell

22 John Carlos to stay away?

23     A.   No.

24     Q.   (Playing video and then stopped.)

25 At this point, 24 -- I'm sorry, 23:24:41, it

Page 244

1    looks like John Carlos has made contact with

2    Ferreiras.  You still have your hand on her

3    right arm.  (Playing video and then stopped.)

4    This is Jansen's point of view, I believe,

5    his camera.  He is putting his hands on John

6    Carlos, right?

7         A.    Both he and Officer Fritsch are

8    putting their hands on John Carlos.

9         Q.    Around 23:24:42?

10        A.    Yes, sir.

11        Q.    Were you able to observe that at

12   the time?

13        A.    I don't recall if I saw that they

14   were doing that.  I was focused on

15   Ms. Ferreiras.  I didn't want to get hit in

16   the face with a crutch.  I don't know what

17   other weapon she has.  I don't know what's

18   going on with her or why she's deciding to

19   take these actions.  And my most significant

20   immediate threat is Ms. Ferreiras.

21        Q.    Who did not make any move to hit

22   you in the face with a crutch, right?

23             MR. MANDO:  Objection, asked and

24        answered multiple times.  Why are we

25        doing this?  Let's ask new questions.  I

1          don't want to have to call the

2          magistrate, Justin, but there comes a

3        time when -- I mean, we have covered

4          these points.  I can't -- I've lost

5          track of the number of times.

6              MR. WHITTAKER:  He's just testified

7          that he --

8              MR. MANDO:  I'm going to call the

9          magistrate if we don't move on.

10             MR. WHITTAKER:  He testified he

11         didn't want to get hit in the face,

12         which is the first time I'm hearing

13         about him not wanting to get hit in the

14         face with a crutch.

15             MR. MANDO:  Go ahead, Doug.

16         A.    As I've said a couple times, she

17      starts jerking her arms around.  She's

18      swinging her arms.  She's pulling away.

19      She's continuing to resist.

20         Q.    Okay.

21         A.    She is an immediate threat.  She

22      has crutches in her arms --

23         Q.    Yeah.

24         A.    -- and regardless of whether or not

25      she requires those for mobility, she can

Page 246

1    still hit somebody with them.

2         Q.    Okay.  And Jansen and Fritsch at

3    this point -- 23:24:42 -- have stepped in to

4    physically -- I don't want to say confront.

5    I don't know if it's confront -- to

6    physically make contact with John Carlos,

7    right?

8         A.    Yes.

9         Q.    Both of them?

10        A.    It certainly appears that way.

11        Q.    (Playing video and then stopped.)

12   Is this Fritsch behind John Carlos?

13        A.    It is.

14        Q.    And this is Jansen holding onto

15   John Carlos's arm?

16        A.    It is.

17        Q.    Around 23:24:47.  (Playing video

18   and then stopped.)  Okay.  Now to me -- to

19   me, this looks like Jansen is ushering John

20   Carlos away from you and Ferreiras and

21   Fritsch.  Does that seem like -- (playing

22   video) -- what he's doing to you?  (Still

23   playing and then stopped.)

24             And I think this is the reverse

25   image of the Ring camera footage where Jansen

1  had moved John Carlos back into Ferreiras's

2  yard.  Is that what's being depicted here?

3  I'm not saying it's -- I'm not saying it's

4  related to the Ring footage, but it is Jansen

5  giving -- getting John Carlos back into the

6  yard.

7          A.    John Carlos is back in the yard at

8  this point, yes.

9          Q.    Because Jansen ushered him that

10 way?

11         A.    Ushered is -- I mean, that's not a

12 term we use, but he has physically gotten in

13 between John Carlos and the rest of the

14 scene, and John Carlos has, of his own

15 accord, backed up.  He has not been shoved or

16 anything like that.  He is walking back into

17 his yard as he is being instructed to do,

18 so...

19         Q.    And would you agree with me that

20 Fritsch -- sorry -- Jansen employed

21 de-escalation techniques to get John Carlos

22 back in the yard?

23         A.    Yes.

24         Q.    Would you agree with me that he

25 used appropriate de-escalation techniques to

Page 248

1    get John Carlos back into the yard?

2          A.    I think he did, yes.

3          Q.    Would you agree with me that his

4    efforts to get John Carlos back into the yard

5    with de-escalation techniques was effective?

6          A.    It was.

7          Q.    Would you agree with me that once

8    back in the yard, John Carlos was no longer

9    an immediate threat?

10         A.    To me or to Officer Jansen?

11         Q.    To you.

12         A.    To me?  No.  He became less of a

13   threat at that point.

14         Q.    At any point, was -- did you

15   construe John Carlos to be interrupting the

16   stop?

17         A.    My read of his actions was he was

18   trying to bring his -- what I now know to be

19   his sister -- back into the yard where she

20   needed to be, and that was less interruptive

21   than what she was doing.

22         Q.    You didn't know that he was her

23   brother at the time?

24         A.    No.  I had no idea.

25         Q.    Did you have any idea of their

1    relationship?

2         A.    None whatsoever.

3         Q.    (Playing video and then stopped.)

4    Would you agree with me that this is a

5    high-stress situation?

6         A.    Reasonably, yes.

7         Q.    Would you agree with me that John

8    Carlos is distressed?

9         A.    He is.

10        Q.    Would you agree with me that

11   Officer Jansen acted appropriately with

12   respect to John Carlos, who you agree is

13   distressed?

14        A.    I believe he did.

15        Q.    (Playing video and then stopped.)

16   Who says, Goshorn?  Is that Jansen?

17        A.    It is.

18        Q.    (Playing video and then stopped.)

19   At this point at 23:25:22, is this Fritsch

20   kneeling down beside her?

21        A.    I think that's the orientation.  I

22   can't tell from the screen.

23        Q.    It is hard.  And if that's Fritsch,

24   you would be standing -- I think from the

25   other video, we saw you standing -- I don't

Page 250

 1   want to say over her, but to Fritsch's right?

 2        A.    I think she'd already kicked me

 3   onto the ground at this point.

 4        Q.    You're on the ground at this point?

 5        A.    (No response.)

 6        Q.    She kicked you with what leg?

 7        A.    I don't remember.

 8        Q.    (Playing video and then stopped.)

 9   Was that Jansen offering handcuffs?

10        A.    It was.

11        Q.    Were they needed?

12        A.    No.

13        Q.    (Playing video and then stopped.)

14   Would you agree with me that John Carlos is

15   repeatedly telling you -- or Jansen, not you

16   -- telling Jansen -- letting him know that

17   she had just had surgery, she's on crutches,

18   she has a broken leg, she can't move, she

19   can't walk, things like that?

20            MR. MANDO:  Objection.  Asked and

21        answered multiple times.  Go ahead.

22        A.    That is what he is saying.

23        Q.    (Playing video and then stopped.)

24   This is you standing at 23:25:50?

25        A.    It is.

Page 251

1          Q.    And Fritsch -- it looks like he's

2    kneeling on the other side of her with her

3    hands behind her back.  Does that seem about

4    right?

5          A.    Yes.

6          Q.    Is she cuffed at that point?

7          A.    She is.

8          Q.    And at that point -- I think you

9    testified before that having cuffed her, her

10   arrest had been effected?

11         A.    Yes.

12         Q.    I don't know if I asked about --

13   what -- her arrest having been effected, what

14   does that mean?  How does that change...

15   Scratch that.  What does her effect being

16   arrested mean?

17         A.    She's been successfully placed into

18   custody at that point.  She's in handcuffs.

19   She is now our responsibility to care for.

20         Q.    Okay.  So having the responsibility

21   to care for her begins when she's in

22   handcuffs?

23         A.    I think we have a responsibility to

24   care for people prior to that.

25         Q.    Sure.

1          A.     But once she's is in handcuffs,

2     she's no longer able to do things like roll

3     onto her side so she can breathe.  Positional

4     asphyxia in this particular situation is

5     really dangerous.

6          Q.     Okay.  And upon effecting her

7     arrest by -- is her arrest effected before

8     the cuffs go on her?

9          A.     I mean, we're getting into super

10    minor -- super minor nuance.  There's an

11    argument to be made that she is under arrest,

12    and the arrest has been effectuated when I

13    tell her she is going to jail and I reach for

14    her.  Before I even touch her body, she is

15    under arrest.

16         Q.     So the arrest could have been

17    effected at that point?

18         A.     I think there's an argument to be

19    made by people with more education in that

20    particular situation than I am.  I'm not an

21    attorney.  But once she's told she's under

22    arrest, she's under arrest.

23              Executing that arrest, getting her

24    into handcuffs is a second thing, and then

25    getting her from the arresting location to

Page 253

1    the jail is another.

2         Q.    Okay.

3         A.    You know, that whole process is the

4    arrest.

5         Q.    Right.  23:25:50, she's on the

6    ground.  I think we agree that her arrest is

7    effected.  She's in cuffs.  You're standing

8    over her.  Jansen -- I'm sorry, Fritsch is

9    kneeling beside her.  (Playing video and then

10   stopped.)  Who said, We're all good here, at

11   23:26?

12        A.    That's me.

13        Q.    Okay.  Who are you speaking to?

14        A.    Dispatch.

15        Q.    (Playing video and then stopped.)

16   So at 23:26:23, are you directing that --

17   that was your comment about, I don't know why

18   she decided to kick me and bite me, right?

19        A.    That is me.

20        Q.    Are you directing that at John

21   Carlos?

22        A.    Yes.

23        Q.    Why?

24        A.    I don't know.  I couldn't tell you

25   at that time.

Page 254

1          (A brief break was taken.)

2          Q.    (By Mr. Whittaker) At 23:26:23...

3    (Playing video and then stopped.)  Are you

4    still interacting with John Carlos?  I

5    thought I heard your voice say something.  I

6    don't know what it was.  I'll back up.

7    (Playing video and then stopped.)  Did you

8    say, She did?

9          A.    I did.

10         Q.    Okay.  I'm sorry.  You said, She

11   did?

12         A.    I said, She did.

13         Q.    Okay.

14         A.    Yes.

15         Q.    I didn't know if -- okay.  (Playing

16   video and then stopped.)  Did you hear

17   somebody say, Roll onto your side?

18         A.    Yes.

19         Q.    Was that Fritsch?

20         A.    It is.

21         Q.    Directing Ferreiras to roll onto

22   her side?

23         A.    Yes.

24         Q.    Because at that point, she's on her

25   stomach?

Page 255

1        A.    She is.

2        Q.    With her arms behind her back

3    cuffed, right?

4        A.    Yes.

5        Q.    Okay.  (Playing video and then

6    stopped.)  She tells you -- or I think she's

7    directing that at Fritsch that she has a

8    broken leg, right?

9        A.    That's what I heard.

10       Q.    23:26:39.  (Playing video and then

11   stopped.)  And you did punch her in the head,

12   right?  She's right about that?

13       A.    I did.

14       Q.    Okay.  (Playing video and then

15   stopped.)  And this is around 23:26:48.  This

16   is Fritsch on the ground tending -- well,

17   this is Fritsch on the ground in the bottom

18   corner, right?

19       A.    Yes.

20       Q.    And you were standing -- fair to

21   say you're standing either behind him or

22   behind his shoulder?

23       A.    No.

24       Q.    Okay.  You're standing to his

25   right?

Page 256

1      A.     I'm, like, in front of Fritsch near

2   -- I'm on the sidewalk to the left of Jansen.

3      Q.     (Playing video and then stopped.)

4   Did you hear her say you just stepped on her

5   foot?

6      A.     Yes.

7      Q.     Okay.  (Playing video and then

8   stopped.)  Did you hear her say it again at

9   23:26:56?

10      A.     Yes.

11      Q.     Did you hear her say it at the

12   time?

13      A.     Yes.

14      Q.     (Playing video and then stopped.)

15   Now, I heard you say at some point, She bit

16   me, right?  And I think you told her to stop

17   kicking at some point, right?

18      A.     I did.

19      Q.     I didn't hear her -- I didn't hear

20   you yell out, She kicked me, or anything like

21   that when -- around the time she says you

22   stepped on her foot.  Did you say anything

23   like that at the time?

24      A.     I believe I did.

25      Q.     Okay.  (Playing video and then

Page 257

1    stopped.)  You're telling her to sit up,

2    right?

3         A.    No.

4         Q.    I'm sorry.  Jansen and Fritsch are

5    telling her to sit up?

6         A.    Yes.

7         Q.    This is 23:25:09 and forward.  I

8    thought you had told me before that it's near

9    impossible for somebody to sit up?

10            MR. MANDO:  I think it's 23:27:09.

11        You said 25.

12        Q.    I'm sorry, 23:27:09.  I thought you

13   told me before that it's nearly impossible

14   for someone to sit up on their own when

15   they're in cuffs and on the ground; is that

16   correct?

17        A.    No.

18        Q.    What did you tell me it was nearly

19   impossible for somebody to do?

20        A.    That if you're sitting on your butt

21   in handcuffs, it's nearly impossible to stand

22   straight up on your own --

23        Q.    All right.

24        A.    -- unassisted.

25        Q.    Okay.  Is that -- okay.  Now...

Page 258

1  (Playing video and then stopped.)  Is it your

2  position that she's able to sit up on her own

3  laying on the ground in that position?

4        A.    I think she can, but she also has

5  two officers attempting to sit her up.

6        Q.    Okay.  (Playing video and then

7  stopped.)  Was that Fritsch who told her to

8  sit up now?

9        A.    It is.

10       Q.    (Playing video and then stopped.)

11  You just -- Fritsch is handing you his

12  glasses at 23:27:35, yeah?

13       A.    Yes, sir.

14       Q.    (Playing video and then stopped.)

15  And she is sitting at this point, correct, at

16  23:27:40?

17       A.    She's being held in a sitting

18  position, but he is trying to get her up onto

19  her butt, but she keeps trying to lay down.

20       Q.    (Playing video and then stopped.)

21  At that point around 23:27:40, I heard

22  Fritsch say, Stand up, and then he pulled her

23  up.  Is that a fair...

24       A.    He pulled her up onto her butt,

25  yeah.

1      Q.    (Playing video and then stopped.)

2  And around -- it was around 23:27:45, you and

3  Fritsch lifted her to her feet?

4      A.    Yes.  We picked her up and beared

5  her weight for her.

6      Q.    (Playing video and then stopped.)

7  And do you her John Carlos this whole time

8  saying things like, She can't move; she's had

9  surgery; she's got a broken foot?

10     A.    Well, I know -- I hear that, but I

11  know that what he's saying is not accurate.

12     Q.    Which part is not accurate?

13     A.    He's saying she can't move.  She's

14  able to walk unassisted from her house out,

15  manipulate a gate, come around.  She clearly

16  can move, so that's just not true.

17     Q.    Do you think he meant that

18  literally, that she couldn't move?

19         MR. MANDO:  Objection, calls for

20         speculation.  Go ahead.

21     Q.    You know, when he's repeating it

22  over and over, do you think that he means she

23  literally isn't capable of moving?

24         MR. MANDO:  Objection,

25         characterization.  Go ahead.

Page 260

1          A.    We're asking her to do very simple

2     things like sit; and then while assisting her

3     up, he's saying she can't move.  When she --

4          Q.    Is there any -- go ahead.

5          A.    If I may.  When she hit me and bit

6     me and kicked -- I'm sorry.  When she hit

7     Fritsch, bit me and kicked me, and I said

8     that out loud, he said, no, she couldn't do

9     that.  She can't move.  So I'm not exactly

10    sure what he means by it, but regardless,

11    he's wrong.

12         Q.    Is there any video representation

13    of her biting you?

14         A.    I think you can see my hand placed

15    right next to her head at the time right

16    before I say she bites me on my body cam.

17         Q.    And is there video representation

18    of her kicking you?

19         A.    Yes.

20         Q.    On your body cam?

21         A.    Yes.  The second time she kicked

22    me, just to be clear.

23         Q.    That was the assault, right?  That

24    was the assault that got her convicted, the

25    kick -- the second kick?

1          A.     I don't know which one it was, but

2     she was assault -- she was convicted of

3     assaulting me one of --

4          Q.     Are you --

5          A.     -- one of those three times she

6     assaulted me.

7          Q.     Are you testifying that the second

8     time -- the second kick, that she actually

9     landed the kick on you?

10         A.     She absolutely did.

11         Q.     Was that the same time she said,

12    You stepped on my foot?

13         A.     Yes, it was in that --

14         Q.     It was --

15         A.     -- approximate.

16         Q.     That was -- okay.  So would you

17    agree with me that from her perspective, you

18    stepped on her foot?

19         A.     I don't --

20              MR. MANDO:  Objection, calls for

21         speculation.  Go ahead.

22         A.     I don't know what her perspective

23    is.  I know what she said.

24         Q.     She said that you stepped on her

25    foot twice, right?  Not that you stepped on

1    her foot twice.  She said, "You stepped on my

2    foot.  You stepped on my foot"?

3         A.    Yes.

4         Q.    (Playing video and then stopped.)

5    And you're not taking what John Carlos is

6    saying to be true because you believe she can

7    move?

8         A.    She can move.

9             MR. MANDO:  Objection.  I want to

10       clarify something.  We need to clarify

11       because earlier, he was asked and

12       answered that he was focused on her and

13       he wasn't paying attention to Carlos's

14       statements.  He knew he was there, but

15       now you're asking him to interpret it

16       after the fact.

17             So I want to make sure we're still

18       on that same after the fact --

19             MR. WHITTAKER:  We are.

20             MR. MANDO:  All right.

21             MR. WHITTAKER:  We are.  I was

22       following up on him saying that what he

23       was saying was not true.

24       Q.    (By Mr. Whittaker) What John Carlos

25    was saying is not true, correct?

1        A.    Yes.

2        Q.    The fact that she can move?

3        A.    She can move.

4        Q.    Was there anything else he was

5    telling you that is untrue?

6        A.    I don't remember anything else he

7    said to me.

8        Q.    (Playing video and then stopped.)

9    Who said she can hop on her one foot?  Did

10   you hear that?

11       A.    I did hear that.  I don't know.

12       Q.    Did you say that?

13       A.    I don't know.

14       Q.    Do you agree that she could have

15   hopped on her one good foot to the car -- to

16   your cruiser?

17       A.    We were acting the same way that

18   crutches would act.  We had, I don't know, 80

19   percent of her body weight supported.  So,

20   yeah, she would just essentially do the exact

21   same thing she would do with crutches but

22   with the police there instead.

23       Q.    Okay.  So she could hop her way

24   over -- whether you said it or not, you agree

25   with the statement that she could hop her way

Page 264

1    over on one leg to the cruiser?

2         A.    I wouldn't have her hop by herself

3    with her hands behind her back on one foot,

4    but she's not exactly hopping.  She's

5    stepping with the assistance of two

6    full-grown men helping carry her over.

7         Q.    (Playing video and then stopped.)

8    Around 23:28:27, you opened your -- I'm

9    sorry.  Did Fritsch open the passenger door

10   to the cruiser?

11        A.    No.

12        Q.    Did Jansen?

13        A.    Yes.

14        Q.    Okay.  Was that to unlock the back

15   seat?

16        A.    Yes.

17        Q.    (Playing video and then stopped.)

18   Is she protesting this -- through this

19   exchange that she can't walk, she can't move,

20   she just had surgery, things like that?

21        A.    She is.

22        Q.    Did you hear her saying things like

23   that?

24        A.    I did.

25        Q.    (Playing video and then stopped.)

Page 265

1    At 23:28:33, I think -- did you hear somebody

2    say, We're going to help you over, but you

3    have to do a little bit on your own?

4         A.    That was me.

5         Q.    That was you?  I was a bit confused

6    by this because I thought you were already

7    over by the car.  What did you mean by that

8    if not to get her over to the car?

9         A.    So it's hard to hear what I'm

10   saying on somebody else's body cam.  It's

11   clear on my body cam that I said, as we said,

12   We're going to help you over here, but you

13   have to help too.  And we still weren't in

14   the car.

15        Q.    Okay.

16        A.    We weren't all the way up to the

17   car.

18        Q.    Okay.

19        A.    We were 3 or 4 feet from the car so

20   we could get photos, and then we had to move

21   her to the car and get her in the car.

22        Q.    I see.  So you took photos of her

23   at some point before getting her into the

24   car, obviously.  But did you stop taking her

25   over to the car so that photos could be taken

Page 266

1    of her?

2         A.    Yes.

3         Q.    Okay.  And Officer Brown took those

4    photos?

5         A.    I believe that's correct.

6         Q.    Okay.  (Playing video and then

7    stopped.)  Is this a supervisor?  (Playing

8    video and then stopped.)  At 23:28:54, I

9    think Jansen looks over towards the -- I

10   don't want to call it the scene -- the events

11   taking place around the cruiser.  Is this

12   Officer Brown in the foreground here?

13        A.    I can't tell who is who from that

14   angle and with all the dark.

15        Q.    And it's you and Officer Fritsch

16   who are trying to get her into the car back

17   at the cruiser, correct?

18        A.    That is correct.

19        Q.    (Playing video and then stopped.)

20   Can you see if this is Officer Brown a little

21   bit better now --

22        A.    It is.

23        Q.    -- around 23:28:56?

24        A.    That is not Officer Brown.

25        Q.    Not.  Is that...  Okay.  Who is

1   that?

2        A.   I'm not sure.

3        Q.   (Playing video.)  At this point, is

4   Officer Jansen -- (stopped video) -- still

5   scene security?

6        A.   I don't know what Officer Jansen's

7   doing at this point.  There's a lot of cops

8   on the scene.

9        Q.   23:29:30.  But would his role be

10  scene security?

11       A.   Potentially.  I was otherwise

12  focused on getting her photographed and

13  safely in the car.

14       Q.   (Playing video.)  And at this

15  point, 23:29:51, she is in the car?  (Stopped

16  video.)

17       A.   I don't have any idea.

18       Q.   No, that's a good point.  (Playing

19  video and then stopped.)  So that's Jansen

20  leaving.  You don't -- you don't know what

21  happened because you're not looking at it.

22            Did you have any reason to believe

23  that she had any special fighting skills?

24       A.   She was wearing a T-shirt that said

25  that she mud wrestles.  I don't know if

1    that's an actual thing that she does or not,

2    but just like I would treat anyone who has,

3    like, one of those afflicted T-shirts or an

4    MMA T-shirt, I don't know if they have

5    additional training or if that's actually

6    something they do.

7        Q.    Is that where you got the idea that

8    she had special fighting skills?

9        A.    The known or perceived fighting

10   skills --

11       Q.    The known or perceived --

12           (Parties overspeaking and reporter

13       interruption.)

14       A.    The known or perceived fighting

15   skills, yes, that's why that box was checked.

16       Q.    Okay.  (Examining documents.)  I

17   guess I don't have 48 with me either, but it

18   was introduced during Fritsch's deposition,

19   Exhibit 48.  I believe this was also produced

20   in discovery.  I thought it was a screenshot,

21   but I think it was actually produced in

22   discovery by the City.

23           I'm going to -- this is what I'm

24   talking about.  It's my understanding that

25   that's what photographs were produced by you

1    guys, photographs taken at the scene?

2         A.    These are scenes -- these are

3    photos from the scene.  I don't know if they

4    were introduced by us.  I don't -- I have --

5         Q.    No, I -- yeah, I was just asking

6    you if you recognize these as photographs

7    taken at the scene of her arrest.

8         A.    They are.

9         Q.    Okay.  For now, I'm going to write

10   1 and 2 on these pages.  On page 1, is this

11   -- is she wearing the mud wrestling T-shirt?

12        A.    She is.

13        Q.    Okay.  And that was the T-shirt

14   that gave you the impression that she had

15   known or perceived fighting skills?

16        A.    That she potentially could, yes.

17        Q.    And she's not wearing any shoes,

18   right, in the first picture?

19        A.    She's not.

20        Q.    And is this how she was stopping --

21   preventing you from advancing her to the car

22   by putting her foot down on the ground?

23        A.    We're standing still in this photo.

24        Q.    Okay.  But was that the foot she

25   was putting down on the ground to prevent you

Page 270

1    from getting her to the car --

2         A.    It was.

3         Q.    -- to the cruiser?

4               This is the second of those

5    photographs.  Are you in one of these -- are

6    you depicted in this photograph, the second

7    one of Exhibit 48?

8         A.    Yes.

9         Q.    Are you on the left?

10        A.    This is the right (indicating)?

11        Q.    Her right?

12        A.    Yes.  It's the right side of the

13   photo and her right.  I'm there holding up

14   her body weight.

15        Q.    And this is Fritsch on the other

16   side, the left?

17        A.    Yes.  He's over here holding up her

18   body weight.

19        Q.    Okay.  And that is the cast or wrap

20   or whatever on her leg?

21        A.    That is, yeah, whatever it is on

22   her leg.  It's not particularly in focus, and

23   it's not fully in the photo, but yes.

24        Q.    But you were aware of that --

25   whatever we're calling it, wrap or cast --

1    before this picture was taken, right?

2         A.    Yes.

3         Q.    Anything else that led you to

4    believe she had some sort of special fighting

5    skills?

6         A.    No.

7               MR. WHITTAKER:  Let's pull up his

8         video, please.

9               MS. NIESEN:  Cruiser or body?

10              MR. WHITTAKER:  Body.

11                   This is Officer Ullrich's --

12         I'm representing it's Officer Ullrich's

13         body-worn camera footage that was

14         produced in discovery.  I don't, off the

15         top of my head, know what Bates number

16         it is.

17              MR. MANDO:  We don't need it.  We

18         know that's what it is.

19         Q.    (By Mr. Whittaker) Officer, do you

20    recognize this as your body-worn camera

21    footage from the night of the Ferreiras

22    incident?

23         A.    Yes.

24         Q.    And I'm looking at 23:23:21 at this

25    point.  And this is Officer Jansen in front

1   of you; is that right?

2        A.    It is.

3        Q.    And you're looking at Ferreiras's

4   house, fair?

5        A.    I'm pointed that way.  I'm not --

6        Q.    You're pointed --

7        A.    Yeah, I don't know what I'm

8   actually looking at.

9        Q.    Okay.  Are you still by your

10  cruiser?

11       A.    I am.

12       Q.    (Playing video and then stopped.)

13  Around 23:24:03 is from your -- from the body

14  cam perspective is the first time we see

15  Ashley Ferreiras coming from the side of her

16  house, right?

17       A.    Yes.

18       Q.    Were you looking in this direction

19  at the time?

20       A.    Yes.

21       Q.    Okay.  (Playing video and then

22  stopped.)  You see that she has crutches at

23  that point, right?

24       A.    I do.

25       Q.    Okay.  (Playing video and then

Page 273

1    stopped.)  You tell her -- that was you

2    saying that she's not welcome at your stop,

3    right?

4         A.    It is.

5         Q.    From your cruiser?

6         A.    Yes.

7         Q.    Okay.  Tell us how far away the

8    cruiser is parked in relation to the

9    sidewalk.

10        A.    I think when I move over there, I

11   think I take three steps to get to the

12   sidewalk.

13        Q.    Okay.  So...

14        A.    6 to 8 feet.

15        Q.    Okay.  Again, this looks to me like

16   the house... the house is more in line with

17   you than it was with Jansen.  So is it fair

18   to say that you are standing -- you're

19   standing at the driver's side of the cruiser,

20   right?

21        A.    No.

22        Q.    You're not.  On the passenger side

23   of the cruiser, right?

24        A.    Yes.

25        Q.    And the house is right in front of

Page 274

1    you, right?

2        A.    I mean, we're on the very south end

3    of the house, but I am lined up with the

4    south corner of the house.

5        Q.    Okay.  (Playing video and then

6    stopped.)  Has she -- has Ferreiras done

7    anything by 23:24:15 to make you believe that

8    she was an immediate threat?

9            MR. MANDO:  Objection, asked and

10        answered.

11            MR. WHITTAKER:  This is from his

12        perspective.

13            MR. MANDO:  You asked him from his

14        perspective when you went through the

15        exact same thing on Jansen's video.

16        This is the --

17            MR. WHITTAKER:  This is the first

18        time I've seen his camera.  This is his

19        perspective from his camera.

20            MR. MANDO:  It's the same thing

21        that was shown in Jansen's camera, the

22        same exact statements that were made by

23        the parties in Jansen's camera, and

24        we're going over it again.

25            MR. WHITTAKER:  I'm looking at --

Page 275

1              MR. MANDO:  Go ahead.

2              MR. WHITTAKER:  I'm looking at --

3              MR. MANDO:  Go ahead.

4              MR. WHITTAKER:  I'm looking at

5     Ullrich's camera for the first time in

6     this deposition.  I'm just establishing

7     time and facts.  This is...

8              MR. MANDO:  The video already

9     demonstrates, but go ahead.

10             MR. WHITTAKER:  From Jansen's point

11    of view.  Fritsch -- we don't even know

12    if Ullrich is looking at it at that

13    point.

14             MR. MANDO:  This is Ullrich's

15    camera.

16             MR. WHITTAKER:  Yeah, and that's

17    why I'm -- this is the first time I'm

18    asking him about it.

19             MR. MANDO:  My objection's noted.

20             (Playing video and then stopped.)

21    Q.    (By Mr. Whittaker) So at 23:24:21,

22    you leave the cruiser -- the side of the

23    cruiser to intercept Ferreiras?

24    A.    Right.  Yeah.

25    Q.    Okay.

Page 276

1       A.    I repositioned myself on the

2   sidewalk to prevent her from going any

3   further.

4       Q.    Okay.  And that was the reason why

5   you moved towards her, was to prevent her

6   from going forward?

7       A.    To come any deeper into the stop.

8       Q.    (Playing video and then stopped.)

9   It looks like to me that you're pointing at

10  her instead of the yard.  (Playing video.)

11  It looks like maybe -- (stopped video) --

12  it's moving up -- your hand might be moving

13  around, but...  (Playing video and then

14  stopped.)  Again, at 23:24:41 is when you

15  move to grab her arm.  John Carlos is coming

16  behind her -- you can see him coming from

17  behind her shoulder, right?

18      A.    I see that on the video.

19      Q.    Okay.  And this is your

20  perspective, fair?

21      A.    This is the perspective from my

22  chest.

23      Q.    Not necessarily what you, yourself,

24  were seeing, correct?

25      A.    Definitely.

Page 277

1          Q.    It definitely was not necessarily

2   the same thing?

3          A.    It is definitely not what I am

4   seeing.

5          Q.    Okay.  What are you seeing?

6          A.    I'm seeing what I'm focused on.

7   While I'm reaching forward to grab her arm,

8   I'm certainly not looking at the planters

9   over here on the side of the house.  Those

10  are not in my field of vision.

11         Q.    Okay.

12         A.    That's not what I'm looking at.

13         Q.    Okay.

14         A.    I'm looking at what my threats are

15  and who the person is I'm arresting.

16         Q.    So you wear your body camera in the

17  middle of your chest, or is it lower?

18         A.    Essentially, here (indicating).  It

19  can be lower.  It depends on exactly what my

20  setup is for the day.

21         Q.    Okay.  And I'm going to guess this

22  is just a product of sort of distortion of

23  the camera, but though your camera might be

24  pointing in this direction towards-ish the

25  house, your field of vision yourself is

1  elsewhere, fair?

2      A.    One hundred percent correct.

3      Q.    And that focus is on -- your visual

4  focus is on Ferreiras and her brother?

5      A.    Correct.

6      Q.    (Playing video and then stopped.)

7  It looked like to me you grabbed her crutch.

8  Is that -- did you?

9      A.    I did at one point.  I don't know

10 if I did right there.

11     Q.    Around 23 --

12     A.    But she's violently jerking away at

13 that point.  I'm just trying to get a hold of

14 her.

15     Q.    She's violently jerking away.

16 Okay.  When you grab her crutch or after you

17 grab her crutch?

18     A.    As I move to grab her and she

19 starts yelling, Don't touch me, you can see

20 she steps backward, she starts swinging her

21 arm backward, and I'm just trying to get a

22 hold of her.

23     Q.    (Playing video.)  Will you tell me

24 when to stop the video when you see her

25 swing?  (Stopped video.)  I'm sorry.  Did you

Page 279

1    hear what I said?

2         A.    I did.

3         Q.    Would you tell me to stop the video

4    when you see her swinging her arms?

5         A.    Sure.

6         Q.    (Playing video.)

7         A.    Right there.

8         Q.    (Stopped video.)

9         A.    You see how her arm is now up even

10   with my body cam -- before this, when I

11   actually said it.  She's swinging her arms

12   around.  I'm trying to hold them still.  John

13   Carlos is trying to hold onto her arms.

14        Q.    It looks to me you've got a hold of

15   her right arm with both of your hands.

16        A.    I do.

17        Q.    Is she swinging her arm at that

18   point?

19        A.    At this point, I'm trying to

20   control her arm so she's not --

21        Q.    Okay.

22        A.    -- effectively swinging it, but it

23   came swinging up there at the beginning a

24   moment before this.

25        Q.    Okay.  Let me...  (Playing video

Page 280

1    and then stopped.)  It looks like to me her

2    arm came up --

3         A.    Yes.

4         Q.    -- in your hand.

5         A.    No.  I did not bring her arm up

6    like that.  I want her arms behind her back,

7    so I wouldn't bring her arm up forward where

8    it was more likely to do damage to me.

9         Q.    Those are your gloved hands, right?

10        A.    They are.

11        Q.    And you've got both of your hands

12   around -- one around her wrist, right, or

13   hand?

14        A.    Roughly.

15        Q.    And the other one roughly looks

16   like her triceps?

17        A.    Yes.

18        Q.    Okay.  I'm just trying to find the

19   swing.  Are you telling me that this is the

20   swing?

21        A.    She's jerking her body back.

22        Q.    Okay.

23        A.    She's stepping back.

24        Q.    Okay.

25        A.    She's jerking her arms around.

Page 281

1    It's not a swing over her head.  She is

2    swinging her arms around as best she can to

3    fight me off, to resist arrest on purpose,

4    taking affirmative actions to fight with the

5    police.

6        Q.    It's your testimony that right now,

7    she is fighting with you?

8        A.    Absolutely.

9        Q.    Okay.

10       A.    She is resisting arrest.  She would

11   be charged with resisting arrest for this

12   much alone.

13       Q.    It has nothing to do with the fact

14   that her crutch had been grabbed by you?

15       A.    No.

16       Q.    Okay.  Would you agree with me that

17   you did grab her crutch, though?

18       A.    I don't know if I grabbed her

19   crutch up to this point or not.

20       Q.    Okay.  But do you believe and agree

21   that at some point you did?

22       A.    Yeah, I removed it because it's

23   just a metal pole at that point.  Her hands

24   are going to be tied behind her back in

25   handcuffs.  Crutches are not helpful for her.

Page 282

1    The only thing she can do with her crutches

2    right now is assault somebody.

3         Q.    Is she in a position to assault you

4    at 23:24:43?

5         A.    I don't have control of her.

6         Q.    Is she in a position to assault

7    you?

8         A.    Yes, because I don't have control

9    of her.

10        Q.    Okay.  (Playing video and then

11   stopped.)  Did you hear her at 23:24:47 tell

12   you that her ankle's broken?

13        A.    Yes.

14        Q.    Did you hear it at the time?

15        A.    I believe so.

16        Q.    Did you alter your conduct in light

17   of that -- in light of her telling you that?

18   Did you change what you were doing in light

19   of her telling you that?

20        A.    In that second?

21        Q.    Yes.

22        A.    No, because at that second, she was

23   still actively fighting with the police, and

24   the only thing that mattered at that point

25   was making sure that she could not assault or

Page 283

1    kill someone.  I've had people who are her

2    size and her weight who have tried to murder

3    me, sir.

4        Q.    Did --

5        A.    Just because she's a woman, just

6    because she's on crutches, doesn't mean she

7    doesn't carry a gun.  When I was on crutches

8    less than a year earlier with a similar

9    injury, I always had at least one gun -- if

10   not two -- plus knives on my person.  So I

11   have no reason to think that she doesn't have

12   a weapon.

13       Q.    Okay.

14       A.    She's confronted the police.

15       Q.    Okay.

16       A.    She's now resisting the police.

17       Q.    Okay.

18       A.    She is absolutely a threat.

19       Q.    Okay.  (Playing video and then

20   stopped.)  Now it looks like to me that you

21   have turned her around by her -- I'm sorry.

22   23:24:52, you've turned her around somehow by

23   manipulating her right arm?

24       A.    No.  She has jerked away and turned

25   her body away.  I have not turned her around.

Page 284

1    I only have control of her arm at this point.

2         Q.    (Playing video and then stopped.)

3    It looks like to me she just hit the deck.

4    Did you see that?

5         A.    The deck?

6         Q.    Floor, ground.

7         A.    No.  We're still standing.

8         Q.    (Playing video and then stopped.)

9    Boom, on the ground, right?

10        A.    No.  She's still standing, sir.

11   We're still holding her up.  If you play it a

12   little further, you'll see that she's still

13   standing because she hasn't hit Officer

14   Fritsch yet.

15        Q.    (Playing video.)

16        A.    She's still standing.

17        Q.    It looks like she was pulled off

18   the ground.

19        A.    Fritsch throws it --

20        Q.    Okay.  (Stopped video.)

21             MR. MANDO:  Objection,

22        characterization.  Go ahead.

23        Q.    (Playing video and then stopped.)

24   Okay.  (Playing video and then stopped.)

25   This is 23:25:80 -- not 80, 23:25:00.  It

Page 285

1    looks like to me she has fallen to the ground

2    or in the process of falling to the ground.

3        A.    I think we are in the middle of

4    falling to the ground.

5        Q.    And Officer Fritsch had just thrown

6    her crutch away, right?

7        A.    He threw her crutch away, and then

8    she hit him, knocking him off balance and her

9    off balance, and pulled me off balance, and

10   we all fell to the ground.

11       Q.    And Officer Fritsch -- it looks

12   like he has a hold of her left -- maybe left

13   -- arm.  Is that fair, or could you tell at

14   that point?

15       A.    I cannot tell.

16       Q.    And it looks like you have a hold

17   of her right arm at that point, right?

18       A.    I do.

19       Q.    And at this point, 23:25, she had

20   fallen?

21       A.    As I just said, I think we are in

22   the process of falling.

23       Q.    Okay.  Were in the process of

24   falling still.  (Playing video and then

25   stopped.)  At this point, she's on the

Page 286

1    ground, right?

2         A.    Now we're on the ground.

3         Q.    So at 23:25:03, she is on the

4    ground.   (Playing video and then stopped.)

5    Did we see the bite at 23:25:10?

6         A.    If you go frame by frame, you can

7    see my hand right next to her face right

8    before she bites me.

9         Q.    I'm not going to go frame by frame,

10   but -- I don't even know if I can.   (Playing

11   video and then stopped.)  Were you standing

12   at this point, 23:25:07?

13        A.    At this point, I'm falling if you

14   -- again, if you went frame by frame, that's

15   the --

16        Q.    (Playing video.)

17        A.    -- that's the kick you can actually

18   see happen.

19        Q.    Okay.

20        A.    And she knocks me off balance

21   enough that I fall onto my hands and knees

22   next to her.

23        Q.    (Still playing video and stopped.)

24   Is she -- is this gate behind one of the

25   officers her gate or the neighbor's gate?

1  Can you tell?

2        A.    We're in -- it would be her gate.

3        Q.    Okay.  (Playing video and then

4  stopped.)  It looks like to me you said, Give

5  us your hands now, at 23:25:27, right?

6        A.    Yes.

7        Q.    And it looks like to me you've got

8  one of her hands, and Fritsch has her other

9  hand; is that fair?

10       A.    Fritsch is still fighting to get a

11  hold of her hand.

12       Q.    But you had one of them?

13       A.    I had one of them.

14       Q.    (Playing video and then stopped.)

15  That's Officer Jansen offering cuffs around

16  23:25:38?

17       A.    It is.

18       Q.    Didn't need them, though?

19       A.    Officer Fritsch was getting the

20  cuffs on her other arm.

21       Q.    Okay.  (Playing video and then

22  stopped.)  Do you hear -- this is your

23  perspective.  Are you looking -- I know it's

24  the camera's perspective, but are you looking

25  in this direction --

Page 288

1          A.     No.

2          Q.     -- of the camera?  Where are you

3     looking?  Where are your eyes?

4          A.     I'm dealing with Ashley still.

5          Q.     (Playing video and then stopped.)

6     At 23:25:52, you have resumed standing?

7          A.     Yes.  I disengaged with her.  I

8     stood up, catch my breath, assess the

9     situation, see what's going on with the car.

10              We're still dealing with the

11    original reason that we're there in the first

12    place.

13         Q.     Does Fritsch have her handcuffed at

14    that point?

15         A.     She is handcuffed when I stand up.

16         Q.     And so when he was -- when he

17    handcuffed her, you felt like you could stand

18    up and disengage from the commotion?

19         A.     Yeah, it's -- one of the steps

20    in our de-escalation is when you're able to

21    disengage, you disengage.

22         Q.     Is that an example of

23    de-escalation?

24         A.     Absolutely.  I stood up and stopped

25    interacting with her, didn't have any more

Page 289

1    force on her, and allowed her to sit there.

2         Q.    (Playing video and then stopped.)

3    At this point, 23:25:55, you're standing up.

4    I think I understood your testimony to be

5    that you're standing up to assess your

6    environment; is that fair?

7         A.    Yes.

8         Q.    Do you hear John Carlos repeatedly

9    telling her -- telling you she can't walk,

10   she can't stand, she's got a broken leg, she

11   had surgery, things like that?

12        A.    I hear that on the video.  I don't

13   know what parts of that I heard and

14   comprehended at the time.

15        Q.    Okay.  Was that part -- was he part

16   of the environment at that point in your

17   mind, or was he -- had he been taken out of

18   the picture?

19        A.    He was still part of that

20   environment.

21        Q.    He still a part of --

22        A.    He's still a potential threat.  I

23   still don't know why they're there.

24        Q.    He's still --

25        A.    Still don't know what their

Page 290

1    relationship is to each other, to the car.

2         Q.    He's still a threat to you?

3         A.    Certainly.

4         Q.    Why didn't nobody -- why didn't you

5    address his status as a threat?  Did you do

6    any -- or did you do anything to assess --

7    address him as a threat?

8         A.    Officer Jansen was maintaining him.

9         Q.    Okay.  So Jansen had John Carlos

10   under control from your perspective?

11        A.    He had moved him back so that he

12   wasn't right on top of us, and he wasn't

13   coming forward.  Had he come forward again

14   and refused to follow lawful commands, he

15   would have gone to jail too, but he followed

16   those commands, so he didn't go to jail.

17        Q.    And irrespective of that, he wasn't

18   -- because Jansen had him separated from the

19   scene -- from the -- from where you were, you

20   felt that Jansen had him under control?

21        A.    Yes.

22        Q.    (Playing video and then stopped.)

23   Is this Officer Jansen at 23:26:36?

24        A.    It is.

25        Q.    Why is he shining -- is he shining

1    his flashlight at your -- at you?

2         A.    Yeah.  He's shining it at my arm

3    where she bit me so he could see if she broke

4    the skin or not.

5         Q.    Which she did not break skin.

6    There was no skin breaking, right?

7         A.    That's correct.

8         Q.    (Playing video and then stopped.)

9    Did you hear her at 23 -- this is from -- I

10   don't know if this is from your perspective

11   or just your body cam's perspective -- at

12   23:26:55 say, You stepped on my foot?

13        A.    I did.

14        Q.    Were you looking at that -- were

15   your eyes focused at that perspective like

16   your camera was?

17        A.    I'm looking at her right now.  I

18   was picking up her crutches, and then when

19   she kicked me, she certainly drew my

20   attention.

21        Q.    But did you say anything about, Oh,

22   you kicked me?

23        A.    I don't know, if you go back and

24   play the whole thing.

25        Q.    But you agree with me that she said

1    that you stepped on her foot?

2         A.    Yes.

3         Q.    Okay.  (Playing video.)

4         A.    Yeah, I just said it.

5         Q.    (Stopped video.)  Fair to say that

6    you disagree with her statement that you

7    stepped on her foot?

8         A.    I never came into contact with her

9    foot.

10         Q.    (Playing video and then stopped.)

11    Now, what did you -- did you say that she's

12    going to prison on felonies?

13         A.    I did.

14         Q.    What did you mean by that?

15         A.    She's being charged with felonies.

16    She did go to prison on that.

17         Q.    Is that what you meant at the time?

18         A.    Yes.

19         Q.    (Playing video and then stopped.)

20    Are you able to comprehend what John Carlos

21    is saying at 23:27:27?

22         A.    That she's not allowed -- she's not

23    able to put any weight on herself.

24         Q.    Whatever he's saying --

25         A.    She cannot move.

Page 293

1        Q.    Yeah, yeah.  Are you able to

2    comprehend -- were you able to comprehend it

3    at the time?

4        A.    I don't know.

5        Q.    Were you focused in that direction,

6    your eyes, irrespective of where you're

7    camera's focused?

8        A.    I'm still dealing with her on the

9    ground.

10        Q.    I thought you had disengaged from

11    her being on the ground?

12        A.    That doesn't mean I'm not focused

13    on her.

14        Q.    Gotcha.

15        A.    Dealing with her on the ground.  I

16    believe at this point, additional units have

17    already arrived --

18        Q.    (Started playing video.)

19        A.    -- and they're dealing with John

20    Carlos, and we're dealing --

21              (Reporter interruption, and the

22        video was stopped.)

23        A.    I believe additional units had

24    arrived, and we are focused on Ms. Ferreiras

25    and getting her in custody and safely getting

1   her to the car, and they're dealing with him.

2        Q.   Is it your testimony or belief that

3   Ashley went to the ground on purpose?

4        A.   No, I never said that.

5        Q.   Okay.  I'm just clarifying.  You

6   don't think that she did -- it's not your

7   testimony that she fell to the ground on

8   purpose?

9        A.   No.  I think she fell to the ground

10  after she struck Officer Fritsch and

11  everybody lost their balance.

12       Q.   You believe that she lost her

13  balance?  Irrespective of how that happened,

14  she lost her balance?

15       A.   Certainly.

16            MR. MANDO:  Objection, form.

17       Q.   And you would disagree that that

18  was a take-down?

19       A.   It was not a take-down.

20       Q.   Okay.

21            MR. WHITTAKER:  Let's take a quick

22       break.

23            (A brief break was taken.)

24            MR. WHITTAKER:  Back on the record.

25       Officer, I don't have any more questions

Page 295

1          for you today.  Mr. Mando might.

2                MR. MANDO:  I have no questions.

3          I'll reserve.  We will request signature

4          on the deposition, please.

5                (Whereupon, signature was

6          requested, and the deposition concluded

7          at 3:52 p.m.)

8

9

10

11          _____

12                DOUGLAS ULRICH

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 296

```
 1                    CERTIFICATE
      STATE OF KENTUCKY :SS
 2    COUNTY OF KENTON  :

 3            I, Kelly Green, a duly qualified

 4    and commissioned Ohio Notary Public, do

 5    hereby certify that before the giving of the

 6    deposition, DOUGLAS ULRICH, was by me first

 7    duly sworn to tell the truth; the foregoing

 8    is a true and accurate record of the

 9    testimony given at said time and place by

10    said deponent; and said deposition was taken

11    by me in stenotype and transcribed by

12    computer-aided transcription.

13            I certify that I am not a relative,

14    employee of, or attorney for any of the

15    parties or attorneys in the above-captioned

16    action; I am not financially interested in

17    the action; I am not under a contract as

18    defined in Civil Rule 28(D).

19            IN WITNESS WHEREOF, I hereunto set

20    my hand and official seal August 28, 2025.

21

22

23

24                    /s/Kelly Green
      My Commission expires:  Kelly Green, RPR
25    May 15, 2029           Notary Public, Kentucky
```