UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at Covington

| | | |
|---|---|---|
| ASHLEY FERREIRAS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:24-cv-00074-SCM-CJS |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| THE CITY OF COVINGTON, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

Getting arrested is never a pleasant experience. And unless the arrestee surrenders, it always involves at least some modicum of force or coercion. Some arrests involve more force than others. There is nothing inherently unlawful about that. Of course, the Constitution prohibits the use of too much force. Specifically, a police officer violates the Fourth Amendment if he or she uses an objectively unreasonable amount of force under the circumstances. *See, e.g.*, *Smith v. Stoneburner*, 716 F.3d 926, 933 (6th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Here, the Plaintiff claims that the police did just that in arresting her. But she is wrong. Given that the Plaintiff resisted arrest and assaulted the police, it was not objectively unreasonable for the police to subdue her by striking her twice, placing her in handcuffs, and forcing her into the back of a police car. Thus, the Plaintiff's excessive-force claim is unavailing. And so are her other claims. Accordingly, the Defendants' motion for summary judgment is granted.

## I.    Facts

This case arises out of Plaintiff Ashley Ferreiras's arrest by City of Covington Police Officers Doug Ullrich and Anthony Fritsch on the night of May 4, 2023. Most of the facts concerning the events of that night are either not disputed by the parties or are clearly depicted in body-camera video footage. Thus, the facts below are taken in the light most favorable to Ferreiras, except that any of the facts clearly depicted by body-camera footage are viewed in the light depicted by such footage. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *Earnest v. Genesee County*, 841 F. App'x 957, 960 (6th Cir. 2021).

At the time of the arrest, Ferreiras lived in a two-level house at 1549 Nancy Street with her partner, Maxwell Mayberry. [Dkt. 71, Ferreiras Deposition, at 11:1–9, 10:20–23]. She was on bedrest while recovering from surgery that had occurred eight days earlier to treat her broken left ankle. [*Id.* at 23:3–18, 34:10–15]. Her brother, Jancarlos Ferreiras, was temporarily staying with her to aid her recovery. [*Id.* at 22:7–23:5].

At about 11:17 p.m., Officers Ullrich and Fritsch entered Nancy Street in their police cruiser to pull over a vehicle with a broken headlight. [Dkt. 76-1, KYIBRS Report, at 6]. Both officers exited their cruiser and initiated the traffic stop, which took place at the end of the street with houses on both sides. [Dkt. 76-2, Ullrich BWC Video, at VR 00:00:54–02:45]. According to the KYIBRS Report, the officers learned during the stop that the driver was Mayberry, that he did not possess insurance, and that the vehicle had a stolen license plate. [Dkt. 76-1 at 6]. Officers Jansen and

Goshorn then arrived via bicycle to assist with the stop. [*Id.*]. Officers Goshorn and Fritsch conducted the stop at Mayberry's vehicle while Officers Ullrich and Jansen stood by Officer Ullrich's cruiser. [Dkt. 76-2 at VR 00:04:14–31].

From her second-floor bedroom, Ferreiras noticed the stop unfolding outside her home, so she called out to the officers to ask what was going on. [Dkt. 71 at 29:23–30:7; Dkt. 76-2 at VR 00:05:44–51]. Officer Ullrich responded, "Hi," to which Ferreiras replied, "Hello, what's going on?" [Dkt. 76-2 at VR 00:05:44–51]. Ferreiras's brother then helped her down the stairs so that she could further investigate the police activity because Ferreiras recognized that the subject of the stop was her partner, Mayberry. [Dkt. 71 at 30:3–14].

Ferreiras then exited the side of her home and again asked the officers what was going on. [*Id.* at 35:17–36:5]. She was using crutches to walk due to her surgery, but she continued to walk through her fenced-in yard toward the gate that faced the street. [Dkt. 76-2 at VR 00:08:27–32]. As Ferreiras reached for the gate, Officer Ullrich stated, "Nope, don't come out here." [*Id.* at VR 00:08:32–38]. Ferreiras then asked, "Why not?" and opened the gate to exit her yard and enter the sidewalk on Nancy Street. [*Id.* at VR 00:08:32–38]. Officer Ullrich told Ferreiras that she could not approach because she was "not welcome at [his] stop," but she continued to walk toward the sidewalk in the traffic stop area. [*Id.* at VR 00:08:32–38]. Once again, Officer Ullrich warned Ferreiras to halt by saying, "If you come out here and you interrupt the stop, you're going to go to jail." [*Id.* at VR 00:08:38–39].

3

Undeterred by Officer Ullrich's commands and admonitions, Ferreiras closed the gate behind her and continued onto the sidewalk. [*Id.* at VR 00:08:39–43]. Officer Ullrich told her to "go back inside the yard," and she replied, "Sorry, this is my house." [*Id.* at VR 00:08:42]. Ferreiras continued advancing on the sidewalk in the direction of Mayberry's stopped car, and Officer Ullrich told her, "Okay, go back inside your yard." [*Id.* at VR 00:08:42–44]. She responded that this was her house, and Ullrich once again told her to leave. [*Id.* at VR 00:08:45–48].

Officer Ullrich stepped forward in front of Ferreiras on the sidewalk and then said, "I am going to put you in handcuffs and take you to jail if you do not go back inside your yard." [*Id.* at VR 00:08:48–08:54]. At the same time, Officer Jansen repositioned himself to support Officer Ullrich. [Dkt. 90-1, Jansen BWC Video, at VR 00:08:27]. Ferreiras stopped moving forward but refused to go back to her yard, and she warned Officer Ullrich not to disrespect her. [Dkt. 76-2 at VR 00:08:48–09:05]. Again, Officer Ullrich said Ferreiras was "not welcome" at the stop, but she replied, "You are not welcome to talk to me like that." [*Id.* at VR 00:08:48–09:05]. Officer Ullrich then gave Ferreiras a choice: "Go back in the yard or go to jail." [*Id.* at VR 00:08:57–09:02]. Ferreiras remained on the sidewalk and told him not to disrespect her as she placed her hand out with an open palm. [*Id.* at VR 00:08:57–09:02]. Meanwhile, her brother was on the other side of the gate observing the confrontation, and he started to walk toward Officer Ullrich and Ferreiras. [*Id.* at VR 00:09:06–09:10].

4

Having decided that Ferreiras was noncompliant and refused to obey his order to leave the vicinity of the traffic stop, Officer Ullrich placed Ferreiras under arrest and told her she was "going to jail." [*Id.* at VR 00:09:06–09]. To make the arrest, Officer Ullrich grabbed Ferreiras and the crutch on her right arm, but she initially pulled her arm away, backed up, and yelled, "Don't touch me!" twice. [*Id.* at VR 00:09:07–12; Dkt. 71 at 38:18–39:3]. She then yelled at Officer Ullrich, "Get the ****off of me!" twice as he told her to stop. [Dkt. 76-2 at VR 00:09:15–24]. Meanwhile, Officer Jansen instructed Ferreiras's brother, Jancarlos, to step away and return to the yard, which he did despite his verbal protests about how the officers were conducting Ferreiras's arrest. [Dkt. 90-1 at VR 00:08:46–09:17]. The officers' body-cameras captured the ensuing struggle with Ferreiras, but the Court will note which aspects of the footage are unclear.

Officer Fritsch attempted to help by grabbing Ferreiras's left arm and discarding the other crutch she was holding. [Dkt. 76-3, Fritsch BWC Video, at VR 00:09:14–20]. The officers believed that the crutches could have been used as potential weapons or caused injury. [Dkt. 72, Officer Ullrich Deposition, at 111:2–113:8; Dkt. 70, Officer Fritsch Deposition, at 32:15–33:5]. Ferreiras then elbowed Officer Fritsch in the nose, which knocked off and broke his eyeglasses. [Dkt. 76-2 at 00:09:26–32; Dkt. 70 at 34:7–18; Dkt. 76-6, Jury Instructions and Verdict, at 6, 10 (providing that Ferreiras was convicted of criminal mischief for damaging the eyeglasses)]. Immediately thereafter, Ferreiras and both officers fell to the ground. [Dkt. 76-3 at VR 00:09:25; Dkt. 76-2 at VR 00:09:26]. The body-camera footage is

5

unclear whether they fell to the ground because the officers knocked Ferreiras down or if it was because Ferreiras attempted to break free. [Dkt. 76-3 at VR 00:09:21–26; Dkt. 76-2 at VR 00:09:27]. Taken in the light most favorable to Ferreiras based on the footage, the officers are the reason that Ferreiras fell. [Dkt. 71 at 39:4–12].

A struggle ensued on the ground between Ferreiras and the two officers. [Dkt. 76-3 at VR 00:09:21; Dkt. 76-2 at 00:09:28; Dkt. 71 at 39:13–24]. The officers used additional force by pushing and grabbing to try to handcuff Ferreiras as she laid facedown, but this proved difficult. [Dkt. 76-3 at VR 00:09:21–10:00; Dkt. 76-2 at VR 00:09:30]. The footage clearly shows Ferreiras thrashing and kicking, [Dkt. 76-2 at VR 00:09:32], but she claims she writhed on the ground to minimize any additional pain or injury to her ankle. [Dkt. 71 at 39:13–24; Dkt. 90 at 20 (conceding that the kick plausibly happened)]. Both sides agree that Officer Ullrich then struck Ferreiras on the side of her head during his attempt to handcuff her.[1] [Dkt. 76-2 at VR 00:09:35; Dkt. 76-4, Ullrich Use of Force Report, at 2; Dkt. 72 at 122:9–13].

After Officers Ullrich and Fritsch successfully restrained Ferreiras with handcuffs, they pulled her up to her feet and told her they were going to walk her to

---

[1] Officer Ullrich claims he only struck Ferreiras once, [Dkt. 72 at 121:24–122:13], and that it was because she bit him, [Dkt. 72 at 260:4–16]. Ferreiras denies having bitten him. [Dkt. 71 at 66:21–22]. Officer Fritsch suggests that Officer Ullrich struck Ferreiras twice even though Officer Fritsch did not see it happen. [Dkt. 70 at 61:5–18, 124:22–125:11]. The footage shows that Officer Ullrich made two movements with his hand toward Ferreiras's head during the struggle, but it is unclear whether one or two of the strikes connected. [Dkt. 76-2 at 00:09:36–38]. Thus, viewing the evidence in the light most favorable to Ferreiras, the Court assumes that Officer Ullrich hit her twice in quick succession while trying to subdue her, and also assumes that she did not bite Officer Ullrich.

the cruiser—or drag her if necessary due to her noncompliance. [Dkt. 76-3 at VR 00:12:24–34]. Ferreiras then insulted Officer Ullrich with profanity and asked him how she was supposed to walk. [*Id.* at VR 00:12:40–56]. The officers proceeded to carry Ferreiras to the cruiser and ask her for her assistance with getting her into the rear passenger door, but she refused. [*Id.* at VR 00:13:20–32; Dkt. 76-2 at VR 00:13:19–32].

Officer Ullrich then attempted to turn Ferreiras's body to move her into the cruiser, and his hand can be seen touching the lower side of her chest in the process. [Dkt. 90-2, Brown BWC Video, at VR 00:03:38–40; Dkt. 76-2 at VR 00:13:45]. Ferreiras then verbally accused Officer Ullrich of touching her breast and nipple. [Dkt. 76-2 at VR 00:13:50–54]. After a brief pause, Officers Ullrich and Fritsch guided Ferreiras into the cruiser and attempted to close the door, but Ferreiras repeatedly kicked the door back open before it could be secured shut. [Dkt. 76-2 at VR 00:14:23–15:00]. Ferreiras was taken to the St. Elizabeth Edgewood Hospital emergency room and was treated for minor injuries like scrapes and scratches and bruising on her body, head, arms, and legs. [Dkt. 71 at 91:20–92:7; 114:7–115:7]. The officers then continued to conduct the traffic stop after Ferreiras was removed from the site. [Dkt. 90-2 at VR 00:05:05]. Ferreiras's brother—who complied with the officers' order to return to the yard—was not arrested.

The Commonwealth of Kentucky pursued criminal charges against Ferreiras for her conduct during the arrest, and a Kenton County jury found her guilty of: (1) resisting arrest in violation of KRS 520.090, a Class A misdemeanor; (2) third

degree criminal mischief in violation of KRS 512.040, a Class B misdemeanor (repealed 2024); (3) obstructing an emergency responder in violation of KRS 525.015, a violation; and (4) third degree assault in violation of KRS 508.025, a Class D felony. [Dkt. 76-5, Kenton Circuit Court, 23-CR-769 Final Judgment, at 1–2; Dkt. 76-6].

On May 3, 2024, Ferreiras filed suit against the City of Covington and Officers Ullrich and Fritsch. [Dkt. 1]. As to Officers Ullrich and Fritsch, Ferreiras makes claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment due to the alleged use of excessive force (Count I) and for violations of the First Amendment due to alleged retaliation (Count III), and she also alleges negligence (Count VIII), intentional infliction of emotional distress (Count IX), and negligent infliction of emotional distress (Count X). [*Id.* at ¶¶ 84–88, 94–98, 119–29]. She also asserts a sexual-abuse claim solely against Officer Ullrich (Count VII). [*Id.* at ¶¶ 113–18]. Finally, Ferreiras raises a 42 U.S.C. § 1983 claim against the City of Covington based on *Monell* liability (Count VI). [Dkt. 1 at ¶¶ 106–12 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978))].

This Court previously dismissed Counts II, IV, and V upon the Defendants' Motion for Partial Judgment on the Pleadings. [Dkt. 24; Dkt. 18]. At the conclusion of discovery, the Defendants filed the pending Motion for Summary Judgment on all remaining claims.[2] [Dkt. 76].

---

[2] This Court also granted Ferreiras's Motion for Leave to Submit Supplemental Authority, which briefed the Court on the applicability of two opinions that followed the summary judgment briefing: *Steger v. Willis*, No. 2:24-095-DCR, 2025 WL 2792118 (E.D. Ky. Sept. 30, 2025); and *Mata v. City of Grayson*, No. 23-122-DLB-EBA, 2025 WL 3451641 (E.D. Ky. Dec. 1, 2025). [Dkt. 118; Dkt. 102].

## II.    Analysis

The Court's role at this stage is not to make credibility determinations or resolve any material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th. Cir. 2013). Instead, all facts must be construed, and all reasonable inferences must be drawn, in favor of the nonmovant—except that any facts clearly depicted by video footage are construed in the light depicted by such footage. *Scott*, 550 U.S. at 380–81; *Earnest*, 841 F. App'x at 960. Viewing the record in this light, the Court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Because there is no evidence on which a reasonable jury could find in favor of the Plaintiff, the Defendants are entitled to summary judgment.

### A. Ferreiras's excessive-force claim under § 1983 fails as a matter of law.

Ferreiras alleges that Officers Ullrich and Fritsch violated her right under the Fourth Amendment to be free from excessive force when they arrested her on May 4, 2023. This claim fails for two reasons. First, there was no constitutional violation because the officers did not use force that was objectively unreasonable under the circumstances. *See Smith*, 716 F.3d at 933 (citing *Graham*, 490 U.S. at 397). Second, even if one were to set that point aside for the sake of argument, the claim would still fail because of qualified immunity.

### 1. The officers' conduct did not violate Ferreiras's constitutional rights.

A violation of a plaintiff's Fourth Amendment right to be free from excessive force occurs when an officer uses force that is deemed objectively unreasonable. *See id.* (citing *Graham*, 490 U.S. at 397). This standard considers "whether the totality of the circumstances justifies a particular level of force." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019)); *Graham*, 490 U.S. at 396 (noting a court must balance "the nature and quality" of the seizure "against the countervailing governmental interests at stake") (citations omitted). Three factors guide a court's evaluation of the totality of the circumstances: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Ultimately, of course, "[r]easonableness is always the touchstone of Fourth Amendment analysis." *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (quoting *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016)). "[O]fficers may employ only the force reasonably necessary to effect an arrest." *Chaney-Snell v. Young*, 98 F.4th 699, 717 (6th Cir. 2024).

When assessing the three *Graham* factors for reasonableness, this Court must view the circumstances "from the perspective of a reasonable officer on the scene." *Mendez*, 581 U.S. at 428 (warning against the use of hindsight to assess an application of force). This lens accounts for the fact that police officers often make "split-second judgments" during "tense, uncertain, and rapidly evolving"

10

circumstances. *Caie v. West Bloomfield Township*, 485 F. App'x 92, 95 (6th Cir. 2012) (citing *Graham*, 490 U.S. at 397). Further, this Court must assess each defendant's liability based on their own individual actions. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Applying these principles, neither Officer Ullrich nor Officer Fritsch used excessive force on Ferreiras.[3]

### i. Officer Ullrich did not use excessive force against Ferreiras.

After considering the totality of the circumstances, this Court finds that Officer Ullrich acted reasonably and did not subject Ferreiras to excessive force. Officer Ullrich's uses of force against Ferreiras included: (1) grabbing Ferreiras's right arm and removing her crutch; (2) striking Ferreiras with a closed fist during the struggle on the ground; and (3) moving Ferreiras to the cruiser and pushing her into the back seat. [Dkt. 76-2 at VR 00:09:07–12, 09:35–40, 13:20–32; 14:23–15:00]. A reasonable officer in Ullrich's position would deem these exercises of force—and any ancillary

---

[3] The Defendants contend that Ferreiras should be precluded from basing her excessive-force claim on any use of force that occurred before she was handcuffed. This issue is ultimately irrelevant because the Court concludes that no use of force in this case was unconstitutionally excessive. But the Defendants are correct nonetheless. A § 1983 action cannot "necessarily imply the invalidity of [a plaintiff's] conviction." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). *Heck* preclusion can arise when a plaintiff is convicted of a crime and does not raise excessive force as an affirmative defense despite the opportunity to do so. *Parvin v. Campbell*, 641 F. App'x 446, 449 (6th Cir. 2016). If such plaintiff claims excessive force was used against her before and after she was handcuffed, *Heck* will bar the pre-handcuffing claim and permit the post-handcuffing claim. *Matheney v. City of Cookeville*, 461 F. App'x 427, 431 (6th Cir. 2012). Ferreiras was convicted of resisting arrest but did not assert excessive force as a defense, [Dkt. 76-5 at 1], even though Kentucky law permitted her to do so. *See Burke v. Forbis*, No. 3:18-cv-802-DJH-CHL, 2021 WL 2418574, at *3 (W.D. Ky. June 14, 2021). Accordingly, *Heck* precludes her from claiming that excessive force was used against her before she was handcuffed.

uses of force connected to them—to be necessary to arrest and subdue Ferreiras based on the *Graham* factors.

The first *Graham* factor weighs in favor of Ferreiras. Officers Ullrich and Fritsch arrested Ferreiras for obstructing an emergency responder in violation of KRS 525.015, [Dkt. 76-1 at 1], which is not a severe crime. *See Reed v. Campbell County*, 80 F.4th 734, 748 (6th Cir. 2023) (finding the severity of an obstruction offense is "minimal"). The Defendants concede this point. [Dkt. 76 at 16; Dkt. 90 at 14].

The second *Graham* factor, however, weighs in favor of Officer Ullrich. Officer Ullrich did not anticipate that Ferreiras would confront the officers during the traffic stop. [Dkt. 72 at 79:2–4, 87:5–12]. Ferreiras exited her home with her brother while using crutches, but the officers did not know at the time the extent of her injuries or why she was approaching them. [Dkt. 72 at 91:9–18; Dkt. 70 at 112:19–113:5]. Crutches are not traditionally thought of as weapons, but Officers Ullrich and Fritsch testified they viewed the crutches as potential weapons given their limited information about Ferreiras's intentions while approaching them. [Dkt. 72 at 111:2–113:8; Dkt. 70 at 32:15–33:5]. Regardless, "a suspect need not be armed to pose an imminent threat to an officer's safety." *Mitchell v. Schlabach*, 864 F.3d 416, 422–23 (6th Cir. 2017).

Viewed from the perspective of a reasonable officer on the scene, *see Graham*, 490 U.S. at 396, Ferreiras posed an immediate threat the moment she exited her gate and continued to walk toward the traffic stop in defiance of Officer Ullrich's clear and

12

unequivocal orders. [Dkt. 76-2 at VR 00:08:37–44]. For all the officers knew, Ferreiras was interfering with the stop to stir up trouble.

The danger posed by Ferreiras subsequently spiked when she pulled away her arm and then fell alongside Officers Ullrich and Fritsch. [Dkt. 76-2 at VR 00:09:07–31; Dkt. 71 at 38:18–39:8]. During the struggle that ensued on the ground, both officers were in a compromised and off-balance position, subject to Ferreiras's thrashing movements. [Dkt. 76-2 at VR 00:09:32–55]. Ferreiras no longer posed an immediate threat once she was in handcuffs, but Officer Ullrich's efforts to seat her in the cruiser used only the minimal force necessary under the circumstances. [*Id.* at VR 00:14:23–15:00]; *see Chaney-Snell*, 98 F.4th at 717. Thus, the second *Graham* factor supports Officer Ullrich using force to subdue Ferreiras and address the threat she posed to the officers and public.

The third *Graham* factor—active resistance to arrest—weighs heavily in favor of Officer Ullrich. Active resistance includes any act of noncompliance combined with "some outward manifestation" of "volitional and conscious defiance." *See Mata v. City of Grayson*, No. 23-122-DLB-EBA, 2025 WL 3451641, at *6 (E.D. Ky. Dec. 1, 2025) (quoting *Kent v. Oakland County*, 810 F.3d 384, 392 (6th Cir. 2017)). Ferreiras's conduct prior to the arrest, her conduct during Officers Ullrich's and Fritch's attempt to arrest her, and her conduct after she was handcuffed all amount to active resistance. These actions later culminated in Ferreiras's convictions for assault, resisting arrest, criminal mischief, and obstructing an emergency responder. [Dkt. 76-6].

13

Ferreiras exhibited clear manifestations of noncompliance from the moment she left her home, which escalated as she exited her gate and approached the stop. [Dkt. 76-2 at VR 00:08:32–55]. Officer Ullrich issued no fewer than eight commands to Ferreiras to either stop advancing or return to her yard. [*Id.* at VR 00:08:32–39, 08:42–09:02]. Rather than adhere to those simple and clear commands, Ferreiras vocally refused to leave the stop and advanced toward the officers until Officer Ullrich intercepted her on the sidewalk. [*Id.* at VR 00:08:39–08:54]. Ferreiras argues she did not confront the officers and that by placing her hands in the air she was extending an "olive branch" to show she did not want any trouble. [Dkt. 90 at 15]. That is contrary to the video evidence, which clearly depicts the events leading up to Ferreiras's arrest. Taken in the light depicted by such footage, no reasonable jury could find that Ferreiras did not confront the officers when she ignored commands and approached them after exiting her gate. [Dkt. 76-2 at VR 00:08:48–08:54]. Ferreiras put her hands up to signal her refusal to obey Officer Ullrich's commands to return to her home. [*Id.* at VR 00:08:57–09:02]. What followed was the natural consequence of her confronting police officers during someone else's traffic stop and refusing the officers' commands.

When Officer Ullrich approached Ferreiras to arrest her, he initially used a minimal amount of force—essentially doing nothing more than clasping her arm to facilitate handcuffing her. [*Id.* at VR 00:09:07–12]. That initial use of force was so miniscule that no reasonable juror could conclude it was objectively unreasonable. If

14

it were otherwise, then practically every arrest ever effectuated would be a potential violation of the Fourth Amendment.

It was only when Ferreiras started actively resisting arrest that Ullrich's use of force escalated. And that escalation was justified. Police officers have the right to arrest a suspect when they have probable cause to believe a crime is being committed, *see Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), and this includes a "subsidiary right to use the 'physical coercion or threat thereof' required to 'effect' [the suspect's] detention," *Chaney-Snell*, 98 F.4th at 716 (quoting *Graham*, 490 U.S. at 396). Ferreiras does not contest that Officers Ullrich and Fritsch had probable cause to arrest her for a variety of crimes, including assault.[4] Thus, Officer Ullrich had the right to arrest Ferreiras for her offense and use the amount of force necessary to detain her.

By pulling her arm away, backing up, and vocally refusing to comply during Officer Ullrich's initial attempt to arrest her, Ferreiras combined her acts of noncompliance with an outward manifestation of defiance. [Dkt. 76-2 at VR 00:09:07–12]. The result was active resistance by Ferreiras that justified additional force to make the arrest. As the body-camera footage shows, that additional force included grabbing Ferreiras and knocking away her crutches to secure her arms. [*Id.* at VR 00:09:07–25]. Doing so was not objectively unreasonable. In fact, it is hard to

---

[4] Nor could she. A jury convicted Ferreiras of those crimes, [Dkt. 76-5], which necessarily means that the officers had probable cause to arrest her. *See Watson v. City of Marysville*, 518 F. App'x 390, 392 (6th Cir. 2013) (quoting *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir. 1985)).

see what else should have been done—especially from the viewpoint of a reasonable officer in Ullrich's position. Ferreiras lost her balance and fell alongside the officers because of their use of force, [*Id.* at VR 00:09:20–30], but Officer Ullrich had to make a split-second decision to remove the crutch before it could cause an injury—either intentionally or unintentionally. His heat-of-the-moment decision was not objectively unreasonable.

Once on the ground, Ferreiras writhed due to the pain she was experiencing in her ankle, cursed at the officers, and made a kicking motion. [*Id.* at VR 00:09:32]. A reasonable officer under these tense circumstances would not be able to discern whether Ferreiras was flailing, contorting her body, and kicking due to discomfort or to fight the officers. Bear in mind that Ferreiras was subsequently convicted of assault, resisting arrest, and criminal mischief for her actions during this sequence, [Dkt. 76-6], which included striking both Officer Ullrich and Officer Fritsch and breaking Officer Fritsch's glasses. [Dkt. 76-2 at 00:09:26–32; Dkt. 70 at 34:7–35:12; Dkt. 71 at 104:13–105:4]. During the chaos, it was reasonable for Officer Ullrich to strike Ferreiras with his hand to subdue her and allow him to apply handcuffs.

Under similar circumstances, the Sixth Circuit has found that physical takedowns, knee strikes, and tasers are appropriate to subdue an actively resisting suspect. *See, e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638, 643 (6th Cir. 2015); *Caie*, 485 F. App'x at 96; *Earnest*, 841 F. App'x at 960; *Burchett v. Kiefer*, 310 F.3d 937, 940, 944 (6th Cir. 2002) (holding officers' use of force to be reasonable when they twisted and turned a suspect to secure handcuffs and roughly pushed the suspect into a police

16

car).  In *Roell v. Hamilton County*, for instance, the court found the third *Graham* factor supported use of force against a suspect who "resisted the deputies' attempts to restrain and handcuff him by kicking, flailing, and wriggling away from their grasp."  870 F.3d 471, 482 (6th Cir. 2017).  Even if Officer Ullrich's act of knocking away Ferreiras's crutch was the reason why the subsequent struggle on the ground occurred, "law-enforcement officers cannot be held liable solely because they created the circumstances requiring the application of force."  *See Roell*, 870 F.3d at 482 (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)). Consistent with the Sixth Circuit's precedents, the active threat posed by Ferreiras's resistance and assault on the officers justified Officer Ullrich in grabbing her and striking her in the head to complete the arrest.

Ferreiras's conduct distinguishes the facts of this case from others she cites where force was found to be unreasonable.  In *Steger v. Willis*, this Court found an officer may have used excessive force against a suspect by pushing a gate into them, striking them, and forcing them to the ground during an arrest for a disorderly conduct offense.  No. 2:24-095-DCR, 2025 WL 2792118, at *3–4 (E.D. Ky. Sept. 30, 2025).  The suspect swore at the officers in a raised voice, but the suspect did not pose a threat that would warrant the level of force applied.  *See id.*  Moreover—and perhaps most importantly—the suspect stayed "on his own property, behind a gate," and "did not ignore any commands to submit to arrest."  *See id.*  Ferreiras, however, did the opposite.  [Dkt. 76-2 at VR 00:08:32–38].  And unlike the suspect in *Steger*,

Ferreiras was convicted of assault, criminal mischief, and resisting arrest. [Dkt. 76-5]; *see* 2025 WL 2792118, at *2.

In *Mata v. City of Grayson*, this Court found repeated strikes to the back of a handcuffed suspect were unreasonable because a "spontaneous assault" or "unprovoked and unnecessary blow" to a suspect who poses no threat is excessive force. 2025 WL 3451641, at *8 (quoting *Coley v. Lucas County*, 799 F.3d 530, 539 (6th Cir. 2015) (citation omitted)). But here, Officer Ullrich struck Ferreiras twice in response to her elbowing, thrashing, and kicking *before* she was handcuffed—not as a spontaneous or unprovoked blow. [Dkt. 76-2 at VR 00:09:35].

Thus, as a matter of law, Officer Ullrich's use of force in subduing and handcuffing Ferreiras was not objectively unreasonable. And the same is true of the force that Officer Ullrich used after handcuffing Ferreiras. Officer Ullrich's post-handcuffing use of force was minimal. That use of force simply involved moving Ferreiras to the patrol car and placing her in the back seat. Because of Ferreiras's refusal to cooperate and her limited movement due to the ankle injury, it was not unreasonable for Officers Ullrich and Fritsch to drag her to the police cruiser and push her into it. [Dkt. 76-2 at VR 00:13:19–14:00]. Bear in mind that Ferreiras violently kicked the rear door open before Officer Ullrich could finally secure her in the passenger compartment. [*Id.* at VR 00:14:40–15:00]. This underscores both her recalcitrance and the reasonableness of the officers' actions in response.

Ferreiras argues that her "physical limitations" rendered unreasonable the uses of force because she "couldn't get into a car on her own, couldn't comply with the

Officers' commands," and needed to be helped up. [Dkt. 90 at 15, 21]. Ferreiras left the comfort of her home to confront the officers and disobey their orders despite her injury. [Dkt. 76-2 at VR 00:08:27–09:09]. She posed a risk to the officers at the scene of the stop—as evidenced by her assault conviction and her elbow that broke Officer Fritsch's glasses—and she resisted arrest. [Dkt. 76-6]. Her injuries made transporting her to the cruiser more difficult, but Ferreiras refused to comply when Officer Ullrich sought her assistance with getting her through the door. [Dkt. 76-2 at VR 00:13:19–32]. Only then did Officer Ullrich push her into the cruiser and attempt to close the door despite her kicks. [*Id.* at VR 00:14:23–15:00]. None of these uses of force was unreasonable—even in light of her injured ankle.

Given the weight of the factors in favor of Officer Ullrich, no reasonable jury could find that he exerted excessive force against Ferreiras during her arrest. The underlying obstruction offense may have been minor, but Ferreiras posed an immediate threat prior to and during her arrest, and the entire sequence of events was littered with acts of resistance by her. Considering the *Graham* factors and the totality of the circumstances, Officer Ullrich did not use an objectively unreasonable amount of force. Thus, he did not violate Ferreiras's Fourth Amendment rights.

### ii. Officer Fritsch did not use excessive force against Ferreiras.

For similar reasons, Officer Fritsch also did not act in an objectively unreasonable manner in using force against Ferreiras. Officer Fritsch took a supportive role during Ferreiras's arrest, and his uses of force included: (1) grabbing Ferreiras's left arm and removing her crutch; and (2) moving Ferreiras to the cruiser

and helping Officer Ullrich place her into the back seat.[5] [Dkt. 76-3, at VR 00:09:15–30, 00:13:20–32]. Each use of force—and any ancillary use of force connected with it—was reasonable under the circumstances.

Just like with Officer Ullrich, the first *Graham* factor weighs in favor of Ferreiras, but the second and third factors weigh in favor of Officer Fritsch. Ferreiras's minor obstruction offense is more than offset by the threat she posed to the officers and her active resistance throughout the arrest process. Ferreiras's crutch could have been used to injure one of the officers, so it was reasonable for Officer Fritsch to knock it away from her reach. [*See* Dkt. 70 at 32:15–33:5]. Plus, in the heat of the moment, an officer in Fritsch's position could easily—and reasonably— have believed that the crutch needed to be discarded so that it did not get in the way of his effort to steady Ferreiras and facilitate her placement in handcuffs. Once Ferreiras was handcuffed, Officer Fritsch helped move her to the cruiser and push her into the passenger compartment. [Dkt. 76-3 at VR 00:13:20–15:00; Dkt. 76-2 at VR 00:14:23–15:00]. Given her recalcitrance, the means that Fritsch and Ullrich used to move Ferreiras to the patrol car and put her in its back seat were not objectively unreasonable. As with Officer Ullrich, a consideration of the *Graham* factors and the totality of the circumstances leads to the conclusion that no reasonable jury could find that Officer Fritsch used an objectively unreasonable amount of force. Thus, Officer Fritsch also did not violate Ferreiras's Fourth Amendment rights.

---

[5] The Defendants are correct that only the second use of force survives *Heck* preclusion. But, again, this point is ultimately irrelevant because no use of force was objectively unreasonable.

## 2. The officers would be entitled to qualified immunity in any event.

Even if one were to look past the absence of a constitutional violation, Ferreiras's excessive-force claim would still fail because Officers Ullrich and Fritsch would be entitled to qualified immunity. In other words, even if there were a violation of Ferreiras's Fourth Amendment right to be free from excessive force, the actions of Officers Ullrich and Fritsch were not contrary to "'clearly established' law at the time [they] acted." *See Mitchell*, 864 F.3d at 424.

A police officer is entitled to qualified immunity in an excessive-force case when his or her conduct—even if ultimately determined to be unconstitutional—"did not violate clearly established Fourth Amendment excessive-force principles." *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025). For an officer's actions to violate clearly established law and negate qualified immunity, a plaintiff must point to existing precedent that "placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Stated differently, a plaintiff must show that the law was "'sufficiently clear' such that 'every reasonable official would have understood' that the officer's actions violated it." *Moore*, 126 F.4th at 1167 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). A legal principle can be clearly established even if there is not a case directly on point, but the "law must be 'particularized' to the facts of the case." *See White*, 580 U.S. at 79 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This requires a high 'degree of specificity'" because a more generalized rule would "avoid[] the crucial question whether the official acted reasonably in the particular

circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Ultimately, there must be fair and clear notice to the officer that his or her conduct was unlawful because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Under this standard, Officers Ullrich and Fritsch are entitled to qualified immunity. There was simply no existing authority that clearly demonstrated that their particular conduct violated Ferreiras's rights.

Ferreiras, however, claims Officers Ullrich and Fritsch violated her right as a disabled or injured person to not be "subjected to excessive force in connection with her disabilities and injuries, particularly when the same are obvious, and/or actually known by the Officers." [Dkt. 90 at 23]. She argues that Officers Ullrich and Fritsch violated this right by not accounting for her broken ankle when they used physical force to arrest her and move her into their cruiser. [*Id.* at 23–24].

In support of this proposition, Ferreiras first cites *St. John v. Hickey*, which found "the right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest" is clearly established. 411 F.3d 762, 774 (6th Cir. 2005) (abrogated in irrelevant part by *Scott*, 550 U.S. at 381 n.8). There, officers used excessive force against a wheelchair-bound suspect who was physically compliant but had muscular dystrophy, which rendered his legs unable to bend. *Id.* at 765–66. There was no evidence in the record that the suspect was violent or physically resisting the officers during the arrest, and the defendant did not contend that the

suspect posed any safety risk. *See id.* at 772. In light of the suspect's known disability, it clearly violated the Fourth Amendment when the officers pushed the suspect into the cruiser and attempted to bend his legs, causing pain and injury. *See id.* at 775.

Ferreiras also cites *Vance v. Wade*, in which the Sixth Circuit found an officer violated a suspect's right to be free from excessive force when the officer pulled on the suspect's handcuffs, shoved the suspect's head and shoulder down onto the cruiser's floorboard, and closed the door to force the suspect's legs into the car. 546 F.3d 774, 783–84 (6th Cir. 2008). The suspect—who was recovering from neck and back surgery—had been uncooperative and interfered with the execution of a search warrant before the arrest. *See id.* at 779, 785. Next, the officer escorted the suspect to the backseat of the cruiser with the car door open and his feet on the ground, left the scene for several minutes as the situation calmed, then returned to cram the suspect into the car's passenger compartment. *See id.* at 778, 785–86 (noting the suspect was "cooperatively sitting handcuffed" on the edge of the backseat before the officer returned). The delay combined with the unnecessarily rough use of force was a clear Fourth Amendment violation even though the suspect did not inform the officers about his surgeries until after he was in the cruiser. *See id.* at 784. But had the officer escorted the suspect into the car and forced him into the compartment without delay, qualified immunity likely would have applied due to the need to "minimize risks and calm a potentially volatile situation." *Id.* at 785.

23

Lastly, Ferreiras points to *Burden v. Caroll*, which found it unreasonable for an officer to violently shove a suspect against a brick wall upon arriving at the scene, and then shove the suspect again into the same wall. 108 F. App'x 291, 292–94 (6th Cir. 2004). While the officer may not have known whether it was clearly unlawful to shove the suspect the first time to secure the area, it was certainly unlawful to do it again once it was clear there was no safety or flight risk. *See id.* at 294 ("It is well established that a police officer cannot continue to use force once a reasonable officer would conclude that force is no longer justified by the circumstances.").

None of these cases is sufficiently particularized to the facts of Ferreiras's case to put Officers Ullrich or Fritsch on notice that their actions were unlawful or that the constitutional question was beyond debate. Unlike the suspect in *St. John*, Ferreiras actively resisted arrest, and her ankle injury did not limit her ability to move to the same extent as a person with muscular dystrophy. Merely pushing Ferreiras forward onto the seat of the car is not comparable to an attempt to bend the legs of a suspect with muscular dystrophy. [Dkt. 76-2 at VR 00:14:23–15:00]. Further, the degree of force used to cram the suspect in the police cruiser in *Vance* was much more severe than the force used by Officers Ullrich and Fritsch. [*Id.*]. Ferreiras was pushed onto the seat—not slammed onto the floorboard. [*Id.*]. There was also no significant delay between Ferreiras's arrest and the effort to place her in the cruiser because Ferreiras needed to be promptly removed from the traffic stop so that it could continue unimpeded. [*Id.*]. And unlike the officer in *Burden*, who used rough force despite the lack of any safety risk, Ferreiras actively resisted arrest,

continued to pose a threat, and was not subdued during the uses of force until immediately before she was handcuffed. [*Id.* at VR 00:09:07–10:10]. She even kept resisting after being handcuffed and placed in the police car by kicking the door open.

The Sixth Circuit's recent decision in *Guptill v. City of Chattanooga*, 160 F.4th 768 (6th Cir. 2025), bears mentioning here. In that case, an off-duty police officer moonlighting as a hospital security guard punched a partially restrained patient in the head as the patient was passively resisting treatment for a mental health emergency. *See id.* at 781–82. The blow caused the patient to suffer "head trauma." *Id.* at 773. Despite those seemingly unjustifiable circumstances, the Sixth Circuit held that the officer's actions were protected by qualified immunity. It concluded that:

> No binding caselaw Guptill identified or that we could find has determined that an officer responding to a perceived medical emergency and a partially restrained patient who is passively resisting medication cannot use a single punch to enforce compliance when that individual pulls away from the officer, even if the officer was not entirely sure about the resistance.

*Id.* at 782 (quotations and citation omitted). If qualified immunity applied to the use of force under those circumstances, it is impossible to see how it could not also apply here, where Ferreiras was *actively* and violently resisting the officers, not passively resisting like the plaintiff in *Guptill*.

The bottom line is that Ferreiras cannot identify a case that found the force used against her unconstitutional under similar circumstances. This means that she has not identified any violation of a clearly established right, and so Officers Ullrich

and Fritsch are entitled to qualified immunity on the § 1983 excessive-force claim no matter whether their conduct was unconstitutional.

### B. Ferreiras's § 1983 First Amendment retaliation claim also fails as a matter of law.

Ferreiras also claims Officers Ullrich and Fritsch violated her First Amendment rights to free speech and association by retaliating against her with improper treatment during and after her arrest. [Dkt. 1 at ¶¶ 94–98]. To assert such a claim under § 1983, a plaintiff must show: "(1) [she] engaged in protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [her] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). If a plaintiff can make that showing, "the burden shifts to the defendant to show he would have taken the same action even if the plaintiff had not engaged in protected conduct." *Sevy v. Barach*, 815 F. App'x 58, 63 (6th Cir. 2020) (citing *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001)). However, in the summary judgment context, it is the defendant-movant's burden to demonstrate a lack of evidence to support the plaintiff-nonmovant's retaliation claim. *See Lubrizol Corp. v. Nat'l Union Fire Ins. Co.*, 200 F. App'x 555, 559 (6th Cir. 2006).

As with the excessive-force claim, there are two levels to analyzing Ferreiras's First Amendment retaliation claim: (1) whether the officers violated her First Amendment rights; and, if so, (2) whether the officers are entitled to qualified immunity because the rights at issue were not clearly established at the time of the

violation. *See Sevy*, 815 F. App'x at 60, 62–64. And just as with the excess-force claims, the first question must be answered here in the negative, and the second must be answered here in the affirmative. Thus, Officers Ullrich and Fritsch are entitled to summary judgment on Ferreiras's First Amendment retaliation claim.

### 1. Officers Ullrich and Fritsch did not violate Ferreiras's First Amendment rights.

Even assuming Ferreiras was engaged in protected conduct, no reasonable jury could find that any adverse actions taken against her were motivated by such protected conduct. Viewing the facts in the light most favorable to Ferreiras—except where the body-camera footage is clear—she cannot satisfy the causation element of her retaliation claim.

To prove retaliation, a plaintiff must be able to show her protected conduct was the but-for cause of the defendant's adverse action. *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). In other words, Ferreiras must show that the adverse action would not have been taken against her if not for the defendant's retaliatory motive. *See id.* at 399. This can be hard to prove when a plaintiff's conduct mixes protected speech with unprotected activities, like the commission of a crime. *See Sevy*, 815 F. App'x at 63 (citing *Novak v. City of Parma*, 932 F.3d 421, 430–31 (6th Cir. 2019)); *see also Nieves*, 587 U.S. at 402 ("[I]t is particularly difficult to determine [for retaliatory arrest claims] whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct."). Here, it is not just difficult to prove, but impossible.

Ferreiras cannot prove causation because the adverse actions toward her were a result of her own unlawful interference with the traffic stop and her own unlawful acts of resisting arrest—not her speech or associations. Officer Ullrich had probable cause to suspect Ferreiras was committing an obstruction offense, which resulted in a conviction. [Dkt. 76-5]. And a plaintiff cannot establish causation for a retaliatory arrest unless they first prove the arresting officer lacked probable cause. *See Nieves*, 587 U.S. at 401; *Sevy*, 815 F. App'x at 63; *Hagedorn v. Cattani*, 715 F. App'x 499, 506 (6th Cir. 2017). Recognizing this, Ferreiras concedes that she cannot assert a claim for retaliatory arrest due to her convictions that establish probable cause. [Dkt. 90 at 30]. Instead, Ferreiras argues her "primary allegations" involve Officers Ullrich and Fritsch retaliating against her speech by assaulting her. [*Id.*]. The problem with Ferreiras's claim is the alleged assault consisted of the lawful force Officers Ullrich and Fritsch used to arrest her and secure her in the cruiser. More to the point, the alleged assault by the officers was in response to her own assault on the police officers, not her exercise of First Amendment rights.

The officers' treatment of Ferreiras's brother confirms this point. He was engaged in the same protected First Amendment activity as her, yet he was neither arrested nor subjected to the use of force by the officers. What made the difference? He complied with the officers' commands and returned to the fenced-in yard while his sister refused to comply and then assaulted the officers. Given these circumstances, it makes no sense to say that what happened to his sister was retaliation for her exercise of First Amendment rights. The only reasonable explanation for their

different outcomes is that they had absolutely nothing to do with their exercises of First Amendment rights and everything to do with their completely opposite responses to the officers' lawful commands to return to their yard and not obstruct the traffic stop. It is simply impossible for a reasonable trier of fact to conclude that there was a causal relationship between Ferreiras's First Amendment activity and the adverse actions of which she complains. Rather, the record clearly establishes that those adverse actions were caused solely by her own unlawful conduct.

For these reasons, there was no violation of Ferreiras's First Amendment rights. Thus, Officers Ullrich and Fritsch are entitled to summary judgment on Ferreiras's § 1983 First Amendment retaliation claim.

### 2. Alternatively, the officers are entitled to qualified immunity on the First Amendment retaliation claim.

Ferreiras has not pointed to any case clearly establishing that what happened to her was a violation of her First Amendment rights. There is no doubt that some of Ferreiras's conduct—*i.e.*, speaking to the officers and expressing her displeasure with their actions—was protected by the First Amendment. And if that conduct had resulted in either her arrest or the use of force against her, she would have a pretty good argument that her clearly established First Amendment rights were violated. But that is not what happened. Instead, she was arrested and subjected to force because she unlawfully obstructed the officers' conducting of a traffic stop, refused to comply with the officers' lawful orders to stop obstructing the traffic stop, and then actively resisted arrest and assaulted the officers. And there is no authority whatsoever clearly establishing that the First Amendment gave Ferreiras a right to

engage in that conduct.  Thus, no reasonable officer in Ullrich's or Fritsch's position could have had any inkling that arresting Ferrerias and using force to overcome her active resistance would violate her First Amendment rights.  This means that, at the very least, Officers Ullrich and Fritsch are entitled to qualified immunity on Ferreiras's First Amendment retaliation claim.  *See, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### C. Ferreiras cannot sustain a *Monell* claim under § 1983 against the City of Covington.

Ferreiras also pursues a claim against the City of Covington for its alleged role in causing its police officers to violate Ferreiras's rights or failing to prevent such violations.  [Dkt. 1 at ¶¶ 107–12].  In *Monell v. Department of Social Services*, the Supreme Court held that municipal bodies can be sued under § 1983, but only when the execution of the municipal body's policies or customs caused the plaintiff's injury. 436 U.S. at 694.  Examples of municipal policies or customs cognizable under *Monell* include inadequate training or supervision of the municipal body's police officers.  *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).  However, a municipal body cannot be liable in a § 1983 *Monell* claim if there is no underlying constitutional violation. *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)).  This Court has held that Officers Ullrich and Fritsch did not violate Ferreiras's rights under the Constitution, so the City of Covington is entitled to summary judgment.

Even so, there is insufficient evidence in the record for Ferreiras to prove her *Monell* claim. To show inadequate training or supervision, Ferreiras would need to demonstrate that the inadequacy that caused her injury was the result of the City's deliberate indifference. *See Romero v. City of Lansing*, 159 F.4th 1002, 1015 (6th Cir. 2025) (citing *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286–87 (6th Cir. 2020)); *Thomas*, 398 F.3d at 429 (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)). Deliberate indifference is difficult to prove and requires the plaintiff to show either: (1) the municipality was on notice of prior instances of similar unconstitutional conduct but ignored any specific deficiencies in its policies; or (2) there was only one violation of federal rights, but the municipality's policy was "so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell County*, 453 F. App'x 557, 567 (6th Cir. 2011) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)). Officers Ullrich and Fritsch received general training on proper uses of force and de-escalation techniques. [Dkt. 76-9; Dkt. 70 at 11:8–12:18]. There is some evidence that the City does not provide substantial ongoing training on these topics, [Dkt. 70 at 66:18–67:7, 88:1–95:19], but Ferreiras fails to connect her injury to any specific inadequacy in the general training that the officers received—especially given the active threat she posed during her arrest. She also has no evidence that the City was on notice of similar prior uses of excessive force or that her alleged injury was substantially certain to occur. Thus,

Ferreiras's *Monell* claim cannot stand even if there was an underlying constitutional violation.

### D. Ferreiras's Kentucky state law claims also fail.

Finally, Officers Ullrich and Fritsch also move for summary judgment on Ferreiras's claims for sexual abuse, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. Officers Ullrich and Fritsch assert qualified immunity or point to evidence in the record to negate each claim. [Dkt. 76 at 30–32]. At no point in the summary judgment briefing has Ferreiras acknowledged these claims or countered the officers' qualified immunity arguments. This alone is a sufficient basis to grant summary judgment for the officers on these claims. *See* Local Rule 7.1(c) ("Failure to timely respond to a motion may be grounds for granting the motion.").

Even so, the claims fail on their merits. Officer Ullrich has demonstrated the absence of evidence supporting Ferreiras's sexual abuse claim, so he is entitled to summary judgment. Clear body-camera footage indicates that Officer Ullrich did not make sexually abusive contact with Ferreiras, [Dkt. 90-2 at VR 00:03:38–40; Dkt. 76-2 at VR 00:13:45–55], and Ferreiras has not come forward with rebuttal evidence to establish a genuine issue for trial. *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Liberty Lobby, Inc.*, 477 U.S. at 256).

Ferreiras's negligence and emotional distress claims must also fail because Officers Ullrich and Fritsch are entitled to qualified official immunity under Kentucky state law. Under Kentucky law, a police officer is entitled to qualified official immunity for any discretionary acts taken in good faith and within the scope

of the officer's authority. *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citation omitted); *see also Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 638–40 (Ky. Ct. App. 2011) (affirming summary judgment for the defendant officials on qualified official immunity grounds regarding claims of negligence and intentional infliction of emotional distress). An act is discretionary if the officer exercises "discretion and judgment, or personal deliberation, decision, and judgment," *Yanero*, 65 S.W.3d at 522, unlike a ministerial act that requires obedience to another's orders or is based on an absolute duty to act when specific facts arise, *see Morales v. City of Georgetown*, 709 S.W.3d 146, 154–55 (Ky. 2024) (citing *Yanero*, 65 S.W.3d at 522). Here, Kentucky law allowed Officers Ullrich and Fritsch to use reasonable force to arrest Ferreiras, *see* KRS 503.090(1), which required the officers to use their judgment to determine the necessary amount of force to apply. Their uses of force were discretionary, in good faith, and within the scope of their statutory authority. *See Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (citing *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008)). Ferreiras has provided no argument to the contrary regarding her state law claims, so Officers Ullrich and Fritsch are entitled to summary judgment on qualified immunity grounds.

## III.    Motions to Strike and Exclude

Both Ferreiras and the Defendants also have pending motions regarding the admissibility of experts. [Dkt. 78; Dkt. 80]. Because the Court grants summary judgment to the Defendants on all claims, these motions are moot.

## IV.    Conclusion

For these reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment, [Dkt. 76], as to all of Ferreiras's claims.  Additionally, the Court **DENIES** Ferreiras's Motion to Exclude, [Dkt. 80], and the Defendants' Motion to Strike, [Dkt. 78], as moot.  A separate judgment will be entered consistent with this opinion.

Dated this 19th day of February, 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky

34